# In the United States Court of Federal Claims

### BID PROTEST

**CSI AVIATION, INC.,**

     *Plaintiff,*

   v.

**THE UNITED STATES,**

     *Defendant.*

**Redacted Version**

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, CSI Aviation, Inc. ("CSI"), by and through counsel, brings this pre-award protest seeking declaratory and injunctive relief to stop the United States of America, acting through the United States Department of Homeland Security ("DHS" or the "Agency"), from moving forward with an unlawful, rushed, and noncompetitive award of a massive three-year, $915 million Indefinite-Delivery, Indefinite-Quantity (IDIQ) Contract No. 70RDA225D00000005 (the "Contract") awarded to Salus Worldwide Solutions Corporation ("Salus") under Request for Proposal No. 70RDA225R0000008 ("RFP" or "Solicitation") for Comprehensive Support to Removal Operations ("CSRO") Support Services, supporting the voluntary self-deportation of illegal aliens. In less than a week, DHS awarded this contract to a company with no track record as a prime government contractor—justifying this award on a manufactured sense of "urgency" tied only to broad policy goals, not pressing operational necessity.

This procurement process was flawed from the outset. DHS rushed a $915 million contract in just five business days, ignored regulatory standards, and foreclosed fair competition by secretly inviting only hand-picked vendors. The "unusual and compelling urgency" on which DHS based

its shortcut is unsupported by the facts and regulations—especially given the Agency had months of advance notice. DHS's conduct violated multiple Federal Acquisition Regulation ("FAR") requirements by stretching the bounds of urgency exceptions, failing to seek competition from as many sources as practicable, exceeding the permissible contract term, withholding public notice, and brazenly moving forward without mandatory flight safety standards. Each of these actions, described in detail below, renders the procurement arbitrary, capricious, and contrary to law.

There is simply no "unusual and compelling urgency" to justify DHS's drastic departure from competitive procurement. The Agency relies on an Executive Order issued fully five months before this rushed decision as supposed justification for urgency, but the timeline tells a different story. Over the course of four months, DHS quietly interviewed only ▮ preselected vendors. Then, in a transparent attempt to manufacture urgency, the Agency covertly released the RFP on Thursday, May 15, 2025, limiting notice to those hand-picked vendors, and set an impossibly short, two-business-day deadline for proposals.[1] This expedited timeline had no credible basis; even DHS officials acknowledged that they were simply following internal orders with no knowledge of why such haste was required. See Ex. 15 ("We were directed to make an award by May 22, 2025… I do not know the origin of why this date was selected…"). This is not urgency—it is a clear case of poor planning and deliberate exclusion, neither of which justifies circumventing the FAR's competition requirements.

Nor can DHS show any "serious injury" as required to invoke unusual and compelling urgency under the law. The exception is reserved for true emergencies where delay would threaten immediate harm to the public or government interests—such as to health, safety, welfare, or critical

---

[1] As explained below, one additional offeror requested a copy of the RFP and was permitted to compete. However, when CSI did the same, DHS refused to allow CSI to compete.

funding. Here, DHS has provided no evidence whatsoever that a standard, competitive procurement would cause any such harm. Their only justification is expediency for its own sake, which falls far short of the legal standard.

Moreover, DHS egregiously ignored its obligation under FAR 6.302-2(c) to seek offers from as many sources as practicable, even if urgency were established. Instead, DHS ensured only a select few were aware of and able to compete for the contract, and affirmatively barred others—including CSI—from participating, even refusing to respond to CSI's direct requests for the RFP or an opportunity to propose. This overt and intentional exclusion undermines the very foundation of federal procurement fairness and transparency.

The violations do not stop there. FAR 6.302-2(d) expressly limits contracts awarded under urgency to the shortest period possible, and, in any event, to no more than one year. DHS flagrantly disregarded this mandate by awarding a three-year contract with no rationale whatsoever for its extended term, and no explanation as to why a competitive contract could not be executed after the first year. This overreach fundamentally subverts the regulatory exception they purport to invoke.

Equally indefensible is DHS's failure to publish the Solicitation and synopsis, as required to afford all qualified vendors an opportunity to compete. For five months, the Agency withheld notice from the public and kept the procurement behind closed doors—contradicting its own claim of "urgency" by squandering the very time it now cites as so precious. DHS simply cannot justify this calculated lack of transparency based on its own lack of advance planning.

Finally, and most alarmingly, DHS is brazenly procuring Commercial Air Services ("CAS") without first having in place the required, agency-specific Flight Program Standards ("FPS") as mandated by 41 C.F.R. Part 102-33.5. DHS openly admits its noncompliance, thereby

violating a fundamental safety prerequisite and rendering any CAS procured under this contract unlawful from the outset.

For these reasons, as elaborated below, DHS's procurement actions are not only arbitrary and capricious but represent a clear abuse of discretion and violation of federal law. This Court should void the unlawful contract, direct DHS to conduct a lawful and competitive procurement, and, at minimum, enjoin further performance—including any acquisition of CAS—beyond the legally allowable one-year limit.

## I.    <u>PARTIES</u>

1.    CSI Aviation, Inc., is a longtime provider of air charter services to the U.S. Government, having supported numerous government agencies including DHS, Immigration and Customs Enforcement ("ICE"), Department of Justice ("DOJ"), Department of Defense ("DoD"), Department of Energy ("DOE"), General Services Administration ("GSA"), the United Nations, and NATO, and has over 43 years of operational management experience under Federal Aviation Administration ("FAA") Part 121 & 135 Operations. CSI currently holds 32 long term government aviation charter contracts and several commercial medical air ambulance contracts. In addition to being an FAA and DoD approved Part 121 and Part 135 air carrier, CSI is ARG/US Gold[2] certified and an approved air carrier for the DOE, Department of Labor ("DOL"), Koch International, the Mayo Clinic, and the University of Texas Medical Branch. CSI is a licensed air ambulance medical services provider with National Accreditation Alliance of Medical Transport Applications ("NAAMTA") accreditation,[3] and the company operates hundreds of emergent movements

---

[2] ARG/US establishes internationally-recognized standards that represent the highest level of quality in aviation.

