# In the United States Court of Federal Claims

**BID PROTEST**

(Filed: September 29, 2025)

|  |  |
|---|---|
| CSI AVIATION, INC., | **Redacted Version** |
| *Plaintiff,* | |
| v. | Case No. 25-1338C |
| THE UNITED STATES, | |
| *Defendant,* | Judge Solomson |
| and | |
| SALUS WORLDWIDE SOLUTIONS CORPORATION, | |
| *Defendant-Intervenor.* | |

---

## PLAINTIFF'S MOTION FOR
## JUDGMENT ON THE ADMINISTRATIVE RECORD

---

Jennifer S. Zucker
    *Counsel of Record*
Christopher M. O'Brien
Cassidy Kim
GREENBERG TRAURIG, LLP
2101 L Street, NW,
Suite 1000
Washington, DC 20037
Tel: (202) 331-3114
Fax: (202) 331-3101
zuckerjs@gtlaw.com

*Counsel for CSI Aviation, Inc.*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   QUESTIONS PRESENTED.................................................................................... 3

III.  STATEMENT OF THE CASE................................................................................ 5

  A.   Presolicitation ............................................................................................... 5

  B.   Investigation into Potential Procurement Integrity Act Violations and
       Organizational Conflicts of Interest.............................................................. 6

  C.   Decision to Conduct an Accelerated Competition to Cleanse Salus's OCIs .... 8

  D.   DHS Issues the RFP To A Limited Vendor Pool ........................................... 9

  E.   GAO Pre-Award Protest, CICA Override, and Award to Salus ..................... 13

IV.   STANDARD OF REVIEW ................................................................................... 15

V.    ARGUMENT ........................................................................................................ 16

  A.   The Agency Did Not Have an Unusual and Compelling Urgency to Issue a Limited
       Procurement ................................................................................................ 17

  B.   The Agency Violated FAR 6.302-2's Requirement to Solicit as Many Offers as
       Practicable................................................................................................... 22

  C.   The Agency Violated FAR 6.302-2's Limitation on the Period of Performance ........... 25

  D.   DHS Failed to Publish the Solicitation and Synopsis.................................... 30

  E.   DHS Continues to Violate 41 CFR Part 102-33.5 by Conducting Aviation
       Operations Without Approved Flight Program Standards ............................... 34

  F.   CSI Is Entitled to Injunctive Relief.............................................................. 37

VI.   CONCLUSION...................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Sys. Develop., Inc. v. United States,*
  72 Fed. Cl. 25 (2006) ................................................................................21

*Ala. Aircraft Indus., Inc. – Birmingham v. United States,*
  586 F.3d 1372 (Fed. Cir. 2009)....................................................................15

*AshBritt, Inc. v. United States,*
  87 Fed. Cl. 344 (2009) ..........................................................................16, 23

*Banknote Corp. of Am., Inc. v. United States,*
  365 F.3d 1345 (Fed. Cir. 2004)....................................................................14

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005)....................................................................15

*Bausch & Lomb, Inc.,*
  B-298444, 2006 CPD ¶ 135 (Sep. 21, 2006) ..........................................22

*Cal. Indus. Facilities Res. v. United States,*
  100 Fed. Cl. 404 (2011) ..............................................................................21

*Centech Grp., Inc. v. United States,*
  554 F.3d 1029 (Fed. Cir. 2009)....................................................................36

*Ceres Env't Servs. v. United States,*
  158 Fed. Cl. 547 (2022) ........................................................................21, 32

*Dell Fed. Sys., L.P. v. United States,*
  906 F.3d 982 (Fed. Cir. 2018)......................................................................37

*Electric On-Ramp, Inc. v. United States,*
  104 Fed. Cl. 151 (2012) ..............................................................................15

*Filtration Dev. Co., LLC v. United States,*
  63 Fed. Cl. 612 (2005) ........................................................................ *passim*

*Glenn Def. Marine Asia, PTE Ltd. v. United States,*
  720 F.3d 901 (Fed. Cir. 2013)......................................................................14

*GovCIO, LLC v. United States,*
  2025 U.S. Claims LEXIS 2195 (Aug. 8, 2025) ......................................16

iii

*Green Tech. Group, LLC v. United States*,
  147 Fed. Cl. 231 (2020) ................................................................38, 39

*Hosp. Klean of Tex., Inc. v. United States*,
  65 Fed. Cl. 618 (2005) ......................................................................40

*HP Enter. Servs., LLC v. United States*,
  104 Fed. Cl. 230 (2012) .....................................................................38

*Hunt Building Co., Ltd. v. United St*ates,
  61 Fed. Cl. 243 (2004) ......................................................................39

*Innovation Dev. Enters. of Am., Inc. v. United States*,
  108 Fed. Cl. 711 (2013) .................................................21, 22, 30, 31

*Mangi Env't Grp., Inc. v. United States*,
  47 Fed. Cl. 10 (2000) ........................................................................40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .....................................................................15, 32

*Orion Tech., Inc. v. United States*,
  704 F.3d 1344 (Fed. Cir. 2013) ...................................................22, 38

*Piedmont Propulsion Sys., LLC v. United States*,
  167 Fed. Cl. 72 (2023) ............................................................37, 38, 40

*Reilly's Wholesale Prod. v. United States*,
  73 Fed. Cl. 705 (2006) ............................................................18, 30, 39

*Savantage Fin. Servs., Inc. v. United States*,
  595 F.3d 1282 (Fed. Cir. 2010) .........................................................14

*Tinton Falls Lodging Realty, LLC v. United States*,
  800 F.3d 1353 (Fed. Cir. 2015) .........................................................15

*Turner Constr. Co. v. United States*,
  645 F.3d 1377 (Fed. Cir. 2011) .........................................................36

*Weeks Marine, Inc. v. United States*,
  575 F.3d 1352 (Fed. Cir. 2009) .........................................................15

**Regulations**

41 C.F.R. § 102-33.5 .............................................................3, 4, 12, 33

41 C.F.R. § 102-33.140 .............................................................34, 35

41 C.F.R. § 102-33.155 ................................................................................................35

41 C.F.R. § 102-33.165 ...........................................................................................35, 36

48 C.F.R. § 6.302-2 ......................................................................................................20

90 FR 8443 ................................................................................................................4, 5

90 FR 20357–58 .............................................................................................................8

FAR 5.002 ....................................................................................................................30

FAR 5.101(a)(1) .......................................................................................................9, 30

FAR 5.201 ...........................................................................................................9, 30, 32

FAR 5.202 ....................................................................................................11, 17, 22, 30

FAR 5.203 ...............................................................................................................9, 30

FAR 6.301(c) ......................................................................................................18, 19, 30

FAR 6.302-2 ........................................................................................................... *passim*

FAR 9.505-2 ....................................................................................................................7

FAR 9.505-4 ....................................................................................................................7

FAR 12.603(c) ................................................................................................................9

FAR 15.203 ...................................................................................................................36

FAR 15.204-3 ...............................................................................................................36

FAR Subpart 5.2 ......................................................................................................29, 33

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................................14

28 U.S.C. § 1491(b)(4) ................................................................................................14

41 U.S.C. § 3304(a)(2)..................................................................................................20

**Other Authorities**

Executive Order 14159 ........................................................................................... *passim*

Rules of the United States Court of Federal Claims Rule 52.1 ...............................1, 16

# I.    <u>INTRODUCTION</u>

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims, Plaintiff, CSI Aviation, Inc. ("CSI"), respectfully requests that the Court grant judgment on the administrative record in favor of CSI, and grant declaratory and injunctive relief prohibiting the United States of America, acting through the United States Department of Homeland Security ("DHS" or "Agency"), Office for Strategy, Policy, and Plans  ("PLCY"), from moving forward with an unlawful, rushed, and noncompetitive award of a massive three-year, $915 million Indefinite-Delivery, Indefinite-Quantity (IDIQ) Contract No. 70RDA225D00000005 (the "Contract") awarded to an untested prime contractor, Salus Worldwide Solutions Corporation ("Salus"), under Request for Proposal No. 70RDA225R0000008 ("RFP" or "Solicitation") for Comprehensive Support to Removal Operations ("CSRO") Support Services.

DHS never intended to conduct a competitive procurement for this nearly $1 billion contract. DHS had been negotiating with Salus since January 2025, in response to Salus' unsolicited proposal, with no sense of urgency and without conducting any market research. It was only after an investigation revealed significant Organizational Conflict of Interest ("OCI") concerns with Salus, including that DHS shared non-public task and budget information with Salus, based the Statement of Work ("SOW") on Salus' proposal, and relied on Salus's budget strategy, that DHS attempted to legitimize the procurement through competition.[1] From the start, however, the result of the competition was preordained: Salus would be awarded the contract.

Salus knew about the requirements months in advance, drafted the procurement objectives, and had advance knowledge of the pricing, while DHS secretly hand-selected the vendors that

---

[1] DHS acknowledged that this was not a "novel" or innovative and unique requirement as "DHS jointly conducted a similar repatriation effort with the Department of State in Panama in 2024," which included both "involuntary and voluntary returns." Tab 107, AR 922; Tab 185, AR 2813; *see also* FAR 15.603.

were allowed to compete, provided an impossible two-business-day deadline to submit a proposal for a $915 million contract,[2] and manufactured an "urgency" to justify its anticompetitive behavior. Offerors like CSI—the primary provider of involuntary removal services for U.S. Immigration and Customs Enforcement ("ICE")—were not afforded a full and fair opportunity to compete for this contract. DHS's conduct violated numerous Federal Acquisition Regulation ("FAR") requirements, eroded public trust, and the integrity of the procurement system.

