**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

Redacted Version

| | |
|---|---|
| CSI AVIATION, INC.<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>v.<br><br>SALUS WORLDWIDE SOLUTIONS<br>CORPORATION,<br><br>     Defendant-Intervenor. | No. 25-1338C (MHS) |

**DEFENDANT-INTERVENOR'S MOTION TO DISMISS, CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Scott N. Flesch
  *Counsel of Record*
Alejandro L. Sarria
Connor W. Farrell
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC 20006
Tel. (202) 626-5800
sflesch@milchev.com

*Counsel for Salus Worldwide Solutions Corporation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ IV

INTRODUCTION ............................................................................................... 1

QUESTIONS PRESENTED ................................................................................ 2

STATEMENT OF FACTS .................................................................................. 2

    A.    The Administration's January 2025 Declaration ............................... 2

    B.    Salus' Unsolicited Proposal and DHS's Evaluation ......................... 3

    C.    DHS's Acquisition Planning ............................................................ 4

    D.    The Administration's May 9, 2025 Proclamation ............................ 7

    E.    Contract Solicitation, Evaluation, and Award .................................. 8

ARGUMENT ...................................................................................................... 9

II.    STANDARDS OF REVIEW ...................................................................... 9

    A.    Motion to Dismiss Under Rule 12(b)(6) .......................................... 9

    B.    Motion for Judgment on the Administrative Record ........................ 10

    C.    Injunctive Relief .............................................................................. 10

III.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE CSI LACKS STANDING AS IT HAS NOT SHOWN A COMPETITIVE INTEREST IN THE PROCUREMENT ................................................................................ 11

    A.    CSI Articulates the Wrong Standard in Claiming It Is an Interested Party ......... 11

    B.    CSI Has Not Shown A Competitive Interest Under Either Standard .................. 12

IV.    ALTERNATIVELY, THE GOVERNMENT IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD BECAUSE THE AGENCY CONDUCTED THE PROCUREMENT TO MEET ITS UNUSUALLY AND COMPELLING URGENT NEEDS IN ACCORDANCE WITH APPLICABLE LAW ............................................................................................. 15

    A.    The Government Is Entitled to Judgment on Count I Because It Reasonably Determined Its Needs Were Unusually and Compellingly Urgent ................................ 15

            1.    The Agency Properly Conducted a Limited Competition Among a Pool of Multiple Offerors and CSI's Suggestion of Non-Competition is Unfounded ........................ 16

            2.    The Agency Properly Established that the Government's Need for the CSRO Requirement Was Unusual and Compellingly Urgent ........... 16

                    a.    *The Agency Reasonably Determined that the Government's Need for Comprehensive Support to Removal Operations Is*

*Unusual and Compellingly Urgent in Compliance with FAR 6.302-2* ................................................................. 16

    b.    *An Acquisition Deadline Existed and DHS Needed to Act Immediately in May 2025* ............................................ 18

    c.    *The Court Must Give Deference to the Interest of National Security When Determining Whether DHS Complied with FAR 6.302-2* ........................................................ 19

    3.    The Agency Did Not Fail to Adequately Plan for this Unusual and Developing National Security Requirement ............................................. 20

    4.    The Government Reasonably Determined It Would Be Seriously Injured by any Delay in Award of the Contract ........................................ 22

B.    The Government Is Entitled to Judgment on Count II Because the Agency Requested Offers from as Many Potential Sources as Practicable Under the Circumstances ................................................................. 23

    1.    DHS Complied with FAR 6.302-2(c)(2) Requirements by Conducting a Limited Competition Between the Pool of Potential Sources Identified During Market Research .............................................. 23

    2.    The Agency Assessed CSI's Capabilities and Exercised Sound Discretion in Deciding Not to Solicit an Offer from CSI ........................ 26

C.    The Government Is Entitled to Judgment on Count III Because the Agency Reasonably Determined that a Three Year Period of Performance Is the Time Necessary to Meet Its Unusual and Compelling Requirements, Especially in Light of the Applicable Exceptional Circumstances ..................... 29

    1.    The Agency Properly Determined that a Three-Year Period of Performance Is the Time Necessary to Meet the Unusual and Compelling Requirements of the Work .................................................. 29

    2.    The Head of the Agency Reasonably Determined that Exceptional Circumstances Necessitate a Period of Performance Exceeding One Year ............................................................................................... 32

D.    The Government Is Entitled to Judgment on Count IV Because the Agency Properly Invoked the Exception to Publication Requirements Based on Unusual and Compelling Urgency ....................................... 35

E.    The Government Is Entitled To Judgment on Count VI Because It Raises Matters of Contract Administration Beyond this Court's Protest Jurisdiction, and CSI Has Not Shown a Clear Violation of Applicable Regulations in any Event ................................................................. 37

    1.    The Court Lacks Subject Matter Jurisdiction Over Count VI Because CSI's Allegations Concern Matters of Contract Administration ......................................................................................... 38

      2.      Even If the Court Has Jurisdiction, CSI Has Not Shown a Clear
and Prejudicial Violation of Applicable Regulations Under Count
VI ........................................................................................................... 40

V.     CSI'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DENIED ....................... 45

CONCLUSION ......................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceptance Ins. Cos., Inc. v. United States*,
   583 F.3d 849 (Fed. Cir. 2009)..................................................................................9

*Advanced Concepts Enters., Inc. v. United States,*
   142 Fed. Cl. 187 (2019) ...............................................................................14, 15

*Aero Corp., S.A. v. United States*,
   38 Fed. Cl. 237 (1997) ................................................................................48

*Aero Spray, Inc. v. United States*,
   156 Fed. Cl. 548 (2021) ...............................................................................47

*Ala. Aircraft Indus., Inc.-Birmingham v. United States*,
   586 F.3d 1372 (Fed. Cir. 2009)..............................................................10

*Am. Fed'n of Gov't Emps. v. United States*,
   258 F.3d 1294 (Fed. Cir. 2001)..............................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................10

*Assessment & Training Sols. Consulting Corp. v. United States*,
   173 Fed. Cl. 123 (2024) ...........................................................................47, 50

*B.H. Aircraft Co. Inc. v. United States*,
   158 Fed. Cl. 750 (2022), *aff'd*, 89 F.4th 1360 (Fed. Cir. 2024) ...........................................14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................9

*Blue Tech Inc. v. United States*,
   155 Fed. Cl. 229 (2021) ...........................................................................47

*Brandt Dev. v. United States*,
   177 Fed. Cl. 353 (2025) ...........................................................................39

*CACI, Inc.-Federal v. United States*,
   67 F.4th 1145 (Fed. Cir. 2023) ...............................................................9

*Centech Grp., Inc. v. United States*,
   554 F.3d 1029 (Fed. Cir. 2009)..............................................................10, 45

*Ceres Env't Servs., Inc. v. United States*,
   158 Fed. Cl. 547 (2022) ...........................................................25, 26, 31, 34

*Chapman L. Firm Co. v. United States*,
    67 Fed. Cl. 188 (2005) ........................................................................................49

*Chapman L. Firm v. United States*,
    63 Fed. Cl. 519 (2005), *aff'd*, 163 F. App'x 889 (Fed. Cir. 2006) ........................................40

*Chronos Sols., LLC*,
    B-418865, 2020 CPD ¶ 319 (Comp. Gen. Sept. 29, 2020)....................................................28

*Cleveland Assets, LLC v. United States*,
    883 F.3d 1378 (Fed. Cir. 2018)................................................................................9

*CliniComp Int'l, Inc. v. United States*,
    904 F.3d 1353 (Fed. Cir. 2018)..............................................................12, 13, 14, 15

*Comprehensive Health Servs., LLC v. United States*,
    151 Fed. Cl. 200 (2020) ........................................................................................25

*Crowley Tech. Mgmt., Inc. v. United States*,
    123 Fed. Cl. 253 (2015) ........................................................................46, 47, 49

*Cubic Def. Sys., Inc. v. United States*,
    45 Fed. Cl. 450 (1999) ........................................................................................45, 46

*Distributed Sols., Inc. v. United States*,
    539 F.3d 1340 (Fed. Cir. 2008)..............................................................................38, 39

*DynCorp Int'l, LLC v. United States*,
    10 F.4th 1300 (Fed. Cir. 2021) ..............................................................................48

*Filtration Dev. Co., LLC v. United States*,
    63 Fed. Cl. 612 (2005) ........................................................................................34

*Frazier v. United States*,
    79 Fed. Cl. 148 (2007), *aff'd*, 301 F. App'x 974 (Fed. Cir. 2008) ........................................39

*G4S Secure Integration LLC v. United States*,
    159 Fed. Cl. 249 (2022) ........................................................................................47, 48

*Gemini Tech Serv., LLC v. United States*,
    No. 25-1337C, 2025 WL 2674585 (Fed. Cl. Sept. 8, 2025)..........................................20, 37

*Gentex Corp. v. United States*,
    58 Fed. Cl. 634 (2003) ........................................................................................20

*Golden IT, LLC v. United States*,
    177 Fed. Cl. 118 (2025) ........................................................................................10

*Harmonia Holdings Grp., LLC v. United States*,
   157 Fed. Cl. 292 (2021) ........................................................................39

*Hosp. Klean of Tex, Inc. v. United States*,
   65 Fed. Cl. 618 (2005) ..........................................................................10

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
   238 F.3d 1324 (Fed. Cir. 2001)...............................................................41

*Indus. Refrigeration Serv. Corp.*,
   B-220091, 86-1 CPD ¶ 67 (Comp. Gen. Jan. 22, 1986) ........................27

*Infrastructure Def. Techs., LLC v. United States*,
   81 Fed. Cl. 375 (2008) ..........................................................................36

*Innovation Dev. Enters. of Am., Inc. v. United States*,
   108 Fed. Cl. 711 (2013) ........................................................................28

*KSD, Inc. v. United States*,
   72 Fed. Cl. 236 (2006) ..........................................................................36

*Metric Sys. Corp. v. United States*,
   42 Fed. Cl. 306 (1998) ..........................................................................36

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...............................................................................45

*MSC Indus. Direct Co. v. United States*,
   140 Fed. Cl. 632 (2018) ........................................................................40

*Myers Investigative & Sec. Servs., Inc. v. United States*,
   275 F.3d 1366 (Fed. Cir. 2002)...............................................................13

*Oracle Am., Inc. v. United States*,
   975 F.3d 1279 (Fed. Cir. 2020)........................................................11, 12

*Orion Tech., Inc. v. United States*,
   704 F.3d 1344 (Fed. Cir. 2013)...............................................................11

*Percipient.AI, Inc. v. United States*,
   153 F.4th 1226 (Fed. Cir. 2025) ...............................................................9

*Petro Star, Inc.*,
   B-248019, 92-2 CPD ¶ 34 (Comp. Gen. July 27, 1992)........................35

*RLB Contracting, Inc. v. United States*,
   118 Fed. Cl. 750 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015) .....................46

*SSI Tech., Inc. v. United States*,
    148 Fed. Cl. 147 (2020) ...........................................................25, 31, 34

*Trace Sys. Inc. v. United States*,
    165 Fed. Cl. 44 (2023) ...................................................................13

*Trailboss Enters., Inc.*,
    B-415970, 2018 CPD ¶ 171 (Comp. Gen. May 7, 2018) .......................35

*Vanquish Worldwide, LLC v. United States*,
    163 Fed. Cl. 57 (2022) ...................................................................12

*Weeks Marine, Inc. v. United States*,
    575 F.3d 1352 (Fed. Cir. 2009)...........................................................11

## Statutes

5 U.S.C. § 706.............................................................................10, 25

28 U.S.C. § 1491 ...................................................................... *passim*

31 U.S.C. § 3551.................................................................................9

41 U.S.C. § 3304............................................................................17, 22

## Other Authorities

14 C.F.R. ch. 1 ............................................................................38, 42, 44

14 C.F.R. ch.1, pt. 5 ...........................................................................44

14 C.F.R. ch. 1, pt. 43 .........................................................................44

14 C.F.R. ch. 1, pt. 91 .........................................................................44

41 C.F.R. ch. 1., pt. 61 .........................................................................44

41 C.F.R. ch. 1., pt. 63 .........................................................................44

41 C.F.R. ch. 1., pt. 65 .........................................................................44

41 C.F.R. ch. 1., pt. 117 .......................................................................44

41 C.F.R. Part 102................................................................... *passim*

41 C.F.R. § 102-33..................................................................................2

41 C.F.R. § 102-33.25(a) ...............................................................41, 42, 43

41 C.F.R. § 102-33.105 .................................................................................................40, 43

41 C.F.R. § 102-33.105 ........................................................................................................42

41 C.F.R. § 102-33.130 ........................................................................................................40

