**Agreed-Upon Redacted Version**

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

No. 25-1338C
(Chief Judge Matthew H. Solomson)

CSI AVIATION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

SALUS WORLDWIDE SOLUTIONS CORPORATION,

Defendant-Intervenor.

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD,
DEFENDANT'S MOTION TO DISMSS, AND, IN THE ALTERNATIVE,
CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

DOUGLAS K. MICKLE
Acting Deputy Director

OF COUNSEL:
Charlene T. Storino
Assistant General Counsel
for Procurement Operations
General Law Division
Office of the General Counsel
Department of Homeland Security
Tel: (202) 357-9936
charlene.storino@hq.dhs.gov

RETA E. BEZAK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-5633
Reta.E.Bezak@usdoj.gov

December 9, 2025

*Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

QUESTIONS PRESENTED.................................................................................................... 2

STATEMENT OF THE CASE................................................................................................ 3

I.      Nature of the Case................................................................................................... 3

II.     Statement Of Facts................................................................................................. 3

        A.      The Administration's Focus on Illegal Immigration ................................. 3

        B.      CSRO Procurement.................................................................................... 4

        C.      GAO Protest............................................................................................... 7

ARGUMENT ......................................................................................................................... 8

I.      Standard of Review................................................................................................. 8

II.     CSI Lacks Standing to Protest the CSRO Procurement....................................... 10

        A.      Bid Protest Standing ............................................................................... 10

        B.      CSI is Not an Interested Party Because it Cannot Meet DHS's
                Requirements ........................................................................................... 11

III.    DHS's Procurement Complied with Applicable Law and Regulation ............... 15

        A.      DHS Complied with FAR 6.302-2 ......................................................... 15

                1.      An Unusual and Compelling Urgency Necessitated
                        Limitations on Competition ......................................................... 15

                2.      DHS Requests Offers from as Many Potential Sources as
                        Practicable................................................................................... 22

                3.      DHS Justified Exceeding FAR 6.302-2's Limitation on the
                        Period of Performance ................................................................ 25

        B.      DHS was Not Required to Publish a Synopsis of the Procurement....... 28

        C.      CSI's Arguments Regarding Flight Program Standards is
                Unsupported............................................................................................. 31

                1.      41 C.F.R. § 102-33.5 Establishes Requirements for
                        Contract Administration............................................................... 31

i

      2.      DHS Complies with 41 C.F.R. § 102-33.5 .................................................31

IV.    CSI Has Failed To Demonstrate Entitlement To Injunctive Relief ...................................32

    A.      Standard For Granting Injunctive Relief......................................................33

    B.      CSI Has Failed To Demonstrate Irreparable Harm.....................................34

    C.      The Balance Of Harms And Public Interest Weigh Heavily Against
           An Injunction, Particularly In Light Of The Significant National
           Security Implications ....................................................................................37

CONCLUSION..................................................................................................................................40

## TABLE OF AUTHORITIES

Cases

*Advanced Sys. Develop., Inc. v. United States,*
  72 Fed. Cl. 25 (2006) ........................................................................................... 20

*Aero Corp., S.A. v. United States,*
  38 Fed. Cl. 237 (1997) ......................................................................................... 37

*Ala. Aircraft Indus., Inc. v. United States,*
  586 F.3d 1372 (Fed. Cir. 2009) ............................................................................. 9

*Alaska Airlines, Inc. v. Johnson,*
  8 F.3d 791 (Fed. Cir. 1993) ................................................................................. 29

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
  239 F.3d 1343 (Fed. Cir. 2001) ........................................................................... 34

*Ashbritt, Inc. v. United States,*
  87 Fed. Cl. 344 (2009) ......................................................................................... 36

*Axiom Res. Mgmt., Inc. v. United States,*
  564 F.3d 1374 (Fed. Cir. 2009) ............................................................................. 8

*Baird Corp. v. United States,*
  1 Cl. Ct. 662 (1983) ............................................................................................. 33

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005) ....................................................................... 9, 10

*Benchmade Knife Co., Inc. v. United States,*
  79 Fed. Cl. 731 (2007) ........................................................................................... 8

*Beta Analytics Int'l, Inc. v. United States,*
  67 Fed. Cl. 384 (2005) ........................................................................................... 8

*Career Training Concepts, Inc. v. United States,*
  83 Fed. Cl. 215 (2008) ......................................................................................... 32

*Centech Grp., Inc. v. United States,*
  554 F.3d 1029 (Fed. Cir. 2009) ............................................................................. 9

*CHE Consulting, Inc. v. United States,*
  78 Fed. Cl. 380 (2007) .............................................................................. 15, 18, 19

*Chromalloy S.D. Corp. v. United States,*
  145 Fed. Cl. 708 (2019) ................................................................................. 35, 36

*Cincom Sys. Inc. v. United States*,
    37 Fed. Cl. 266 (1997) .................................................................................. 37

*Citizens to Pres. Overton Park, Inc. v. United States*,
    401 U.S. 402 (1971) ..................................................................................... 19

*CliniComp Int'l, Inc. v. United States*,
    904 F.3d 1353 (Fed. Cir. 2018) .......................................................... 10, 11, 12, 13

*Crow Creek Sioux Tribe v. United States*,
    900 F.3d 1350 (Fed. Cir. 2018) ................................................................... 13

*CSE Constr. Co., Inc. v. United States*,
    58 Fed. Cl. 230 (2003) .................................................................................. 37

*CW Gov't Travel, Inc. v. United States*,
    110 Fed. Cl. 462 (2013) ................................................................................ 36

*Digitalis Educ. Sols., Inc. v. United States*,
    664 F.3d 1380 (Fed. Cir. 2012) .................................................................... 10

*E.W. Bliss Co. v. United States*,
    77 F.3d 445 (Fed. Cir. 1996) .......................................................................... 9

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ................................................................................ 33, 35

*Fisher Sand & Gravel Co. v. United States*,
    143 Fed. Cl. 247 (2019) ................................................................................ 37

*FMC Corp. v. United States*,
    3 F.3d 424 (Fed. Cir. 1993) .......................................................................... 34

*Galen Med. Assocs., Inc. v. United States*,
    369 F.3d 1324 (Fed. Cir. 2004) .................................................................... 29

*Gemtron Corp. v. Saing-Gobain* Corp,
    572 F.3d 1371 (Fed. Cir. 2009) .................................................................... 36

*Glenn Def. Marine (ASIA), PTE Ltd. v. United States*,
    720 F.3d 901 (Fed. Cir. 2013) ...................................................................... 10

*GTA Containers, Inc. v. United States*,
    103 Fed. Cl. 471 (2012) ........................................................................... 37, 38

*Harmonia Holdings Grp., LLC v. United States*,
    999 F.3d 1397 (Fed. Cir. 2021) ...................................................................... 8

*Honeywell, Inc. v. United States*,
 870 F.2d 644 (Fed. Cir. 1989) ............................................................................. 9

*Hydraulics Int'l, Inc. v. United States*,
 176 Fed. Cl. 191 (2025) ..................................................................................... 34

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
 238 F.3d 1324 (Fed. Cir. 2001) .................................................................. 8, 9, 11

*Info. Tech. & Applications Corp. v. United States*,
 316 F.3d 1312 (Fed. Cir. 2003) ......................................................................... 10

*Innovation Development Enterprises of America, Inc. v. United States*,
 108 Fed. Cl. 711 (2013) ..................................................................................... 24

*Intelligent Waves, LLC v. United States*,
 135 Fed. Cl. 299 (2017) ..................................................................................... 35

*Iron Bow Techs., LLC v. United States*,
 136 Fed. Cl. 519 (2018) ..................................................................................... 37

*KL3, LLC v. United States*,
 176 Fed. Cl. 657 (2025) ................................................................................ 13, 14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
 478 U.S. 221 (1986) ........................................................................................... 19

*Labatt Food Serv., Inc. v. United States*,
 577 F.3d 1375 (Fed. Cir. 2009) ......................................................................... 11

*Linc Gov't Servs., LLC v. United States*,
 96 Fed. Cl. 672 (2010) ........................................................................... 19, 34, 37

*Lujan v. Def. of Wildlife*,
 504 U.S. 555 (1992) ........................................................................................... 14

*M. Steinthal & Co. v. Seamans*,
 455 F.2d 1289 (D.C. Cir. 1971) ........................................................................... 9

*Marathon Targets, Inc. v. United States*,
 175 Fed. Cl. 725 (2025) ..................................................................................... 34

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ..................................................................................... 33, 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ............................................................................................... 9

*MVL USA, Inc. v. United States*,
  176 Fed. Cl. 582 (2025) ................................................................................. 34

*Myers Investigative & Sec. Servs., Inc. v. United States*,
  275 F.3d 1366 (2002) ............................................................................. 12, 13

*Newimar, S.A. v. United States*,
  163 Fed. Cl. 240 (2022) ............................................................................... 35

*North Dakota v. United States*,
  495 U.S. 423 (1990) ..................................................................................... 38

*OAO Corp. v. United States*,
  49 Fed. Cl. 478 (2001) ........................................................................... 35, 36

*Orion Technology, Inc. v. United States*,
  704 F.3d 1344 (Fed. Cir. 2013) .................................................................... 36

*Paradissiotis v. Rubin*,
  171 F.3d 983 (5th Cir. 1999) ....................................................................... 32