[3] NAAMTA establishes uniform standards for medical transport providers.

monthly to transport critically ill patients. Additionally, CSI is a DoD Commercial Airlift Review Board ("CARB") approved air carrier for passenger, cargo, and air ambulance transportation, which authorizes the company to provide flight services to all DoD components and commands

2.      Defendant is the United States, acting through the United States DHS, Office of Procurement Operations, located at 245 Murray Lane SW, Mailstop 0115, Washington, DC 20528.

## II.    JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action, and venue lies in this Court, pursuant to the Tucker Act, as amended, 28 U.S.C. § 1491(b), as this action arises out of violations of law and regulation in connection with a procurement.

4.      Plaintiff is an "interested party" to bring this pre-award protest, within the meaning of 28 U.S.C. § 1491(b), as it is a prospective offeror under the Solicitation whose direct economic interest has been affected by the procurement errors complained of herein. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352 (Fed. Cir. 2009) (establishing "non-trivial competitive injury" standard for pre-award bid protests). Specifically, CSI suffered non-trivial competitive injury by the Agency's decision to conduct a noncompetitive procurement in violation of FAR 6.302-2 and CICA. CSI was (and remains) an interested bidder and has a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations. But for the Agency's illegal solicitation that extended beyond its actual needs, CSI would not have been wrongfully deprived or the opportunity to fully and fairly compete.

5.      CSI preserved its rights to bring this pre-award protest before this Court by filing a protest with the Government Accountability Office ("GAO") before the closing date for bidding. *See Adv. Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 219 (2013) ("as a general rule, a party may preserve its rights by filing a protest with the agency or GAO, instead of this court,

before the closing date for bidding"); *DGR Assocs., Inc. v. United States*, 94 Fed. Cl. 189, 194 (2010) (explaining that "if a party has challenged a solicitation impropriety before the close of the bidding process, the party is not precluded from later filing its protest at the Court of Federal Claims"). By filing a protest with GAO prior to the deadline for receipt of proposals, CSI preserved its pre-award challenges to the Solicitation and those challenges may be properly heard in this Court.

### III.    FACTUAL BACKGROUND

#### A.  Presolicitation Activities

6.      On January 20, 2025, President Trump issued Executive Order 14159 ("EO 14159"), which has the stated purpose of "[e]nforcing our Nation's immigration laws." 90 FR 8443. EO 14159 states that it was prompted by an increase in illegal immigration over the past four years during "the prior administration." *Id.* It directs the Secretary of Homeland Security to take all appropriate action to "ensure the efficient and expedited removal of aliens from the United States" and "adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible." 90 FR 8445. EO 14159 does not establish a date certain by which DHS must accomplish this directive. *See generally* 90 FR 8443–48.

7.      In February 2025, DHS began market research to identify a contractor to assist with the voluntary deportation efforts. *See* Ex. 1 at 3, 14.

8.      At no point during the five months between January and May 2025 did DHS issue a public Request for Information ("RFI"), synopsize the requirement, or otherwise publicize the requirement, as required by FAR 5.201, 5.201, and 5.204.

9.      Instead, over the next four months, between February 2025 and May 2025, DHS interviewed ▮ contractors: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████   *Id.* at 3.

10.     DHS did not engage with ICE AIR contractors, or any other contractors outside of the ██ hand-selected vendors. *See generally id.*

11.     On May 9, 2025, President Trump issued Presidential Proclamation 10935, Establishing Project Homecoming, which again cited an increase in immigration "[o]ver the last 4 years" and announced an initiative to encourage illegal aliens to leave the United States voluntarily. 90 FR 20357–58. The Proclamation directed DHS to create a process for illegal aliens to rapidly depart the United States and authorized DHS to supplement its enforcement and removal operations force by no less than 20,000 officers. *Id.* Presidential Proclamation 10935 does not establish a date certain by which the process for illegal aliens to voluntarily depart the United States must be implemented. *See generally id.*

12.     On May 13, 2025, DHS held an Industry Day with ██ vendors it previously contacted about this requirement. Ex. 1 at 9–10; Ex. 1; Ex. 3. No other potential vendors were notified of or invited to the Industry Day.

13.     On May 14, 2025, DHS held one-on-one meetings with the vendors that were invited to the Industry Day.

14.     On May 15, 2025, DHS prepared a number of documents related to the procurement, including a Justification and Approval for Other Than Full and Open Competition based on Unusual and Compelling Urgency ("J&A"), Ex. 10, a Determination to Award a Single-Award IDIQ Contract, Ex. 11, and a Determination and Findings ("D&F") for a Three-Year period of performance, Ex. 12.

15.     The Agency's J&A expressly cites the January 20, 2025 EO 14159 as the justification for invoking FAR 6.302-2, Unusual and Compelling Urgency. Ex. 10 at 1–2, 4–5. It states DHS anticipates a single award IDIQ contract valued at $915 million, with a three-year ordering period. *Id.* at 1–2. In the detailed description of activities, DHS listed "Flight Coordination & Management" as the first activity that was "inherent within th[e] mission space." *Id.* at 3. In the explanation of why the acquisition is justified based on unusual and compelling urgency, the J&A simply points to the January 20, 2025 EO 14159 and asserts there is "an immediate need to address the significant cases of Voluntary Removals" and "a delay in award inhibits the building a stronger, more coordinated partnerships [sic] with our neighbors and international allies." *Id.* at 4–5.