The Agency contends its actions were justified due to an "unusual and compelling urgency" based on the issuance of Executive Order 14159 ("EO 14159") on January 20, 2025, *five months before DHS conducted this procurement*. Fatal to DHS's invoking this exception to competition, however, is that the record shows that the "urgency" only materialized once DHS concluded it was necessary to meet Salus' arbitrary unsolicited proposal price deadline, to mitigate Salus's OCI issues, and to account for the Agency's gross lack of planning. Similarly, there is no evidence that DHS would have been harmed by a delay because it already waited *five months* to issue the RFP.

Moreover, DHS egregiously ignored its obligation under FAR 6.302-2(c) to seek offers from as many sources as practicable. DHS simply hand-selected a few contractors to compete against Salus and affirmatively barred others—including qualified, experienced contractors like CSI—from participating. The Agency's overt and intentional exclusion undermines the very foundation of federal procurement fairness and transparency.

DHS also flagrantly disregarded the FAR 6.302-2(d) express limitations on contracts awarded under the "urgent and compelling" exception to competition to the shortest period possible, and, in any event, to *no more than one year*. The Agency ignored the federal procurement

---

[2] The original RFP incorrectly listed the value of the procurement at $95 million instead of $915 million. Tab 111a, AR 959; Tab 112a, AR 1038.

regulations and awarded a three-year contract "*just in case*" an urgent need for these services persists for more than one year, and without any explanation for why a competitive contract could not be executed within six months to a year. *See* Tab 98, AR 860. This overreach fundamentally subverts the regulatory exception DHS purports to invoke.

Equally indefensible is DHS's failure to publish the Solicitation and synopsis, as required to afford all qualified vendors an opportunity to compete. For five months, the Agency failed to issue a sources sought, withheld notice from the public, and kept the procurement behind closed doors—contradicting its own claim of "urgency" by squandering the very precious time it now cites. DHS simply cannot justify this calculated lack of transparency based on its own lack of advance planning.

Finally, and most troubling, DHS is brazenly procuring Commercial Air Services ("CAS") without first having in place the required, agency-specific Flight Program Standards mandated by 41 C.F.R. § 102-33.5. DHS openly admits its noncompliance, thereby violating a fundamental safety prerequisite and rendering any CAS procured under this contract unlawful from the outset.

Thus, DHS's procurement actions are not only arbitrary and capricious but represent a clear abuse of discretion and violation of federal law. This Court should void the unlawful contract, direct DHS to conduct a lawful and competitive procurement, and, at minimum, enjoin further performance—including any acquisition of CAS—beyond the legally allowable one-year limit.

## II.    <u>QUESTIONS PRESENTED</u>

1.    Whether the Agency's rushed decision to conduct a limited competition one week before Salus's proposal was set to expire, solely to purify multiple Organizational Conflicts of Interest with its pre-determined awardee, justifies invoking the "unusual and compelling urgency" exception to preclude full and open competition.

2.      Whether a delay in award of a contract would have "seriously injured" the Agency in procuring contractor support to assist with voluntary self-deportation of illegal aliens by conducting a full and open competition.

3.      Whether DHS complied with its obligation to solicit as many offerors as practicable by holding a closed-door industry day with six hand-selected vendors that were informed of the procurement only hours earlier, inviting only those hand-selected vendors to submit a bid on a $915 million contract within three business days, and excluding a qualified offeror like CSI that requested an opportunity to compete.

4.      Whether the Agency justifying the award of a three-year contract that exceeds the maximum one-year performance period allowed under FAR 6.302-2, "in case the need for services persists beyond a year," is rational to "immediately stop newly identified sources of illegal immigrations and [to] ramp up operations."

5.      Whether the Agency rationally concluded that it **would take at least three years** to solicit and award a contract using competitive procurements, despite having just awarded a $915 million contract in less than one week.

6.      Whether the Agency's lack of advance planning and last minute decision to hold a limited competition for the sole purpose of purifying the OCI issues with its pre-determined awardee, constitutes unusual and compelling urgency sufficient to cure its lack of advance planning and justify its failure to publicize the procurement action as required by the FAR.

7.      Whether the Agency hiring Commercial Aviation Services without having agency-specific Flight Program Standards in place that govern DHS's aviation operations violates the Management of Government Aircraft regulations in 41 C.F.R. § 102-33.5.

4

### III.    STATEMENT OF THE CASE

#### A.  Presolicitation

On January 20, 2025, President Trump issued EO 14159, which states that "[o]ver the last 4 years" there has been an unprecedented flood of illegal immigration into the United States. 90 FR 8443. Prompted by these "last 4 years" of immigration, EO 14159 announces a policy of "[e]nforcing our Nation's immigration laws" and directs the Secretary of Homeland Security to take all appropriate action to "ensure the efficient and expedited removal of aliens from the United States" and "adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible." 90 FR 8445. ***EO 14159 does not establish a date certain by which DHS must accomplish this directive***. *See generally* 90 FR 8443–48 (emphasis added).

At this point, CSI was actively serving as the prime contractor for ICE Air Operations supporting the involuntary removal of illegal aliens, as it had been doing for 20 of the past 24 years. *See* Tab 113, AR 1117.

Three days after the issuance of EO 14159, Salus[3] submitted an unsolicited proposal to DHS, offering to "support the President's mandate of quickly removing undocumented immigrants from the United States." Tab 2b, AR 7. Salus's proposal makes clear that it "is not an air transportation broker." Tab 2b, AR 12. Instead, Salus states it will rely on its team members that "utilizes aircraft, crew, and services that are contractually dedicated to [the] effort…." Tab 2b, AR 18. In addition to the significant aviation efforts, Salus proposed providing mission integration, regional engagement support, capacity building, travel and logistics, identity verification, medical

---

[3] Salus is a self-certified woman-owned small business headed by Chief Executive Officer, Dr. William Walters. Tab 2b, AR 7. Dr. Walters was, until recently, a member of the Senior Executive Service within the U.S. Department of State and "former Level III Contracting Officer's Representative for State Department aviation and logistics contracts." Tab 2b, AR 23; Tab 118b, AR 1346.

care, data integration, aircraft support, lodging services, mobilization, and ticketing. Tab 2b, AR 15–22. Salus anticipated this would be performed as a commercial items contract. Tab 2b, AR 31.

On February 18, 2025, Salus resubmitted its unsolicited proposal with updated pricing and scope and a revised protective legend. Tab 5, AR 380; Tab 5a, AR 382–508. The proposal stated that it was valid for 90 calendar days until May 19, 2025. Tab 5a, AR 386.

From February through April, Salus and DHS negotiated the scope of work and pricing models, *see* Tab 29, AR 607–08 (proposing adding purchase of commercial airline tickets and proposing representative price builds). On April 4, 2025, DHS shared **non-public information with Salus regarding DHS's operational needs**, Tab 47, AR 682; Tab 47a, AR 683–84;[4] Tab 107, AR 921, as well as **source selection budget information "matching areas of the [Independent Government Cost Estimate ("IGCE")]**." Tab 107, AR 921. By mid-April, 2025, DHS had prepared a draft Statement of Objectives ("SOO") that used much of Salus's draft SOO, Tab 107, AR 922; Tab 12a, AR 555–564; Tab 107, AR 921–22, concluded the requirements could be accomplished using commercial items, Tab 63, AR 731, assigned a procurement number, Tab 61, AR 718; Tab 64, AR 732, and secured a letter of intent for funding from the Department of State, Tab 65, AR 733–34.

### B. Investigation into Potential Procurement Integrity Act Violations and Organizational Conflicts of Interest

On April 18, 2025, Salus and DHS attended a Microsoft Teams meeting during which a DHS employee revealed an email from Salus titled "Draft SOO for Comprehensive support for Removal Ops," which triggered an inquiry by the DHS Office of General Counsel. Tab 107, AR

---

[4] DHS shared a document with Salus on April 4, 2025 that references providing "support to Operation Homecoming," *see* Tabs 47–47a, AR 682–83, one month before the issuance of Presidential Proclamation 10935, Establishing Project Homecoming (May 9, 2025).

921. The DHS Office of the Inspector General ("OIG") was notified of a possible Procurement Integrity Act ("PIA") violation based on the information shared between Salus and DHS, and the OIG referred the matter to the ICE Office of Professional Responsibility ("OPR"). To this point, DHS had never identified the requirement as being "urgent."

The ensuing investigation revealed that DHS employees "routinely engaged with Salus from February through April 17, 2025, through no less than 40 emails, *see* Tabs 2–60, "to discuss procurement requirements and status," and shared with Salus "non-public high-level task information . . . to which Salus responded with support details and associated costs." Tab 107, AR 921. Additionally, Salus's draft SOO was compared to DHS's draft SOO and there were "similarities multiple areas, including background, objectives, mission integration, regional engagement support, capacity building, travel and logistics, identity verification, medical care, data integration, aircraft support, and lodging services." *Id*. It also revealed that, on April 4, 2025, DHS shared with Salus "high-level non-public budget information matching some areas of the IGCE." *Id.* at 922.

The investigators determined that the actions of Salus and DHS raised potential Biased Ground Rules OCI under FAR 9.505-2 based on Salus helping to prepare the specifications and work statements and then competing for the resulting contract, Unequal Access to Information OCI under FAR 9.505-4 based on Salus's access to non-public information that provides an unfair competitive advantage, and an Appearance of Impropriety based on the sharing of non-public information between Salus and DHS and adoption of portions of Salus's proposal by DHS. Tab 107, AR 920–22.