41 C.F.R. §§ 102-33.140 through 102-33.185 .....................................................................42

41 C.F.R. § 102-33.145 ........................................................................................................42

41 C.F.R. § 102-33.155 ........................................................................................................42

FAR 2.101 ............................................................................................................................20

FAR 5.202 .................................................................................................................25, 35, 37

FAR 5.203 ............................................................................................................................35

FAR 6.302-2 ................................................................................................................ *passim*

FAR 15.203 ....................................................................................................................44, 45

FAR 15.204-3 .......................................................................................................................45

FAR 15.603 ............................................................................................................................3

FAR 15.606 ..........................................................................................................................20

FAR 15.606-1 .........................................................................................................................3

FAR 17.2 ...............................................................................................................................33

FAR 17.202 ..........................................................................................................................33

FAR 17.205 ..........................................................................................................................33

FAR 17.207 ..........................................................................................................................34

FAR 52.212-4 .......................................................................................................................43

FAR 102-33.145 ...................................................................................................................42

FAR Subpart 5.2 ..................................................................................................................35

FAR Subpart 15.2 ................................................................................................................37

FAR Subpart 15.6 ..................................................................................................................3

HSAR 3015.602 .....................................................................................................................3

HSAR 3015.606-1...................................................................................................................3

Executive Order 14159, Protecting the American People Against Invasion (Jan.
20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025)................................................................ *passim*

Executive Order 14165, Securing Our Borders (Jan. 20, 2025), 90 Fed. Reg. 8467
(Jan. 30, 2025)................................................................................................ *passim*

Proclamation No. 10886, Declaring a National Emergency at the Southern Border
of the United States (Jan. 20, 2025), 90 Fed. Reg. 8327 (Jan. 29, 2025) .....................2, 17, 33

Proclamation No. 10935, Establishing Project Homecoming (May 9, 2025), 90
Fed. Reg. 20,357 (May 14, 2025) ...................................................................... *passim*

Fed. Cl. Rule 12 .......................................................................................................1, 9

Fed. Cl. Rule 52.1 .......................................................................................................1

## INTRODUCTION

Pursuant to Rules 12(b)(1), 12(b)(6) and 52.1(c) of the Rules of the Court of Federal Claims ("RCFC") and the Court's order dated November 17, 2025, Defendant-Intervenor Salus Worldwide Solutions Corporation ("Salus") respectfully requests that the Court dismiss Plaintiff CSI Aviation, Inc.'s ("CSI") complaint because CSI is not an interested party, or, in the alternative, grant judgment for the United States on the administrative record and deny CSI's motion for judgment on the administrative record ("CSI Motion").

In this bid protest action, CSI challenges the U.S. Department of Homeland Security's ("DHS" or "Agency") solicitation and award of Indefinite-Delivery, Indefinite-Quantity Contract No. 70RDA225D00000005 ("Contract") to Salus under Request for Proposal No. 70RDA225R0000008 ("Solicitation") for Comprehensive Support to Removal Operations ("CSRO") Support Services. Through the CSRO program, DHS aims to incentivize and execute voluntary deportation of undocumented persons from the United States, establish international staging areas to facilitate removal and voluntary returns, and support foreign allied countries who have agreed to accept those persons.

CSI's protest fails because it is premised on a false narrative that conflicts with the facts in the record, overstates applicable legal requirements, and ignores the urgent national security threats that the CSRO procurement is designed to address. The Court should dismiss CSI's protest for lack of standing because, by CSI's own admission, it lacks the experience and capabilities needed to perform the full scope of the CSRO requirements. In the alternative, the Court should grant judgment for the United States on the administrative record because DHS conducted a limited, yet robust, competition in accordance with Federal Acquisition Regulation ("FAR") 6.302-2 and other applicable regulations, including those governing agency flight program standards. Moreover, even if CSI succeeds on the merits, injunctive relief is not

1

warranted because CSI is not qualified to perform the CSRO requirements and the harm to the United States' national security interests far outweigh CSI's pecuniary interests in the procurement.

## QUESTIONS PRESENTED

1.      Whether CSI possesses standing to challenge the CSRO procurement where it was not a qualified bidder.

2.      Whether DHS adequately justified its decision to utilize less than full and open competition based on unusual and compelling urgency.

3.      Whether DHS complied with the requirements of 41 C.F.R. § 102-33 regarding aviation standards for contractors.

4.      Whether CSI has demonstrated entitlement to injunctive relief.

## STATEMENT OF FACTS

**A.      The Administration's January 2025 Declaration**

On January 20, 2025, the President declared a national emergency at the southern border due to persistent and imminent national security threats caused by illegal immigration. *See* Tab110_AR949-52 (referencing Executive Order 14159, Protecting the American People Against Invasion (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025) ("EO 14159"), EO 14165, Securing Our Borders (Jan. 20, 2025), 90 Fed. Reg. 8467 (Jan. 30, 2025) ("EO 14165"), and Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States (Jan. 20, 2025), 90 Fed. Reg. 8327 (Jan. 29, 2025) ("Proc. 10886")). The declaration explained the gravity and significance of the illegal immigration problem—a problem that has allowed millions of undocumented persons to enter the country illegally, many of whom "present significant threats to national security and public safety." EO 14159 § 1; *see also* EO 14165 § 1 (explaining the U.S. has endured an "unprecedented" and "large-scale invasion" of illegal aliens,

"including, potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent").

The declaration announced the Government's policy "to take all appropriate action to secure the borders of our Nation" including through "[r]emoving promptly all aliens who enter or remain in violation of Federal law." EO 14165 § 2. Specifically, DHS was directed to take urgent action to help resolve the national emergency at the southern border and illegal immigration at-large. *See id.* § 6 (directing DHS "[a]s soon as practicable" to ensure that, certain aliens "are returned to the territory from which they came"); EO 14159 § 9 (directing DHS to "promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law . . . to ensure the efficient and expedited removal of aliens from the United States").

### B. Salus' Unsolicited Proposal and DHS's Evaluation

In response to the Administration's declaration, on January 23, 2025, Salus submitted an unsolicited proposal, pursuant to FAR Subpart 15.6, to "collaborate with DHS to provide the necessary contingency logistics, pre-travel coordination, manifesting, medical, and aviation support services" and support the Agency "in responding to the unprecedented emergency brought on by years of unchecked illegal immigration." Tab2a_AR4; Tab2; Tab2b; *see also* FAR 15.603(a); HSAR 3015.602 (encouraging proposals that sustain or enhance DHS's mission).[1]

In accordance with FAR 15.606-1 and HSAR 3015.606-1, DHS conducted an initial review of Salus' unsolicited proposal in late February, accepted it for a comprehensive evaluation, and notified Salus that it may request additional information and/or clarification from the company as part of the process. *See* Tab6_AR509 (stating Salus' proposal "is not for a known agency requirement," but is "related to the agency mission"); Tab8_AR548;

---

[1] Salus re-submitted its unsolicited proposal with revisions in February 2025. *See* Tabs3-5a.

Tab20_AR576-77. In the ensuing weeks, Salus and DHS shared information and discussed the unsolicited proposal and market research provided for DHS's evaluation. *See, e.g.*, Tabs9-19.

On March 7, 2025, DHS completed a favorable comprehensive evaluation of Salus' proposal, finding it constituted "an innovative approach to augmenting DHS ability to remove illegal aliens at scale as directed by President Trump" and that the proposed program "would directly support accomplishment of the agencies mission by enabling DHS to more effectively and efficiently deport illegal aliens, the current top security priority for the United States." Tab20a_AR578; Tab20. The evaluation noted that additional discussions with Salus would be necessary to "further refine the costs [] tailored to DHS operations, interagency coordination, and international diplomatic relations," and that the Agency may elect to modify certain areas of the proposed scope of work. Tab20a at AR579. Accordingly, in March and April, Salus and DHS continued their discussions of the proposed program, which included Salus providing several items to support the Agency's ongoing market research efforts. *See, e.g.*, Tab28 (providing representative price and financial models as market research); Tab30 (providing white paper on potential funding authorities); Tab44 (providing business case as market research).

### C.    DHS's Acquisition Planning

DHS's initial acquisition planning efforts, from February to April, were largely focused on the evaluation of Salus' unsolicited proposal, consideration of Salus' related market research materials, and assessment of the proposed program—its scope of work, its funding, and how it would support the Agency's mission to facilitate the Government's security priorities. Specifically, DHS engaged with the U.S. Department of State ("State"), culminating in an interagency agreement (IAA) under which State would provide up to $250 million in Migration and Refugee Assistance funds to DHS to "facilitate project activities and associated costs for voluntary returns." Tab65_AR733; *see also* Tabs105-105a. As part of its initial efforts, DHS also

engaged in broader research efforts to assess the relevant marketplace, including with industry and discussing technical requirements with State. *See* Tab106_AR909.

In mid-April 2025, the DHS Office of the General Counsel (OGC) became aware of concerns regarding the Agency's handling of Salus' unsolicited proposal and the information shared between the two parties. *See* Tab107_AR921. The OGC notified the Office of the Inspector General of a possible Procurement Integrity Act violation, and the matter was referred to the Immigration and Customs Enforcement, Office of Professional Responsibility. *See id.* The OGC and Contracting Officer conducted a review of all communications and identified "potential OCI concerns." *See id.* In particular, the OCI investigation determined that (1) the Agency's perceived use of portions of Salus' unsolicited proposal for its own draft statement of objectives "gives the appearance of a biased grounds rules OCI," and (2) the level of communications and information sharing between the parties "gives the appearance of unequal access to information OCI." *See id.* at AR921-22. The Agency ultimately determined, however, that the actions of and communications between the parties were not improper. *See id.* at AR922-23 ("the communications with the vendor were simply the result of well-meaning conversations with a vendor concerning their 'unsolicited proposal' and not an attempt to undermine the federal procurement rules").[2] Still, "to ensure, to the maximum extent possible, a fair process," the Agency shifted its acquisition strategy to a competitive procurement. *See id.* at AR923. This shift in acquisition strategy aligned with other, concurrent Agency considerations—tailoring the scope of work to best meet its requirements and support its mission, further assessing the relevant

---

[2] The Agency also determined CSRO was not a "novel requirement" borne out of Salus' unsolicited proposal, but instead, shared similarities to a joint DHS-State repatriation effort conducted in Panama in 2024, such that no biased ground rule OCI existed. *See* Tab107_AR921-22.

marketplace, enhancing competition, and obtaining best value. *See, e.g.*, Tab20a_AR579 (contemplating modifications to proposed scope in Salus' unsolicited proposal); Tab106_AR914, 916; Tab108_AR932. Ultimately, DHS's Head of the Contract Activity determined it was in the Government's best interest to waive any potential OCIs or appearances of impropriety because of the "mission-critical nature of this procurement for removal operations and the urgent need to deploy these capabilities to support national security and immigration enforcement objectives." Tab107_AR924. Importantly, CSI does not challenge the propriety of the OCI waiver.

With this new strategy in place, DHS engaged in additional market research. *See* Tab106. This additional research led the Agency to determine that "multiple firms [] have the capability and experience to perform **certain segments of the overall requested scope outlined** within the Statement of Work but lack the experience to deliver the requested complete integrated solution within the SOW." *Id.* at AR914. But "only one vendor [Salus] was identified with the unique mix of experience and skills to address the complete requirement as prescribed in the SOW." *Id.* Nevertheless, DHS went a step further, electing to conduct a limited competition amongst vendors identified during market research to "further assess their capabilities" and "negotiate a competitive price for the requirement." *Id.* at AR914, AR916. At the same time, DHS concluded a limited competition was the best approach "given the urgent and compelling needs of the Department." *Id.* at AR918.

DHS's market research included evaluation of two established contract vehicles performed by CSI. First, DHS considered ICE Air vendors as potential sources but found they would not be suitable for the requirement "due to distinct difference in scope and nature of the

work being performed." Tab106_AR915; *see also* CSI Mot. at 5.[3] Second, DHS evaluated GSA

Schedule MAS 481211 Transportation and Logistics Services, "as a potential vehicle . . .as it

**could potentially fulfill at least some of the services** as it relates to commercial charter and

related services for both domestic and international travel and transportation needs."