*Percipient.ai, Inc. v. United States*,
  153 F.4th 1226 (2025) ........................................................................... 10, 11

*PGBA, LLC v. United States*,
  389 F.3d 1219 (Fed. Cir. 2004) .................................................................... 33

*PMTech, Inc. v. United States*,
  95 Fed. Cl. 330 (2010) ................................................................................. 20

*Qingdao Taifa Grp. Co. v. United States*,
  581 F.3d 1375 (Fed. Cir. 2009) .............................................................. 34, 35

*Rex Serv. Corp. v. United States*,
  448 F.3d 1305 (Fed. Cir. 2006) .................................................................... 10

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) .................................................................... 35

*Savantage Fin. Servs. v. United States*,
  595 F.3d 1282 (Fed. Cir. 2010) .............................................................. 8, 9, 29

*Sci. Applications Int'l Corp. v. United States*,
  108 Fed. Cl. 235 (2012) ............................................................................... 38

*Tinton Falls Lodging Realty, L.L.C. v. United States*,
  800 F.3d 1353 (Fed. Cir. 2015) ...................................................................... 9

vi

*Totolo/King v. United States*,
  87 Fed. Cl. 680 (2009) ......................................................................................... 35

*Tyler Constr. Grp. v. United States*,
  570 F.3d 1329 (Fed. Cir. 2009) .......................................................................... 28

*USfalcon, Inc. v. United States*,
  92 Fed. Cl. 436 (2010) ......................................................................................... 19

*W&G Machine Co., Inc. v. United States*,
  146 Fed. Cl. 455 (2020) ....................................................................................... 13

*Weeks Marine, Inc. v. United States*,
  575 F.3d 1352 (Fed. Cir. 2009) .......................................................................... 10

*Winter v. Nat. Res. Def. Counsil, Inc.*,
  555 U.S. 7 (2008) ........................................................................................... 35, 38

*XOtech, LLC v. United States*,
  950 F.3d 1376 (Fed. Cir. 2020) ............................................................................ 8

*Yakus v. United States*,
  321 U.S. 414 (1944) ....................................................................................... 33, 38

<u>Statutes</u>

5 U.S.C. § 702 .................................................................................................................... 8

5 U.S.C. § 706(2)(A) .......................................................................................................... 8

28 U.S.C. § 1491(b) .................................................................................................. passim

<u>Regulations</u>

41 C.F.R. § 102-33 ......................................................................................................... 2, 8

41 C.F.R. § 102-33.5 ........................................................................................................ 31

41 C.F.R. § 102-33.105 .................................................................................................... 32

FAR 5.201 ......................................................................................................................... 28

FAR 5.202(a)(2) ................................................................................................................ 28

FAR 5.203 ......................................................................................................................... 28

FAR 6.302-2 ............................................................................................................. passim

FAR 9.503 ..................................................................................................................... 7, 30

FAR 9.504(e) ...................................................................................................................... 30

FAR 9.505 ........................................................................................................................... 30

FAR 15.606-1 ....................................................................................................................... 4

FAR 15.607 ........................................................................................................................... 5

FAR 17.202 ......................................................................................................................... 27

FAR 17.205 ......................................................................................................................... 27

FAR 33.104(c) ...................................................................................................................... 8

<u>Other Authorities</u>

Exec. Order No. 14159, 90 Fed. Reg. 8443-8448 (Jan. 29, 2025)..................................... 3

Proclamation No. 10886, 90 Fed. Reg. 8327 (Jan. 29, 2025) ............................................ 3

Exec. Order No. 14194, 90 Fed. Reg. 9117-9120 (Feb. 7, 2025)...................................... 3

Proclamation No. 10935, 90 Fed. Reg. 20357, 20357 (May 14, 2025)................................. passim

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| CSI AVIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | ▉▉▉▉▉▉▉▉▉ |
| | ) | |
| v. | ) | No. 25-1338C |
| | ) | (Chief Judge Matthew H. Solomson) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SALUS WORLDWIDE SOLUTIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD,
DEFENDANT'S MOTION TO DISMSS, AND, IN THE ALTERNATIVE,
<u>CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Pursuant to Rules 12(b)(6) and 52.1 of the Rules of the Court of Federal Claims (RCFC),

defendant, the United States, respectfully requests that the Court dismiss the complaint filed by

plaintiff, CSI Aviation, Inc. (CSI), for lack of standing or, in the alternative, grant judgment on

the administrative record in favor of the United States and deny the motion for judgment on the

administrative record filed by CSI.  In this bid protest, CSI challenges the procurement actions

taken by the Department of Homeland Security (DHS) in soliciting an indefinite-delivery,

indefinite-quantity (IDIQ) contract for Comprehensive Support for Removal Operations (CSRO)

in support of domestic voluntary return operations, establishment of international staging areas

for removals and voluntary returns, and operational and logistical support for foreign partners

accepting removals and voluntary returns.

As demonstrated below, CSI lacks standing to challenge this procurement because the contracting officer determined that CSI does not have the necessary experience to perform the services required under the contract, a determination CSI has failed to refute.  Even if CSI possesses standing, DHS's decision to limit competition for the CSRO procurement is rational and consistent with Federal Acquisition Regulation (FAR) 6.302-2 and other applicable laws and regulations.  Moreover, DHS policy regarding flight standards for aviation contracts complies with Federal regulation.

Even if CSI could prevail on the merits, the CSRO procurement is vital to national security and any interruption in its performance would cause severe harm to the operational capabilities of DHS's mission to address illegal immigration, to DHS's law enforcement personnel, to the people of the United States, and to the illegal aliens who are attempting to take advantage of DHS's voluntary removal operations.  Thus, CSI cannot demonstrate that it is entitled to injunctive relief.

## **QUESTIONS PRESENTED**

1.    Whether CSI possesses standing to challenge the CSRO procurement where it was not a qualified bidder.

2.    Whether DHS adequately justified its decision to utilize less than full and open competition based on unusual and compelling urgency.

3.    Whether DHS complied with the requirements of 41 C.F.R. § 102-33 regarding aviation standards for contractors.

4.    Whether CSI has demonstrated entitlement to injunctive relief.

## STATEMENT OF THE CASE

### I.    Nature of the Case

CSI challenges DHS's decision to limit competition for its CSRO procurement.  CSI does

not have the capability to perform the CSRO requirements; it therefore lacks standing to

challenge DHS's procurement decisions.  Nevertheless, DHS rationally documented the unusual

and compelling urgency justifying a limited competition for the CSRO procurement and

competed the solicitation among as many offerors as practicable under circumstances.

### II.    Statement Of Facts

#### A.    The Administration's Focus on Illegal Immigration

On January 20, 2025, President Trump declared a national emergency at the Southern

border regarding the illegal entry of aliens into the United States.  The President subsequently

ordered the Secretary of Homeland Security to "promptly take appropriate actions to…ensure the

efficient and expedited removal of aliens from the United States."  Exec. Order No. 14159, 90

Fed. Reg. 8443-8448 (Jan. 29, 2025); *see also* Proclamation No. 10886, 90 Fed. Reg. 8327

(January 29, 2025).  Since that time, DHS has implemented initiatives to fulfill the requirements

of the declaration, to include launching the CBP Home Application as a pathway for illegal

aliens to identify themselves and self-deport. Exec. Order No. 14194, 90 Fed. Reg. 9117-9120

(Feb. 7, 2025).

On May 9, 2025, the President issued a public proclamation titled "Establishing Project

Homecoming" in which he directed DOS and DHS "to create seamless processes for illegal

aliens to rapidly depart the United States, including through available technological resources,

such as the "CBP Home" application."  Proclamation No. 10935, 90 Fed. Reg. 20357, 20357

(May 14, 2025).  In furtherance of that goal, the proclamation directed that the agencies "take all

appropriate actions to enable the rapid departure of illegal aliens from the United States who currently lack a valid travel document from their country of citizenship or nationality or who desire to travel to any other country willing to accept their entry.  *Id.* at 20357-58.  It further required the agencies to create a "concierge service" to assist illegal aliens in the removal procedures, authorized an "exit bonus" to be paid to any illegal alien who voluntarily departs the United States, and directed a campaign to notify illegal aliens of the available procedures as well as the consequences for failing to depart voluntarily.  *Id.*

The proclamation further required DHS to add an additional 20,000 law enforcement officers within 60 days to support "an intensive campaign to remove illegal aliens who have failed to depart voluntarily."  *Id.* at 20358 (Sec. 3(b)).

### B.    CSRO Procurement

On January 23, 2025, Salus Worldwide Solutions Corporation (Salus) submitted an unsolicited proposal to DHS's Office of Procurement Operations offering "a comprehensive solution to address the urgent need for enhanced diplomatic engagement support tied in with logistical capabilities to support the President's mandate of quickly removing undocumented immigrants from the United States."  Tab 2b, AR 7.  Broadly, Salus offered to "develop, maintain, refine, and manage an integrated collection of commercial services to meet the Department's removal, deportation, and other national security needs."  Tab 12a, AR 556; *see also* Tab 2b, AR 12-13 (describing aviation logistical services).