16.     In the "Description of Efforts Made to Ensure that Offers are Solicited from as Many Potential Sources as is Practicable," DHS does not even attempt to explain any such efforts. *Id.* at 5. Instead, DHS simply states: "An announcement for this action will not be published at SAM.gov. It is exempt from the requirement per the exception at FAR 5.202(a)(2)." *Id.* Notably, DHS had not made any effort to ensure offers were solicited from as many sources as practicable.

17.     In the Determination to Award a Single-Award IDIQ Contract, Ex. 11, the Agency asserts that task orders will require establishing international staging areas "to facilitate scaled ICE removal flights of third-party nationals [] from the US." *Id.* at 1.

18.     In the Determination and Findings for a Three-Year period of performance, Ex. 12, DHS again cites the January 20, 2025 EO 14159 as the primary basis for the action. *Id.* at 1–2. The only justification provided for the three-year period of performance is: "Due to shifts in illegal immigration patterns, locations, and populations, the contract requires two (2) one-year

option periods to immediately stop newly identified sources of illegal immigrations and ramp up operations." *Id.* at 2.

19.     There is no explanation in the D&F as to why two one-year option periods is needed to stop "newly identified sources of illegal immigrations" under a contract for the voluntary removal of existing aliens, or why three years is needed to "ramp up operations." *See generally id.* Nor is there any explanation as to why the Agency could not enter into another contract for the required goods and services through the use of competitive procedures. *Id.*

20.     Also on May 15, 2025, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the parent company of ▮▮▮▮▮▮▮▮▮, learned of the procurement and asked to be included in the vendor pool. Ex. 15 at 2. DHS added ▮▮▮▮▮▮ to the competition pool to "increase the chances of finding a capable vendor of performing." *Id.* at 2.

## B. Expedited Procurement History

21.     On May 16, 2025, at 12:00 am ET, the Agency released the RFP to its predetermined vendor pool that was invited to the Industry Day, including ▮▮▮▮▮▮▮, which the Agency had voluntarily added to the list. *Id.* Vendors were instructed to submit their questions that very same afternoon, by 2:00 pm ET, and were further notified that proposals would be due in just three days on May 19, 2025 at 10:00 am ET. Ex. 4 at 1. The Agency set its own deadline to issue an award decision on the same day as the proposal deadline, giving itself less than a day to evaluate vendor proposals. Ex. 17 at 6.[4]

22.     The RFP contemplated award of a single IDIQ contract to support the Agency's domestic removal operations over a 1-year base period and two 1-year option periods. Ex. 4 at

---

[4] During the Industry Meeting, held just three days priors, vendors were initially advised that the Agency would issue an award decision on May 22, 2025. Ex. 17 at 8.

2–3. The RFP was issued under NAICS 481211 (Nonscheduled Chartered Passenger Air Transportation). *Id.* at 2.

23.     The RFP sought to "augment DHS's domestic removal operations increasing throughput for voluntary returns, building the capacity of foreign partners to assist the U.S. in removal operations, building the capacity of foreign partners to conduct their own removal operations, and enhancing the ability to identify and stop U.S. bound illegal migration long before illegal aliens reach U.S. borders." *Id.* at 18. In particular, the Agency would require the awardee to perform the following CSRO functions:

> 1. Supplement domestic voluntary return operations by increasing available dedicated aircraft and commercial ticketing for voluntary returns, respectively, and
>
> 2. Provide capacity building to foreign partners to accept U.S. removals/voluntary returns and operational transportation support to facilitate onward movement of removals/voluntary returns.

*Id.* Each of the foregoing functions would be a separate CLIN with subtasks that would be performed on a firm fixed-price, time & materials, or labor hour basis. *Id.* at 20–21.

24.     On May 16, 2025 at 1:21 pm, DHS posted acquisition Forecast Record Number F2025069952, on the DHS Acquisition Planning Forecast System describing the acquisition. Ex. 5.

25.     On May 17, 2025, the day after the RFP was issued to DHS's hand-selected pool of vendors, CSI emailed the contracting officer inquiring about the Solicitation and expressing a desire to compete. Ex. 8 at 1. More specifically, CSI asked whether the Solicitation would be posted to the System for Award Management ("SAM"), requested a copy of the RFP, and inquired as to the procurement timeline. *Id.* CSI further explained that it was interested in submitting a proposal and that CSI has been supporting similar ICE Air Operations for two decades, including

as the current prime contractor for all ICE Air Operations. *Id.*

26.     DHS never responded to CSI.

27.     Hours after CSI emailed the DHS contracting officer, the Agency released Amendment 2 to the RFP with a reminder that proposals were due on Monday, May 19, 2025 at 10:00 am ET. Ex. 9 at 1.

28.     On May 18, 2025, the day after CSI emailed DHS expressing an interest in competing for the procurement, the Agency inexplicably removed the Acquisition Forecast.