**C.  Decision to Conduct an Accelerated Competition to Cleanse Salus's OCIs**

DHS concluded it could cleanse its procurement of Salus's significant OCIs by conducting a "competitive procurement." Tab 107, AR 923. DHS did not post a Request for Information, sources sought, or otherwise publicize its requirements, but rather hand-selected five potential vendors to attend a same-day pre-proposal conference on May 13, 2025, where these contractors first learned about DHS's requirements for this $915 million effort, after Salus had months to draft the SOO, review the IGCE and otherwise prepare. Tab 107, AR 923. The pre-proposal conference materials referenced Presidential Proclamation 10935, Establishing Project Homecoming (May 9, 2025), which directed DHS to create a process for illegal aliens to rapidly depart the United States and authorized DHS to supplement its enforcement and removal operations force by no less than 20,000 officers. 90 FR 20357–58.

The vendors invited to attend this private conference included: ██████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████. Tabs 68–71, AR 757–65; Tabs 75–77, AR 787–91. DHS did not engage with ICE AIR contractors, who routinely handle involuntary removal efforts, or any other contractors outside of the six hand-selected vendors.

In the May 13, 2025 Industry Day slides, DHS noted that proposals would be due on May 19, 2025 and an award would be issued by May 22, 2025. Tab 67, AR 747. In a declaration, the DHS Division Director stated, "We were directed to make an award by May 22, 2025. ***While I do not know the origin of why this date was selected, it was my understanding that the Agency needed to award this effort quickly***." Tab 186, AR 2819 ("Aki Decl.") (emphasis added). Later that evening, Salus reminded DHS that its proposal was "set to expire on May 19, 2025" and that

its proposal was marked as proprietary, remarking "we trust that the solicitation will not be based on our approach or data." Tab 66, AR 735. Thereafter, for the first time, DHS began referring to the procurement as having an "accelerated award schedule." Tab 72, AR 766.

The next day on May 14, 2025, the same hand-selected offerors were given a copy of the IGCE, the SOW, a Pricing Scenario, and invited to one-on-one sessions to ask questions. Tab 107, AR 923; *see also* Tabs 68–84, AR 757–806; Tab 90.

### D.  DHS Issues the RFP To A Limited Vendor Pool

On Wednesday, May 15, 2025 at 11:59pm, DHS released the RFP to the limited pool of offerors. Tab 111, AR 956. DHS did not publicly post the solicitation or otherwise provide public notice of the procurement in accordance with FAR 5.101(a)(1), FAR 5.201, FAR 5.203, and FAR 12.603(c). Yet ███████████████████, the parent company of ███████████, learned of the procurement and asked to be included in the vendor pool.[5] Tab 94, AR 834. DHS added ██████████ to the competition pool to allegedly "increase the chances of finding a capable vendor of performing." Tab 186, AR 2820. Questions related to the RFP were due 14 hours later on May 16, 2025 by 2:00 pm, and DHS advised that it anticipated issuing an RFP amendment in the afternoon of Friday, May 16, 2025. *Id.* Proposals were due an astonishing one business day later on Monday, May 19, 2025 by 10:00 am. *Id.*

The RFP contemplated award of a single IDIQ contract to support the Agency's domestic removal operations over a one-year base period and two (2) one-year option periods. Tab 111a,

---

[5] ██████ was the prime contractor on the Department of State procurement upon which this DHS was modeled and for which Salus's experience as a subcontractor was a significant factor in DHS's award decision. *See* Tab 5a, AR 504–08; Tab 106, AR 914; Tab 126, AR 1711–12. Curiously, ██████ was not invited by DHS to participate in this procurement. *See* Tab 106, AR 913–14.

AR 959–60.[6] The RFP was issued under NAICS 481211 (Nonscheduled Chartered Passenger Air Transportation). Tab 102, AR 876.

The RFP sought to "augment DHS's domestic removal operations increasing throughput for voluntary returns, building the capacity of foreign partners to assist the U.S. in removal operations, building the capacity of foreign partners to conduct their own removal operations, and enhancing the ability to identify and stop U.S. bound illegal migration long before illegal aliens reach U.S. borders." Tab 111a, AR 962. In particular, the Agency would require the awardee to perform the following CSRO functions:

1. Supplement domestic voluntary return operations by increasing available dedicated aircraft and commercial ticketing for voluntary returns, respectively, and

2. Provide capacity building to foreign partners to accept U.S. removals/voluntary returns and operational transportation support to facilitate onward movement of removals/voluntary returns.

*Id*. Each of the foregoing functions would be a separate CLIN with subtasks that would be performed on a firm fixed-price, time and materials, or labor hour basis. *Id*. at AR 980; *see also* Tab 5a, AR 386, 410–17.

After releasing the RFP, DHS executed a multitude of documents, including: (i) Determinations and Findings ("D&F") to Use a Time and Materials Contract, Tab 88, AR 816–819; (ii) Small Business Review Form, Tab 89, AR 820–23; (iii) Requisition Request, Tab 91, AR

---

[6] The original rushed RFP contained significant typographical errors, numerical errors, and omissions, including misstating the value of the RFP as $95 million, rather than $915 million. *See* Compl., ECF No. 1 at 15, n.5; Tab 111a, AR 959 (ceiling value listed as $95,000,000.00), AR 960 ("FAR 52.22-4(e)()(iii) ALT I (NOV 202)."), 969 ("DHS Form 052-,"), 971 ("Telephone: (202) 447-500"), 973 ("52.22-4 Contract Terms and Conditions—Commercial Products and Commercial Services. (Nov 2023))", 979 ("FAR 52.22-4(g)"), 981 ("FAR 52.29-28"), 987 ("[FAR] 52.2-7"), 1017 ("one () cover page") (highlighting added for ease of reference). Several offerors requested clarification as to these errors. *See* Tab 114c, AR 1123 ("It appears a formatting issue deleted most of the numeral "1" throughout the RFP, as it is missing from many FAR clauses, provisions, sections, etc, as well as from RFP section numbers, and even some text"), *id*. ("bullet currently states to include a total of 75 with 35 in each country, but that math does not work because 35 plus 35 is 70, not 75"), 1124 (same). These appear to have been corrected in Amendment 1. *See generally*, Tab 112a.

827; (iv) D&F to include two one-year option periods to extend the period of performance beyond one year, Tab 98, AR 860–61; (v) Justification for the Inclusion of Options to extend the period of performance beyond one year, Tab 99, AR 862–63; (vi) Source Selection Plan, Tab 100, AR 864–72; (vii) Acquisition Review Decision, Tab 101, AR 873–75; (viii) Acquisition Planning Forecast System Record, Tab 102, AR 876–77; (ix) Checklist for Controlled Unclassified Information, Tab 103, AR 879–83; (x) Interagency Agreement with the Department of State, Tab 105, AR 892–99; (xi) Market Research Report, Tab 106, AR 905–19; (xii) OCI Waiver for Salus, Tab 107, AR 920–24; (xiii) Acquisition Plan; Tab 108, AR 925–44; (xiv) Determination for Single Award, Tab 109, AR 945–47; and (xv) Justification and Approval ("J&A") for Other than Full and Open Competition, Tab 110, AR 948–55.[7]

With respect to the D&F and Justification to include two one-year option periods, Tab 98–99, AR 860–63, DHS determined the base year was needed "to immediately stop illegal immigration" and the "option to extend the contract period of performance for up to two (2) additional years is included in case the urgent need for these services persists beyond a year." Tab 98, AR 860. The Justification for the Option Periods cites cost savings, an "opportunity for a greater volume of work," flexibility to "maintain continuity of services" and "obtain discounted and negotiated prices" as reasons for extending the period of performance beyond one year. Tab 99, AR 862–63.

The J&A for other than full and open competition on the basis of "unusual and compelling urgency" cites the January 20, 2025 EO 14159 as the primary basis of the urgency. Tab 110, AR 948–52. It also asserts that "a delay in award inhibits the building a stronger, more coordinated

---

[7] At the GAO proceedings, which were based on the same protest grounds that are before this Court, the Agency Report inexplicably omitted many of these relevant records. *See* Tabs 162–195.

partnerships with our neighbors and international allies" and that "[t]o reduce any delays to the rapid removals/returns of illegal aliens, a limited competition is needed." *Id.* at AR 952. For the "Description of Efforts Made to Ensure that Offers are Solicited from As Many Potential Sources as is Practicable," the J&A simply asserts that an "announcement for this action will not be published at SAM.gov" on grounds that "[i]t is exempt from the requirement per the exception at FAR 5.202(a)(2)." *Id.* at AR 952. The Description of Market Research section claims that DHS consulted with stakeholders and industry, while neglecting to note that it hand-selected vendors to participate in the industry day with only hours' notice. *Id.* at AR 952–53. It also states that DHS PLCY "will continue to conduct market research to determine if other sources are capable of supporting this requirement…." *Id.* at AR 953. DHS never considered the ICE Air contractor supporting involuntary removal efforts, CSI.

On May 16, 2025 at 1:21 pm, DHS posted acquisition Forecast Record Number F2025069952, on the DHS Acquisition Planning Forecast System describing the acquisition. Tab 102, AR 876–77. The next day, DHS emailed RFP Amendment 1 to the select pool of offerors, which also included a High Level Notional Operational Plan that DHS provided to Salus over two months prior. Tab 112, AR 1035; *compare* Tab 112d, AR 1115–16, *with* Tab 47a, AR 683–84. That same evening, at 6:49 PM, CSI emailed the DHS Contracting Officer, outlining CSI's capabilities, requesting a copy of the RFP, and expressing a desire to participate in the procurement. Tab 113, AR 1117. DHS never responded to CSI's request. Nonetheless, hours after CSI emailed DHS, the Agency released Amendment 2 to the RFP with a reminder that proposals were due on Monday, May 19, 2025 at 10:00 am ET. Tab 114, AR 1118. On May 18, 2025, the day after CSI emailed DHS expressing an interest in competing for the procurement, the Agency inexplicably removed the Acquisition Forecast.