Tab106_AR915 (emphasis added). The Agency found, however, that utilizing SIN 481211

contractors was not "viable" because "there are significant services beyond the commercial

charter requirements" thus requiring "contractors to team and/or subcontract with other vendors

to fill the gaps within its experience and expertise" which would present significant risk given

the complexity of the requirement and the need to immediately ramp up performance. *Id.*

     **D.**     **The Administration's May 9, 2025 Proclamation**

     On May 9, 2025, the President issued Proclamation "Establishing Project Homecoming"

which directed the State and DHS to "create seamless processes for illegal aliens to rapidly

depart the United States." Proclamation No. 10935 § 1 (May 9, 2025), 90 Fed. Reg. 20,357 (May

14, 2025) ("Proc. 10935"). Those processes included, among others, Federally-funded flights and

financial incentives for illegal aliens voluntarily departing the U.S. and actions to enable the

departure of illegal aliens who lack valid travel documents. *See id.* §§ 1-2. In other words,

significant portions of the CSRO scope of work. *See id.* The Proclamation also set a 60 day

---

[3] DHS explained, "[t]he required experience for voluntary return coordination which require [sic] coordination with consulates/embassies for travel documents is not a required function of the contractor or prospective contractors of ICE Air. The vendors of ICE Air do not have the experience either as Prime or subcontractors conducting this type of work. ICE Air centers around logistics movements for air operations solely, ICE conducts all the detention capability domestically therefore not scoped into this effort, separately ICE Air/Removals also conducts all the coordination with foreign consulates/embassies to coordinate the receipt of travel documents to facilitate removal missions." Tab106_AR915; *see also* Tab194_AR2926

deadline, July 8, by which DHS was required to supplement enforcement and removal forces to involuntarily "remove illegal aliens who have failed to depart voluntarily" through the processes established by Project Homecoming. *Id.* § 3(b).

> E.    **Contract Solicitation, Evaluation, and Award**

In response, DHS "rapidly accelerated its development of the CSRO requirement and routing through the procurement process." Tab161_AR2310. Given the directives of Proc. 10935—in conjunction with the January 2025 Executive directives, including the national emergency declaration—the Agency determined that unusual and compelling urgency existed such that a limited and expedited competition was warranted. *See generally* Tab110.

On May 13, 2025, DHS initiated the solicitation process, contacting the seven vendors identified during its market research and holding an Industry Day. *See* Tab67. In the ensuing days, DHS provided the vendors with a draft performance work statement, held a pre-solicitation conference, and conducted one-on-one vendor meetings. *See* Tabs72-72c. It issued the Solicitation on May 16, 2025 and conducted another Industry Day meeting. *See* Tabs111, 104. Solicitation Amendments 1 and 2 issued the following day. *See* Tabs112, 114.

On Saturday, May 17, 2025 at 6:49 pm, CSI contacted the Contracting Officer, Ms. Kenser, to request a copy of the Solicitation. Tab113. On the morning of the next business day, Monday, May 19, 2025, Ms. Kenser reviewed her email and saw CSI's request. *See* Tab184_AR 2811. Shortly thereafter, Ms. Kenser received notification of CSI's protest at GAO. *Id.* Because of the protest, Ms. Kenser did not respond to Plaintiff's request. *Id.*

DHS received four proposals prior to the submission deadline, May 19, 2025 at 10:00 a.m.. *See* Tabs115, 118, 120, 123. On May 20, 2025, DHS determined that Salus represented the best value to the Government, providing a superior technical approach compared to other offerors, as well as the lowest total evaluated price under the pricing scenario. *See* Tabs126–33.

Later that day, the Contract was awarded to Salus. *See* Tab134. As of December 9, 2025, Salus is 203 days, or more than halfway through completing the base year period of performance.

## ARGUMENT

## II.    STANDARDS OF REVIEW

### A.    Motion to Dismiss Under Rule 12(b)(6)

This Court possesses jurisdiction to review bid protests related to procurements pursuant to the Tucker Act, 28 U.S.C. § 1491(b). *See Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1381 (Fed. Cir. 2018). The Tucker Act requires the protestor demonstrate that it is an "interested party" in the procurement challenged, regardless of the type of challenge brought. 28 U.S.C. § 1491(b)(1); *Percipient.AI, Inc. v. United States*, 153 F.4th 1226, 1243 (Fed. Cir. 2025). This statutory standing requirement is not a jurisdictional requirement, but instead is a necessary element of a claim. *CACI, Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).

Courts generally interpret "interested party" in accordance with the definition of the term as found in the Competition in Contracting Act (CICA). *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). CICA defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2). Therefore, to be an "interested party" for purposes of 28 U.S.C. § 1491(b), a plaintiff must (1) establish that it is "an actual or prospective bidder," and (2) possess a "direct economic interest" in "the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302.

To survive a challenge under RCFC 12(b)(6) in this case, CSI must plausibly allege the necessary element of statutory standing as an "interested party" as part of its bid protest claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009). Wherever a necessary element of any claim is

challenged, and the Court determines that the complaint fails to "state a claim to relief that is plausible on its face," then the Court must dismiss that claim or complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

###### B.    Motion for Judgment on the Administrative Record

Pursuant to 28 U.S.C. § 1491(b)(4), "this Court applies the standard of review from the Administrative Procedure Act." *Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 131 (2025); 5 U.S.C. § 706. Under that standard, the Court must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *id.* "An agency's decision is arbitrary and capricious . . .where the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)). The Court's review of an agency's decision is deferential, as it "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Golden IT*, 177 Fed. Cl. at 131 (citations omitted). To prevail, a protestor must also show that the procurement error resulted in prejudice to the protestor. *Hosp. Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 621 (2005).

###### C.    Injunctive Relief

When determining whether to award injunctive relief in a bid protest, the Court considers "whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships . . .favors the granting of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

III.  **THE COMPLAINT SHOULD BE DISMISSED BECAUSE CSI LACKS STANDING AS IT HAS NOT SHOWN A COMPETITIVE INTEREST IN THE PROCUREMENT[4]**

A.  **CSI Articulates the Wrong Standard in Claiming It Is an Interested Party**

CSI alleges a direct economic interest in the procurement because it says it "suffered non-trivial competitive injury by the Agency's decision to conduct a noncompetitive procurement in violation of FAR 6.302-2 and CICA." Compl. ¶ 4. This is the wrong standard for demonstrating a direct economic interest under the circumstances.[5] As an "exception to [the substantial chance] standard," this Court has recognized that protestors may, in the pre-award context, establish standing by demonstrating a "non-trivial competitive injury." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013). The use of that standard is limited, however, to situations where "there is no factual foundation for a 'but for' prejudice analysis." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009). When an adequate factual record exists, the protestor must establish standing by showing a substantial chance of receiving an award. *See Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1292 (Fed. Cir. 2020).

Here, an adequate factual predicate exists because proposals were submitted, evaluated, and contract award has been made. In other words, the record before the Court encompasses the entire life-cycle of the procurement. While, as CSI notes, it did not submit a proposal, the Agency assessed CSI's capabilities during market research and determined it "did not have the necessary capability to perform all the functional areas of CSRO." Tab194_AR2925; Tab106_AR915. This presents an adequate factual predicate to allow the Court to make a "but

---

[4] Defendant-Intervenor also requests this Court dismiss Count VI of CSI's complaint for lack of subject matter jurisdiction as it concerns matters of contract administration. *See infra* IV.E.1.

[5] In its motion, CSI asserts its belief that a factual basis for conducting a substantial chance analysis does not exist because "DHS's errors precluded CSI from submitting a proposal." CSI Mot. at 22 n.10. As explained, CSI's belief is mistaken.

for" prejudice analysis—that is, whether CSI had a substantial chance of award absent the alleged errors in the procurement process. *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358–61 (Fed. Cir. 2018) (applying "substantial chance" test in pre-award protest challenging sole-source award); *Oracle*, 975 F.3d at 1292  (applying "substantial chance" test in pre-award protest challenging protestor's elimination from consideration based on gate criteria set forth in solicitation).

### B.    CSI Has Not Shown A Competitive Interest Under Either Standard

Under either standard, "a plaintiff must allege facts—not mere conclusory assertions of law—demonstrating prejudice." *Vanquish Worldwide, LLC v. United States*, 163 Fed. Cl. 57, 69–71 (2022). CSI has failed to meet that burden.

CSI's complaint is devoid of any representation that it is capable of performing the full CSRO scope of work. At most, CSI makes vague allegations that it is a "longtime provider of air charter services," has performed "similar ICE Air Operations" to the U.S. Government, that it is "a current ICE prime contractor," and that it has "significant experience in this field." Compl. ¶¶ 1, 25, 51, 63. Plaintiff's motion adds nothing more, merely asserting its experience in providing air charter services—a narrow portion of the overall CSRO effort—and otherwise making vague, unsupported claims it could perform the requirements. [6] *See* Decl. of Taundria Cappel ¶ 6 ("Contract performance has involved 9 chartered aircraft flights, supporting 917" of the total 34,738 voluntary departures as of December 1, 2025) (attached as Exhibit A).

---

[6] *See* CSI Mot. at 14 (describing CSI's experience as a "provider of air charter services" to the Government and asserting "the requirements of this contract fall squarely within CSI's area of expertise"); *id.* at 21-22 (claiming "a substantial likelihood of receiving an award considering CSI's long history of performing this type of work for government agencies over the past 43 years"); *id.* at 25 (asserting CSI "has a high chance of receiving an award due to CSI's extensive experience with such requirements"); *id.* at 39 ("CSI regularly performs the services").

CSI's failure to adequately show that it could perform the work contemplated by the very procurement it challenges is fatal to demonstrating a substantial chance of winning the contract and establishing "interested party" status, the proper inquiry here. *See CliniComp*, 904 F.3d at 1358–61 (protestor lacked standing where it "failed to show it possessed the kind of experience that would enable it to compete for the work contemplated by the" proposed sole-source contract); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370–71 (Fed. Cir. 2002) (protestor challenging sole source award lacked standing where it failed to show "it had the sources or the man-power to supply the guard services" sought).

This Court's decision in *Trace Systems Inc. v. United States*, 165 Fed. Cl. 44 (2023) is illustrative on this point. There, Trace challenged the agency's sole-source extension of a bridge contract based on its determination that the awardee was the only source who could fulfill the requirements without risking "mission critical failure" and "a substantial break in service and support." *See id.* at 51. Trace claimed it had standing because it "had literally been awarded the follow-on contract before it was improperly terminated," demonstrating it was "capable of satisfying the Agency's requirement" and "therefore would be a qualified bidder with a substantial chance of award" of the bridge contract if the agency engaged in competition. *Id.* at 69. This Court found Trace's allegations "conclusory," and more importantly, that they failed to "directly address the key [standing] question: could Plaintiff, with only a little more than seventy days between award and commencement of [] bridge contract work . . . have performed the required services without mission critical failure and risk of a substantial break in service and support . . . ?" *Id.* Put another way, because the plaintiff failed to show it could perform all of the contract's work, and under the agency's timeline, it did not establish a substantial chance it would have received the contract award and lacked standing. *Id.* at 70.

The same is true here. CSI fails to address the key standing question: does it have the "capability and experience to . . . deliver the requested completed integrated solution within the SOW" and do so in a timeframe that meets the Agency's urgent needs. Tab106_AR914. And, as the record demonstrates, the Agency has answered that question, finding CSI lacked relevant capabilities and experience and explaining the undue risk to the Government if it procured CSRO from a contractor, like CSI, was the identified gaps. *See id.* at AR915 (the "high complexity of this requirement and the need to immediately ramp up and be able to start performing the services within days of the contract award" would have made it "significantly riskier to award this contract to a contractor that does not have direct experience and expertise with the major aspects of the requirement and operating within a foreign environment").

For the same reasons, even if the lesser prejudice standard applied, CSI cannot show a non-trivial competitive injury to establish standing. "[T]o suffer a non-trivial *competitive injury*, [the protestor] must at least be qualified to compete for the contract it seeks." *CliniComp*, 904 F.3d at 1358–61 (finding protestor lacked standing under either prejudice standard); *B.H. Aircraft Co. Inc. v. United States*, 158 Fed. Cl. 750, 764 (2022), *aff'd*, 89 F.4th 1360 (Fed. Cir. 2024) (regardless of "whether the Court applies a 'substantial chance' test, a 'non-trivial competitive injury' test, or some other variation of prejudice," the pre-award protestor failed to establish standing where it was not "in a position to compete" for the subject requirement).

For example, in *Advanced Concepts Enterprises, Inc. v. United States*, this Court, in applying the non-trivial competitive injury standard, held that the protestor had not shown "it could satisfy the specific requirements in the Solicitation," and therefore "failed to establish that it is qualified for an award of the subject contract and has thus failed to establish an economic

harm sufficient to establish standing." 142 Fed. Cl. 187, 202–04 (2019).[7] Here, CSI alleges no

facts that it "could satisfy the specific requirements" of the CSRO requirement (beyond

chartering services), and thus, has failed to show even a non-trivial competitive injury.

Here, CSI fails to (and the record shows CSI cannot) adequately demonstrate that it could

provide the CSRO scope of work, and do without undue risk to the Government. Therefore, CSI

has not and cannot demonstrate "interested party" status with standing to challenge the

procurement under 28 U.S.C. § 1491(b)(1), and CSI's complaint must be dismissed.