DHS completed an initial review of Salus's proposal on February 25, 2025, finding the proposal met the requirements of FAR 15.606-1.  Tab 20, AR 576-77.  A further comprehensive evaluation of the proposal was favorable and recommended further discussion with Salus to clarify pricing questions.  Tab 20a, AR 578-79.  However, DHS noted that a favorable evaluation

does not necessarily justify a contract without further competition.  AR 576, Tab 20 (citing FAR 15.607).  Over the next two months, DHS and Salus communicated periodically about the proposal, its scope, and how it could be funded.  *See, e.g.*, Tabs 30, 31, 37, 43, 50, 60.

As DHS's response to the President's January Executive Order evolved and DHS continued to explore funding options for the CSRO effort, DHS engaged with the Department of State (DOS) to secure Migration and Refugee Assistance (MRA) funds to support voluntary removal efforts.  On April 26, 2025, DOS issued a letter of intent to enter into an interagency agreement to provide DHS with up to $250,000,000 in MRA funds to facilitate voluntary removals.  AR 733, Tab 65.  The letter authorized a portion of funding starting on May 1, 2025, with the remainder available when the agreement was finally approved.  AR 733, Tab 65.

Although Salus had submitted its unsolicited offer, DHS acknowledged that the receipt of a promising unsolicited offer does not necessarily justify a non-competitive contract.  AR 576, Tab 20 (citing FAR 15.607).  Despite the urgent need to establish CSRO services, *see* AR 907, 916, Tab 106; AR 951-92, Tab 110, DHS determined that the CSRO requirement could be sourced through a limited competition.  AR 918, Tab 106; *see also* AR 910-16, Tab 106.  The contracting officer discovered "multiple firms that have the capacity and experience to perform **certain segments of the overall requested scope outlined** within the Statement of Work but lack the experience to deliver the requested complete integrated solution within the SOW."  AR 914, Tab 106 (emphasis in original).  Only one firm was identified that could clearly perform all aspects of the work.  AR 914, Tab 106.  Nevertheless, in order maximize competition, DHS "compete[d] the requirement among the vendors identified within [the] market research to further assess their capabilities."  AR 914, Tab 106.

On May 9, 2025, the President issued a public proclamation titled "Establishing Project Homecoming" in which he directed DOS and DHS "to create seamless processes for illegal aliens to rapidly depart the United States, including through available technological resources, such as the "CBP Home" application."  Proclamation No. 10935, 90 Fed. Reg. 20357, 20357 (May 14, 2025).  The proclamation required DHS to "take all appropriate actions" facilitate the voluntary removal of illegal aliens.  *Id.* at 20357-58.  It also dramatically expanded the capacity for removal efforts, ensuring the volume of voluntary removals would immediately increase.  *Id.* at 20358.

Four days after the Project Homecoming proclamation, on May 13 and 14, 2025, the contracting officer held informational meetings and exchanges with the seven vendors identified in the market research as potentially capable of performing the CSRO requirements.  *See* Tabs 67, 72.  On May 15, 2025, DHS issued the request for proposals (RFP or solicitation) to the pool of vendors.  AR 956, Tab 111.[1]  Proposals were due on May 19, 2025.  AR 956, Tab 111.  Four offerors submitted proposals.  *See* AR 1705, Tab 126.  On May 20, 2025, after the offerors' technical and price factors were evaluated, the contracting officer determined that Salus's proposal represented the best value to the Government.  AR 1865-73, Tab 131.

During the proposal window, the CSRO contracting officer issued an organizational conflict of interest (OCI) waiver related to Salus.  AR 920-24, Tab 107.  The contracting officer explained that, by virtue of the communications between DHS and Salus related to Salus's unsolicited proposal, (1) Salus appeared to contribute to DHS's ultimate statement of work for the CSRO procurement, suggesting a biased ground rules OCI, (2) DHS shared high-level budget

---

[1]  The RFP was issued to six vendors—one of the seven indicated it did not intend to submit an offer on the procurement.  AR 794, Tab 79.

and task information with Salus that was not available to the public, suggesting an unequal access to information OCI, and (3) the information sharing that took place created an appearance of favoritism toward Salus.  AR 920, Tab 107.  However, the contracting officer concluded that the potential OCIs and appearance of impropriety could be—and had been—eliminated or mitigated by DHS sharing cost and requirements information with all offerors, engaging in one-on-one sessions with each offeror, and creating a Pricing Scenario for evaluation purposes that was created by and known only to DHS personnel until it was released simultaneously to all offerors.  AR 923, Tab 107.  In light of these mitigation efforts, as well as the contracting officer's conclusion that DHS's communications with Salus had not been undertaken with an intent to undermine procurement rules, the contracting officer recommended that the Head of the Contracting Activity waive the potential OCIs pursuant to FAR 9.503.  AR 923, Tab 107.  The Head of the Contracting Activity concurred with the contracting officer's recommendation and waived the OCI and appearance of impropriety restrictions, based on the mitigation efforts as well as the urgency and national security implications of the procurement.  AR 924, Tab 107.

### C.    GAO Protest

On May 17, 2025, CSI reached out to the contracting officer expressing interest in the CSRO procurement.  AR 2800, Tab 182.  The contracting officer had previously determined that CSI did not have the necessary experience to perform the contract, and did not respond to CSI's inquiry.  On May 19, 2025, the day proposals were due, CSI submitted a protest to the Government Accountability Office (GAO) alleging (1) DHS failed to properly publish the CSRO solicitation and synopsis, (2) DHS failed to provide a reasonable opportunity to respond to the solicitation, (3) DHS was required to set aside the CSRO requirement for small businesses, and (4) the CSRO procurement does not have approved Flight Program Standards (FPS) for

Commercial Air Service as required by 41 C.F.R. § 102-33.  AR 2056-68, Tab 156.  On May 20, 2025, DHS issued a memorandum memorializing its decision to proceed with the award of the CSRO contract despite the GAO protest, as permitted by FAR 33.104(c).  AR 2288, Tab 157; *see also* AR 2801-08, Tab 182.

GAO conducted outcome-prediction alternative dispute resolution (ADR) with the parties.  AR 2963, Tab 200.  As a result of the ADR, CSI withdrew its protest.  AR 2969, Tab 206; *see also* AR 2970, Tab 207.  This protest followed.

## ARGUMENT

### I.    Standard of Review

The Administrative Procedure Act (APA) supplies the standard of review in bid protests. 28 U.S.C. § 1491(b)(4); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  In a bid protest, the question is whether the challenged agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. §§ 702, 706(2)(A); *Garufi*, 238 F.3d at 1332; *see also XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020).  In answering this question, however, the Court recognizes that contracting officers are "'entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'"  *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Garufi*, 238 F.3d at 1332); *see also Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1406 (Fed. Cir. 2021); *Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 740 (2007) ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment."); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) ("[T]he minutiae of the procurement

process . . . involve discretionary determinations of procurement officials that a court will not second guess.") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Thus, this Court applies a highly deferential rational basis review to procurement decisions, *Savantage*, 595 F.3d at 1286, and a protestor bears the heavy burden of showing that the award decision had no rational basis, *Garufi*, 238 F.3d at 1333.

Given these principles, the Court will uphold the agency's action unless the protestor can prove that the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [issued a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)); *Tinton Falls Lodging Realty, L.L.C. v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015). This means that the protestor must prove that the agency made a clear error of judgment in weighing the relevant factors, exercised its discretion based upon an error of law, or made a clearly erroneous finding of fact. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). The Court does not overturn an agency's decision "even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations" if the Court finds a reasonable basis for the agency's action. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

Additionally, even if a protestor can show any errors in the procurement process, it must then demonstrate that it was "significantly prejudiced" by those errors. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). To establish significant prejudice, the protestor

must show that "there was a 'substantial chance' it would have received the contract award but for the [agency] errors in the bid process." *Id.* at 1358 (citations omitted); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013).

## II.   CSI Lacks Standing to Protest the CSRO Procurement

As a threshold matter, CSI has failed to demonstrate that it is an interested party with standing to challenge DHS's procurement. During its market research, DHS determined that CSI did not have the capacity to fulfill the full scope of this procurement and therefore did not include CSI in the pool of prospective offerors. CSI has failed to demonstrate that it could provide the full scope of services and therefore that it has standing to protest this procurement.

### A.   Bid Protest Standing

In bid protests, only an "interested party" has standing to challenge a procurement action. *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). An interested party with standing to bring a protest "is an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Percipient.ai, Inc. v. United States*, 153 F.4th 1226, 1243 (2025) (*en banc*), *petition for cert. filed*, No. 25-428 (Oct. 6, 2025); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

To satisfy the "direct economic interest" requirement, a protester generally "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In addition, a protester "must show that it was prejudiced by a significant error in the procurement process." *CliniComp Int'l, Inc. v. United States*, 904 F.3d

1353, 1358 (Fed. Cir. 2018). That is, "*but for the error*, [the protester] would have had a substantial chance of securing the contract." *Id.* (emphasis in original). In the absence of prejudice—harm caused by the error alleged—28 U.S.C. § 1491(b)(1) does not allow the Court to grant relief in any bid protest. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009) ("Without a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue.").

Regarding prejudice, or a direct economic interest, a plaintiff must "establish that it *could* compete for the contract if the bid process were made competitive[.]" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (cleaned up and emphasis added).