### C. GAO Pre-Award Protest

29.     On May 19, 2025, prior to the deadline for receipt of proposals and after not receiving any response from DHS regarding CSI's interest in competing for the procurement, CSI filed a timely pre-award protest with the Government Accountability Office ("GAO") to preserve its ability to compete. *See* Ex. 18. In its protest, CSI challenged: (1) DHS's failure to publicize the requirement; (2) DHS's failure to synopsize the requirement; (3) DHS's failure to provide a sufficient or reasonable opportunity to respond to the Solicitation; (4) DHS's violation of the Rule of Two in failing to set-aside the procurement for small-businesses; and (5) DHS's violation of 41 C.F.R. Part 102-33.5 by hiring CAS without having approved FPS. CSI requested an automatic stay under the Competition in Contracting Act ("CICA") and one was put in place. Thereafter, DHS announced that it would override the CICA automatic stay of performance and awarded the Contract to Salus. Weeks later, DHS published a redacted Justification and Approval ("J&A") for its already-completed limited source competition. *See* Ex. 10.

30.     On July 21, 2025, GAO conducted outcome predictions in which it advised the parties, without any analysis, that it expected to deny CSI's protest and asked CSI to withdraw its protest. CSI withdrew its protest on August 5, 2025.

31.     This protest now follows.

## IV.     CAUSES OF ACTION

### COUNT I

**Contravention of FAR 6.302-2**

32.     Plaintiff realleges and reincorporates by reference the allegations in the preceding Paragraphs as if stated fully herein.

33.     The Agency's decision to limit competition under the authority of FAR 6.302-2 for alleged unusual and compelling urgency is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law because there is no unusual and compelling urgency, and the Government would not be seriously injured by conducting a full and open competition.

34.     FAR 6.302-2 applies only where:

(1) An unusual and compelling urgency precludes full and open competition; and

(2) Delay in award of a contract would result in serious injury, financial or other, to the Government.

35.     Even where applicable, FAR 6.302-2 mandates that "agencies shall request offers from as many potential sources as is practicable under the circumstances." FAR 6.302-2(c)(2).

36.     FAR 6.302-2 also imposes a cap on the period of performance for any contact issued under its authority, which:

(i) May not exceed the time necessary-

(A) To meet the unusual and compelling requirements of the work to be performed under the contract; and

(B) For the agency to enter into another contract for the required goods and services through the use of competitive procedures; and

(ii) May not exceed one year, including all options, unless the head of the agency determines that exceptional circumstances apply.

37.     In rushing to complete this procurement in just seven calendar days, the Agency relied solely on the "unusual and compelling urgency" basis under FAR 6.302-2 to bypass the publication and synopsis requirements for full and open competition as required by FAR 5.101(a)(1), FAR 5.201, FAR 5.203, and FAR 12.603(c), respectively. Ex. 10.

38.     However, neither requirement of FAR 6.302-2 is met here because: (i) there is no unusual and compelling urgency as demonstrated by the five months it took the Agency to issue the RFP for this requirement and the absence of any date certain in EO 14159 or Presidential Proclamation 10935 by which the Agency was required to complete its voluntary departure program; and (ii) there is no "serious injury" that would result from a competitive procurement because DHS has not identified any injury that would result.

39.     The Agency generally cites Executive Order 14159 and related Presidential Proclamations for justification of unusual and compelling urgency. However, ***nothing in those directives sets a date certain or approximate deadline by which the CSRO efforts had to be procured***, let alone within a week.

40.     While an unusual and compelling urgency may exist due to emergencies such as a tornado, *Ceres Envt'l Servs., Inv. v. United States*, 158 Fed. Cl. 547 (2022), or to award a bridge contract for continued services, *EOD Tech. Inc. v. United States,* 82 Fed. Cl. 12 (2008), a generalized desire to stand up a program in response to an Executive Order issued five months earlier, that has no timeline for agency action, does not constitute "unusual and compelling urgency." *Cf. Info. Ventures, Inc.*, B-293541, Apr. 9, 2004, 2004 CPD ¶ 81 at 4 (rejecting agency's claim of urgency due to alleged deadline in recently enacted statute where cited statute did not set any deadline).  Moreover, a lack of advance planning is not sufficient justification for contracting without full and open competition. FAR 6.301(c); *Innovation Dev. Enters. of Am., Inc. v. United*

*States*, 108 Fed. Cl. 711, 728 (2013); *Reilly's Wholesale Prod. v. United States*, 73 Fed. Cl. 705, 715 (2006) (enjoining agency where "unusual and compelling urgency" was the result of the agency's lack of advance planning).

    41.    EO 14159 was issued on January 20, 2025, five months before the Agency conducted this procurement. Thus, the Agency knew about this requirement for five months before it issued this RFP and limited the competition pool based on purported "unusual and compelling urgency." Nowhere in EO 14159 is DHS directed to begin facilitating the voluntary removal of immigrants by a date certain. *See* EO 14159, Protecting the American People Against Invasion, 80 Fed. Reg. 8443–48 (Jan. 29, 2025), *available at* https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion.

    42.    Similarly, the Presidential Proclamation of May 9, 2025, titled Establishing Project Homecoming, does not establish a date certain by which DHS must begin facilitating the voluntary removal of immigrants. Proclamation No. 10935, 90 FR 20357 (May 9, 2025). The Proclamation merely directs: (1) that the Secretary of State and the Secretary of Homeland security create processes for illegal aliens to rapidly depart the United States; (2) flights will be funded by the Federal Government; (3) appropriate actions to enable the rapid departure of illegal aliens from the United States who currently lack valid travel documents; (4) creation of a "concierge service" whereby an alien may arrive at an airport and collect an exit bonus; (5) an "exit bonus" for each illegal alien who voluntarily and permanently departs the United States; (6) penalties for illegal aliens who fail to depart voluntarily; and (7) an increase of "no less than 20,000 officers" to support enforcement and removal operations within 60 days from the date of the Proclamation. Proclamation No. 10935, 90 FR 20357 (May 9, 2025). Notably, nothing in the Presidential Proclamation establishes a date certain by which voluntary departure operations must begin.