**E.  GAO Pre-Award Protest, CICA Override, and Award to Salus**

On May 19, 2025, before the deadline for receipt of proposals and after not receiving any response from DHS regarding CSI's interest in competing for the procurement, CSI filed a timely pre-award protest with the Government Accountability Office ("GAO") to preserve its ability to compete. *See* Tab 156. In its protest, CSI challenged: (1) DHS's failure to publicize the requirement; (2) DHS's failure to synopsize the requirement; (3) DHS's failure to provide a sufficient or reasonable opportunity to respond to the Solicitation; (4) DHS's violation of the Rule of Two in failing to set-aside the procurement for small-businesses; and (5) DHS's violation of 41 C.F.R. § 102-33.5 by hiring CAS without having approved Flight Program Standards. Tab 156, AR 2062–65. CSI requested an automatic stay under the Competition in Contracting Act ("CICA"), and one was put in place. Thereafter, DHS announced that it would override the CICA automatic stay of performance and awarded the Contract to Salus. Tab 157, AR 2288; Tab 183, AR 2801–08; Tab 130, AR 1887. CSI did not challenge the override.  Weeks later, DHS published a redacted J&A for its already-completed limited source competition. *See* Tab 110.

In evaluating offerors, Salus was the only bidder to receive a "High Confidence" rating under Factor 1 Technical Approach, despite never having served as a prime contractor for the U.S. Government, and also proposed the lowest price by a significant margin. Tab 131, AR 1869; *see also* Tab 5a, AR 434; Tab 106, AR 914–15; Tab 118b, AR 1347–50. DHS found that Salus had a strong, clear understanding of the proposed requirements. Tab 126, AR 1710–11. In contrast, the Agency found the other offerors, who had less than a week to familiarize themselves with DHS's requirements, offered vague responses to describe operational requirements and did not provide enough detail. Tab 126, AR 1708, 1713, 1715. As noted above, the extent of Salus' government contracting experience was serving as subcontractors on two Department of State contracts. *See*

13

Tab 5a, AR 434; Tab 106, AR 914–15; Tab 118b, AR 1347–50. Despite having no experience as a prime contractor, and certainly no experience managing a contract of this magnitude, DHS awarded this nearly $1 billion contract to Salus, which was the only offeror that had more than mere days to familiarize itself with DHS's requirements and prepare a responsive proposal.

CSI, on the other hand, is a longtime provider of air charter services to the U.S. Government, having supported numerous government agencies as a prime contractor including DHS, ICE, Department of Justice ("DOJ"), Department of Defense ("DoD"), Department of Energy ("DOE"), General Services Administration ("GSA"), the United Nations, and NATO, and has over 43 years of operational management experience under Federal Aviation Administration ("FAA") Part 121 & 135 Operations. CSI currently holds 32 long term government aviation charter contracts and several commercial medical air ambulance contracts. CSI is also ARG/US Gold certified and an approved air carrier for the DOE, Department of Labor ("DOL"), Koch International, the Mayo Clinic, and the University of Texas Medical Branch. CSI is a licensed air ambulance medical services provider with National Accreditation Alliance of Medical Transport Applications ("NAAMTA") accreditation, and the company operates hundreds of emergent movements monthly to transport critically ill patients. Additionally, CSI is a DoD Commercial Airlift Review Board ("CARB") approved air carrier for passenger, cargo, and air ambulance transportation, which authorizes the company to provide flight services to all DoD components and commands. *See* Compl., ECF No. 1 at 4–5; Tab 113, AR 1117; Tab 156, AR 2065. Accordingly, the requirements of this contract fall squarely within CSI's area of expertise. But CSI was unfairly precluded from the Agency's noncompetitive procurement and suffered non-trivial competitive injury.

14

## IV.    STANDARD OF REVIEW

The Court of Federal Claims reviews bid protests using the standards set forth in the Administrative Procedure Act ("APA"). *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004); 28 U.S.C. § 1491(b)(4). Under the APA, an agency's decision must remain undisturbed unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A challenged decision may be overturned where either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine Asia, PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)).

"[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). An agency's decision must be set aside where it is proved that an agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [issued a decision that] is so implausible that [the decision] could not be ascribed to a difference in view or the product of agency expertise." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (quoting *Ala. Aircraft Indus., Inc. – Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)).

In addition, the protestor must show that it was prejudiced by the error. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) ("A bid protest proceeds in two steps…. [I]f the trial court finds that the government's conduct fails the APA review …, then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."). In the pre-

15

award protest context, the inquiry is whether the Plaintiff has "demonstrated non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009).

Under RCFC 52.1, when reviewing agency procurement decisions, this Court conducts "the equivalent of an expedited trial on a paper record" and resolves questions of fact "by reference to the administrative record." *Electric On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 158 (2012) (citing *Bannum, Inc.*, 404 F.3d at 1356). Unlike motions for summary judgment, "the existence of genuine issues of material fact does not preclude judgment on the administrative record." *Bannum*, 404 F.3d at 1355–57.

## V.    ARGUMENT

The Agency violated numerous procurement laws and regulations by improperly invoking the exception to full and open competition under FAR 6.302-2, despite not meeting the requirements. FAR 6.302-2 provides for a limited exception to CICA's requirements for full and open competition that permits an agency to use noncompetitive procedures only where there is "[a]n unusual and compelling urgency" ***and*** "[d]elay in award of a contract would result in serious injury, financial or other, to the Government." FAR 6.302-2(b). This Court has explained that "[t]he invocation of the unusual and compelling urgency exception is constrained by several inherent limitations as to scope and duration." *Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 612, 622 (2005); *see also* FAR 6.302-2(c)–(d). Further, where the record demonstrates "the Agency did not adequately explain how the relevant Executive Order created an urgent and compelling need," this Court has held "it cannot defer to an Agency's conclusion that is absent from the record." *GovCIO, LLC v. United States*, 2025 U.S. Claims LEXIS 2195, at *3 (Aug. 8, 2025); *see also AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370 (2009) ("Where an agency

fails to document or retain evaluation materials, it bears the risk that there will be inadequate supporting rationale in the record for the evaluation and source selection decision and that [the Court] will not conclude that the agency had a reasonable basis for the decision.").

Here, the Court should grant judgment for Plaintiff on its noncompetitive procurement allegations in Counts I–IV, because the record establishes the Agency's actions were not informed by a legitimate urgency, reflects further circumvention of the Agency's obligation to conduct full and open competition, or is otherwise inadequate to demonstrate the Agency's rationale.

Furthermore, the Court should grant judgment in favor of Plaintiff on Count V because the record shows that the Agency is hiring Commercial Aviation Services ("CAS") without having the requisite agency-specific Flight Program Standards in place. These standards are mandated to ensure the safety of aviation operations and are required to exceed Federal Aviation Administration ("FAA") standards. DHS's failure to have agency-specific Flight Program Standards precludes it from conducting aviation operations and procuring CAS, rendering this entire procurement invalid.

### A. The Agency Did Not Have an Unusual and Compelling Urgency to Issue a Limited Procurement

The record demonstrates the Agency relied solely on the "unusual and compelling urgency" exception to competition basis under FAR 6.302-2 and FAR 5.202 but orchestrated a superficial procurement, providing select vendors little opportunity to participate – serving merely as window dressing to justify the selection of its pre-ordained vendor to bypass the requirements for full and open competition.

***First***, the Agency's *post-hoc* J&A states that "[t]he immediate action supported by this [FAR 6.302-2] authority is in response to a national emergency declaration," referencing Executive Order 14159, issued on January 20, 2025. Tab 110, AR 951; *see also* Tab 98, AR 860 (D&F) (referencing the same EO). The J&A further states, rather summarily, that "[t]o reduce any

17

delays to the rapid removals/returns of illegal aliens, a limited competition is needed … to quickly solicit and award a contract by using a reduced pool of vendors that are positioned, based on available resources and capabilities, to respond to this immediate need." Tab 110, AR 952.

While the Agency generally references an immediate need and cites EO 14159 for justification, ***nothing in that directive sets a date certain or approximate deadline by which the CSRO efforts had to be procured***, let alone within a week; not to mention they knew of the requirement in January. *See* Tab 186, AR 2819–20 (Aki Decl.) (describing seven-day procurement period from Industry Day to contract award). Even at the GAO bid protest proceedings, the Agency's Contracting Officer proffered only that "[d]ue [t]o the declaration of the national emergency at the Southern border, it was determined that the agency's need for the services was of such an unusual and compelling urgency that the Government would be seriously injured unless the agency was permitted to limit the number of sources from which it solicited proposals, resulting in the need to invoke the FAR 6.302-2 Unusual and compelling urgency authority." Tab 184, AR 2809. This is a clear case of an agency's lack of adequate planning that does not justify invoking the urgent and compelling exception to competition. *Cf.* FAR 6.301(c); *see also Reilly's Wholesale Prod. v. United States*, 73 Fed. Cl. 705, 715 (2006) (enjoining agency where "unusual and compelling urgency" was the result of the agency's lack of advance planning).

***Second***, the current Administrative Record—substantially more robust than what was before GAO[8]—tells a very different story. It reflects the unsolicited proposal, the improper provision of source selection information to the chosen vendor, the identification of multiple OCIs,

---

[8] CSI raised identical protest grounds at GAO but, there, DHS asserted there were no additional relevant documents beyond its limited production. *See* Tab 159, AR 2290 ("All relevant documents concerning the solicitation will be provided"); *see also* Tabs 160–195. The significantly larger record now evidences that DHS failed to produce relevant documents during the GAO protest, which is both inappropriate and undermines the integrity of the protest process.

and their cursory dismissal and waiver.  Together, these facts reveal not a fair competition, but a rushed, pre-ordained procurement cloaked in the appearance of a process in which the Agency's actions were driven by selecting its preferred vendor, as demonstrated by the following facts:

- **January 23, 2025:** Salus emailed its unsolicited proposal to the Agency for multi-mission logistics and engagement support services. Tabs 2–2b.