## IV. ALTERNATIVELY, THE GOVERNMENT IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD BECAUSE THE AGENCY CONDUCTED THE PROCUREMENT TO MEET ITS UNUSUALLY AND COMPELLING URGENT NEEDS IN ACCORDANCE WITH APPLICABLE LAW

### A. The Government Is Entitled to Judgment on Count I Because It Reasonably Determined Its Needs Were Unusually and Compellingly Urgent

CSI's first count alleges that DHS's invocation of "noncompetitive procedures" based on

an unusual and compelling urgency basis was improper and inconsistent with FAR 6.302-2

requirements. CSI Mot. at 16-20. According to Plaintiff, no such unusual and compelling

urgency existed because the agency took "five months . . . to issue the RFP for this requirement

and the absence of any date certain in EO 14159 or Presidential Proclamation 10935 by which

the Agency was required to complete its voluntary departure program," and otherwise failed to

adequately document its justification. Compl. ¶ 38; *see also* CSI Mot. at 16–17, 18. CSI further

claims that the Agency's lack of advance planning undermines the limited competition

conducted. CSI Mot. at 20. Underlying all of Plaintiff's competition-related allegations is an

---

[7] CSI's arguments that it could fill its capability gaps through the use of the Solicitation's contemplated teaming arrangements does not cure the standing defect. *See, e.g.*, CSI Mot. at 30; *CliniComp*, 904 F.3d at 1358–61 (finding protestor's "cursory references to using subcontractors to perform the work it is unable to do . . .insufficient to cure [protestor's] otherwise deficient showing that it is a qualified bidder" with standing); *Advanced Concepts*, 142 Fed. Cl. at 204.

attempt to paint a procurement premised upon an alleged conspiracy between Salus and DHS. *Id.* at 19-22. Finally, Plaintiff suggests that DHS failed to "meaningfully consider[] what 'serious injury, financial or other' might result from a delay in contract award due to the alleged urgency, as required by FAR 6.302-2(b)(2)." *Id.* at 21. CSI's arguments fail.

      1.   <u>The Agency Properly Conducted a Limited Competition Among a Pool of Multiple Offerors and CSI's Suggestion of Non-Competition is Unfounded</u>

CSI asserts that "FAR 6.302-2 provides for a limited exception to CICA's requirements for full and open competition that permits an agency to use noncompetitive procedures only where there is '[a]n unusual and compelling urgency' ***and*** '[d]elay in award of a contract would result in serious injury, financial or other, to the Government.'" CSI Mot. at 16 (emphasis in original). While Plaintiff is correct that DHS utilized expedited and limited competition procedures in accordance with FAR 6.302-2, CSI ignores the fact that the Agency *utilized* "Other Than Full and Open Competition" *competitive* procedures pursuant to the FAR. The record plainly reflects that DHS used competitive procedures, albeit amongst a limited pool of potential offerors "as [was] practicable under the circumstances." FAR 6.302-2(c)(2); Tab186_AR2819–20. This procurement was competitive, just not to the level of CSI's liking.

      2.   <u>The Agency Properly Established that the Government's Need for the CSRO Requirement Was Unusual and Compellingly Urgent</u>

          a.   *The Agency Reasonably Determined that the Government's Need for Comprehensive Support to Removal Operations Is Unusual and Compellingly Urgent in Compliance with FAR 6.302-2*

The Agency reasonably invoked its authority to limit competition pursuant to FAR 6.302-2 and adequately documented its justification and decision-making process. This authority may be invoked when: (1) an unusual and compelling urgency precludes full and open competition; and (2) delay in award of a contract would result in serious injury, financial or other, to the

Government. FAR 6.302-2(b); *see also* 41 U.S.C. § 3304(a)(2). However, an agency must justify the exercise of this authority in writing but may do so after contract award. FAR 6.302-2(c)(1). The Agency did exactly that. *See* Tabs98, 102, 106, 108–10, 130, 160–61, 191, 193.

Here, DHS identified and considered the gravity and urgency of the illegal immigration problem as articulated in Proc. 10886, EO 14165, EO 14159, and Proc. 10935 (collectively, the "Executive Directives"). DHS also understood its responsibilities under the Executive Directives and the role that the CSRO requirement would play in accomplishing the objectives of the Executive Directives—namely, ending the national emergency at the southern border by stopping illegal immigration. Based on these circumstances, DHS reasonably determined that the Government's need for CSRO services was unusual and compellingly urgent. DHS explained that its urgent need for the CSRO requirement[8] was borne out of the policies and mandates found in the Executive Directives.[9] Those directives established two things. First, the gravity and significance of the illegal immigration problem—a problem unaddressed for four years that has allowed millions of illegal aliens into the United States, many of whom "present significant threats to national security and public safety." EO 14159 § 1; *see also* EO 14165 § 1. Second, DHS was directed to take urgent action to assist in solving the national emergency at the southern border and illegal immigration at-large. *See* EO 14165 § 6; EO 14159 § 9. Moreover,

_____

[8] CSI agrees that the requirement to support the President's mandate of quickly removing undocumented immigrants from the United States is–and remains–a valid requirement. CSI Mot. at 19 ("While these requirements were, and remain, valid, the Agency itself determined that Salus was not the only responsible source and nevertheless proceeded with a superficial competition, ultimately awarding the contract to Salus as originally intended") Thus, CSI agrees the Agency's need for immediate CSRO services was, and continues to be urgent and timely.

[9] *See* Tabs98, 109–10, 160–61, 191, 193 (referencing Proc. 10886); Tabs110, 160–61, 191 (referencing EO 14159); Tab110 (referencing EO 14165); Tabs98, 102, 130, 191 (referencing Proc. 10935).

the Executives Directives made clear that the specific tasks under the CSRO requirement are an

integral part of resolving the national emergency at the southern border and stopping illegal

immigration. *See* EO 14165 § 2; EO 14159 §§ 9, 12, 13.

Against this backdrop, the Agency was able to make a proper determination of its urgent

requirements. For example, the J&A for Other than Full and Open Competition (the "J&A")

acknowledged the role the CSRO requirement would play in enabling DHS "to meet U.S. border

security and immigration enforcement goals." Tab110_AR948 (explaining CSRO "will increase

DHS's domestic throughput for voluntary returns, building the capacity of foreign partners to

assist the U.S. in removal operations, building the capacity of foreign partners to conduct their

own removal operations, and enhancing the ability to identify and stop U.S. bound illegal

migration long before illegal aliens reach U.S. borders").

        b.      *An Acquisition Deadline Existed and DHS Needed to Act*
                *Immediately in May 2025*

Plaintiff wants this Court to believe DHS manufactured the urgency to justify limited

competition and an expedited procurement timeline based solely on DHS's OCI analysis. *See*

CSI Mot. at 8-9, 18-19. Moreover, CSI claims that, "[i]n fact, nothing in the record evidences the

Agency was operating under any Executive Order deadlines or other requirement that

necessitated an ultra-expedited solicitation and limited procurement." CSI Mot. at 20. CSI's

beliefs are unfounded.

DHS's deadline for CSRO was immediate. Project Homecoming—including the direction

to set-up processes to incentivize, assist, and facilitate the rapid voluntary departure of illegal

aliens (i.e., CSRO)—set a 60 day deadline, July 8, by which the Secretary of Homeland Security

was required to supplement enforcement and removal forces to *involuntarily* "remove illegal

aliens who have failed to depart *voluntarily*" through the processes established by Project

Homecoming. Proc. 10935 § 3(b). Logically, DHS was under an immediate deadline to implement CSRO well before the July 8 supplemental force requirement. Said another way, the 60 day deadline to remove any remaining illegal aliens who failed to self-deport would be meaningless if there was no deadline, as CSI claims, to begin executing voluntary deportations in the first place. The Agency's D&F justifying the limited competition underscores this point. There, the Contracting Officer explained, "[a]s part of its plan to comply with the President's declaration and address these exceptional circumstances caused by illegal immigration, and in accordance with President Trump's May 9, 2025 Executive Order titled 'Establishing Project Homecoming', DHS *is launching CRSO to facilitate the removal of illegal immigrants* within the United States." Tab98_AR860-61. It is evident that the urgency was real, was directly tied to the CSRO Solicitation, and was adequately explained by DHS in the contemporaneous record. At bottom, CSRO had to be launched immediately to support the President's mandates and address national security concerns. *See id.* at AR860.

        c.     *The Court Must Give Deference to the Interest of National Security When Determining Whether DHS Complied with FAR 6.302-2*

Plaintiff asks this Court to second guess the President's Executive authority during a National Emergency to "direct [State and DHS] to take all appropriate actions to enable the rapid departure of illegal aliens from the United States." Proc. 10935 § 1. The Solicitation implements the Executive Directives and reflects a clear nexus between the services contemplated by the Solicitation and national security.[10]  This Court should not take CSI's bait.

This Court must give due consideration to national security concerns implicated by CSRO. *See* 28 U.S.C. § 1491(b)(3). While the Court will not do so blindly, the acute and urgent

---

[10] *See supra* note 9.

national security concerns were clear and considered by DHS in this case. *See Gemini Tech Services, LLC v. United States*, No. 25-1337C, 2025 WL 2674585, at *14 (Fed. Cl. Sept. 8, 2025) (finding that the agency's rational supporting a stay override decision was "further bolstered . . . where the procurement supports combatting what the President has deemed an issue of national security"); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 655–56 (2003). This Court has more than sufficient justification to recognize that DHS's need for CSRO services reflected an unusual and compelling urgency that justified the use of limited competitive procedures in accordance with FAR 6.302-2.

        3.      <u>The Agency Did Not Fail to Adequately Plan for this Unusual and Developing National Security Requirement</u>

Contrary to CSI's position, DHS did not fail to adequately plan for this procurement as market research efforts commenced in February 2025, shortly after Salus submitted its unsolicited proposal. Tab106_AR906-09. Over the next three months, DHS engaged with Salus as part of the evaluation of its unsolicited proposal and considered market research information[11] allowing the Agency to evaluate Salus' unsolicited proposal in accordance with procedures enumerated in FAR 15.606. *See e.g.,* Tabs4-6, 8-9, 12, 20-20a, 22, 28-30, 43-44, 50, 59-60a. During this period, DHS also engaged with knowledgeable individuals in industry including other contractors, who were assessed for relevant experience, procurement history, size status, and capabilities. Tab106_AR906-09. In support of these efforts, DHS assessed pricing sources, market conditions, and held an industry briefing with five companies deemed potentially capable of performing CSRO requirements. Tab106_AR910-14; Tab67.

---

[11] The FAR broadly defines "market research" as the process of "collecting and analyzing information about capabilities within the market to satisfy agency needs." FAR 2.101. The correspondence and exchanges of information between DHS and Salus regarding the unsolicited proposal are consistent with this definition.

DHS continued to engage with Salus in this way until the Agency determined it was better to compete the requirement–all while an immigration crisis and the crystallization of Administration's priorities rapidly accelerated in May 2025, justifying limited competition procedures "to immediately stop illegal immigration." Tab98_AR860

There was also no conspiracy between DHS and CSI to avert procurement laws or regulations, despite what CSI may think. While CSI attempts to support its theories by claiming DHS held a "clear preference for its favored vendor, Salus—evidenced by the proposal validity end date of May 19, 2025, which aligned precisely with both the submission deadline and award date," this fiction is dispelled by the facts. CSI Mot. at 20; *see also id.* at 21 n.9. The record simply reflects Salus' consistent efforts to respond to stated Administration priorities and DHS's parallel efforts to fulfill the President's Executive Directives while protecting the integrity of the procurement process. Additionally, after Salus submitted its unsolicited proposal in January 2025, it repeatedly sought updates from DHS regarding consideration of its unsolicited proposal. *See* Tab21; Tab66_AR735. In DHS's contemporaneous view, these interactions with Salus were part and parcel of routine market research. *See* Tab62_AR725, Tab107_AR922. Any coincidence in dates between the validity of the unsolicited proposal and the date of the contract award is just that: a coincidence. To infer otherwise would require an assumption that Salus was clairvoyant in January 2025 and knew to time its proposal expiration with the yet undetermined award date in a limited competition that had not even started. What is more, the validity date of Salus' unsolicited proposal is immaterial because Salus' proposal in response to the Solicitation is the only one which mattered and was valid for 60 days from submission. Tab118b_AR1339.

4.    <u>The Government Reasonably Determined It Would Be Seriously Injured by any Delay in Award of the Contract</u>

The Agency reasonably exercised its authority to limit competition pursuant to FAR 6.302-2 and adequately documented its justification and decision-making process, including rational as to why a delay in award of a contract would result in serious national security and public safety injury to the United States. FAR 6.302-2(b); *see also* 41 U.S.C. § 3304(a)(2). While CSI focuses on the length of time the agency took to shape its requirements and decide to limit competition, the process and direction that DHS undertook cannot be reviewed in a vacuum–the context is critical.