### B.    CSI is Not an Interested Party Because it Cannot Meet DHS's Requirements

In order to show that it possesses standing, CSI must be able to show that: (1) it is an actual or prospective bidder; and (2) it possesses a direct economic interest. *Percipient*, 153 F.4th at 1243. CSI cannot meet its burden as to the second factor because it has not demonstrated that it can meet the requirements of the CSRO solicitation.

As the solicitation explained, the CSRO program is designed augment DHS's domestic removal operations by not only "increasing throughput for voluntary returns," but also by "building the capacity of foreign partners to assist the U.S. in removal operations, building the capacity of foreign partners to conduct their own removal operations, and enhancing the ability to identify and stop U.S. bound illegal migration long before illegal aliens reach U.S. borders." AR 962, Tab 111a. Thus, the solicitation sought two primary categories of services:

1. Supplement domestic voluntary return operations by increasing available dedicated aircraft and commercial ticketing for voluntary returns, respectively, and

11

2.  Provide capacity building to foreign partners to accept U.S. removals/voluntary
    returns and operational transportation support to facilitate onward movement of
    removals/voluntary returns.

AR 962, Tab 111a; *see also* AR 963, Tab 111a ("Scope of Contract").

In conducting its market research for the CSRO contract, DHS considered CSI, who, in its own words, is "the Prime Contractor for all ICE Air Operations flights . . . provid[ing] ICE with a large portion of the charter passenger airlines available on the market in the US." AR 1117, Tab 113. However, DHS identified a "distinct difference in scope and nature of the work being performed" between the ICE Air Operations and the CSRO requirements. AR 915, Tab 106. The contracting officer explained that "[t]he required experience for voluntary return coordination which require coordination with consulates/embassies for travel documents is not a required function of the contractor or prospective contractors of ICE Air. The vendors of ICE Air do not have the experience either as Prime or subcontractors conducting this type of work." AR 915, Tab 106.

CSI has failed to contradict this conclusion. *See* Pl. MJAR at 24-25. CSI claims that the agency's reasoning—i.e., that the ICE Air contractors do not have the experience to perform part of the contract—"would justify excluding qualified vendors from virtually any procurement involving a new scope of work or lacking an incumbent, undermining the very principles of competition." *Id.* at 25. This argument presupposes a "qualified" vendor, which CSI is not. But more importantly, it fails to address the threshold issue, which is that a bid protest cannot be maintained by a party who would be unable to compete for the contract. Even if DHS impermissibly limited competition—it did not—CSI cannot challenge that limitation unless it can demonstrate, at minimum, that it would have been a qualified bidder. *CliniComp*, 904 F.3d at 1358; *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370-

71 (2002) ("The mere fact that [the protester] might have submitted a bid in a competitive procurement is not sufficient.  Although it need not show that it would have received the award in competition with other hypothetical bidders, it must show that it would have been a qualified bidder.").

As the Federal Circuit recognized in *CliniComp*, "[p]rejudice [in the context of standing] is a fact question." *Id.* at 1359.  There, the Federal Circuit upheld this Court's determination that a prospective bidder who "had failed to demonstrate a capability even approaching what would be required under a contract of [the] size and scope" contemplated by the solicitation at issue had "failed to show it possessed the kind of experience that would enable it to compete for the work contemplated by the [] proposed contract[.]" *Id.*  Similarly, in *W&G Machine Co., Inc. v. United States*, this Court concluded that a manufacturer of helicopter parts had not demonstrated that it was a qualified bidder where it had previously supplied the Government with the parts contemplated by the contract but "provided no evidence to demonstrate that it has experience performing under a government contract of comparable value to the solicitation at issue in this case." 146 Fed. Cl. 455, 462 (2020).  The Court therefore found the protester lacked standing. *Id.*  CSI similarly has presented no evidence that it is capable of providing the full range of services contemplated by the CSRO procurement; namely, coordination with consulates and embassies and supporting and developing international staging areas.

Indeed, CSI's allegations and arguments are limited to the "threadbare recitals of the elements of standing, supported by mere conclusory statements," that this Court has found do not suffice. *KL3, LLC v. United States*, 176 Fed. Cl. 657, 668 (2025) (quoting *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1355 (Fed. Cir. 2018)).  CSI alleges that it "has performed similar work for other government agencies," Compl. ¶ 63, and that DHS "excluded capable

offerors such as CSI, *id.* ¶ 58.  CSI makes no effort in its MJAR to identify any evidence of its

ability to perform the CSRO contract.  *See* Pl. MJAR at 24-25; *see also Lujan v. Def. of Wildlife*,

504 U.S. 555, 561 (1992) (explaining that the elements of standing must be supported "with the

manner and degree of evidence required at the successive stages of the litigation"); *KL3*, 176

Fed. Cl. at 667, 670.  This failure is fatal to CSI's assertions of standing to challenge DHS's

procurement.

CSI finally contends that it should not matter whether it could perform the contract itself

because the contract contemplates teaming agreements.  Pl. MJAR at 25.  This argument would

utterly swallow the standing requirement—a prospective contractor would never need to

demonstrate that it could be a qualified bidder on a solicitation that permits teaming or

subcontracting.  More importantly, even if the possibility of teaming could exempt a prospective

contractor from qualifying as a bidder on its own, it would still need to make a showing that its

team could qualify.  CSI has presented no information regarding its potential teaming partners or

their capabilities.  *See* Pl. MJAR at 24-25.[2]  It has therefore failed to demonstrate standing to

challenge the CSRO procurement.  *See KL3*, 176 Fed. Cl. at 670 (finding that the protester

lacked standing where it only repeated conclusory allegations of standing, "not once citing to any

specific facts, set forth by affidavit or other evidence, nor does it support any such facts

adequately by the evidence adduced from the record" (internal quotation marks omitted)).

---

[2]  The market research memorandum explained that DHS determined that "[t]he
partnering solution from air charters, staging facilities and voluntary return/travel document
coordination and logistics to provide this suite of services was deemed too high risk.  The
Department requires immediate action and implementation of this effort."  AR 916, Tab 106.

**III.    <u>DHS's Procurement Complied with Applicable Law and Regulation</u>**

      Because CSI lacks standing, as demonstrated above, the Court need not consider the merits challenges.  Nevertheless, the record demonstrates that DHS's procurement proceeded lawfully and rationally.  CSI alleges (1) that DHS violated the provisions of FAR 6.302-2, which permits less than full and open competition under certain circumstances, (2) that DHS failed to publish a synopsis of the CSRO requirement as required by FAR 5.2, and (3) that DHS did not have approved FPS for the CSRO procurement.  DHS adequately justified its use of less than full and open competition based on the requirements of FAR 6.302-2, which also permitted it to not publish a synopsis.  Further, DHS has approved FPS that comports with regulation and is applicable to the CSRO contract.  The Court should therefore deny CSI's protest.

      **A.    <u>DHS Complied with FAR 6.302-2</u>**

      DHS solicited the CSRO procurement pursuant to FAR 6.302-2, which permits the Government to use less than full and open competition when:

      (1) An unusual and compelling urgency precludes full and open competition; and

      (2) Delay in award of a contract would result in serious injury, financial or other, to the Government.

FAR 6.302-2(b).  DHS's J&A explaining the rationale for limited competition, supported by the contemporaneous record, demonstrates that these requirements were met.

      1.    <u>An Unusual and Compelling Urgency Necessitated Limitations on Competition</u>

      The contracting officer's justification and approval (J&A) supporting limitation on competition demonstrates the unusual and compelling urgency of DHS's requirements.  The record further supports that justification.  In addition, the justification relies on and implicates critical national security objectives that are owed particular deference.  *See CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) ("When matters of greater agency discretion are

involved, it is more difficult for a protestor to prove that a procurement decision was arbitrary and capricious . . . Moreover, where acquisitions concerning national defense and security are involved, the Court must afford even wider deference to the agency." (internal citations omitted)).

The contracting officer explained that, on January 20, 2025, "the President of the United States declared a national emergency at the Southern border of the U.S. to stop the illegal entry of aliens."  AR 951, Tab 110.  The J&A further explained that, "[c]oupled with this emergency, there is an immediate need to address the significant cases of Voluntary Removals and provide immediate capability and capacity to partnering countries to curtail illegal immigration within their borders."  AR 951, Tab 110.  This immediate need stemmed from the President's May 9, 2025 proclamation establishing Project Homecoming and directing DHS to "create seamless processes for illegal aliens to rapidly depart the United States, including through available technological resources, such as the 'CPB Home' application," and "to take all appropriate actions to enable the rapid departure of illegal aliens from the United States who currently lack a valid travel document from their countries of citizenship or nationality or who desire to travel to any other country willing to accept their entry."  Pres. Proc. No. 10935, "Establishing Project Homecoming," Sec. 1(a), (c), May 9, 2025.  The proclamation further directed DHS to dramatically ramp up domestic removal operations by adding not less than 20,000 law enforcement personnel "in order to conduct an intensive campaign to remove illegal aliens who have failed to depart voluntarily."  *Id.*, Sec. 3(b).

The contracting officer further explained that

there is an immediate need to address the significant cases of Voluntary Removals and provide immediate capability and capacity to partnering countries to curtail illegal immigration within their borders.  Continued illegal entries at the Southern border not only poses significant threats to national security, but it also places an

overwhelming burden on our law enforcement, border control agencies, and vital resources, to include increased burden on American immigration facilities. Additionally, a delay in award inhibits the building [of] stronger, more coordinated partnerships with our neighbors and international allies. The CSRO enhances the capabilities of foreign governments to accept, process, and remove/return illegal aliens who have been apprehended in the United States.