43.    Accordingly, the Agency cannot show there is an unusual and compelling urgency created by the new Administration's policy preference.

44.    The Agency's own lack of clarity regarding the abbreviated timeline indicates a degree of insufficient planning, which cannot support the use of noncompetitive procedures. *See* FAR 6.301(c)(1) ("Contracting without providing for full and open competition shall not be justified on the basis of [a] lack of advance planning by the requiring activity[.]"). For example, regarding the adjusted award decision date from May 22, 2025 to May 19, 2025, there is zero detail in the J&A as to what change prompted a further abbreviation of the solicitation timeline and what the three days were intended to achieve. *See generally* Ex. 10. The J&A memo itself was finalized on May 20, 2025, after the date that proposals were due and expected contract award on the same day. This sequence further suggests that the Agency's noncompetitive procurement was rushed without proper planning.[5]

45.    Furthermore, there is no explanation as to how the Agency "would be seriously injured" due to a delay in contract award arising out of the alleged urgency. FAR 6.302-2(b)(2).

46.    Serious injury may be found based on prohibitive contract extension costs, *Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 581 (2003), or public safety risks due to the absence of personnel, *Chapman Law Firm Co. v. United States*, 67 Fed. Cl. 188 (2005). However, this Court has found that a justification that "cites no specialized and unique

---

[5] This is further evidenced by the numerous typographical errors, numerical errors, and omissions throughout the initial version of the RFP, including listing the value of the procurement at $95 million instead of $915 million. *See* Ex. 7 at 4 ("FAR 52.22-4(e)()(iii) ALT I (NOV 202)."), 13 ("DHS Form 052-;"), 15 ("Telephone: (202) 447-500"), 17 ("52.22-4 Contract Terms and Conditions—Commercial Products and Commercial Services. (Nov 2023)), 23 ("FAR 52.22-4(g)"), 25 ("FAR 52.29-28"), 31 ("[FAR] 52.2-7"), 61 ("one () cover page") (highlighting added for ease of reference).

consequences of delay beyond [a] generic desire to get on with the procurement" is insufficient. *Advanced Sys. Develop., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006).

47.    Here, DHS's J&A cites no serious injury that would result from delay. The only "injury" mentioned in the J&A is: "a delay in award inhibits the building a stronger, more coordinated partnerships [sic] with our neighbors and international allies." Ex. 10 at 5. Even where the Agency provides "Any Other Facts Supporting the Use of Other than Full and Open Competition," it only describes other potential areas of delay in the removal and return process. *Id*. at 6. Crucially, the Agency fails to articulate what "serious injury, financial or other" that might result due to delay in contract award, as required by FAR 6.302-2(b)(2).

48.    A generalized desire to improve relations with international allies is not sufficient to show that "serious injury" would result from conducting this procurement through full and open competition.

49.    Consequently, the Agency has not established that "Delay in award of a contract would result in serious injury, financial or other, to the Government."

50.    As such, the Agency's decision to limit competition for this procurement was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

51.    Had the Agency properly conducted a full and open competition, CSI would have competed for the Solicitation and there would have been a substantially different pool of eligible offerors. Further, CSI, a current ICE prime contractor with significant experience in this field, would have had a substantial chance of receiving the award.[6]

52.    The Agency's actions were therefore arbitrary, capricious, an abuse of discretion,

---

[6] As the Agency conceded in the GAO protest, if it "would have conducted a full and open competition … [CSI] would have seen the notice and had a chance to compete." Ex. 19 at 13–14.

and otherwise contrary to law.

## COUNT II

### The Agency Violated FAR 6.302-2's Requirement to Solicit As Many Offers As Practicable

53.     Plaintiff realleges and reincorporates by reference the allegations in the preceding Paragraphs as if stated fully herein.

54.     Even if the Agency properly and reasonably articulated a basis for invoking FAR 6.302-2, the Agency disregarded the requirement to "request offers from as many potential sources as is practicable."

55.     Here, DHS failed so solicit offers from as many sources as practicable.

56.     In the J&A, the Agency provided only the following explanation: "An announcement for this action will not be published at SAM.gov. It is exempt from the requirement per the exception at FAR 5.202(a)(2)." Ex. 10 at 5.

57.     For this three-year, nearly one-billion-dollar procurement, the Agency never issued a Request for Information as part of its limited market research efforts and never solicited offers from any vendor outside of the ▮ pre-selected contractors.  Even under a truncated timeline, there is no excuse for not doing so.

58.     Because the Agency did not conduct an adequate survey of the market, the Agency's RFP distribution list was limited from the outset and excluded capable offerors such as CSI. This is particularly unreasonable where the Solicitation expressly contemplated teaming arrangements. Ex. 4 at 76 (Authorizing Contractor Teaming Arrangements); Ex. 7 at 68 (same).

59.     DHS conducted a closed-door industry day with a few hand-selected offerors and then only provided the RFP to those hand-selected offerors.

60.    CSI learned of the procurement and requested a copy of the RFP on May 17, 2025, but the Agency ignored CSI's interest.

61.    Despite emailing a copy of Amendment 2 to the hand-selected offerors after receiving CSI's email, DHS refused to respond to CSI, refused to provide CSI with a copy of the Solicitation, and otherwise refused to allow CSI to compete. *See* Exs. 8–9.

62.    There is no evidence that DHS assessed CSI's capabilities to perform this contract.

63.    CSI has performed similar work for other government agencies and expressed a desire to compete for this procurement.