- **February 18, 2025:** After receiving no Agency response, on February 10, 2025, Salus resubmitted its unsolicited proposal with updated pricing and scope. Tabs 3–3a. On February 18, 2025, in response to Agency request, Salus resubmitted its proposal with a revised protective legend and specified the proposal is valid for "90 calendar days." Tab 5a, AR 386.

- **February 24, 2025:** The Agency informed Salus that upon initial review, Salus' "unsolicited proposal will be accepted for a comprehensive evaluation," which "is expected to take approximately sixty (60) days." Tab 8, AR 548.

- **February 25, 2025:** Salus drafted and submitted to the Agency a Statement of Objectives for CSRO. Tabs 12–12a.

- **April 18 – May 18, 2025:** Assessment of potential Procurement Integrity Act violation and OCI implications. Tab 107.

- **May 13, 2025:** Salus responded to the Agency's decision to compete the CSRO requirement, indicating its intent to participate and reiterating that its "Proposal remains valid for a period of 90 calendar days from the date submitted and is set to expire on May 19, 2025." Tab 66, AR 735.

The preceding timeline shows that Salus conceived both the Solicitation and its underlying requirements in anticipation of DHS's response to the January 20, 2025 EO 14159. *See* Tab 5a, AR 392 (proposed effort submitted by Salus "to support the President's mandate of quickly removing undocumented immigrants from the United States"). While these requirements were, and remain, valid, the Agency itself determined that Salus was not the only responsible source and nevertheless proceeded with a superficial competition, ultimately awarding the contract to Salus as originally intended. Further, while the Agency's *post-hoc* justifications characterize the Solicitation as responsive to an immediate need to support the national emergency declaration, the

record shows the Agency ignored Salus' unsolicited proposal for over three weeks, which was then followed by a two-week initial review period and a further two-month comprehensive evaluation period. *See* Tab 3, AR 122; Tab 8, AR 548; Tab 66, AR 735. To the extent the Agency's delayed review indicates a degree of insufficient advance planning, it cannot serve as a basis to use noncompetitive procedures. *See* FAR 6.301(c)(1) ("Contracting without providing for full and open competition shall not be justified on the basis of [a] lack of advance planning by the requiring activity").

This approach undermines the integrity of the procurement process, creating only the appearance of competition rather than a genuine opportunity for other qualified offerors. By orchestrating a superficial competition under the guise of "urgent and compelling need," the Agency compromised fairness and transparency, eroding trust in its acquisition practices and diminishing opportunities for other qualified vendors to contribute innovative solutions while this requirement remains improperly locked for the next three years—far beyond the time permitted for even legitimate unusual and compelling circumstances. These actions undermine the core objectives of federal procurement: fairness, efficiency, and best value for the government.

In fact, nothing in the record evidences the Agency was operating under any Executive Order deadlines or other requirement that necessitated an ultra-expedited solicitation and limited procurement. The agency's actions suggest a predetermined outcome and a clear preference for its favored vendor, Salus—evidenced by the proposal validity end date of May 19, 2025, which aligned precisely with both the submission deadline and award date. *See* Tab 66, AR 735; Tab 67,

AR 747.[9] This presumptive need to preserve the validity of Salus' proposal terms does not justify the Agency's use of the unusual and compelling urgency exception under FAR 6.302-2.

**Third**, the record contains no explanation or evidence that the Agency meaningfully considered what "serious injury, financial or other" might result from a delay in contract award due to the alleged urgency, as required by FAR 6.302-2(b)(2). The only mention of serious injury in the Agency's J&A appears in its recitation of the statutory authority for limited competition under 41 U.S.C. § 3304(a)(2) and 48 C.F.R. § 6.302-2. Even when discussing "Any Other Facts Supporting the Use of Other than Full and Open Competition," the Agency merely cites potential delays in the removal and return process, Tab 110, AR 953, but fails to articulate what specific serious injury, financial or otherwise, would result from such delays. *See Ceres Env't Servs. v. United States*, 158 Fed. Cl. 547, 559–60 (2022) (finding threat of serious injury where there was "a risk that radioactive materials would leak and contaminate surrounding buildings and environment"); *Filtration Dev. Co.*, 60 Fed. Cl. at 382 (finding monetary justification sufficient to demonstrate harm where "the Army expended $300 million to remove and replace approximately 400 engines"). As this Court has held, a justification that "cites no specialized and unique consequences of delay beyond [a] generic desire to get on with the procurement" is insufficient. *Advanced Sys. Develop., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006).

The Agency's actions in this regard were thus arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. But for these errors, DHS would have held a full and open competition that included CSI, who has a substantial likelihood of receiving an award considering

---

[9] The Agency's Division Director had declared she "do[es] not know the origin of why this [expedited award] date was selected" and only explained that "[i]n the midst of pre-solicitation activities, the [award] date was changed [from May 22, 2025] to May 19, 2025 due to the urgency of the requirement," giving the Agency less than a day to evaluate the proposals. Tab 186, AR 2819. The record before CSI now reveals the source of the award date was parallel to Salus' proposal expiration date.

CSI's long history of performing this type of work for government agencies over the past 43 years and thus also suffered non-trivial competitive injury by these errors.[10]

**B.  The Agency Violated FAR 6.302-2's Requirement to Solicit as Many Offers as Practicable.**

DHS made no effort to comply with the requirement to solicit as many offers as practicable. Pursuant to FAR 6.302-2(c)(2), "even when an agency limits the number of sources because of unusual and compelling urgency, CICA requires the agency to 'request offers from as many potential sources as is practicable under the circumstances.'" *Cal. Indus. Facilities Res. v. United States*, 100 Fed. Cl. 404, 410 (2011). This Court has found that an agency fails to solicit as many sources as practicable when it improperly ignores a contractor that states an interest in the procurement. *See Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. 711, 732–33 (2013) (agency failed to solicit as many sources as practicable where it did not consider a potential competitor to the awardee, "neglected to post a synopsis which might have produced expressions of interest … and performed only the most cursory searches for contractors capable of fulfilling the [contract]"); *see also id.* at 732 (citing *Bausch & Lomb, Inc.*, B-298444, 2006 CPD ¶ 135 at *2 (Sep. 21, 2006) for the notion that a protest may be sustained where "the agency has not reasonably demonstrated why it could not have opened the requirement up to an expedited limited competition among those firms that had expressed interest in the acquisition").

---

[10] While the Court has recognized that if there is a factual basis for conducting a "substantial chance" analysis, a protester cannot merely allege a "non-trivial competitive injury," *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 563 (2021) (citing *Orion Tech., Inc. v. United States*, 704 F.3d 1344 (Fed. Cir. 2013) and *Oracle Am., Inc. v. United States*, 975 F.3d 1279 (Fed. Cir. 2020)), CSI does not believe such a factual basis exists here as DHS's errors precluded CSI from submitting a proposal, thus making it impossible to conduct a "substantial chance" analysis. Nevertheless, should the Court conclude a "substantial chance" analysis applies, CSI also meets that standard.

The contemporaneous record shows the Agency's efforts fell short of this requirement in conducting this nearly $1 billion procurement. In the J&A, for example, the Agency had an opportunity to describe the "efforts made to ensure that offers [we]re solicited from any many potential sources as [wa]s practicable." Tab 110, AR 952. The Agency's only description was that "[a]n announcement for this action will not be published at SAM.gov" and that "[i]t is exempt from the requirement per the exception at FAR 5.202(a)(2)." *Id.* Despite being aware of the requirement since January, the Agency failed to take any proactive steps for nearly five months.

For this three-year $915 million procurement, DHS did not issue a Request for Information or sources sought notice, neglecting even basic market research that could have informed a more competitive and transparent process. As a result of its inadequate market survey, the Agency's RFP distribution list was limited to just seven hand-picked vendors—one declined to bid, and another was only added after specifically requesting to participate just four days before proposals were due. Tab 186, AR 2819–20. Moreover, CSI's request to participate, despite its extensive experience in deportation operations, was simply ignored. Tab 113, AR 1117. DHS's lack of diligence severely restricted competition and undermined the integrity of the procurement process.

Because the Agency did not conduct an adequate survey of the market, the Agency's RFP distribution list included only seven total vendors, one of which decided not to submit a bid, and one that was belatedly engaged (just four days before the proposal due date) upon that vendor's request. Tab 186, AR 2819–20. And although the record suggests that the Agency conducted several months of market research—including purported interviews with industry representatives and meetings with vendors such as ███████████████████, Tab 106, AR 909—there is no actual evidence that the Agency engaged with any offeror other than Salus before Industry Day on May 13, 2025. *See, e.g.*, Tab 100 (Source Selection Plan, May 15, 2025),

23

Tab 106 (Market Research Report, May 16, 2025), Tab 108 (Acquisition Plan, May 20, 2025).

In fact, all external correspondence in the record before that date is exclusively with either the State Department or Salus. *See e.g.*, Tab 48, AR 685; Tab 65, AR 733; Tab 107, AR 921 (OCI Waiver confirming that "Department employees routinely engaged with Salus after receiving the unsolicited proposal from February through April 17, 2025, to discuss procurement requirements and status"). It does not follow that the Agency conducted market research meetings with non-Salus offerors in the months leading up to the Agency's PIA investigation in April and its eventual decision to conduct a limited procurement in mid-May. *See AshBritt, Inc.*, 87 Fed. Cl. at 370 ("Where an agency fails to document or retain evaluation materials, it bears the risk that there will be inadequate supporting rationale in the record for the evaluation and source selection decision and that we will not conclude that the agency had a reasonable basis for the decision."). This calls into question the thoroughness and impartiality of the Agency's market research efforts. According to DHS's logic, nearly any procurement involving a new scope of work or lacking an incumbent would face similar unjustified exclusions.