First, as explained above, the record demonstrates that DHS understood—based on the clear instructions in the Executive Directives—the severity and urgency of the illegal immigration problem, its responsibilities in addressing that problem, and the role that the CSRO requirement would play in accomplishing the objective to end the national emergency by stopping illegal immigration. Moreover, DHS recognized that further delay in procuring CSRO services would risk national security and public safety. *See* Tab110_AR951 (acknowledging declared national emergency and the "significant threats to national security"). The Executive Directives reasonably relied upon by DHS described an ongoing and imminent national emergency due to the millions of illegal aliens already in the United States, which "present significant threats to national security and public safety." EO 14159 § 1; *see also* EO 14165 § 1.

Second, DHS was directed to take urgent action to assist in solving the national emergency at the southern border and illegal immigration at-large. *See* EO 14165 § 6; EO 14159 § 9. And the Executive Directives made apparent that the specific tasks under the CSRO requirement are an integral part of the solution. *See* EO 14615 § 2; EO14159 §§ 2, 12, 13; Proc. 10935 § 1.

Third, DHS clearly and rationally articulated its understanding that the CSRO requirement would play an essential role in addressing this national emergency. DHS explained:

> On January 20, 2025, the President of the Unites States declared a national emergency at the Southern border of the U.S. to stop the illegal entry of aliens. Coupled with this emergency, there is an immediate need to address the significant cases of Voluntary Removals and provide immediate capability and capacity to partnering countries to curtail illegal immigration within their borders. . . . [A] delay in award inhibits the building a stronger, more coordinated partnerships with our neighbors and international allies. The CSRO enhances the capabilities of foreign governments to accept, process, and remove/return illegal aliens who have been apprehended in the United States.

Tab110_AR951−52. Importantly, CSI does not dispute that CSRO is a valid requirement. CSI Mot. at 19. In short, DHS rationally explained why its urgent need for CSRO was unusual and compelling, and that any delay in award would result in serious injury.

**B.      The Government Is Entitled to Judgment on Count II Because the Agency Requested Offers from as Many Potential Sources as Practicable Under the Circumstances**

CSI's second count claims that DHS "made no effort to comply" with FAR 6.302-2's requirement to solicit "'offers from as many potential sources as is practicable under the circumstances.'" CSI Mot. at 22 (citation omitted); FAR 6.302-2(c)(2). Specifically, CSI asserts that the Agency violated the requirement by "failing to solicit an offer from CSI after CSI expressed an interest in competing in the procurement." Compl. ¶ 65. Count II fails.

1.      DHS Complied with FAR 6.302-2(c)(2) Requirements by Conducting a Limited Competition Between the Pool of Potential Sources Identified During Market Research

When an agency invokes the unusual and compelling urgency exception, "full and open competition need not be provided for," instead, the agency need only "request offers from as many potential sources as is practicable under the circumstances." FAR 6.302-2(a)(2); FAR 6.302-2(c)(2). DHS fulfilled its obligations here.

23

The market research efforts DHS undertook to identify potential sources for the CSRO requirement, considering capability, experience, and urgency during the process. *See* Tab106; Tab110_AR952-53 (identifying potential sources with "available resources and capabilities . . . to immediately support [the CSRO] requirement"). Ultimately, the Agency identified one vendor "with the unique mix of experience and skills to address the complete requirement as prescribed in the SOW" and several other firms with "the capability and experience to perform certain segments of the overall requested scope." Tab106 at AR914 (emphasis omitted).

It is axiomatic that agencies are afforded broad discretion in structuring acquisitions, and here, DHS reasonably decided to conduct a limited competition among the pool of potential sources identified during market research. As the Agency explained, a limited competition would allow DHS to "further assess the capabilities" of the potential sources and enhance competition, while, at the same time, ensure an expedited evaluation and award process so that the CSRO requirement could support the Government's "immediate need to significantly reduce the illegal immigration population within the United States" and avoid serious injury to the Government. Tab106_AR914; Tab110_AR952. On May 15, 2025, DHS issued a request for proposals to seven vendors. *See* Tab111; *see also* Tab130_AR1856.[12] Simply put, DHS engaged in and documented a reasonable procurement process that demonstrates DHS's solicitation of offers from seven vendors was the most practicable under the circumstances. This meets FAR 6.302-2.

CSI's arguments do not dispute this conclusion. First, CSI claims that the J&A's "only description" of DHS's efforts to comply with FAR 6.302-2(c)(2) was that "[a]n announcement

---

[12] On May 15, 2025, ▮▮▮▮▮ expressed interest in the procurement, and DHS added them to the limited competition "based on its past history as a vendor for a Department of State requirement in Afghanistan that was reviewed as part of market research" and because it believed their "inclusion would increase the chances of finding a capable vendor. . . and continue to meet the spirit of . . .[]CICA[] . . . by expanding the field of competition." Tab186_AR2820; Tab94.

for this action will not be published at SAM.gov" and that "[i]t is exempt from the requirement

per the exception at FAR 5.202(a)(2)." CSI Mot. at 23; Tab110_AR952. This argument

improperly fails to consider the J&A—and the record—in its entirety. *See Comprehensive*

*Health Servs., LLC v. United States*, 151 Fed. Cl. 200, 207 (2020) (considering the "entirety of"

the Agency's J&A); *see also* 5 U.S.C. § 706. The Market Research Report details DHS's efforts

to assess the relevant marketplace and identify potential sources it could solicit offers from. *See*

Tab106. Likewise, the Acquisition Plan and J&A document why a limited competition, and

soliciting offers from seven vendors identified during market research, was practicable under the

circumstances. *See* Tabs108, 110. Taken as a whole, the record shows DHS complied with FAR

6.302-2(c)(2) and CSI's attempt to narrow its focus to a single statement in the J&A is

unavailing. *See SSI Tech., Inc. v. United States*, 148 Fed. Cl. 147, 161–62 (2020) (finding J&A

sufficiently documented the Army's steps to comply with FAR 6.302-2(c)(2) where it "explained

the urgency of the Army's requirements," and detailed the Army's market research efforts).

CSI alleges that DHS neglected to perform "even basic market research" such as issuing

a Request for Information (RFI) or sources sought notice to support its claim that DHS violated

FAR 6.302-2(c)(2). CSI Mot. at 23. As explained above, this conflicts with what the record

shows. Moreover, FAR 6.302-2(c)(2) does not mandate that an agency issue an RFI or engage in

any specific action. Instead, it obligates the agency to solicit offers from "as many potential

sources as is practicable under the circumstances." DHS met that obligation. The J&A explains

the urgency of the CSRO requirement and why a limited competition, soliciting offers from the

seven vendors identified, was practical and necessary. *See* Tab110_AR952.

This Court's decision in *Ceres Environmental Services, Inc. v. United States* supports a

finding that DHS complied with its obligations. 158 Fed. Cl. 547 (2022). There, the agency

awarded a sole-source contract under FAR 6.302-2 despite its awareness of other potential

sources, including the protestor who was "preparing to make an offer for the emergency

contract." *Id*. at 560. Nevertheless, this Court held that the agency had met the requirements of

FAR 6.302-2(c)(2) because the agency provided a rational explanation why it was not

"practicable" to use competitive procedures to solicit offers from additional sources, even a

"streamlined acquisition process" advanced by the protestor, because the agency could not afford

a delay in contract award to meet its needs of unusual and compelling urgency. *See id.* at 561.

The agency "had four options: full competition, limited competition, a sole-source award

combined with a limited competition, and a sole-source award," and reasonably determined that

soliciting only one offer for a sole-source award was practicable under the circumstances. *Id*. The

same holds true here. DHS exercised reasonable discretion in determining that a limited

competition was the best approach to maximizing competition and obtaining the best value to the

Government in light of its urgent needs. *See* Tab187_AR2822.

2.    The Agency Assessed CSI's Capabilities and Exercised Sound Discretion
      in Deciding Not to Solicit an Offer from CSI

In truth, the crux of Count II is that DHS did not solicit an offer from CSI, and allegedly

refused to do so after CSI expressed interest in the procurement. *See* Compl. ¶ 65; CSI Mot. at

22. CSI's view of the facts is wrong, and in any event, does not provide a basis for this Court to

find a violation of FAR 6.302-2(c)(2).

DHS provides a rational explanation why it did not provide a response to CSI's

expression of interest; DHS did not "ignore" CSI as it claims. *See* Compl. ¶ 60; CSI Mot. at 23.

Specifically, CSI asserts that "[d]espite emailing a copy of Amendment 2 to the hand-selected

offerors after receiving CSI's email, DHS refused to respond to CSI, refused to provide CSI with

a copy of the Solicitation, and otherwise refused to allow CSI to compete." Compl. ¶ 61. This

allegation lacks support in the record. On Saturday, May 17, 2025 at 6:49 p.m., CSI emailed the

Contracting Officer, Ms. Leslie Kenser, to express its interest in competing for the CSRO

requirement. *See* Tab113. A little over an hour later, at 8:10 p.m., Amendment 2 was issued to

offerors. *See* Tab114. However, OPO Division Director, Ms. Cynthia Aki, issued Amendment

2—not Ms. Kesner. *See id.* These facts align with Ms. Kesner's explanation that she did not

provide a response to CSI's request because CSI's email was not received until early the next

business day, shortly before receiving notification of CSI's GAO protest. *See* Tab184_AR2811.

In other words, DHS did not "ignore" CSI's interest, "refus[e] to provide CSI with a copy of the

Solicitation," or "refus[e] to allow CSI to compete," in violation of FAR 6.302-2(c)(2). Compl.

¶ 61. Instead, CSI's interest was not received until hours before the close of proposals and

"minutes" before CSI filed a protest at GAO, a vendor it had already determined was not a

capable, potential source.[13] Tab184_AR2811; Tab106; Tab194_AR2925-26.

     Second, even assuming DHS was aware of CSI's expressed interest in a timely manner,

DHS's decision not to request an offer from CSI was not a violation of FAR 6.302-2(c)(2),

which requires solicitation of offers from "***potential sources***." (emphasis added). DHS assessed

CSI during market research and reasonably determined it was not a potential source for CSRO.

*See* Tab106_AR915. An agency is permitted to reasonably limit competition to sources it

identifies as capable, as DHS did here, and doing so is in accord with FAR 6.302-2(c)(2). *See*

*Indus. Refrigeration Serv. Corp.*, B-220091, 86-1 CPD ¶ 67 (Comp. Gen. Jan. 22, 1986) ("It is

clear that there was an urgency situation, and it is also clear that in light of the urgency the

agency was not in a position to solicit a large number of firms. We think what the VA did here,

---

[13] CSI had a copy of the Solicitation and Industry Day materials from one of the solicited
vendors prior to the proposal due date. *See* Tab156a.

limiting the competition to firms with satisfactory work experience which, in the VA's view, could promptly and properly finish the work, was consistent with CICA"); *Chronos Sols., LLC*, B-418865, 2020 CPD ¶ 319 (Comp. Gen. Sept. 29, 2020).

CSI cites to *Innovation Development Enterprises of America, Inc. v. United States*, 108 Fed. Cl. 711 (2013) in support of its argument. *See* Compl. ¶ 65; CSI Mot. at 22. CSI's reliance on *Innovation* is misplaced, and rather, demonstrates why DHS's actions were proper. There, the agency was found to have violated FAR 6.302-2(c)(2) where it made "only minimal efforts to expand its consideration of potential sources beyond [the] incumbent contractor." 108 Fed. Cl. at 732. The agency "neglected to look into its own contract files to discover" the protestor as a source for the requirement, "neglected to post a synopsis which might have produced expressions of interest from competitors to [the awardee]; and performed only the most cursory searches for contractors capable of fulfilling" the requirement. *Id.* Further, the record was "devoid of any assessment of [protestor's] qualifications" and lacked any "reasonable explanation why the Air Force did not solicit a proposal from [the protestor]." *Id.* at 733.

Aside from DHS's decision not to post a synopsis for the CSRO requirement—which itself is not a requirement of FAR 6.302-2(c)(2)—this procurement shares no similarities to that found in *Innovation*. Here, DHS assessed and reasonably determined that CSI was not a potential source to solicit an offer from. And the record does not show that DHS performed a "cursory search[]" for capable sources, "neglect[ed] to look into its own contract files," engaged in "minimal efforts" to consider sources outside an incumbent, or anything of the like. 108 Fed. Cl. at 732. Indeed, the inapposite facts underlying this Court's decision in *Innovation* support an opposite finding here—that DHS's actions complied with FAR 6.302-2(c)(2) requirements.