AR 951-52, Tab 110. According to DHS, "[i]n anticipation of significantly ramped up domestic operations, DHS must work with foreign partners to eliminate international bottlenecks by building the capacity of foreign partners to accept and support significantly increased U.S. deportations." AR 2802, Tab 183. "As both voluntary returns and involuntary removals are an immediate priority for CSRO, DHS must immediately bring on necessary contract support to enable CSRO to scale commensurate with domestic operations and priorities." AR 2802, Tab 183.

Against this backdrop, on May 16, 2025, DHS and the Department of State (DOS) entered into an interagency agreement whereby DOS would provide $250,000,000 in Migration and Refugee Assistance funds to support DHS's "project activities and associated costs for voluntary returns." AR 892-99, Tab 105; *see also* AR 733-34, Tab 65 (DOS Letter of Intent). At that time, DHS had more than 12 million voluntary return cases in need of coordination. AR 2803, Tab 183. And although DOS had identified many foreign governments willing to "support expanded U.S. removal operations . . . many potential partners [] identified critical shortfalls for border security and management necessary to support expanded U.S. operations or to help interdict illegal migration smuggling and trafficking routes." AR 2803, Tab 183. Thus, immediate ramp-up of removal coordination and support for foreign partners was necessary to address the backlog of voluntary removal cases and the ongoing national emergency.

CSI argues that the J&A cites the January 20, 2025, Executive Order announcing a national emergency but that nothing in that order set a deadline by which the CSRO efforts had

to be procured.  Pl. MJAR at 17-18.  To the contrary, as demonstrated above, the Executive

Order is just the starting point for the agency's justification.  The J&A—and other

contemporaneous record documents—describes the evolution of the CSRO program and

interagency operations as well as the circumstances on the ground in May 2025 that necessitated

immediate action by DHS.  In May 2025, the President issued a public proclamation directing

immediate operational implementation of "Project Homecoming," an initiative requiring

accelerated repatriation, voluntary return, and coordination with foreign partners.  90 Fed. Reg.

20357.  DHS identified the mission-critical need to stand up increased international staging,

consular coordination, foreign-partner capacity building, and integrated logistics operations on

an immediate basis:

> The Government requires a solution to be delivered to ensure voluntary return
> efforts are coordinated for the release of the CBP Home app/Project Homecoming,
> required lead time to effectively establish international staging areas (ISA) to
> facilitate scaled ICE removal flights and third country nationals (TCN) from the
> US to accepting foreign nations, support wrap around services for ISAs, and
> manage the complex logistics of all of these operations simultaneously.

AR 962, Tab 111a.  These mission requirements are not speculative—they are directly reflective

of Executive-level direction and operational demands at the border impacting the security of the

nation.  As such, they are owed extraordinary deference.  *CHE Consulting*, 78 Fed. Cl. at 387

("[W]here acquisitions concerning national defense and security are involved, the Court must

afford even wider deference to the agency.").  Indeed, CSI's protest indirectly challenges the

President's declared national emergency and the implementation of the Project Homecoming

proclamation, which demanded urgent action and provided a 60-day deadline after which

involuntary removal efforts could overtake voluntary removals.  The Court should not second-

guess these policy choices and value determinations constitutionally committed to the Executive

Branch, especially in an instance like here, where the agency is simply carrying out the

President's directive and there are no tests or standards for the Court to apply to when reviewing the found urgency. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 449 (2010) ("The court is not empowered to substitute its judgment for that of the agency." (quoting *Citizens to Pres. Overton Park, Inc. v. United States*, 401 U.S. 402, 416 (1971))).

Moreover, nothing in the record supports CSI's theory that DHS delayed the procurement for strategic reasons or to improperly restrict competition. To the contrary, the J&A demonstrates that the United States faced a present need for immediate contractual performance and that any delay would cause serious harm: the Government's rapid response capacity was at risk, repatriation timelines were tied to diplomatic and foreign-partner windows, and failure to initiate performance immediately would jeopardize border-security operations. AR 949-53, Tab 110; *see CHE Consulting*, 78 Fed. Cl. at 387; *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 704 (2010) (granting agency discretion because of army personnel's testimony that plaintiff's injunction could threaten military's safety).

The record further shows continuous procurement activity—draft solicitation preparation, iterative statement of objectives development, industry-day exchanges, and coordination with the Head of Contracting Activity—not a procurement left unattended until the eleventh hour. *See generally* Tabs 63, 65, 67, 72, 88, 89, 90, 91, 98-110. The contemporaneous purchase-request approval (AR 827, Tab 91), determination and findings (D&F) regarding the need to extend the period of performance beyond one year (AR 860-61, Tab 98), and the J&A routing timeline (AR 948-55, Tab 110) contradict CSI's claim that DHS manufactured urgency.

Moreover, again contrary to CSI's argument, Pl. MJAR at 21, the J&A describes the serious injury to the United States that would result from delay of the contract. AR 953, Tab

110.  It notes that delay in the procurement will (1) "inhibit the support and scale required to

have a significant operational impact on US enforcement operations"; (2) "delay return actions to

illegal aliens seeking assistance through the CBP Home application, which will further burden

resources internal to the United States"; and, (3) "significantly delay the establishment of

International Staging Areas to serve as reception areas for domestic removal flight[s] further

hampering the operational effectiveness of ICE Air and the U.S. government's approach to

removal flights supporting final order cases."  AR 953, Tab 110.  Contemporaneously, the

contracting officer further explained that thousands of individuals had applied for voluntary

removal through the CBP Home application and that delay in the procurement "could cause

those individuals who have chosen voluntary pathways to be removed as criminals with severe

penalties, including waiting periods of between five and twenty years before they can legally

attempt to re-enter the United States" and the possibility of steep penalties and monetary fines.

AR 2807, Tab 183.  In addition, the contracting officer explained that any delay "in providing

comprehensive support for voluntary returns and removal operations perpetuate the unnecessary

threats and acts of violence directed at the U.S. citizens and the DHS front line personnel that

this population interacts with daily due to critical mission needs that cannot be put on hold."  AR

2803, Tab 183.  Thus, far from a "generic desire to get on with the procurement," Pl. MJAR at

21 (citing *Advanced Sys. Develop., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006), DHS

identified particularized serious injury that would result from delaying the procurement.  *See*

*PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 346 (2010) ("[A] threat of immediate harm to

health, welfare or safety would create a situation where the 'unusual and compelling urgency' of

agency needs permits a sole-source procurement.").

Furthermore, the record belies CSI's argument that the urgency in implementing the procurement was due to DHS's lack of adequate planning. As demonstrated above, in the Project Homecoming proclamation on May 9, 2025, the administration identified its immediate priorities in confronting a national emergency. DHS moved immediately to operationalize Project Homecoming, to effectuate the rapid departure of illegal aliens from the country, and to support the imminent ramp-up of immigration enforcement operations. *See* AR 2801-02, Tab 183. The agency did not fail to adequately plan for the procurement. Rather, it engaged with the administration's priorities and issued the solicitation to address the impending expansion of enforcement and voluntary removal operations.

Finally, CSI's attempts to tie the procurement timeline to the expiration of Salus's unsolicited proposal, *see, e.g.*, Pl. MJAR at 19, 21 n.9, 30, are a red herring. The solicitation was not a noncompetitive acquisition based on the unsolicited proposal; instead, DHS expressly convened a limited competition to ensure the Government received multiple proposals. Consequently, the expiration of Salus's unsolicited offer had no operative effect on the solicitation schedule. Indeed, the solicitation required all offerors—including Salus—to certify that their proposals would be valid for at least 60 days from the submission deadline. AR 1015, Tab 111a. All offerors—including Salus, AR 1339, Tab 118b—provided this certification.

The procurement timeline reflects operational deadlines—coordination with DOS, the timing of international staging requirements, and the date by which DHS had to begin scaling up repatriation operations. The award date is thus rationally connected to mission needs documented in the J&A, not to contractor preferences. Ultimately, DHS documented the operational threat, the mission urgency, the risk of delay, and the consequences of not awarding the CSRO contract quickly. CSI's opinion regarding the administration's response to the

21

ongoing national emergency or its speculation regarding Salus's participation in the procurement development cannot overcome the contracting officer's contemporaneous justification of urgency.

           2.    <u>DHS Requests Offers from as Many Potential Sources as Practicable</u>

CSI next contends that DHS failed to solicit as many offers as was practicable. Pl. MJAR at 22-25. To the contrary, DHS diligently surveyed likely contractors, identified several that could potentially perform at least some of the contract, and solicited offers from all of those identified. Under the unusual and compelling urgency exception, the agency must solicit as many sources as practicable, not all vendors who might be interested or who self-certify they can perform. FAR 6.302-2(c)(2). The record demonstrates that DHS reasonably limited the competition to vendors with immediate capacity to support the full operational scope, that expanding the pool would have delayed award, and that CSI did not possess or demonstrate capability to perform the full requirement within the required timeframe.