64.    This Court has found that an agency fails to solicit as many sources as practicable when it improperly ignores a contractor that states an interest in the procurement. *See Innovation Dev. Enters. of Am.*, 108 Fed. Cl. at 732–33 (finding agency failed to solicit as many sources as practicable where it failed to consider a potential competitor to the awardee and "neglected to post a synopsis which might have produced expressions of interest . . . and performed only the most cursory searches for contractors capable of fulfilling the [contract]").

65.    By failing to solicit an offer from CSI after CSI expressed an interest in competing in the procurement, DHS committed a clear violation of FAR 6.302-2(c)(2) by failing to solicit offers from as many sources as was practicable. *See Innovation Dev. Enters. of Am.*, 108 Fed. Cl. at 732–33 (finding agency's failure to solicit offers from as many sources as practicable to be a violation of FAR 6.302-2(c)(2) where the agency neglected to consider the protester as a source for the services, failed to post a synopsis, and performed "only the most cursory searches for contractors"); *Cf. Reilly's Wholesale Prods.*, 73 Fed. Cl. at 715 (granting an injunction where the agency failed to solicit as many offers as practicable and it "appear[ed] that, from the start, the

result of the interim procurement was preordained—[the awardee] would be selected and other potentially viable competitors would be excluded.").

66.     The Agency's actions were therefore arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

## COUNT III

### The Agency Violated FAR 6.302-2's Limitation on the Period of Performance

67.     Plaintiff realleges and reincorporates by reference the allegations in the preceding Paragraphs as if stated fully herein.

68.     Even if the Agency properly and reasonably articulated a basis for invoking FAR 6.302-2, which it did not, the Agency completely disregarded the requirement to limit the total period of performance.

69.     Specifically, contracts awarded under the FAR 6.302-2 authority must comply with the following restrictions:

> (i) May not exceed the time necessary-
>
>> (A) To meet the unusual and compelling requirements of the work to be performed under the contract; **and**
>>
>> (B) For the agency to enter into another contract for the required goods and services through the use of competitive procedures; **and**
>
> (ii) May not exceed one year, including all options, unless the head of the agency determines that exceptional circumstances apply. This determination must be documented in the contract file.

FAR 6.302-2(d)(1) (emphasis added).

70.     As this Court has explained, "the unusual and compelling urgency exception must be limited in both scope and duration. *Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 612, 623 (2005). A justification that focuses on total needs, as opposed to the Government's emergency

needs, contravenes the requirements of FAR 6.302-2. *Id.* (finding J&A was not substantially justified on the basis of unusual and compelling urgency where the Government requested an indefinite extension to allow for future deliveries and focused on total needs).

71.     Here, the Solicitation was issued (and contract was awarded) on a one-year base period and two one-year option period basis, for a total performance period of three years. Ex. 4 at 2–3. This is a clear violation of FAR 6.302-2's restrictions on limited procurements.

72.     The Agency's own D&F belies any purported need for the overextended performance period. In particular, the D&F states that "[t]o meet the urgent need to immediately stop illegal immigration, the contract requires a base period of one year." Ex. 12 at 1. This is, namely, the "time necessary … [t]o meet the unusual and compelling requirements of the work to be performed under the contract." FAR 6.302-2(d)(1)(i)(A). However, the D&F goes further to justify "[a]n option to extend the contract period of performance for up to two (2) additional years … *in case the urgent need for these services persists beyond a year*." Ex. 12 at 1 (emphasis added). While the regulations do allow for an extension based on "exceptional circumstances" as documented by the head of the agency in addition to the approval of the justification, FAR 6.302-2(d)(1)(ii)–(d)(4), the regulations simply do not permit agencies to overextend noncompetitive procurements on the off-chance that today's urgent needs might still be applicable more than one or two years in the future.

73.     Moreover, the Agency fails to address the requirement that the performance period not exceed the time necessary to enter into a contract using competitive procedures. There is simply no explanation in the J&A as to why the Agency will not be able to award a competitive contract in the next year.

74.     Even if the Agency properly articulated a basis for an unusual and compelling urgency, which it did not, there is simply no basis to conclude that such urgent need will last three years.

75.     The only explanation that the Agency provides is "[d]ue to shifts in illegal immigration patterns, locations, and populations, the contract requires two (2) one-year option periods to immediately stop newly identified sources of illegal immigrations and ramp up operations." Ex. 12 at 2.

76.     There is no explanation as to why a "shift in illegal immigration patterns" requires three years of performance of a contract supporting voluntary deportations. Nor is there any explanation as to why a three-year performance period is necessary to "ramp up operations." There likewise is no explanation as to why the Agency cannot conduct a full and open procurement during the first year to ensure competition and ensure that the Agency gets its needs met at the most competitive prices.

77.     DHS's focus on its total needs, rather than its immediate needs, does not justify a performance period beyond the one-year maximum imposed by FAR 6.302-2(d). *Filtration Dev. Co.*, 63 Fed. Cl. at 623 (finding J&A was not substantially justified on the basis of unusual and compelling urgency where the Government requested an indefinite extension to allow for future deliveries and a focused on total needs).

78.     The Agency's improper reliance on FAR 6.302-2 should be redressed by a permanent injunction to stop the implementation of the illegal contract and to reissue the Solicitation to accurately reflect the Agency's needs.

## COUNT IV

### The Agency Failed to Publish the Solicitation and Required Synopsis

79.     Plaintiff realleges and reincorporates by reference the allegations in the preceding Paragraphs as if stated fully herein.

80.     The Agency has failed to publicize the requirement in violation of the CICA, FAR 5.101(a)(1), FAR 5.201, FAR 5.203, and FAR 12.603(c).