Moreover, the Agency's purported justification for not "re-engag[ing] with prior ICE Air commercial vendors due to the distinct difference in scope and nature of the work being performed," Tab 162, AR 2332, does not relieve DHS from its obligation to "obtain competition to the maximum extent practicable." FAR 6.302-2(c)(2). The Agency could have easily satisfied this requirement by inviting contractors like CSI—who was both readily identifiable and affirmatively reached out to the contracting officer to request the Solicitation—to compete. The Agency's rationale for excluding ICE Air contractors is unconvincing, as it rests solely on the claim that based on the argument that "ICE Air centers around logistics movements for air operations" and does not "require coordination with consulates/embassies for travel documents"

24

as this Solicitation does. *Id.* If accepted, the Agency's reasoning would justify excluding qualified vendors from virtually any procurement involving a new scope of work or lacking an incumbent, undermining the very principles of competition. Moreover, this rationale is irrelevant to whether ICE Air contractors could meet the Solicitation's requirements, especially since the Solicitation specifically permitted various teaming arrangements. Tab 175, AR 2632–33 (outlining Contractor Team Arrangement options).

The Agency's exclusion of readily identifiable and interested contractors was arbitrary and capricious, and constitutes a clear failure to obtain competition to the maximum extent practicable. But for this error, CSI would not have been excluded from competing in this procurement and has a high chance of receiving an award due to CSI's extensive experience with such requirements.

### C. The Agency Violated FAR 6.302-2's Limitation on the Period of Performance

Even assuming DHS's reliance on FAR 6.302-2 was otherwise proper, which it was not, that exception from full and open competition requires that the contract period of performance be limited to the time needed to address the exigency. FAR 6.302-2 provides that contracts issued under that authority "may not exceed" the time necessary: (i) to "meet the unusual and compelling requirements of the work to be performed under the contract;" ***and*** (ii) for "the agency to enter into another contract for the required goods and services through the use of competitive procedures." FAR 6.302-2(d)(1)(i). In addition, the period of performance "[m]ay not exceed one year, including all options" unless "exceptional circumstances" apply. FAR 6.302-2(d)(1)(ii).

This Court has similarly emphasized that the "[unusual and compelling urgency] exception ***should not continue for more than a minimum time***," and places the obligation on agencies "to accurately determine [their] needs and describe them." *Filtration Dev. Co., LLC*, 63 Fed. Cl. at 622–23 (citations omitted) (emphasis added) (finding J&A was not substantially justified on the

basis of unusual and compelling urgency where the Government requested an indefinite extension to allow for future deliveries and focused on total needs).

The Agency disregarded FAR 6.302-2(d)(1)'s limitations by requirements in awarding a three-year contract to Salus. Tab 134, AR 1888 (defining Period of Performance from 05/20/2025 to 05/19/2028). There are multiple problems with this decision.

***First***, there is no evidence in the record supporting the Agency's claim determination that its actual minimum needs require a prolonged three-year contract. In fact, pre-solicitation discussions between the Agency and Salus focused on ███████████████████████ █████████████████████████████████████████████. Tab 52a, AR 692–93. Likewise, the Agency's correspondence with the State Department regarding joint funding explicitly efforts similarly "anticipated … to fund twelve months of support" for the CSRO services. Tab 65, AR 733; *see also* Tab 105, AR 892 (Interagency Agreement defining one-year period of performance). These documents directly contradict the Agency's assertion that the alleged urgency justifies a significantly extended performance period.

Moreover, the concept of operations (CONOP) that was developed during the pre-solicitation discussions estimated that the CSRO system ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████. Tab 65, AR 693. This expedited timeline underscores that the Agency could have achieved full operational status within a year. Yet the record provides no justification for why a contract longer than twelve months—let alone three years—was necessary, or why the Agency could not have facilitated full

and open competition within that period.[11] *See* FAR 6.302-2(d)(1)(i)(B) (the contract period "[m]ay not exceed the time necessary … [f]or the agency to enter into another contract for the required goods and services through the use of competitive procedures").

**Second**, even if a one-year base period could be justified, the record lacks any explanation for the necessity of two additional option periods. The Agency's Justification for the Inclusion of Options (Options Justification) offers several purported reasons for these extensions, but none comes close to establishing the requisite "exceptional circumstances" required under FAR 6.302-2(d)(1)(ii). For example, the Agency argues that "[i]nclusion of optional ordering periods provides the opportunity for greater volume of work to industry, which in turn increases the potential for DHS to benefit from economies of scale." Tab 99, AR 862. Not only is this speculative benefit irrelevant to the determination of exceptional circumstances, meeting the unusual and compelling requirements, or the Agency's ability to enter into another contract through the use of full and open competition, but it also undermines DHS's decision to conduct a limited procurement that excluded capable and interested offerors in the first place.

Equally problematic is the rationale set forth in the D&F. *See* Tab 98, AR 860–61. The Agency claims the initial base period of one year is required to "meet the urgent need to immediately stop illegal immigration" and that "[a]n option to extend the contract period for up to two (2) additional years is included **in case** the urgent need for these services persists beyond a year," is equally problematic. Tab 98, AR 860 (emphasis added). But the scope of this contract is not to "stop illegal immigration," it is to "[s]upplement domestic voluntary return operations" and "[p]rovide capacity building to foreign partners to accept U.S. removals/voluntary returns." Tab

---

[11] Immigration efforts being a top priority of this administration only further supports that this contract should be procured through full and open competition.

112a, AR 1040. Additionally, extending the performance period beyond the one-year limit "in case" there is a need cannot constitute "exceptional circumstances." If that were the case, the exception would swallow the rule and every contract issued under FAR 6.302-2 could continue indefinitely "in case" the agency needs those goods or services again. *See Filtration Dev. Co., LLC*, 63 Fed. Cl. at 623 (finding J&A was not substantially justified where the Government requested an indefinite extension to allow for future deliveries and focused on total needs).

The remaining justifications—such as minimizing costs and retaining price flexibility—are equally unpersuasive. *See, e.g.*, Tab 99, AR 863 (claiming that "[e]xercising the optional ordering periods avoids unnecessary costs attributed to constant and annualized re-procurements" and that "[t]he use of option periods allows the Government the flexibility to … maintain continuity of services … and [ ] to obtain discounted and negotiated pricing for the proposed option period that are fair and reasonable"). These rationales do not constitute exceptional circumstances and are insufficient to warrant an extended contract period.

***Third***, the record clearly demonstrates that even the Agency itself questioned the necessity of the option periods. Throughout the Options Justification memo, the Agency repeatedly inserted caveats to avoid any commitment beyond the base period. *See* Tab 99, AR 862–63. For instance, it expressly stated that evaluating prices for the optional periods "will in no way obligate the Government to exercise the option periods," and that a preliminary notice to extend the contract "will not commit the Government to any contractual extension." Tab 99, AR 863.

These reservations are consistently aligned with the Agency's contemporaneous D&F, which reiterates the assessment that "[t]o meet the urgent need to immediately stop illegal immigration, the contract requires a base period of one year." Tab 98, AR 860. The one-year base period may align with the minimum "time necessary … [t]o meet the unusual and compelling

requirements of the work to be performed under the contract." FAR 6.302-2(d)(1)(i)(A). Yet the D&F attempts to goes further to try to justify "[a]n option to extend the contract period of performance for up to two (2) additional years one-year option periods "***in case the urgent need for these services persists beyond a year***," Tab 98, AR 860 (emphasis added), despite the lack of any documented "exceptional circumstances" as required by regulation. It is also plainly unreasonable for the Agency to assert that it "requires two (2) one-year option periods ***to immediately stop*** newly identified sources of illegal immigration and ***ramp up operations***," *id.* at AR 861 (emphasis added);[5] particularly when ███████████████████████████

███████████████████████████. Tab 52a, AR 693 (emphasis added). The multiple option periods, therefore, are not justified by the Agency's urgent needs and instead only overextend the scope of this noncompetitive procurement.

While the regulations allow for an extension based on "exceptional circumstances" as documented by the head of the agency – which is not borne out in the record here – the regulations simply do not permit agencies to overextend noncompetitive procurements on the off-chance that today's urgent needs might still apply more than one or two years in the future. It is also patently unreasonable and facially inconsistent that the Agency "requires two (2) one-year option periods to immediately stop newly identified sources of illegal immigrations and ramp up operations," *id.* at AR 861 (emphasis added), and, even if valid, that they cannot conduct a legitimate procurement during that time.

In sum, the Agency's emphasis on its overall requirements, rather than its immediate needs,

---

[5] The Agency's inclusion of a throwaway line that it will prepare separate D&F before each option period does not obviate the need to comply with FAR 6.302-2's performance period requirements. Tab 98, AR 861. The Agency cannot simply delay its obligation to conduct, and bidders' opportunity for, full and open competition beyond the "time necessary … [f]or the agency to enter into another contract for the required goods and services through the use of competitive procedures." FAR 6.302-2(d)(1)(i)(B).

does not warrant extending the performance period beyond the one-year maximum imposed by FAR 6.302-2(d). The Agency's improper reliance on FAR 6.302-2 should be remedied through a permanent injunction preventing implementation of the unlawful contract and requiring the Agency to reissue the Solicitation in a manner that accurately reflects its urgent needs. CSI suffered non-trivial competitive injury and, but for these errors, CSI would, at a minimum, have an opportunity to compete for this procurement under full and open competition and has a substantial chance of receiving an award.