**C.** **The Government Is Entitled to Judgment on Count III Because the Agency Reasonably Determined that a Three Year Period of Performance Is the Time Necessary to Meet Its Unusual and Compelling Requirements, Especially in Light of the Applicable Exceptional Circumstances**

CSI's third count argues that the Contract, with a base year period and two one-year option periods, violates FAR 6.302-2(d)(1)'s limitations on period of performance because (1) the record does not support the Agency's determination that its minimum needs require a three-year contract, and (2) the Agency failed to establish the "exceptional circumstances" required to justify awarding the two option periods beyond a one year period of performance. *See* CSI Mot. at 25-30. Once again, CSI has it wrong.

    1.    <u>The Agency Properly Determined that a Three-Year Period of Performance Is the Time Necessary to Meet the Unusual and Compelling Requirements of the Work</u>

CSI claims there is "no evidence in the record" supporting the Agency's determination that its minimum needs require a three-year contract. CSI Mot. at 26. Like its position on Count I, this argument fails to consider the relevant context, that is, the circumstances driving DHS's urgent needs and the determination of the time necessary to meet those needs. As described at length above, *supra* IV.A.2; IV.A.4, the Executive Directives were a primary consideration and driving factor in the Agency's invocation of the unusual and compelling urgent needs exception; DHS acknowledged the urgency of the national emergency and illegal immigration problem, and its responsibilities under the Executive Directives, including CSRO's role in supporting the Government's top security priority.

For the same reasons, the Executive Directives underlie the Agency's determination that a three-year contract is necessary for it to meet its urgent needs, and show why that determination was within the sound discretion of the Agency. The record shows that, pursuant to the Executive Directives, the Agency understood that the national emergency and illegal

immigration were dynamic, evolving problems with an undefined response scope. *See, e.g.*, Tab110_AR949 ("DHS is scaling and conducting the largest domestic enforcement operation"); *id.* at AR950 (noting "12M+" CBP Home app cases). DHS explained the dynamic factors at play that made a definitive determination as to the scope and duration of its urgent need difficult to ascertain. *See id.* at AR951 (the CSRO requirement is supported by a "highly complex integration of national emergency declaration priorities, domestic DHS-run initiatives, and deterrence efforts within international host nations"). The Agency noted that "shifts in illegal immigration patterns, locations, and populations" made it difficult to "estimate accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence." Tab98_AR861; *see also* Tab88_AR816 ("it is difficult to predict the extent of removal operations needed to support the removal of illegal immigrants . . . the illegal immigrants' country of origin, the final country to deport the illegal immigrants to and the level of coordination may vary from case to case. The level of effort and duration needed to support the integration of DHS border security initiatives within host governments is also unpredictable.").

Balancing the seriousness of the problems at issue with the various factors that could impact the scope and duration of the Agency's needs, DHS determined that it required a base year period "to immediately stop illegal immigration," but also two one-year option periods to properly account for the unknowable—namely, "newly identified sources of illegal immigration" or other "shifts in illegal immigration patterns, locations, and populations" that mandated, at the very least "continuous operation of deportation services" and potential "ramp up operations" if necessary.[14] When viewed against the record as a whole, including the Executive Directives

---

[14] CSI's endeavor to read a conflict into the explanation is unconvincing. The Agency sensibly suggested that, given "shifts in illegal immigration patterns, locations, and populations,"

underlying the procurement's ultimate objectives, DHS's determination as to the scope and duration of its urgent needs "evince[es] rational reasoning and consideration of relevant factors" that the Court should not disturb. *SSI Tech.*, 148 Fed. Cl. at 158; *see also Ceres Env't Servs.*, 158 Fed. Cl. at 562–63 (holding duration of work contemplated by J&A complied with FAR 6.302-2 where the agency "did not know the full scope of the work required").

CSI relies on several documents that purportedly undermine the Agency's determination that it requires three years of performance to meet its minimum needs. *See* CSI Mot. at 26-27. These arguments are unavailing.

First, CSI contends that Salus' April 4, 2025 draft concept of operations plan demonstrates that the parties ████████████████████████. *See id.* To start, CSI is incorrect as a factual matter. *See* Tab52a_AR693 ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ (emphasis added); *see also* Tab47a_AR683 (contemplating ███████████████). But more importantly, this document was provided by Salus—as CSI puts it, during "pre-solicitation discussions." CSI Mot. at 26. In other words, discussions that took place while the Agency was still engaged in acquisition planning, before the issuance of Proc. 10935—which had a significant impact on the Agency's determination of its actual needs and the time necessary to meet them, and before ultimately DHS finalized its required needs. *See* Tab98; Tab111. Salus' draft CONOPS plan, and any assertions therein about when Salus could ███████████████, has no bearing on the reasonableness of the Agency's period of performance determination.

---

additional sources of illegal immigration may be identified during performance that could require increases in operational capacity, in furtherance of the Agency's objective to stop the newly identified illegal immigration as soon as possible.

Second, CSI claims that State's letter of intent and IAA "directly contradict the Agency's assertion that the alleged urgency justifies a significantly extended performance period." CSI Mot. at 26. This too is a red herring. The letter does not state that the Agency's urgent requirement is only for twelve months. It simply provides that the anticipated IAA "is intended to fund twelve months of support." Tab65_AR733 ("[w]e expect revisions and modifications as these activities are implemented"). Likewise, the fact that the IAA (initially) contemplates 12 months of *funding* is irrelevant to whether the Agency reasonably determined it required three years of *performance* to meet its minimum, urgent requirements. *See* Tab105_AR892 (listing the "Original Base/Current" period of performance as May 1, 2025 – April 30, 2026).[15] CSI's cherry-picking of the record does not support a finding that the Agency violated  FAR 6.302-2(d)(1)(i).

        2.      The Head of the Agency Reasonably Determined that Exceptional Circumstances Necessitate a Period of Performance Exceeding One Year

CSI also asserts that the Agency has failed to show the "exceptional circumstances" required for a contract awarded under FAR 6.302-2 to exceed one year of performance. *See* CSI Mot. 25-30; FAR 6.302-2(d)(1)(ii). The record plainly shows otherwise. The Head of the Contracting Activity for DHS determined and documented in the record that exceptional circumstances—the gravity of the problems the CSRO requirement would assist in resolving—required the period of performance to exceed one year. *See* Tab98_AR860 ("[t]hese exceptional circumstances include among other circumstances, the immediate and significant harm to Americans caused by 'cartels, criminal gangs, known terrorists, human traffickers, smugglers,

---

[15] Further, CSI does not, and cannot, sincerely refute that the IAA's initial 12 month funding period may simply be the product of appropriations and budgeting restrictions. *See* Tab105a_AR900 (listing the various governing fiscal authorities); *see id.* at AR903.

unvetted military-age males from foreign adversaries, and illicit narcotics' caused by illegal immigrations through the southern border") (quoting Proc. 10886) Nothing more is required.

Finally, CSI puts forth two additional arguments in support of Count III: (1) "the record lacks any explanation for the necessity of two additional option periods," and (2) "the record clearly demonstrates that even the Agency itself questioned the necessity of the option periods." CSI Mot. at 27, 28. These arguments also fail.

As an initial matter, CSI repeatedly relies on the Agency's Justification for the Inclusion of Options ("Options Justification") in making these arguments. *See, e.g.*, *id.* at 27–28 ("[t]hroughout the Options Justification memo, the Agency repeatedly inserted caveats to avoid any commitment beyond the base period") DHS issued the Options Justification in accordance with FAR 17.2, which permits an agency to include option periods in the contract "when it is in the Government's interest," such as when the Government has a need "for continuity of operations" or an "anticipated need for a similar service beyond the first contract period." *See* Tab99_AR862; FAR 17.202(a), (d). Here, the Options Justification does just that—explain why it would be in the Government's best interest to include option periods. The Options Justification (rightfully) does not attempt to explain the exceptional circumstances, pursuant to FAR 6.302-2(d)(1)(ii), that allow for a period of performance beyond one year—that is a separate and distinct inquiry.[16] Accordingly, CSI's arguments regarding these statements are irrelevant.

CSI's attacks on the FAR 6.302-2(d)(i)(ii) D&F are similarly flawed. CSI first argues that the Agency's rationale is problematic because "the scope of this contract is not to 'stop illegal immigration, it is to '[s]upplement domestic voluntary return operations' and '[p]rovide capacity

---

[16] FAR 17.205(b) merely requires that any J&As and D&Fs "required by part 6 . . . specify both the basic requirement and the increase permitted by the option." The Agency did exactly that.

building to foreign partners to accept U.S. removals/voluntary returns.'" CSI Mot. at 27. As

explained, this allegation is merely an example of CSI's incorrect view and understanding of the

procurement. *See supra* IV.A.2.a. Next, CSI takes issue with the Agency's statement that the

option periods are necessary "in case" its urgent needs persist beyond a year. CSI Mot. at 27–28;

Tab98_AR860. The record shows DHS acknowledged that, given the dynamic and evolving

problems at issue, that the scope of its response would also be dynamic, and thus, unknown.

Although unable to determine the exact period of performance needed to meet its urgent needs,

DHS considered the gravity of the problems and the applicable exceptional circumstances, and

reasonably determined that its urgent needs could persist beyond one year. *See Ceres Env't

Servs.*, 158 Fed. Cl. at 562–63 (holding duration of work contemplated by J&A complied with

FAR 6.302-2 where the Agency "did not know the full scope of the work required").[17] Finally,

CSI claims that "the Agency itself questioned the necessity of the option periods." CSI Mot. at

28. Not so. In support, CSI cites several Agency statements[18] that were simply made in

accordance with FAR 17.207 requirements. *See, e.g.*, FAR 17.207(c) (explaining circumstances

when an option can be exercised).

　　　　At bottom, CSI puts forth mere disagreement with the Agency's proper determination of

the necessary period of performance, and this Court should not disturb it. *See SSI Tech.*, 148 Fed.

---

[17] Unlike *Filtration Development Co., LLC v. United States*, 63 Fed. Cl. 612, 623 (2005), cited by CSI, DHS's D&F is not asking for an "indefinite extension" to the period of performance, but a three-year contract, which is reasonable given the exceptional circumstances and the dynamic problems the CSRO requirement seeks to aid in resolving.

[18] *See* CSI Mot. at 28 ("evaluating prices for the optional periods 'will in no way obligate the Government to exercise the option periods'"); *id.* ("a preliminary notice to extend the contract "will not commit the Government to any contractual extension"); *id.* at 29 (stating the Agency will prepare a separate D&F before each option period).

Cl. at 164 (finding 20-month sole source contract award "discretionary determination[s] of procurement officials that a court will not second guess").

### D.     The Government Is Entitled to Judgment on Count IV Because the Agency Properly Invoked the Exception to Publication Requirements Based on Unusual and Compelling Urgency

Count IV argues that the Agency violated FAR Subpart 5.2 by failing to publish the Solicitation and a synopsis of the proposed contract action. *See* CSI Mot. at 30-34. CSI asserts that DHS improperly invoked FAR 5.202(a)(2)'s exception to publication requirements on the basis of unusual and compelling urgency because (1) the urgency was caused by the Agency's own lack of advance planning, and (2) the record contains no evidence that DHS would have been "seriously injured" by complying with FAR 5.203's publication notice requirements.

CSI's first argument is nothing more than a re-hashing of claims made in Count I. *See* CSI Mot. at 20 (arguing the Agency's need was not unusual and compellingly urgent due to insufficient advance planning). As discussed, *supra* IV.A.3, the Agency did not fail to adequately plan, reasonably invoked the unusual and compelling urgency exception, and therefore met the first requirement of FAR 5.202(a)(2) (stating notice requirements inapplicable when conditions of FAR 6.302-2 are met). To be sure, the Agency's "sudden shift" in the urgency of its needs was not manufactured or primarily caused by OCI concerns, as CSI claims, but due to the issuance of Project Homecoming. *See supra* IV.A.2.a-b; *see also* Tab98_AR861. In fact, less than two business days after the issuance of Project Homecoming, the Agency began its limited competition. *See* Tabs67, 72. This does not reflect a lack of advance planning, but a change in circumstances. *See* Tab191_AR2896; *see also Trailboss Enters., Inc.*, B-415970, 2018 CPD ¶ 171 (Comp. Gen. May 7, 2018) ("the fact that an agency encounters delays or exigencies does not demonstrate that the agency failed to meet its obligation for advance planning"); *Petro Star, Inc.*, B-248019, 92-2 CPD ¶ 34 (Comp. Gen. July 27, 1992) ("a change in conditions does not

generally indicate a lack of advance planning by an agency").[19] That the Agency "abruptly produced . . . a source selection plan, multiple D&Fs and JA&, a market research report, interagency agreements, and several iterations of the RFP" in the subsequent days, if anything, demonstrates that the Agency was prepared to respond to and effectuate the directives of the Proclamation—not that the Agency had failed to advance plan. CSI Mot. at 32. And, as shown above, the record reflects reasonable market research efforts on DHS's part, further evidence of adequate planning. *See Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 312–313 (1998) (rejecting lack of advance planning argument where J&A explained market research efforts that included feasibility studies, consultation with other military services, evaluation of existing solutions, and informal market surveys with industry).[20] CSI fails to show otherwise. *See KSD, Inc. v. United States*, 72 Fed. Cl. 236, 265 (2006) ("the plaintiff has failed to bring forth sufficient evidence to prove that the Army's decision not to purchase the technical data rights stemmed from a lack of advanced planning").