The contracting officer described the search for potential offerors, explaining that "only one vendor was identified with the unique mix of experience and skill to address the complete requirement as prescribed in the SOW" but that the "marketplace consists of multiple firms that have the capability and experience to perform certain segments of the overall requested scope outlined within the statement of work." AR 914, Tab 106; *see also* AR 916, Tab 106 ("[A] fully integrated solution is not widely commercially available with the layered international component to address diplomatic challenges. The experience required facilitating support to the government to receive travel visas, passports, assist with validation of citizenship are of great importance to the Government to ensure the contractor can fully support the SOW and support potential diplomatic challenges encountered by USG personnel."). As part of his market

research, the contracting officer's representative reached out to DOS contracting personnel to understand their experience with similar requirements. DOS told the contracting officer that, in their experience, the pool of contractors who could actually perform the work was significantly smaller than the pool of those expressing interest. AR 914, Tab 106 ("In our experience companies either have this experience of operating in a denied or difficult area with significant risk [] due to project exposure in the press or locally, or they do not[.]"). Nevertheless, in order to ensure competition among the greatest practicable pool, DHS competed the CSRO requirement among the vendors it identified "to further assess their capabilities." AR 914, Tab 106.

CSI identifies no prospective offeror DHS overlooked—other than CSI itself. *See* Pl. MJAR at 23-25. But CSI was not overlooked; as demonstrated above, it was considered as an ICE Air vendor during market research, but the contracting officer concluded that the ICE Air vendors did not have the necessary experience coordinating with foreign embassies or otherwise handling the scope of a program like CSRO. AR 915, Tab 106. Indeed, the market research conducted in the months leading up to the procurement demonstrated that the requirement involved far more than charter flight operations. DHS required immediate stand-up of a comprehensive international repatriation and staging platform, including: (1) diplomatic engagement and consular coordination, (2) international staging and on-ground coordination abroad, (3) partner-nation capacity building, (4) multimodal logistics, (5) transportation-security integration, (6) medical, escort, and surge capabilities, and (7) non-aviation infrastructure and communications systems. AR 915-16, Tab 106. DHS reasonably determined that very few vendors had the global logistics footprint, international partnerships, and standing operational capability to perform these functions without months of preparation. AR 910-916, Tab 106.

CSI has not rebutted DHS's stated concerns. CSI's experience relates almost exclusively to ICE Air charter rotations—a critical mission for sure, but one that is fundamentally different from the services required for CSRO. The record does not show CSI possessing the diplomatic, foreign-partner coordination, or international staging capacity that constitutes a substantial portion of the requirement. *See* AR 915, Tab 106. Nothing in CSI's protest submissions identifies such capability, nor does CSI point to any portion of the record contradicting DHS's assessment.

CSI nevertheless argues that DHS improperly ignored its interest in the procurement, citing *Innovation Development Enterprises of America, Inc. v. United States*, 108 Fed. Cl. 711, 732-33 (2013). Pl. MJAR at 22. However, *Innovation Development* does not stand for the sweeping proposition that an agency may not ignore any expression of interest. In *Innovation Development*, this Court determined that the agency failed to conduct any market research at all and, moreover, that it excluded a potential offeror who the agency *admitted* had the experience to perform the agency's requirements. 108 Fed. Cl. at 724, 730. In addition, *Innovation Development* involved a challenge to a sole-source bridge contract the agency justified on the basis of the existence of only one responsible source. *Id.* at 725. Thus, the existence of another offeror the agency knew was capable was a fatal flaw. Id. at 728, 730. Here, the contracting officer knew of CSI and its capabilities, but because of this knowledge rationally determined that CSI did not have the experience necessary to address DHS's needs. AR 915, Tab 106. The contracting officer also conducted market research to identify those contractors who could potentially perform the contract.

CSI emailed DHS on May 17, 2025, requesting the RFP after the final solicitation amendment had already been issued and less than 48 hours before proposals were due. AR 2800,

Tab 182. By that point, the vendor pool had been set based on documented market research, the solicitation had been issued and amended, one-on-one vendor exchanges had already occurred, DHS was preparing to receive proposals under a compressed urgent timeline, and any addition of new vendors would necessarily push back the award date.  The record demonstrates that DHS assessed operational deadlines tied to international staging, foreign-partner coordination cycles, and the initial deployment of CSRO infrastructure.  AR 907–913, Tab 106.  Nothing in FAR 6.302-2 required DHS to restart the competition or extend the timeline to accommodate late expressions of interest.

Nothing in the record shows that DHS acted irrationally, manipulated the competition, or sought to exclude CSI for reasons unrelated to mission need.  The urgency exception does not obligate DHS to solicit every potential vendor—it requires DHS to solicit participation from as many offerors as practicable.  That is what DHS did.

3.    DHS Justified Exceeding FAR 6.302-2's Limitation on the Period of Performance

Next, CSI argues that DHS violated the period of performance limitation in FAR 6.302-2, namely that the period of performance not exceed the time necessary "(A) To meet the unusual and compelling requirements of the work to be performed under the contract; and (B) For the agency to enter into another contract" for the services through competitive procedures.  FAR 6.302-2(d)(1)(i).  Further, the regulation prohibits a period of performance that exceeds one year "unless the head of the agency determines that exceptional circumstances apply."  FAR 6.302-2(d)(1)(ii).  DHS's period of performance fits the urgent requirement it solicited and DHS provided a reasoned justification for exceeding the one-year limitation.

The "unusual and compelling requirement" here is the United States' immediate need to initiate CSRO operations—international staging, foreign-partner coordination, capacity-building,

aircraft and ground logistics, security, and associated support—on an accelerated timeline.  AR 948-55, Tab 110.  DHS documented that one year is the minimum necessary for such a complex, world-wide initiative that requires DHS to stand up, stabilize, and maintain the CSRO global infrastructure in response to Executive-level directives and rapidly evolving migration flows. AR 948-55, Tab 110; AR 860-61, Tab 98.  DHS reasonably concluded that repeated, short-duration, serial procurements would introduce unacceptable operational risk, delay the ramp-up of foreign-partner coordination, and impede the ability to respond to migration surges.

The options included in the contract are not themselves "urgent performance periods" within the meaning of FAR 6.302-2(d).  They are contingent, non-binding mechanisms available only if the need remains urgent *and* DHS conducts and approves a separate D&F before exercising any option.  AR 861, Tab 98.  Thus, the options do not convert the contract into a multi-year urgency action; they simply preserve continuity if the conditions requiring urgent action persist.

Moreover, FAR 6.302-2(d)(1)(ii) permits the head of the contracting activity to authorize a performance period longer than one year where necessary to meet urgent needs.  DHS executed such an authorization.  DHS explained that the exceptional circumstances justifying limiting competition for the CSRO procurement include "the immediate and significant harm to Americans caused by 'cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics' caused by illegal immigrations through the southern border."  AR 860, Tab 98.  DHS further explained that continuous operation of deportation services is necessary to address the exceptional circumstances.  AR 861, Tab 98.  It identified the need for the ability and agility to "immediately stop newly identified sources of illegal immigration and ramp up operations."  AR 861, Tab 98.

26

The nature of the contract requirements underscores the need for continuity throughout performance.  The agency described the harms that would result if there was a break in voluntary removal facilitation.  *See* AR 951-53, Tab 110.  Moreover, coordination with foreign partners and the development of international staging areas requires predictability; fostering relationships with foreign governments and facilitating staging areas only to turn over performance to a new contractor would likely result in delays and avoidable risk that would stall removal efforts and jeopardize international relationships.  The authorization approving a period of performance greater than one year, particularly in conjunction with the J&A for limited competition, demonstrates that DHS considered the applicable FAR provision, evaluated operational risks, and made a documented, rational judgment that additional option years were necessary to preserve continuity.

Contrary to CSI's suggestion, FAR 6.302-2(d) does not impose a hard one-year limit.  Rather, it requires the Government to limit the duration to what the urgent requirement demands and to obtain agency head approval for durations exceeding one year.  FAR 6.302-2(d)(1).  Those requirements are satisfied here.  DHS determined that a one-year base period is required to meet the urgent need and that options are permissible because the need may persist, but only after new approvals.  AR 860-61, Tab 98; AR 948-953, Tab 110.

CSI points to DHS's memorandum justifying the inclusion of option periods in an attempt to undercut the rationale for a period of performance beyond one year.  *See* Pl. MJAR at 28.  The option period memorandum is a requirement of FAR 17.202 and 17.205, and the considerations for including option periods in a contract are different from those justifying limited competition.  The fact that the contracting officer addressed the regulatory requirements

for including option periods does not undermine the stated rationale for the period of performance.

This Court does not second-guess how an agency structures urgent requirements unless the structure lacks any rational basis. *See Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1334 (Fed. Cir. 2009) (finding that agencies have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation"). CSI does not identify, and the record does not contain, any evidence showing that the duration selected was arbitrary, unsupported, or designed to circumvent competitive requirements; rather, it was necessary in light of the urgency, complexity, and sensitivity of the requirement. The CSRO contract's period of performance is therefore rational and supported by the urgency of the requirement and the nature of the work.

### B.    DHS was Not Required to Publish a Synopsis of the Procurement

CSI further argues that DHS failed to publish a synopsis of its proposed procurement as typically required by FAR 5.2. Pl. MJAR at 30. This argument rises or falls with DHS's justification for less than full and open competition. For the same reasons that justify DHS's invocation of the unusual and compelling urgency exception to full and open competition, DHS was not required to publish a synopsis.