81.     Agencies are required to publicize procurement actions by publishing or posting procurement notices to a Government-wide Point of Entry ("GPE") whenever a contract is expected to exceed $25,000. FAR 5.101(a)(1); 41 U.S.C. § 1708.

82.     This requirement is designed to achieve three policy goals: (1) increase competition; (2) broaden industry participation in meeting Government requirements; and (3) assist small business concerns in obtaining contracts. FAR 5.002.

83.     To invoke the exception to the publication requirements under FAR 5.202(a)(2), the agency's underlying determination that unusual and compelling urgency exists must be reasonable. *See Innovation Dev. Enters. of Am.*, 108 Fed. Cl. at 728.

84.     The Agency has not shown the that unusual and compelling urgency exception existed to limit competition and has not demonstrated that the Government would be seriously injured if the Agency complied with the publication requirements.

85.     There are no deadlines in the Executive Orders or Presidential Proclamations that establish this requirement is urgent.

86.     In fact, the Agency's Division Director for the DHS Communication & Outreach Acquisition Division stated she "do[es] not know the origin of why this [expedited award] date was selected." Ex. 15 at ¶ 3.

87.     Moreover, the Agency also cannot demonstrate that "serious injury" would result if the Agency complied with the publication requirements. "Serious injury" may be found in "situations in which the public at large could be harmed," such as "a threat of immediate harm to health, welfare or safety," *Ceres Env't Servs. v. United States*, 158 Fed. Cl. at 559–60 (finding threat of serious injury where there was "a risk that radioactive materials would leak and contaminate surrounding buildings and environment"), for significant funding concerns, *Filtration Dev. Co.*, 60 Fed. Cl. at 382 (finding monetary justification sufficient to demonstrate harm where "the Army expended $300 million to remove and replace approximately 400 engines").

88.     Here, however, DHS knew of the requirement for five months and knowingly decided not to post an RFP or even request information from potential vendors beyond the six the Agency hand-selected. In this circumstance, the Agency cannot show that it would have suffered "serious injury" by posting an RFI or the RFP in the five months between when it learned of the requirement and made an award.

89.     Thus, the Agency unreasonably failed to comply with the publication requirements under FAR 5.101, FAR 5.203, and FAR 12.603(c) because it has not established that unusual and compelling urgency existed or that the Government would be seriously injured if it complied with the publication requirements.

90.     Moreover, an agency's lack of advance planning cannot justify a failure to publicize or synopsize a solicitation. *See* FAR 6.301(c). The Agency knew about this requirement for over five months but failed to publicize the requirements. The Agency cannot now claim there was an unusual and compelling urgency created by its failure to properly plan or conduct the procurement in the five months from when it learned of the requirement.

91.      Even if unusual and compelling urgency existed, which it does not, an agency may not intentionally delay the posting of a J&A or otherwise "engage in gamesmanship to avoid any review of an improper . . . award." *Cal. Indus. Fac. Res., Inc. v. United States*, 100 Fed. Cl. 404, 412 (2011) (finding that, although the posting of a J&A was technically within the 30-day period allowed by FAR 6.305(b), the conduct was nevertheless arbitrary and capricious and "[could] not be condoned in any reputable procurement system.").

92.      Here, the Agency did not post the J&A for this procurement for two weeks after the deadline for receipt of proposals and award was made, and after CSI filed a pre-award protest challenging the procurement at GAO.

93.      The Agency intentionally delayed the posting of the J&A.

94.      Thus, even if unusual and compelling urgency existed, the Agency's intentional delay in posting the J&A to avoid review of its improper procurement and award was arbitrary and capricious, and cannot stand.

95.      The Agency's actions in failing to publicize the Solicitation were therefore arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

### COUNT VI

### The Agency Violated 41 C.F.R. Part 102-33.5 by Hiring CAS Without Flight Program Standards

96.      Plaintiff realleges and reincorporates by reference the allegations in the preceding Paragraphs as if stated fully herein.

97.      The Agency is improperly procuring Commercial Air Services ("CAS") through this Solicitation in violation of 41 C.F.R. Part 102-33.5 because DHS does not have approved Flight Program Standards ("FPS").

98.     The regulations governing the Management of Government Aircraft in 41 C.F.R. Part 102-33.5, state: "The rules in this part apply to *all Federally-funded aviation activities* of executive branch agencies of the U.S. Government *who use Government aircraft to accomplish their official business*." 41 C.F.R. § 102-33.5(a) (emphasis added).

99.     The regulations define "Government aircraft" as including "[a]ircraft hired as commercial aviation services (CAS)," which includes: "[c]harter aircraft for hire under a contractual agreement for one-time exclusive use that specifies performance (The commercial source operates and maintains a charter aircraft);" and "[c]ontracting for full services (*i.e.,* aircraft and related aviation services for exclusive use)." 41 C.F.R. § 102-33.20.

100.    "Exclusive use" is defined as "a condition under which an aircraft is operated for the sole benefit of the U.S. Government." 41 C.F.R. § 102-33.20.

101.    The Solicitation calls for "[s]upport[ing] voluntary return operations with chartered aircraft and/or escorted/unescorted commercial returns" and "[p]rovid[ing] solutions for both chartered aircraft and commercial tickets to facilitate removals…." Ex. 7 at 9, 12.

102.    The Solicitation therefore calls for hiring CAS.

103.    The regulations are explicit that "*[i]f you hire CAS, you are responsible for . . . [e]stablishing agency-specific Flight Program Standards*, as defined in [41 C.F.R.] §§ 102-33.140 through 102-33.185, . . . *and requiring compliance with these standards in your contracts and agreements*." 41 C.F.R. § 102-33.130(a) (emphasis added).