### D. DHS Failed to Publish the Solicitation and Synopsis

DHS violated the requirement to publicly post a synopsis of its proposed contract action under FAR Subpart 5.2. Instead, DHS arbitrarily invoked the exception for "unusual and compelling urgency," despite failing to meet its requirements. The only urgency cited was the Agency's rush to award Salus a contract before its unsolicited proposal expired on May 19, 2025, and the Agency's own lack of advance planning—neither of which constitutes unusual and compelling urgency sufficient to justify bypassing full and open competition or the notice requirements. The record also contains no evidence that DHS would have been "seriously injured" by complying with the notice requirements. As a result of these arbitrary and capricious actions, DHS issued no public notice of its $915 million contract and conducted a sham competition with a predetermined outcome: an award to Salus.

As a baseline, the FAR requires contracting officers to publish a notice and synopsis of proposed contract actions on SAM.gov for every contract expected to exceed $25,000. *See* FAR 5.201(b); FAR 5.101(a)(1). This requirement serves to: (i) increase competition; (ii) broaden industry participation; and (iii) assist small businesses in obtaining contracts and subcontracts. FAR 5.002; *see also* FAR 5.201(c) ("The primary purposes of the notice [of proposed contract

30

actions] are to improve small business access to acquisition information and enhance competition by identifying contracting and subcontracting opportunities."). Agencies generally must publish the notice at least 15 days before issuing a solicitation or proposed contract intended for negotiation with only one source, though a shorter period may be allowed for commercial item acquisitions. FAR 5.203(a).

Exceptions to the publication requirement are narrow. One such exception applies only when: (1) the contract action is due to "unusual and compelling urgency" that precludes full and open competition; and (2) the Government would be "seriously injured" if it complied with the FAR 5.203 time periods. FAR 5.202(a)(2). To invoke this exception, the agency's determination that such urgency and injury exist must be reasonable. *See Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. at 728. Critically, lack of advance planning does not justify bypassing competition. FAR 6.301(c); *see also Reilly's Wholesale Prod.*, 73 Fed. Cl. at 715 (enjoining agency where "unusual and compelling urgency" was the agency's lack of advance planning).

Here, DHS fails both criteria for invoking the "unusual and compelling urgency" exception. As discussed above, the record shows only a rushed attempt to create the appearance of competition and to address Salus's multiple OCI issues, stemming from DHS's lack of planning. There is also no evidence that the Government would suffer "serious injury" if it published a synopsis of the requirement.

Salus submitted an unsolicited proposal on February 18, 2025, which DHS later used to draft its Statement of Objectives ("SOO") for this procurement. Tab 66, AR 735–36; Tab 107, AR 922. Throughout February to April, DHS did not reveal any urgency to award Salus a contract. *See e.g.*, Tab 48, AR 685. Only after DHS identified significant OCIs in Salus's proposal and decided to compete the requirement did the Agency abruptly begin to assert urgency. *See* Tab 72,

AR 766 ("Thank you for participating in our initial vendor engagement meeting this afternoon to review the high priority and urgent CSRO requirement and key procurement dates").

This sudden shift underscores a clear lack of advance planning. DHS abruptly produced at least 15 documents—including a source selection plan, multiple D&Fs and J&A, a market research report, interagency agreements, and several iterations of the RFP. *See* Tabs 88–91, 98–110. Notably, DHS did not conduct any market research or plan for a competitive procurement until after deciding on May 13, 2025 that it could not proceed with Salus's unsolicited proposal. *See, e.g.*, Tab 100 (Source Selection Plan, May 15, 2025), Tab 106 (Market Research Report, May 16, 2025), Tab 108 (Acquisition Plan, May 20, 2025); *cf. Innovation Dev. Enters. of Am.*, 108 Fed. Cl. at 727 (holding that lack of advance planning does not justify a sole-source award when there is "no evidence in the record of any efforts ... to conduct adequate market research, or to plan and prepare for a competitive procurement, before [the predecessor] contract expired").

DHS's lack of planning is further highlighted by its repeated references to the January 20, 2025, EO 14159 as the impetus for this requirement. *See* Tab 98, AR 860 (D&F for option periods); Tab 106, AR 906 (Market Research Report); Tab 110, AR 949 (J&A for Other Than Full Competition); Tab 130, AR 1855 (Business Evaluation); Tab 183, AR 2801 (CICA Override). If DHS truly believed the January 20, 2025, declaration of national emergency created "unusual and compelling urgency," it is irrational that the Agency waited five months to begin acquisition planning, only to rush an award in less than one week. Thus, the Agency has not established the existence of unusual and compelling urgency.

For the same reasons, DHS cannot demonstrate that a delay in award would result in "serious injury" to the Government as required by FAR 6.302-2(b)(2). "Serious injury" is found only when the public faces immediate harm—such as threats to health, welfare, or safety—or

where significant financial losses are at stake. *See Ceres Env't Servs.*, 158 Fed. Cl. at 559–60 (finding serious injury where radioactive materials threatened to contaminate surrounding buildings and environment); *Filtration Dev. Co.*, 60 Fed. Cl. at 382 (monetary harm sufficient injury where the Army expended $300 million to replace engines). Yet no such harm exists here.

The Agency's J&A asserts that "a delay in award inhibits building stronger, more coordinated partnerships with our neighbors and international allies." Tab 110, AR 951. Not only is this alleged harm, at best, neutral, but DHS itself waited five months after the January 20, 2025 issuance of EO 14159 to issue the RFP. DHS offers no rational explanation for why it could wait 115 days to release the RFP, yet claims it would suffer "serious injury" from a mere 15-day public notice period. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (requiring agencies to make a "rational connection between the facts found and the choice made"). Accordingly, DHS has not established it would suffer serious harm by complying with the FAR 5.201 notification requirements.

Because DHS cannot establish either unusual and compelling urgency or serious injury that would result from complying with the publication requirements, its failure to post a synopsis of the contract action was improper. This prejudiced CSI, who was excluded from the competition due to lack of notice. Indeed, while the Contracting Officer permitted █████ to join the competition, she claimed not to have seen CSI's email requesting to participate—sent on Saturday, May 17, 2025—until Monday, May 19, 2025, despite emailing RFP Amendment 2 to vendors hours after CSI's request. Tab 184, AR 2811. Had DHS properly publicized the procurement, CSI would have had an opportunity to respond during normal business hours.[12] This constitutes non-trivial

---

[12] Before GAO, the Agency conceded that if it "would have conducted a full and open competition … [CSI] would have seen the notice and had a chance to compete." Tab 161 at AR 2320-21.

competitive injury, and but for these errors, CSI would have a substantial chance of award.

Accordingly, the Court should find DHS's failure to comply with FAR Subpart 5.2 arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

### E. DHS Continues to Violate 41 CFR Part 102-33.5 by Conducting Aviation Operations Without Approved Flight Program Standards

DHS's procurement of charter flights through this solicitation violates 41 C.F.R. § 102-33.5, the regulations governing the Management of Government Aircraft, because DHS does not have approved Flight Program Standards.

The regulations for the Management of Government Aircraft apply to "***all Federally-funded aviation activities*** of executive branch agencies of the U.S. Government ***who use Government aircraft to accomplish their official business***." 41 C.F.R. § 102-33.5(a) (emphasis added). "Government aircraft" is defined to include "[a]ircraft hired as commercial aviation services (CAS)," such as:

- "Charter aircraft for hire under a contractual agreement for one-time exclusive use that specifies performance (The commercial source operates and maintains a charter aircraft);" and

- "Contracting for full services (*i.e.,* aircraft and related aviation services for exclusive use)"

§ 102-33.20. Thus, a chartered aircraft hired to perform DHS's missions constitute CAS. *Id.*

Here, DHS is hiring CAS. The Solicitation calls for "[s]upport[ing] voluntary return operations with chartered aircraft and/or escorted/unescorted commercial returns" and "[p]rovid[ing] solutions for both chartered aircraft and commercial tickets to facilitate removals…."[13] Tab 112a, AR 1041–43 ("Task 2.1.3: Support voluntary return operations with chartered aircraft . . . The Contractor shall provide a mechanism to charter aircraft") ("Task 2.2.2.:

---

[13] The purchase of commercial airline tickets is not CAS and is not relevant for purposes of this discussion.

Provide solutions for both chartered aircraft and commercial tickets . . . The Contractor shall provide solutions for both chartered aircraft and a mechanism to purchase commercial tickets"). Similarly, the IGCE accounts for multiple dedicated aircraft throughout entirety of the contract performance period and millions in costs associated with charter flights. *See* Tab 90, AR 824–26.

The regulations are explicit that "*[i]f you hire CAS, you are responsible for . . . Establishing agency-specific Flight Program Standards*, as defined in [41 C.F.R.] §§ 102-33.140 through 102-33.185, . . . *and requiring compliance with these standards in your contracts and agreements*." § 102-33.130(a) (emphasis added); § 102-33.105 ("[a]t a minimum, [an agency's] CAS contracts and agreements must require that any provider of CAS comply with . . . Your agency's Flight Program Standards"). Flight Program Standards are "the minimum requirements that must be incorporated into an agency's flight programs to ensure that your aircraft are operated safely, effectively, and efficiently." § 102-33.140. They must be "specific to [the] agency's aviation operations" and "*[m]eet or exceed* applicable civil or military rules . . . *and applicable FAA regulations*."[14] § 102-33.140 (emphasis added).