Likewise, CSI's second argument—that DHS has not shown how "the Government would be seriously injured if the agency complies with the time periods specified in 5.203"— parrots those found in Count I. *See* CSI Mot. at 21 Thus, it fails for the same reasons as Count I. *See supra* IV.A.4 (describing the Agency's rational for why delay in contract award would cause

---

[19] CSI claims that "[t]hroughout February to April, DHS did not reveal any urgency to award Salus a contract" and "DHS's lack of planning is further highlighted by its repeated references to the January 20, 2025, EO 14159 as the impetus for this requirement." CSI Mot. at 31, 32. These arguments fail to acknowledge the changed circumstances caused by Proc. 10935.

[20] In substance, CSI's alleges that the advance planning was not successful, in that it resulted in a "rushed" acquisition. But that is not the relevant standard. *See Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 398 (2008) ("it is well settled that, procurement planning need not be entirely error-free or even actually successful. All that is required is that the planning actions be reasonable").

"serious national security and public safety injury to the United States"). Logically, because the Agency reasonably determined and described the serious injury that would result if contract award was delayed, it follows that the same serious injury would result if compliance with publication requirements, as doing so, itself, would result in a delay to contract award.

This Court has recently held that many of the Executive Directives that underlie the Agency's urgent need for the CSRO requirement do in fact involve "threats to health, or safety" and "thus qualify as 'urgent and compelling' circumstances." *Gemini Tech*, 2025 WL 2674585, at *7 ("Here, the Army and ICE were charged with an urgent and compelling requirement to enforce U.S. immigration laws and ensure public safety as outlined in [EOs 14159 and 14165]. A delay in performance would critically jeopardize ICE's ability to manage the escalating detention surge") (cleaned up). And CSI itself admits that "'[s]erious injury' is found only when the public faces immediate harm—such as threats to health, welfare, or safety—or where significant financial losses are at stake." *See* CSI Mot. at 32-33.[21] Thus, the record supports a finding that the Agency met the requirements of FAR 5.202(a)(2)'s exception to publication requirements.

E.    **The Government Is Entitled To Judgment on Count VI[22] Because It Raises Matters of Contract Administration Beyond this Court's Protest Jurisdiction, and CSI Has Not Shown a Clear Violation of Applicable Regulations in any Event**

For its last count, CSI argues that the Solicitation violates regulations in 41 C.F.R. Part 102 and FAR Subpart 15.2 because it claims (1) DHS is acquiring Commercial Aviation Services ("CAS")—namely, chartered aircraft services—without "agency-specific Flight

---

[21] The Executive Directives also describe the significant financial implications of the illegal immigration problem. *See* EO 14159 § 1 (the presence of illegal immigrations "has cost taxpayers billions of dollars"); Proc. 10935 (noting "[i]n Fiscal Year 2023 alone, these costs were estimated to exceed $150 billion in taxpayer dollars.").

[22] CSI's complaint does not contain a Count V. *See* ECF No. 01.

Program Standards" that are "in addition to" applicable requirements in Federal Aviation

Administration (FAA) regulations, and (2) the Solicitation did not "contain the contractually

required Flight Program Standards." CSI Mot. at 34, 35 n.14, 36. According to CSI, this renders

the procurement "contrary to law" and requires the Court to "enjoin further performance of the

contract." *Id.* at 37; Compl. ¶¶ 96–117. CSI is wrong.

        1.    <u>The Court Lacks Subject Matter Jurisdiction Over Count VI Because CSI's</u>
<u>Allegations Concern Matters of Contract Administration</u>

CSI asserts that the Court has jurisdiction under 28 U.S.C. § 1491(b)(1) because its

protest "arises out of violations of law and regulation in connection with a procurement." Compl.

¶ 3. In Count VI, CSI accuses DHS of violating regulations in Part 102 because it claims DHS

does not have appropriate Flight Program Standards needed to acquire CAS chartered flights.

CSI Mot. at 34–37. CSI claims that DHS was required to adopt agency specific Flight Program

Standards with requirements that are "in addition to" those in applicable FAA regulations and

then incorporate those "contractually required" standards in the Solicitation. *See* CSI Mot. at 35–

36 and n.14; Compl. ¶¶ 109–12. CSI also contends that DHS's existing aviation standards are

inadequate because those standards require contracted CAS providers to comply only with the

FAA regulations in Title 14 C.F.R., Chapter 1. *See* CSI Mot. at 36.

CSI's allegations are unfounded because they are based on a misreading of the Part 102

regulations. Those regulations do not require DHS to adopt additional standards it does not need.

But the Court need not reach the merits of CSI's claims because they raise issues of contract

administration outside the Court's protest jurisdiction, so Count VI should simply be dismissed.

This Court's protest jurisdiction is admittedly broad, and the Federal Circuit has

recognized that the phrase "in connection with a procurement or proposed procurement" found in

28 U.S.C. § 1491(b)(1) is "very sweeping in scope." *Distributed Sols., Inc. v. United States*, 539

F.3d 1340, 1345 (Fed. Cir. 2008). Thus, a "non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish [Tucker Act] jurisdiction." *Id.*, n.1.

Section 1491(b)(1) does not, however, "extend so far as to cover all manner of claims touching upon a procurement." *Harmonia Holdings Grp., LLC v. United States*, 157 Fed. Cl. 292, 299 (2021). Claims "about contract performance after the close of [a] procurement relate to contract administration, not procurement" and "cannot be brought under section 1491(b)(1)." *Brandt Dev. v. United States*, 177 Fed. Cl. 353, 360 (2025). Such "claims are not appropriate in a bid protest, even if clothed in the guise of a protest of an alleged statutory [or regulatory] violation occurring in relation to a procurement." *Frazier v. United States*, 79 Fed. Cl. 148, 160 (2007), *aff'd,* 301 F. App'x 974 (Fed. Cir. 2008). If a claim concerns "a matter of contract administration," a plaintiff cannot establish protest jurisdiction under Section 1491(b)(1) "simply by alleging violations of statutory or regulatory provisions." *Harmonia*, 157 Fed. Cl. at 299.

In this case, although CSI styles Count VI as a protest of the Solicitation's terms, the substance of its claims clearly concern matters of contract administration. Specifically, CSI asserts that DHS was prohibited from awarding the CSRO contract because, according to CSI, DHS did not establish proper Flight Program Standards and mandate compliance with such standards in the Solicitation, as provided in the Part 102 regulations. CSI Mot. at 35–37.

But that is not what Part 102 requires. No provision in Part 102 prohibits an agency from issuing a solicitation or awarding a contract for CAS unless it has first established agency specific Flight Program Standards—much less standards that are inapt for the agency's CAS operations. Nor does Part 102 set any specific deadline by which an agency must enforce such standards when they are required. Put differently, even when an agency's aviation needs can be

met only by the kind of heightened standards CSI seeks to impose, Part 102 does not require agencies to have them in place before soliciting proposals or awarding a CAS contract. CSI does not cite any Part 102 provision imposing such requirements because none exists.

Instead, as stated plainly in Part 102, an agency is at most required to enforce compliance with adequate Flight Program Standards in its awarded "***contracts and agreements***." *See* 41 C.F.R. § 102-33.105 ("What minimum requirements must we put ***into our CAS contracts***?") (emphasis added); § 102-33.130 (same). That is to say, whatever the makeup and validity of an agency's aviation standards, Part 102 requires only that they be enforced during contract performance, after a contract is awarded. And therein lies the truth about Count VI.

At its core, Count VI presents issues of pure contract administration because, in a claim alleging violations of Part 102, the agency action that matters is whether and to what the extent the agency will enforce compliance ***under the contract*** with appropriate Flight Program Standards. Resolving the merits of CSI's claims would therefore require this Court to first interpret the CSRO contract and then determine how the contract must be performed and administered. Those are classic questions of contract administration outside this Court's bid protest jurisdiction. *See, e.g.*, *MSC Indus. Direct Co. v. United States*, 140 Fed. Cl. 632, 651 (2018) (dismissing protest alleging that an awarded agreement could not be performed in compliance with the agency's outsourcing prohibitions); *Chapman L. Firm v. United States*, 63 Fed. Cl. 519, 529 (2005) (dismissing protest alleging failure to comply with bonding requirements under the contract as awarded), *aff'd*, 163 F. App'x 889 (Fed. Cir. 2006).

      2.      <u>Even If the Court Has Jurisdiction, CSI Has Not Shown a Clear and Prejudicial Violation of Applicable Regulations Under Count VI</u>

CSI concedes that agency specific Flight Program Standards are not required to "purchase [] commercial airline tickets" because those services are "not CAS." CSI Mot. at 34

n.13; Tab112a_AR1042–43. That is a significant concession because DHS estimated that roughly **72 percent** of all return and removal flights under the CSRO contract will be accomplished by purchasing individual tickets for travel on commercial airlines. *See* Tab90_AR825 (estimating 3,753 commercial ticket purchases over three years). In other words, only about 28 percent of the flights anticipated for the CSRO contract are chartered flights, and CSI's allegations in Count VI reach only those flights. *See also* Ex. A ¶ 6 (stating only nine chartered flights have occurred during Contract performance as of December 1, 2025).

The question, then, is whether CSI has shown "a clear and prejudicial violation of applicable statutes or regulations" with respect to the Solicitation tasks for chartered aircraft services, which are CAS. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quotations omitted). It has not.

CSI misreads Part 102 as imposing a "one-size-fits-all" requirement on every federal agency that relies on contracted CAS to any degree. It argues that if an agency ever contracts for CAS (i.e., chartered aircraft services), then the agency must develop its own Flight Program Standards "in addition to" enforcing compliance with applicable FAA regulations. *See* CSI Mot. at 34–35 and n.14; Compl. ¶¶ 109–12.

That is not correct. Part 102 does not require federal agencies, when contracting for CAS, to adopt and enforce Flight Program Standards that must necessarily go above and beyond the requirements in FAA regulations. And Part 102 does not require an agency to adopt extra standards it does not need. Rather, an agency may rely exclusively on applicable FAA regulations for its CAS operations where it determines that doing so is safe, efficient, effective and "consistent with the nature of [the] agency's aviation missions." *See* 41 C.F.R. § 102-

33.25(a). That is, depending on the scope of an agency's contracted CAS operations, an agency

may adopt standards that require compliance with:

> ***(a) Civil standards in 14 CFR [FAA regulations] that are applicable to the type of operation(s) [the agency is] is asking the contractor to conduct;***

> (b) Applicable military standards; ***or***

> (c) [The] agency's Flight Program Standards (see §§ 102-33.140 through 102-33.185 for the requirements for Flight Program Standards).

*See* 41 C.F.R. § 102-33.105 (emphasis added). While it is true FAA regulations "***may*** not

cover or address all aspects of [a given] agency's flight program," *id.* § 102-33.145 (emphasis

added), that is not true in all cases, and it is not true in this case.[23]

Consistent with applicable Part 102 regulations, DHS has adopted a Management

Directive for "Aviation Management and Safety" (MD 0020.1) that provides "for an efficient,

effective, secure, and safe aviation program for [DHS] and its contractor aviation operations."

*Compare* Tab7_AR512, *with* 41 C.F.R. § 102-33.25(a) (requiring agencies to "acquire and

manage . . . CAS . . . as safely, efficiently, and effectively as possible consistent with the nature

of [their] aviation missions"). The Directive applies "to all DHS Organizational Elements

(OE) . . . and their contractors involved with the management, operation, and/or maintenance of

aircraft and related services, and OEs that obtain . . . CAS." *Compare* Tab7_AR512 and AR517–

18, *with* 41 C.F.R. § 102-33.155 (requiring agencies to establish policies and procedures for

management, operation, maintenance, and related services, such as training and safety).

Under MD 0020.1, contractors and subcontractors that provide CAS "in support of DHS

program requirements must comply with the [FAA] regulations and guidance in Title 14 C.F.R.,

---

[23] For example, FAA regulations may not speak to an agency's "non-certificated aircraft, high-risk operations, special personnel requirements, etc." FAR 102-33.145. CSI does not allege that such matters are relevant under DHS's aviation program or the CSRO contract.