FAR 5.201 generally requires agencies to publish notices of contract actions. However, a notice is not required when "[t]he proposed contract action is made under the conditions described in 6.302-2 . . . and the Government would be seriously injured if the agency complies with the time periods specified in 5.203." FAR 5.202(a)(2). FAR 5.203 describes how much time an agency must provide between synopsis and solicitation, as well as how much time must be allowed for responses to a solicitation. For the same reasons described in the J&A, adhering

to the time frames for publishing the synopsis and solicitation would have caused serious injury to the American public as well as to illegal aliens seeking to avail themselves of DHS's voluntary removal program.

Although not actually a separate allegation—likely because CSI is not actually challenging the award decision or even the substance of the solicitation—CSI nevertheless accuses DHS of a "sham competition with a predetermined outcome: an award to Salus."  Pl. MJAR at 30.  This charge requires a response.

First, CSI's contention is tantamount to accusing DHS of bad faith.  "[G]overnment officials are presumed to act in good faith."  *Savantage*, 595 F.3d at 1288; *see also Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993) ("[T]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations.... [T]his presumption stands unless there is irrefragable proof to the contrary.").  CSI has identified nothing in the record to suggest that DHS acted with intent to injure CSI or any other potential bidder.  *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("In the cases where the court has considered allegations of [governmental] bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.").

Moreover, this baseless allegation is rebutted by the record.  The record here demonstrates that DHS undertook a competitive procurement, applied a formal OCI waiver that identified reasonable mitigation strategies, materially modified the requirement from Salus's unsolicited proposal, and conducted a contemporaneously documented mini-competition and evaluation among multiple vendors.

DHS did not blindly accept or implement Salus's unsolicited offer on a sole-source basis. Instead, DHS took the opposite course: it initiated a limited but competitive procurement under FAR 6.302-2 and invited multiple vendors to compete. Had the agency desired to favor Salus, it could have awarded directly on the basis of the unsolicited proposal. *See* AR 914, Tab 106 (explaining that only one vendor—Salus—possessed the full range of experience and skills to address the complete requirement, but that DHS nevertheless intended to compete the requirement to assess the capabilities of other vendors with the ability to perform significant aspects of the scope of work). It did not. DHS determined that the appropriate strategy was competition among qualified vendors and executed a formal OCI waiver, in full compliance with FAR 9.504(e) and 9.505. AR 914, Tab 106; AR 920-24, Tab 107.

The record further shows that DHS was aware of potential OCIs involving Salus, including unequal access to information and biased-ground-rules concerns. AR 920-24, Tab 107. The contracting officer issued an OCI waiver under FAR 9.503, approved at the appropriate level, addressing the potential OCI concerns including biased ground rules, unequal access to information, and maintainable separation between past advisory activities and the competitive acquisition. AR 920-24, Tab 107. The contracting officer acknowledged that Salus's unsolicited proposal and subsequent discussions with agency personnel appeared to contribute to DHS's ultimate statement of work. AR 921-22, Tab 107. The contracting officer also acknowledged that Salus's communications with DHS likely provided Salus access to non-public, competitively useful information. AR 922, Tab 107. However, DHS concluded that, to the extent either of these circumstances provided Salus a competitive advantage, such advantage could be eliminated or sufficiently mitigated by providing the same information and access to the

other offerors.  AR 922-23, Tab 107.  DHS thus executed an OCI waiver, and CSI has failed to undermine its rationale.

### C.    CSI's Arguments Regarding Flight Program Standards is Unsupported

Finally, CSI argues that DHS is impermissibly conducting aviation operations without flight program standards, in violation of 41 C.F.R. § 102-33.5.  Pl. MJAR at 34-37.  The applicability and sufficiency of flight program standards are a matter of contract administration and therefore outside the bounds of a protest.  Regardless, DHS has complied with the applicable regulations.

### 1.    41 C.F.R. § 102-33.5 Establishes Requirements for Contract Administration

As an initial matter, whether DHS has adequate flight program standards is a matter of contract administration and therefore not a basis to protest this procurement.  The agency's flight program standards impose requirements on DHS's oversight of its Commercial Aviation Services (CAS) contractors, but do not require any particular solicitation terms or evaluation criteria.

Moreover, CSI has identified no prejudice stemming from its allegation that DHS's flight program standards are insufficient.  If DHS's standards are insufficient, that does not alter CSI's position relative to the procurement or to the awardee—CSI would be no closer to securing the contract.

### 2.    DHS Complies with 41 C.F.R. § 102-33.5

DHS's policies require CAS contractors to comply with civil aviation standards.  That requirement satisfies applicable regulations.

The regulations CSI cites state:

At a minimum, your CAS contracts and agreements must require that any provider of CAS comply with—

31

>   (a) Civil standards in 14 CFR that are applicable to the type of operation(s)
>       you are asking the contractor to conduct;
>
>   (b) Applicable military standards; or
>
>   (c) Your agency's Flight Program Standards (see §§ 102-33.140 through 102-
>       33.185 for the requirements for Flight Program Standards).

41 C.F.R. § 102-33.105.  DHS's Management Directive No. 0020.1, Aviation Management and

Safety, states:

> DHS [Organizational Elements] that use Commercial Aviation Services (CAS)
> exclusively for the performance of governmental missions or passenger operations
> must require the vendor or contractor to comply with the civil aviation standards
> [Title 14 CFR, Chapter 1 and 49 CFR Chapter XII] applicable to the type of
> operations conducted while in service to the Department or its contractor.

AR 2830, Tab 188.  Thus, consistent with 41 C.F.R. § 102-33.105, DHS requires that CAS

contracts comply with relevant civil aviation standards.  "In matters like this, which involve

foreign policy and national security, we are particularly obliged to defer to the discretion of

executive agencies interpreting their governing law and regulations."  *Paradissiotis v. Rubin*, 171

F.3d 983, 988 (5th Cir. 1999).

## IV.    <u>CSI Has Failed To Demonstrate Entitlement To Injunctive Relief</u>

CSI asks the Court to enjoin DHS's procurement, to require DHS to conduct a full and

open procurement for the CSRO requirement, and to prohibit DHS from hiring CAS for this

procurement.  Pl. MJAR at 40; Compl., ECF No. 1, at 28.  As demonstrated above, CSI has

failed to demonstrate that DHS prejudicially violated procurement law in its decision to limit

competition for the CSRO solicitation; CSI is therefore not entitled to injunctive relief.  *See*

*Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 219 (2008) (explaining that a

permanent injunction requires actual success on the merits).  However, even if the Court were to

conclude that DHS's J&A was irrational or that it otherwise violated procurement law, CSI has nevertheless failed to demonstrate an entitlement to injunctive relief.

### A.   <u>Standard For Granting Injunctive Relief</u>

The Supreme Court has held that an "injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). Even if CSI were to succeed upon the merits in this case, the Court must also consider three additional criteria before ordering a permanent injunction: 1) "whether the plaintiff will suffer irreparable harm if the [C]ourt withholds injunctive relief;" 2) "whether the balance of hardships to the respective parties favors the grant of injunctive relief;" and 3) "whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citations omitted). The plaintiff must establish an entitlement to injunctive relief by clear and convincing evidence. *Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983) ("Where injunctive relief is sought, which relief is deemed drastic in nature, the court must exercise great caution and even then, the aggrieved bidder should be made to establish its right to such drastic relief by means of clear and convincing evidence.") (citation omitted).

If a plaintiff does not demonstrate irreparable harm, then the Court must deny its request for a permanent injunction. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury"). A party faces an even greater burden when it seeks injunctive relief that would interfere with Governmental operations. *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 440 (1944) ("But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an

injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.").  Indeed, the Court's jurisdictional statute mandates that the Court will "give due regard to the interests of national defense and national security" when deciding bid protest cases. 28 U.S.C. § 1491(b)(3).  "When military and national security interests are implicated, the public interest factor gains 'inflated' importance in the [C]ourt's balancing of the equities."  *Linc Gov't Servs.*, 96 Fed. Cl. at 702 (citation omitted).  "And when these interests raise national security concerns, they place the weight of both the public interest and the balance of hardships firmly on defendant's side of the scale."  *Id.*

As demonstrated above, CSI has failed to prove that DHS's procurement suffered from any error, much less a prejudicial error.  Consequently, CSI is not entitled to injunctive relief. Moreover, even if CSI were to demonstrate an error in the agency's procurement decisions, the Court should decline to grant any requested relief.

## B.    CSI Has Failed To Demonstrate Irreparable Harm

Although the Court may balance the injunction factors, *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993), a failure to demonstrate irreparable harm is fatal to a protestor's request for injunctive relief.  *MVL USA, Inc. v. United States*, 176 Fed. Cl. 582, 620 (2025) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original)); *Hydraulics Int'l, Inc. v. United States*, 176 Fed. Cl. 191, 198 (2025) (quoting *Amazon*, 239 F.3d at 1350); *Marathon Targets, Inc. v. United States*, 175 Fed. Cl. 725, 734 (2025) (quoting *Amazon*, 239 F.3d at 1350); *see also Qingdao Taifa Grp.*

34

*Co. v. United States*, 581 F.3d 1375, 1382 (Fed. Cir. 2009) (irreparable harm and likelihood of success on the merits are the most influential factors in a preliminary injunction analysis).