104.    The regulations explain that FPS "are the minimum requirements that must be incorporated into your flight programs" and must "[b]e *specific to [the] agency's aviation operations*" and "*[m]eet or exceed* applicable civil or military rules . . . and *applicable FAA regulations*." 41 C.F.R. § 102-33.140 (emphasis added).

105.    The FPS must consist of written policies and procedures for all aspects of aviation operations, including management, administration, and operation of the flight program, maintenance and training, and safety and accident reporting. 41 C.F.R. § 102-33.155.

106.    The regulations also mandate that agencies establish and require contractors to comply with a host of standards, such as "[b]asic qualifications and currency requirements for your pilots and other crewmembers, maintenance personnel, administrative personnel and other mission-related personnel" and "[l]imitations on duty time and flight time for pilots and other crew members." 41 C.F.R. § 102-33.165.

107.    DHS does not have "agency-specific Flight Program Standards."

108.    By hiring CAS without agency-specific FPS, DHS is violating 41 C.F.R. Part 102-33.5.

109.    Additionally, 41 C.F.R. § 102-33.140 is clear that FPS must "meet or exceed" FAA regulations:

> ***Flight Program Standards are the minimum requirements*** that must be incorporated into your flight programs to ensure that your aircraft are operated safely, effectively, and efficiently. ***These requirements must***:
>
> (a) Be specific to your agency's aviation operations, including your CAS;
>
> (b) Meet the requirements identified in §§ 102-33.155 through 102-33.185.
>
> (c) ***Meet or exceed*** applicable civil or military rules (in particular 49 U.S.C. 40102(a)(37) and 40125), and ***applicable FAA regulations***); and
>
> (d) Incorporate risk management techniques when civil or military rules do not apply.

41 C.F.R. § 102-33.140 (emphasis added).

110.    The regulations also lay out "Why must [agencies] establish Flight Program Standards," explaining:

> You must establish Flight Program Standards because Title 14 of the Code of Federal Regulations (14 CFR) may not cover or address all aspects of your agency's flight program, such as non-certificated aircraft, high-risk operations, special personnel requirements, etc.

41 C.F.R. § 102-33.145.

111.    Indeed, the regulations repeatedly emphasize that FPS are *in addition to* the requirements in 14 CFR. *See* §§ 102-33.140, 102-33.145, 102-33.215(a) ("You may carry passengers only on aircraft that you operate or require contractually to be operated in accordance with the rules and requirements in 14 CFR").

112.    Accordingly, DHS cannot simply rely on FAA regulations in Title 14 of the Code of Federal Regulations because the FPS requirements are in addition to the FAA requirements.

113.    Moreover, under 41 C.F.R. § 102-33.130(a), agencies must require compliance with FPS in their contracts. Furthermore, "[f]or the operation of [a] flight program, [agencies] must establish or require (contractually, where applicable)," various standards such as basic qualifications for pilots and crew members, and limitations on duty time and flight time.[7] 41 C.F.R. § 102-33.165.

114.    Pursuant to FAR 15.203, RFPs must describe the "[a]nticipated terms and conditions that will apply to the contract." *See also* FAR 15.204-3 (requiring that agencies include and "clauses required by law or by [the FAR] and any additional clauses expected to be included in any resulting contract").

---

[7] These standards are evident in the GSA Schedule requirements for SIN 481211B, which establish minimum performance measures that must be satisfied for any "operator that wishes to apply for an initial GSA schedule award." *See* GSA, Schedule SIN 481211B Air Charter Services – Broker, at 12–16, 18–20, 21–24, *available at*: https://www.gsa.gov/system/files/481211B%20Air%20Charter%20Services_Updated%203.12.2024_0.pdf

115.    The Agency's failure to establish FPS means that this Solicitation does not set forth the basic qualifications for pilots and crew members, or any limitations on duty time and flight time. *See* 41 C.F.R. § 102-33.165. This is particularly concerning considering one of the main goals of the acquisition is "increasing available dedicated aircraft" to supplement voluntary return operations. Ex. 7 at 9, 12.

116.    The omission of basic qualifications for pilots or limitation on flight time from the Solicitation is a defect in the Solicitation because it does not describe the "[a]nticipated terms and conditions that will apply to the contract." FAR 15.203.

117.    The Agency's actions in this regard are arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

## V.    <u>PRAYER FOR RELIEF</u>

For these reasons, Plaintiff, CSI Aviation requests that this Court enter judgment in Plaintiff's favor and against the United States as follows:

i.   Enter an Order declaring DHS procurement arbitrary, capricious, an abuse of discretion, or not in accordance with law;

ii.  Enter an Order enjoining DHS from the performance of any contract awarded under the Solicitation and requiring that DHS conduct a proper procurement, or, at a minimum, enjoining performance of the contract beyond the one-year mark after performance began;

iii. Enter an Order enjoining DHS from hiring CAS under this procurement;

iv.  Enter an Order awarding CSI its reasonable attorneys' fees and costs; and

v.   Order such further relief as the Court deems appropriate, fair and just.


Respectfully submitted,

Dated: August 11, 2025

s/ Jennifer S. Zucker
Jennifer S. Zucker
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Tel: (202) 331-3114
zuckerjs@gtlaw.com

*Of Counsel:*

Christopher M. O'Brien
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
(202) 533-2306
obriencm@gtlaw.com

Cassidy Kim
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco CA 94105
(415) 590-5133
Cassidy.Kim@gtlaw.com