Flight Program Standards must consist of written policies and procedures for all aspects of aviation operations, including management, administration, and operation of the flight program, maintenance and training, and safety and accident reporting. § 102-33.155. The regulations require that agencies establish and require contractors to comply with a host of standards, such as "[b]asic qualifications and currency requirements for [] pilots and other crewmembers, maintenance

---

[14] Agencies are required to establish Flight Program Standards because FAA regulations "may not cover or address all aspects of [the] agency's flight program, such as non-certificated aircraft, high-risk operations, special personnel requirements, etc." § 102-33.145. Flight Program Standards are thus "in addition to" FAA requirements; not "instead of" FAA requirements. *See* §§ 102-33.140, 102-33.145, 102-33.215(a) ("You may carry passengers only on aircraft that you operate or require contractually to be operated in accordance with the rules and requirements in 14 CFR").

personnel, administrative personnel and other mission-related personnel" and "[l]imitations on duty time and flight time for pilots and other crew members."[15] § 102-33.165.

DHS does not have any "agency specific" Flight Program Standards. While the record contains internal management directive (MD) 0020.1, Tab 7, AR 512, that document does not establish or constitute agency-specific Flight Program Standards, as required by 41 C.F.R. § 102-33.140. It does not provide policies and procedures for operation of the flight program, maintenance or training, or establish safety standards. *Compare* Tab 7, AR 519–35, *with* 41 C.F.R. § 102-33.155. Nor does MD 0020.1 establish basic qualifications for pilots, crewmembers, or other personnel, or demark limitations on duty time and flight time. *Compare* Tab 7, *with* 41 C.F.R. § 102-33.165. Simply put, MD 0020.1 does not establish or constitute Flight Program Standards.

Nor does the RFP contain the contractually required Flight Program Standards as mandated by §§ 102-33.105, 102-33.130(a). *See generally* Tab 112a. Under FAR 15.203, RFPs must describe the "[a]nticipated terms and conditions that will apply to the contract." *See also* FAR 15.204-3 (requiring that agencies include and "clauses required by law or by [the FAR] and any additional clauses expected to be included in any resulting contract"). The Agency's failure to establish Flight Program Standards means that this Solicitation does not set forth the basic qualifications for pilots and crew members, or any limitations on duty time and flight time. *See* 41 C.F.R. § 102-33.165. This is particularly troubling considering the high number of charter flights that are expected under this contract, *see* Tab 90, AR 825 (estimating 1480 charter flights over three years). The omission of basic qualifications for pilots or limitation on flight time from the

---

[15] These standards are evident in the GSA Schedule requirements for SIN 481211B, which establish minimum performance measures that must be satisfied for any "operator that wishes to apply for an initial GSA schedule award." *See* GSA, Schedule SIN 481211B Air Charter Services–Broker, at 12–16, 18–20, 21–24, *available at*: https://www.gsa.gov/system/files/481211B%20Air%20Charter%20Services_Updated%203.12.2024_0.pdf

Solicitation is a defect in the Solicitation because it does not describe the "[a]nticipated terms and conditions that will apply to the contract." FAR 15.203.

For these reasons, DHS's procurement is contrary to law and the Court should therefore enjoin further performance of the contract. These errors are prejudicial because DHS is improperly procuring these services through this vehicle, rather than through a proper vehicle, such as the GSA Schedules or ICE BPA contract, for which CSI could bid on as a prime- or subcontractor.

### F.  CSI Is Entitled to Injunctive Relief

The Court possesses broad equitable authority to grant appropriate remedies in bid protest actions. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). In determining whether injunctive relief is warranted, the Court considers whether: (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm absent relief; (3) the balance of hardships favors the plaintiff; and (4) granting relief serves the public interest. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Success on the merits is required for a permanent injunction, but the Court may balance the other three factors in deciding whether to grant injunctive relief. *Piedmont Propulsion Sys., LLC v. United States,* 167 Fed. Cl. 72, 90–91 (2023) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018)). As explained below, all four factors support granting injunctive relief.

### 1.  CSI Has Established Success on the Merits

As detailed above, CSI has established success on the merits. DHS violated multiple procurement rules in this solicitation and covertly facilitated a noncompetitive procurement in response to its own concerns about potential OCI issues and PIA violations associated with their months-long, exclusive discussions with Salus. The Agency retroactively leaned on an Executive Order for an alleged urgency – one which did not compel any specific deadlines – and made only

cursory efforts to comply with FAR 6.302-2's requirements, all the while trying to meet their real deadline, *i.e.*, Salus's proposal expiration date. The Agency's unduly restrictive and rushed efforts excluded interested and available offerors like CSI and further preempts competition due to the overextended contract length. DHS did not have a rational basis for imposing such restrictions on prospective offerors. Also, it cannot be disputed that DHS does not have any "agency specific" Flight Program Standards or that the RFP does not contain the contractually required Flight Program Standards. Thus, the Agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The proper remedy is to enjoin further performance of the contract and resolicit under a revised, full and open competition in accordance with CICA.

### 2.  CSI Will Suffer Irreparable Harm Absent Injunctive Relief

CSI was, and will continue to be, irreparably harmed by the Agency's performance of an unduly restrictive and noncompetitive procurement. A bid protester can demonstrate prejudice by showing that it was deprived of the opportunity to compete. *Orion Tech., Inc.*, 704 F.3d at 1349; *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 (2012). "[I]n a pre-award bid protest, the 'lost opportunity to compete in fact constitutes irreparable harm for purposes of injunctive relief.'" *Piedmont Propulsion Sys., LLC,* 167 Fed. Cl. at 91 (citations omitted). Where "the [agency]'s error caused [the protester] to be 'entirely removed from competition without recourse … [the protester] will suffer irreparable harm if injunctive relief is not provided.'" *Id*.; *see also Green Tech. Group, LLC v. United States*, 147 Fed. Cl. 231, 246 (2020) ("when procurement decisions contrary to law deprive an offeror of the opportunity to compete for a contract, the resulting lost profits are sufficient to constitute irreparable injury.") (citation omitted).

Here, CSI suffered non-trivial competitive injury due to the Agency's decision to conduct a noncompetitive procurement in violation of FAR 6.302-2 and CICA. The Agency's violations

expressly prevented CSI from competing and will continue to do so for a protracted contract period of three years. CSI was (and remains) an interested bidder and has a definite, economic stake in the solicitation being carried out fairly. Anything short of an injunction and a re-solicitation of the Agency's actual needs would not amount to an adequate remedy.

      3.   <u>The Balance of Hardships Weighs Heavily in Favor of CSI</u>

In weighing the third factor for injunctive relief, the Court must balance the harm plaintiff would suffer without injunctive relief against the harm that would be inflicted on defendant and defendant-intervenor by way of that injunction. *Reilly's Wholesale Prod.*, 73 Fed. Cl. at 715. In this case, the balance of hardships weighs heavily in favor of CSI and granting injunctive relief.

CSI's hardship, absent injunctive relief, is significant and irreversible. CSI regularly performs the services called for under this procurement but was inexplicably excluded from bidding on this requirement. *See* Tab 113, AR 1117 ("As a prime contractor supporting ICE air for 20 of the past 24 years, we are well-positioned to support your new program quickly . . . Your mission aligns with our other flight operations and could be developed into a DHS air-centric operation"). CSI was categorically preempted from the opportunity to compete for a substantial contract, and would be shut out from this effort for a period of three years.

By contrast, any potential hardship to DHS is minimal. Any delay in performance or cost to the Government arising out of a re-solicitation and/or other relief that compels the Agency to follow procurement rules "is not a hardship, but an obligation." *Green Tech. Group, LLC*, 147 Fed. Cl. at 246. Moreover, according to the pre-solicitation CONOP, DHS has already achieved steady state operations. *See* Tab 52a, AR 692–93 (estimating full operating capacity and "steady state operations" by two months into performance). Given this expedited timeline, there is no rational basis why the Agency would not be able to quickly on-ramp a CSRO provider under full and open

competition; particularly when DHS already conducted a "competition" for this requirement in less than one week. Defendant-Intervenor Salus likewise cannot demonstrate harm because no contractor is entitled to a contract that was awarded in violation of law, as the CSRO contract was. *See Hunt Building Co., Ltd. v. United S*tates, 61 Fed. Cl. 243, 280 (2004) ("Similarly, [the awardee] will be harmed by having to undergo a recompetition—but not as severely as [the protester] would be, if the unfair selection were allowed to stand."). Accordingly, the balance of harms weighs in favor of granting injunctive relief.

    4.  <u>The Public Interest Is Served By Imposing the Requested Injunction</u>

"[T]here is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations." *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). Any countervailing interest in efficiency of operations cannot come at the expense of providing a fair and level playing field for all competitors and preserving the integrity of the public procurement process. *See Mangi Env't Grp., Inc. v. United States*, 47 Fed. Cl. 10, 19–20 (2000). Here, DHS has violated myriad procurement laws and awarded a non-competitive $915 million procurement to a company that has never served as a prime contractor. The public interest demands that a contract of this magnitude be procured through full and open competition, which far outweighs DHS's interest in procuring this requirement as quickly as possible.

Accordingly, all factors support granting injunctive relief. CSI respectfully requests that the Court enjoin DHS from further performance of this improper contract.

## VI.   <u>CONCLUSION</u>

For the reasons above, CSI respectfully requests that this Court grant Plaintiff's Motion for Judgment on the Administrative Record and grant CSI the relief requested in the Complaint.

Dated: September 29, 2025

Respectfully submitted,

*/s/ Jennifer S. Zucker*
Jennifer S. Zucker
Greenberg Traurig, LLP
2101 L Street, NW,
Suite 1000
Washington, DC 20037
(202) 331-3114
zuckerjs@gtlaw.com

*Counsel for CSI Aviation, Inc.*

*Of Counsel*:

Christopher M. O'Brien
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC  20037
(202) 533-2306
obriencm@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
cassidy.kim@gtlaw.com