Chapter 1 . . . applicable to the type of operations conducted while in service to the Department." Tab7_AR522; Tab7_AR519. Contracted CAS providers must also meet requirements relating to FAA certifications, delivery of "passenger safety briefings," and "[reporting] . . . to ensure CAS are effectively used, program needs are met, and accurate information is obtained to provide accountability to appropriate oversight entities." Tab7_AR522.

Here, pursuant to MD 0020.1, DHS determined that chartered aircraft services under the CSRO contract must comply only with applicable FAA regulations. *See* Tab194_AR2922–23; Tab112a_AR1066 (requiring compliance via FAR 52.212-4(q) with "all applicable Federal . . . laws, executive orders, rules and regulations applicable to [] performance under this contract"). DHS based this determination on the "type of operation(s) [it is] asking the contractor to conduct" for the CSRO contract—that is, to purchase "commercial tickets" from "carriers that adhere to FAA standards" and hire "commercial operated air carriers for ad hoc one-time charters (also in accordance with FAA standards . . . )." *See* Tab194_AR2923.

In other words, because ***all CSRO flights*** will be arranged by the CSRO prime contractor for performance by third party FAA-regulated commercial air carriers, DHS is requiring CSRO chartered flights to comply only with FAA regulations, instead of imposing additional Flight Program Standards that are either "redundant" or inconsistent with what the FAA already requires of those commercial carriers. *See id.* That decision not only makes good sense, it is also entirely consistent with the regulations at Part 102, which, again, authorize agencies to draw on FAA regulations for CAS operations where (as here) applying those regulations is "consistent with the nature of [the] agency's aviation missions" and appropriate for "the type of operation(s) [the agency] is asking the contractor to conduct." 41 C.F.R. §§ 102-33.25(a), 102-33.105.

CSI argues that "MD 0020.1 does not establish or constitute Flight Program Standards" because the Directive itself does not include certain policies and procedures required by Part 102. *See* CSI Mot. at 36. But that misses the point. MD 0020.1 establishes an agency policy requiring contracted CAS providers to follow applicable FAA regulations based on DHS's determination that applying those FAA regulations is safe, efficient, and effective for DHS aviation missions and the CAS operations conducted by DHS contractors. CSI may think it knows better, but that is no reason to upend DHS's reliance on its own lawful policy in the CSRO procurement—especially because the FAA regulations in Title 14 C.F.R., Chapter 1 address *all* the substantive policies and procedures CSI claims are missing from MD 0020.1. *Compare* CSI Mot. at 36 (asserting MD 0020.1 lacks standards for "maintenance . . . training . . . safety . . . basic qualifications for pilots, crewmembers, or other personnel . . . limitations on duty time and flight time"), *with* 14 C.F.R. Chapter 1, Part 5 (safety), Parts 43 and 91 (Subpart E) (maintenance), Part 61 (training and basic qualifications of commercial pilots), Part 63 (training basic qualifications of crewmembers), Part 65 (training and basic qualifications of other personnel), Part 117 (flight and duty limitations).

At bottom, CSI does not and cannot identify a provision in Part 102 that clearly prohibits DHS from relying on applicable FAA regulations for the limited use of FAA-regulated commercial chartered aircraft on the Contract. CSI therefore fails to show a clear and prejudicial violation of applicable regulations. That should be the end of the analysis on Count VI.

CSI also faults DHS for not including "the contractually required Flight Program Standards" in the Solicitation. CSI Mot. at 36. It claims this is a solicitation "defect" that violates FAR 15.203 and 15.204-3, which provide that agency solicitations must identify terms and conditions that are required by law, or anticipated or expected, to be in an awarded contract.

*Id.* at 36–37. In making this argument, CSI assumes that the Solicitation must require the CSRO contractor to comply with Flight Program Standards, as *CSI* conceives them, to avoid a violation of FAR 15.203 and 15.204-3. *See id.*

But CSI has it backwards. As shown above, Part 102 does not require DHS to impose or create different Flight Program Standards for the CSRO contract given that DHS's aviation missions and contracted CAS operations are served adequately through compliance with the FAA regulations adopted through the agency's existing standards (i.e., MD 0020.1). And since DHS does not need new flight standards for the procurement, the Solicitation does not violate FAR 15.203 or FAR 15.204-3 because such extra standards are not "required by law or by this regulation" and they are neither "anticipated" nor "expected" terms of the CSRO contract. *See* FAR 15.203(a)(2), FAR 15.204-3; Tab194_AR2923, AR2925 (explaining why adopting new Flight Program Standards was unnecessary for the CSRO procurement). CSI's FAR-based arguments fail as a result.

## V.    CSI'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DENIED

CSI requests the Court enjoin performance and require DHS conduct a proper procurement or, "at a minimum," enjoin performance beyond the base performance year. CSI Compl. at 28 (Prayer for Relief ¶ ii). CSI also asks the Court to enjoin "DHS from hiring CAS under the procurement." *Id.* (Prayer for Relief ¶ iii); *see also* CSI Mot. at 3. A permanent injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). As such, the plaintiff must establish entitlement by clear and convincing evidence. *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 450, 474 (1999). Under the relevant considerations, CSI cannot meet its burden. *See Centech Grp.*, 554 F.3d at 1037.

Here, CSI will not succeed on the merits. *See supra* IV. This is fatal to CSI's request for injunctive relief and should be the end of the analysis. *See Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 265 (2015). Nevertheless, even if CSI succeeded on the merits of some argument, this Court has held that "[e]stablishing legal and prejudicial error . . . does not automatically translate into injunctive relief." *Cubic Def. Sys., Inc.*, 45 Fed. Cl. at 473. CSI must still establish "each of the" remaining factors by clear and convincing evidence. *Id.* at 474.

CSI claims it will suffer irreparable harm absent injunctive relief because it will be "deprived of the opportunity to compete." CSI Mot. at 38. To be sure, this Court has recognized that "the loss of an opportunity to compete for an award . . . is sufficient injury to warrant relief," but only when the "party would not otherwise be disqualified." *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 761 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015). CSI has not demonstrated it was a qualified bidder for the procurement and thus has not, and will not be, deprived of an opportunity to compete absent relief. *See supra* III.B; *see also Cubic Def. Sys., Inc.*,  45 Fed. Cl. at 474 ("If Cubic has faltered in carrying its burden of demonstrating ordinary prejudice, it has utterly failed to make the greater showing required before this Court grants the extraordinary remedy of injunctive relief").

According to Plaintiff, the balance of harms favors injunctive relief because its alleged lost opportunity to compete outweighs the "minimal" harm to DHS, a "delay in performance or cost to the Government arising out of a re-solicitation and/or other relief that compels the Agency to follow procurement rules." CSI Mot. at 39. In CSI's view, this is especially true where "DHS has already achieved steady state operations" and would "be able to quickly on-ramp a CSRO provider under full and open competition" if relief was granted. *Id.* at 39-40. CSI also alleges that Salus "cannot demonstrate harm because no contractor is entitled to a contract

that was awarded in violation of law." *Id.* at 40. First, there is no irreparable harm to CSI absent relief. Second, CSI mischaracterizes the harm to the Government and Salus. Injunctive relief would not simply cause a "delay in performance or cost to the Government," it would risk continuity of operations and the effectiveness of the CSRO requirement, undermining its role in addressing the "significant threats to national security and public safety" caused by illegal immigration. EO 14159 § 1; *see also* Ex. A ¶ 10 (explaining the "operational, diplomatic, humanitarian, financial, and national security consequences" to the Government if Contract performance is enjoined). "When interests raise national security concerns they place the weight of [the] . . . balance of the hardships firmly on defendant's side of the scale." *Crowley Tech. Mgmt.*, 123 Fed. Cl. at 267 (cleaned up); *Assessment & Training Sols. Consulting Corp. v. United States*, 173 Fed. Cl. 123, 132 (2024) (denying preliminary injunction that "would unduly risk harming the agency and the country's national security"); *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548 (2021) (denying permanent injunction where enjoining awards "would reduce the Agency's retained fleet and 'increase[ ] the danger not only to the national woodlands' but also to 'firefighting personnel on the ground who would be aided by these additional airborne firefighting assets'").

The harm to Salus, also a consideration under this factor, likewise supports a finding that the balance of harms weighs against injunctive relief. *See Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 246 (2021); *see also G4S Secure Integration LLC v. United States*, 159 Fed. Cl. 249, 263 (2022) ("Injury to other parties weighs against injunctive relief when the defendant would be forced into a more expensive contract and the defendant-intervenor would suffer a delay in performing and profiting from its contract"). If Contract performance were enjoined, Salus would suffer significant logistical and financial harm. Specifically, the company would be

forced to either terminate 200 contractor personnel, many of whom have Top Secret (TS) / SCI or Secret security clearances, or self-finance their employment until DHS resolves the protested issues. *See* Ex. A ¶¶ 5, 11. Salus does not currently have other active contracts to which these employees can be transferred, making retention of these essential personnel and their expertise nearly impossible. *Id.* ¶ 11. Further, Salus would suffer loss of "contract-specific infrastructure investments," and "loss of economies of scale" the company has achieved through its operational successes thus far during performance. *Id.* ¶¶ 9, 12. Injunctive relief would also result in the loss of Salus' only federal prime contract, causing "catastrophic financial harm" to Salus as a non-public, privately financed company. *Id.* ¶ 12. These harms further tip the balance against granting CSI's requested relief. *See id.* at 264 (balance of harms weighed against protester where relief "would cause logistical and financial harm to the defendant and, especially, to the defendant-intervenor").

Finally, CSI asserts that the "'overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations'" is implicated here because DHS " violated myriad procurement laws and awarded a non-competitive $915 million procurement." CSI Mot. at 40 (citation omitted). According to CSI, this "outweighs DHS's interest in procuring this requirement as quickly as possible." *Id.* CSI's view of the public interest is unavailing. As an initial matter, DHS did not award a "non-competitive procurement" in violation of procurement law, it reasonably invoked the unusual and compelling urgency exception and conducted a *limited* competition. And this Court has recognized that there is a public interest in allowing a procuring agency "to conduct procurements without excessive judicial infringement upon the agency's discretion." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997) (citations omitted); *accord DynCorp Int'l, LLC*

*v. United States*, 10 F.4th 1300, 1310–11 (Fed. Cir. 2021) ("when a decision within the scope of [agency] discretion 'is reasonable, a court may not substitute its judgment for that of the agency'"). This alone weighs against injunctive relief.

Further, CSI fails to acknowledge the national security and public safety risks if injunctive relief is granted. "When interests raise national security concerns they place the weight of . . . the public interest . . . firmly on defendant's side of the scale." *Crowley Tech. Mgmt., Inc.*, 123 Fed. Cl. at 267. This Court has stated that the "public interest lies in the health and safety" of the public. *Chapman L. Firm Co. v. United States*, 67 Fed. Cl. 188, 194 (2005) (noting, in an analogous context, the Supreme Court has vacated a stay where it threatens "to undermine a government program's protection of public safety"). Here, the re-solicitation and "on-ramp [of] a CSRO provider under full and open competition" would cause severe impacts on continuity of operations and the objectives of the CSRO requirement, and undue risk to the Government's efforts to resolve the national emergency and illegal immigration that "present significant threats to national security and public safety." EO 14159 § 1; *see also* EO 14165 § 1; Ex. A ¶ 10.

CSI's request for limited injunctive relief—enjoining performance after the base year—does not alter the analysis and should be denied. In this regard, narrower relief does not change CSI's failure to demonstrate success on the merits or irreparable harm absent relief. Likewise, the balance of harms still weighs against relief because enjoining performance after the base year end would cause the same harm to the Government if performance was enjoined during the base year—impairing continuity of operations and the effectiveness of the CSRO requirement, undermining its role in addressing the "significant threats to national security and public safety." EO 14159 § 1. And, for the same reasons, enjoining performance after the base year of

performance would still "unduly risk harming . . . the country's national security" and public safety. *Assessment & Training Sols. Consulting Corp.*, 173 Fed. Cl. at 132.

Altogether, nothing weighs in favor of the Court granting injunctive relief to CSI under the circumstances.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court dismiss CSI's complaint, or in the alternative, deny CSI's motion for judgment on the administrative record and request for injunctive relief and grant Salus' cross-motion for judgment on the administrative record.


December 9, 2025                                     Respectfully submitted,

                                             */s/ Scott N. Flesch*

                                             Scott N. Flesch
                                             Alejandro L. Sarria
                                             Connor W. Farrell
                                             MILLER & CHEVALIER CHARTERED
                                             900 Sixteenth St. NW
                                             Washington, DC 20006
                                             Tel. (202) 626-5800
                                             sflesch@milchev.com

                                             *Counsel for Defendant-Intervenor Salus*
                                             *Worldwide Solutions Corporation*