The Supreme Court has held that courts cannot *presume* that irreparable harm exists, and the burden is on the plaintiff to *demonstrate* it. *Monsanto*, 561 U.S. at 156-58; *Winter v. Nat. Res. Def. council, Inc.*, 555 U.S. 7, 22 (2008); *eBay Inc.*, 547 U.S. at 391. For example, it used to be the law of the Federal Circuit that patent holders were presumed to suffer irreparable harm upon success on the merits. But *eBay* "jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).

Likewise, the Court no longer may automatically presume the existence of irreparable harm merely because a protestor succeeds on the merits. *See Robert Bosch*, 659 F.3d at 1149. Standing alone, procurement errors in "an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury," because "if they were, any bid protest would involve an irreparable injury." *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001). Rather, each protestor "must provide facts or evidence to support its assertions of harm and cannot rely only 'on attorney arguments to establish irreparable injury." *See Newimar, S.A. v. United States*, 163 Fed. Cl. 240, 254 (2022) (quoting *Chromalloy S.D.. v. United States*, 145 Fed. Cl. 708, 744 (2019) (citing *Intelligent Waves, LLC v. United States*, 135 Fed. Cl. 299, 314 (2017) (noting that the protestors, rather than submitting evidence in support of their claims of irreparable injury, relied on the averments of counsel, and holding that neither protestor "provided the court with the evidence necessary to carry its burden"); *Totolo/King v. United States*, 87 Fed. Cl. 680, 693 (2009) ("Nor can a court evaluate the parties' factual showings regarding the three equitable findings for injunctive relief without accepting post-final-agency-action evidentiary

submissions."); *Ashbritt, Inc. v. United States*, 87 Fed. Cl. 344, 367 (2009) (holding that evidence "pertaining to … the factors governing injunctive relief … is crucial to assess whether relief is warranted"))); *accord OAO Corp.*, 49 Fed. Cl. at 480.

Nevertheless, most protestors cite *CW Government Travel* or similar cases for the proposition that this Court "has repeatedly held that a protester suffers irreparable harm if it is deprived of an opportunity to compete fairly for a contract." *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 495 (2013) (collecting cases).[3] This line of cases, which appears to date back to the early 1990s, recognizes a presumption that irreparable harm exists in every single bid protest whenever a procurement error exists. *See id.* The Court should not follow cases like *CW Government Travel* in light of *Monsanto*, *Winter*, *eBay*, and *Robert Bosch*.

Aside from relying upon flawed presumptions, CSI has not attempted to *demonstrate* irreparable harm. Specifically, it has not submitted a declaration supporting any claim of irreparable harm and, instead, relies solely on the arguments of counsel. *See Gemtron Corp. v. Saing-Gobain Corp*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) (observing that "unsworn attorney argument … is not evidence."); *Chromalloy*, 145 Fed. Cl. at 744 ("Protestors may not rely on attorney argument to establish irreparable injury."). Accordingly, CSI has failed to demonstrate harm and its request for injunctive relief should be denied outright.

---

[3] CSI cites *Orion Technology, Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013), in support of this proposition. Pl. MJAR at 38. *Orion* is unhelpful as it addresses standing and does not speak to irreparable harm—or any other injunctive factor—at all. *See Orion*, 704 F.3d at 1349 (explaining that the protester had standing to challenge its exclusion from the competition because, absent that allegedly irrational decision, it would have had the opportunity to compete for the contract).

C.    **The Balance Of Harms And Public Interest Weigh Heavily Against An Injunction, Particularly In Light Of The Significant National Security Implications**

CSI's failure to establish any meaningful irreparable harm would be sufficient to deny injunctive relief even if there were not serious national security concerns that weighed against such relief.  However, an added reason why CSI's request should be denied is because of the profound national security concerns implicated in the CSRO procurement.  In this Court's jurisdictional statute, Congress instructed that the Court will "give due regard to the interests of national defense and national security" when deciding bid protest cases.  28 U.S.C. § 1491(b)(3); *Linc Gov't Servs.*, 96 Fed. Cl. at 703.  As this Court has held, this statute "states in as plain English as Congress ever proffers that the interests of national defense and national security must be accorded due regard in determining whether to award injunctive relief."  *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 493 (2012).  This Court has held that, where national security issues are implicated, it "clearly places the weight of the balance-of-harms factor on defendant's side of the scale."  *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241-42 (1997); *Cincom Sys. Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997) ("Given the importance of military preparedness to the national defense, the balance of harms tips in defendant's favor."); *Iron Bow Techs., LLC v. United States*, 136 Fed. Cl. 519, 532 (2018) (considering "national security interest in preventing foreign interference with the Nation's technologies" in the injunctive relief analysis); *Fisher Sand & Gravel Co. v. United States*, 143 Fed. Cl. 247, 254 (2019) (finding national security and emergency concerns "to be the anvil that falls on the scale of justice in favor of the government.").

The public interest in national defense and national security is of "paramount import." *Linc*, 96 Fed. Cl. at 702; *see also CSE Constr. Co., Inc. v. United States*, 58 Fed. Cl. 230, 263 (2003) (denying injunctive relief in light of national security concerns because "the relative harm

37

to the government and to the public interest . . . substantially outweighs harm to the plaintiff").

Although this Court has held that it will not "blindly accede" to claims of national security

implication, *GTA Containers, Inc.*, 103 Fed. Cl. at 493, the Supreme Court has held that courts

should defer to military officials' "specific, predictive judgments" regarding the potential harm

of an injunction to national defense and security.  *See Winter*, 555 U.S. at 27; *North Dakota v.*

*United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating

to ... military operations, we properly defer to the judgment of those who must lead our Armed

Forces in battle.").  Indeed, "proper consideration" of national security and the safety of our

service men and women alone can require denial of requested injunctive relief, regardless of the

merits of a protest.  *Id*. at 24; *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 284

(2012) (citing *Yakus,* 321 U.S. at 441, which it described as "the Supreme Court's seminal

opinion on the dominant role of public interest in consideration of any request for injunctive

relief, explaining that the court may 'go much further both to give and withhold relief in

furtherance of the public interest' than it may 'when only private interests are involved.'").

        Here, the United States provides specific, detailed demonstrations of the harm to the

public's national security interests that will likely result from delays to performance of the CSRO

contract.  In a declaration provided in support of this response, Benjamine C. Huffman, the

Senior Official Performing the Duties of the Under Secretary for Management at DHS, explains

that an injunction of the CSRO contract "would have catastrophic consequences for DHS's

ability to fulfill its mission of safeguarding the homeland, enforcing immigration laws, and

maintaining national security."  Decl. of Benjamine C. Huffman (Huffman Decl.), ¶ 12 (attached

as Exhibit A).  In particular, a disruption in CSRO services would cause "immediate disruptions

to ongoing operations, including bottlenecks in removal processes, delays in repatriation flights,

and the inability to process voluntary returns and removals at scale." *Id.* ¶ 13.  It would also require DHS to divert personnel from other operations, weakening DHS's "ability to respond to higher-priority threats, including counterterrorism operations and efforts to dismantle transnational criminal organizations." *Id.* ¶ 14.  It would also "leave high-risk individuals, including those with criminal histories or ties to national security threats, in U.S. communities for longer periods," reducing the public's trust in DHS.  *Id.*

Suspending the voluntary return program would also require DHS to detain more individuals, straining already near-capacity detention centers and further overburdening the immigration court system.  *Id.* ¶¶ 15-16.

In addition to the operational problems, enjoining the CSRO contract would result in the loss of nearly $500,000,000 in obligated funds, a large portion of which has already been invoiced and is therefore unrecoverable.  *Id.* ¶ 17.  Transitioning urgent requirements to alternative vehicles would cost an estimated $85,700,000 over three months, including the cost of maintaining services at current levels and recompeting the CSRO requirement.  *Id.* ¶ 18. Moreover, the CSRO contract facilitates the distribution of financial incentives for voluntary removal; delay in the distribution of those incentives would harm those currently waiting for bonuses, undermine the efficiency of the program, and discourage other individuals from participating in the voluntary removal program.  *Id.* ¶ 19.

Ultimately,

The harm caused by terminating the CSRO contract would extend far beyond individual cases, creating systemic vulnerabilities in the United States's immigration enforcement and national security systems.  DHS would lose critical momentum in its efforts to address illegal immigration, safeguard national security, and uphold its mission.  The cumulative effect of stopping the contract would include diverted resources, weakened partnerships with foreign governments, and increased enforcement burdens.

*Id.* ¶ 28.  The balance of harms and the public interest thus weigh heavily against injunctive relief.  The Court should therefore decline to issue an injunction in this case.

**<u>CONCLUSION</u>**

For these reasons, the United States respectfully requests that the Court dismiss CSI's complaint for lack of standing.  In the alternative, we respectfully request that the Court grant judgment on the administrative record in favor of the Government and deny CSI's motion for judgment upon the administrative record.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Acting Deputy Director

OF COUNSEL:
Charlene T. Storino
Assistant General Counsel
for Procurement Operations
General Law Division
Office of the General Counsel
Department of Homeland Security
Tel:  (202) 357-9936
charlene.storino@hq.dhs.gov

s/ Reta E. Bezak
RETA E. BEZAK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tele: (202) 305-5633
Reta.E.Bezak@usdoj.gov

December 9, 2025

*Attorneys for Defendant*