**Redacted Version**

# Exhibit A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

| | | |
|---|---|---|
| CSI AVIATION, INC., | ) | **Proposed Redacted Version** |
| Plaintiff, | ) | |
| v. | ) | No. 25-1338C |
| | ) | (Judge Solomson) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| SALUS WORLDWIDE SOLUTIONS CORP., | ) | |
| Defendant-Intervenor. | ) | |

**DECLARATION OF BENJAMINE C. HUFFMAN, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE UNDERSECRETARY FOR MANAGEMENT**

I, Benjamine C. Huffman, declare the following to be true and correct.

1. I serve as the Senior Official Performing the Duties of the Under Secretary for Management at the Department of Homeland Security (DHS). As part of these duties, I am responsible for establishing and overseeing the implementation of policies within the Department regarding management, transition strategy, budget, appropriations, expenditures, acquisition, human capital, information technology, facilities, property, and other material resources. I am designated as the DHS Chief Acquisition Officer, and I exercise and fulfill all acquisition management responsibilities for the Department, including serving as the DHS Acquisition Decision Authority. These responsibilities are critical to ensuring that DHS's mission is achieved through effective management of the agency's acquisition activities and resources.

2. As Chief Acquisition Officer, I oversee and approve acquisition and procurement decisions across DHS, including the contract entitled Comprehensive Support for Removal Operations (CSRO), which is the subject of this bid protest. My role includes defining, implementing, and overseeing DHS-wide acquisition governance structures, policies, and procedures to ensure the efficient and

effective execution of major and non-major acquisition programs. I also serve as the approving authority for acquisition determinations and certifications required under federal law and regulation. The CSRO contract is a significant procurement that directly supports DHS's mission of safeguarding the homeland, enforcing immigration laws, and maintaining national security. As the official responsible for acquisition management and oversight, I am uniquely positioned to provide this declaration and explain the significance of the CSRO contract to DHS's operations and objectives.

## PROCEDURAL BACKGROUND

3. The United States continues to face record levels of illegal immigration, necessitating an aggressive response to reinforce border security, enforce domestic immigration laws, and remove individuals unlawfully present in the country. To address this challenge, DHS has implemented a multi-faceted strategy that includes domestic enforcement operations and international capacity-building efforts.

4. On January 20, 2025, President Trump declared a national emergency at the Southern border to halt illegal entries into the United States. This declaration directed DHS to take immediate and decisive actions to ensure the efficient and expedited removal of illegal aliens.

5. In response, DHS launched several initiatives, including the CBP Home Application, which provides a pathway for individuals to self-identify and voluntarily return to their home countries.

6. Building on these efforts, the President issued Proclamation 10935, Establishing Project Homecoming on May 9, 2025, which directed DHS to ramp up programs supporting voluntary returns and self-deportations. This proclamation also mandated a significant increase in domestic immigration enforcement operations, including the addition of at least 20,000 law enforcement personnel to locate, detain, and deport individuals who fail to self-deport.

7. To meet these ambitious goals, DHS partnered with the Department of State to engage foreign governments and build their capacity to accept and support increased U.S. deportations. This collaboration is essential to eliminating international bottlenecks and ensuring the success of both voluntary and involuntary removal operations.

8. DHS rapidly solicited and awarded the CSRO contract using unusual and compelling urgency to meet the efforts identified in the President's May 9th Proclamation.

9. The CSRO contract provides a wide range of essential services that enable DHS to meet its mission needs under Project Homecoming. These services include

logistical coordination for voluntary returns and involuntary removals, transportation and travel support for individuals being repatriated, and the establishment and management of international staging areas to facilitate removal flights. The contractor also provides operational support for the CBP Home Application, which allows individuals to self-identify and voluntarily return to their home countries. Additionally, the CSRO contract includes building foreign partner capacity to accept deportees and conduct their own removal operations, as well as managing the complex logistics of simultaneous domestic and international operations.

10. The scope of the CSRO contract is expansive, encompassing the coordination of removal flights, case tracking from initial processing to final destination, and the provision of $1,000 exit bonuses to individuals and $2,500 stipends to unaccompanied minor children opting for voluntary returns. These services are critical to ensuring that DHS can scale its operations to meet the ambitious goals of Project Homecoming. Without the CSRO contract, DHS would lack the operational infrastructure and logistical capacity to conduct removal operations at the scale and efficiency required to meet its mission objectives. The contract's comprehensive scope ensures that DHS can address both domestic and international challenges in enforcing immigration laws and safeguarding the homeland.

11. Under the CSRO contract, DHS issued a task order and began immediate voluntary departure operations of illegal aliens. These operations, conducted as part of Project Homecoming, have been critical to fulfilling the objectives outlined in the May 9, 2025 Presidential Proclamation. To date, the CSRO contract has facilitated the voluntary return of 38,380 individuals, with another 28,582 individuals in various stages awaiting departure. The CSRO contract has provided DHS with the logistical and operational framework necessary to initiate and sustain removal operations at a scale that would not have been possible otherwise. These achievements demonstrate the essential role of the CSRO contract in enabling DHS to meet the ambitious goals of Project Homecoming efficiently and effectively.

## POTENTIAL OF HARM IF CONTRACT IS STOPPED

12. Suspending or discontinuing the CSRO contract would have catastrophic consequences for DHS's ability to fulfill its mission of safeguarding the homeland, enforcing immigration laws, and maintaining national security.

13. The CSRO contract provides a unique logistical framework that allows DHS to synchronize voluntary returns with involuntary removals, ensuring maximum efficiency and throughput. Without it, DHS would face immediate disruptions to ongoing operations, including bottlenecks in removal processes, delays in repatriation flights, and the inability to process voluntary returns and removals at

scale. These disruptions would severely undermine DHS's ability to meet the
goals of Project Homecoming and enforce immigration laws effectively.

14. Terminating the CSRO contract would force DHS to divert personnel, funding,
and logistical resources from other critical missions to address the gaps left by the
suspended or canceled contract. Such diversions would weaken DHS's ability to
respond to higher-priority threats, including counterterrorism operations and
efforts to dismantle transnational criminal organizations. Delays in removal
operations would leave high-risk individuals, including those with criminal
histories or ties to national security threats, in U.S. communities for longer
periods, increasing the potential for harm. This would also lead to public criticism
and reduced trust in DHS's ability to manage immigration challenges humanely
and efficiently, further eroding public confidence in the Department's operations.
The voluntary return pathway provided under Project Homecoming has fostered
public confidence in DHS's ability to address unlawful migration in a structured
and humane manner. Without the CSRO contract, DHS would be forced to rely on
less efficient and more costly measures that could undermine this trust and
increase public scrutiny.

15. Detention centers are already operating near capacity. Removing, or even
temporarily suspending, the voluntary return option would force DHS to detain
more individuals, leading to overcrowding, increased operational inefficiencies,
and heightened risks of legal challenges related to detention conditions.

16. The immigration court system is already overburdened, with cases taking years to
resolve. Removing the streamlined voluntary return pathway would flood the
courts with additional cases, further delaying proceedings and undermining the
integrity of the judicial process.

17. Halting the CSRO contract would result in the loss of significant investments
already made in DHS's operations under Project Homecoming, including
$498,297,146.19 in obligated funds, of which $179,735,518.70 has already been
invoiced and is therefore unrecoverable. Resources allocated to developing a
comprehensive application that works with the CBP Home Application, and
building foreign partner capacity would be wasted, forcing DHS to start over and
incur additional costs.

18. Transitioning to alternative measures would require substantial time and funding,
further straining DHS's budget. DHS estimates that transitioning to alternative
solutions over a three-month period would cost approximately $85,700,000,
including the cost to re-compete the contract and maintain services at their current
levels. Without the streamlined processes supported by the CSRO contract, DHS
would face higher per-unit costs for removals, resulting in an overall increase in
operational expenses. The financial harm caused by halting the contract would be
immediate and long-lasting, jeopardizing DHS's ability to meet its objectives

under Project Homecoming and fulfill its broader mission of safeguarding the homeland.

19. The CSRO contract facilitates the distribution of $1,000 exit bonuses for individuals and $2,500 stipends for unaccompanied minor children choosing voluntary returns. These bonuses are a key component of Project Homecoming, incentivizing individuals to self-identify and voluntarily return to their home countries. The bonuses help establish trust in the program and encourage participation, reducing the need for costly and resource-intensive involuntary removal efforts. Disrupting the CSRO contract would interrupt the distribution of these exit bonuses, potentially leaving thousands of individuals who have opted for voluntary departure unable to collect their bonuses upon arrival in their home countries. This would undermine trust in the program and discourage future participation, forcing DHS to rely more heavily on expensive and logistically challenging involuntary removals. Halting the CSRO contract would also directly disrupt ongoing cases involving individuals already participating in voluntary return efforts. These individuals would face uncertainty and potential hardship, as DHS would no longer have the resources or logistical support to manage their cases effectively. This disruption would undermine the credibility of Project Homecoming, eroding trust in DHS's ability to provide humane and structured pathways for addressing immigration status.

20. The voluntary nature of Project Homecoming, supported by the CSRO contract, serves as a deterrent by demonstrating that the United States is committed to addressing unlawful migration in a structured and humane manner. The program provides individuals with a clear and dignified pathway to return to their home countries voluntarily, reducing the need for detention and enforcement actions. Terminating the CSRO contract would weaken this deterrent effect, encouraging further unlawful migration and increasing pressure on border security operations. Without the incentives and streamlined processes provided by the CSRO contract, DHS would face higher costs, longer timelines, and greater challenges in managing migration effectively.

21. DHS explored several alternate solutions to the CSRO contract, including relying on existing contracts, modifying current agreements, reallocating internal resources, using government personnel to perform the required services, expanding detention operations, increasing court proceedings for removal cases, conducting direct enforcement actions, and negotiating bilateral agreements with foreign governments. However, none of these alternatives provide the comprehensive scope of services offered under the CSRO contract, nor can they match the efficiency, scale, and cost-effectiveness of the current contract.

22. Existing contracts do not include the full range of required services, such as logistics, transportation, case tracking, and medical support. Attempting to modify these contracts would exceed their scope and capacity, creating significant coordination challenges and accountability gaps as individuals move through the

repatriation process. This would also introduce dangerous operational seams between contractors, particularly for time-sensitive medical services and transportation, and increase the risk of inconsistent service delivery and standards across the removal process.

23. Relying solely on government personnel to perform these tasks would create significant risks of unsuccessful performance and delay in meeting mission requirements. DHS lacks sufficient personnel with the specialized skills required for these operations, particularly for aviation and medical components. While DHS personnel can provide oversight and program management, the scope of services required under the CSRO contract is too voluminous and complex for current DHS personnel to perform without external support.

24. DHS also considered reallocating existing resources and personnel from other critical missions to fill the gap left by the CSRO contract. These alternatives could include expanding detention operations, increasing court proceedings for removal cases, conducting more direct enforcement actions, or negotiating additional bilateral agreements with foreign governments to facilitate removals without the logistical and operational support provided by the CSRO contract. However, these alternatives would come at a high cost. Diverting resources from other DHS missions, such as counterterrorism efforts, cybersecurity initiatives, and disaster response operations, would create significant operational inefficiencies and leave critical areas of national security vulnerable.

25. Traditional enforcement measures, such as expanding detention facilities and court proceedings, are resource-intensive and would require substantial additional funding. Without the streamlined processes supported by the CSRO contract, DHS would face higher costs and longer timelines for achieving its removal goals. Additionally, the absence of the CSRO contract would limit DHS's ability to scale operations and coordinate effectively with foreign governments, leading to bottlenecks in removal processes, delays in repatriation flights, and reduced cooperation from international partners. Relying on traditional enforcement measures could also lead to public criticism and reduced trust in DHS's ability to manage immigration challenges humanely and efficiently. The voluntary return pathway provided under Project Homecoming has fostered public confidence in DHS's ability to address unlawful migration in a structured and humane manner. Without the CSRO contract, DHS would be forced to rely on less efficient and more costly measures that could undermine this trust and increase public scrutiny.

26. Stopping the CSRO contract would create significant logistical challenges for DHS, including wasted resources, disruptions to ongoing operations, and delays in reconfiguring enforcement measures. The absence of the CSRO contract's logistical framework would force DHS to rely on piecemeal solutions, such as expanding detention operations and increasing court proceedings, which are resource-intensive and inefficient. Transitioning from a voluntary approach to traditional enforcement measures would require substantial time and funding,

further straining DHS's ability to respond to immediate needs. These logistical challenges would undermine DHS's ability to maintain operational continuity and prioritize high-risk cases, such as those involving national security threats or individuals with criminal histories.

27. DHS relies on close collaboration with foreign governments to facilitate repatriations and build international capacity for immigration enforcement. Terminating the CSRO contract would undermine trust with foreign governments, making it more difficult for DHS to secure future cooperation on deportations and broader security initiatives. Countries that have agreed to accept deportees under the CSRO framework may impose additional conditions or reduce their cooperation, creating bottlenecks in removal operations and straining diplomatic relationships. This would also damage diplomatic relations with foreign governments and international organizations, reducing their willingness to collaborate on other security initiatives. The loss of credibility as a leader in addressing migration and transnational threats would severely weaken the United States's ability to form and maintain critical alliances.

28. The harm caused by terminating the CSRO contract would extend far beyond individual cases, creating systemic vulnerabilities in the United States's immigration enforcement and national security systems. DHS would lose critical momentum in its efforts to address illegal immigration, safeguard national security, and uphold its mission. The cumulative effect of stopping the contract would include diverted resources, weakened partnerships with foreign governments, and increased enforcement burdens. These challenges would irreparably harm DHS's ability to address broader threats to the homeland, including transnational criminal organizations, human trafficking networks, and potential national security risks.

29. Given the immediate and far-reaching consequences described above, it is imperative that the CSRO contract be allowed to continue to ensure the safety and security of the United States and its citizens.

I declare under penalty of perjury that the foregoing is true and correct.

BENJAMINE C HUFFMAN
Digitally signed by BENJAMINE C HUFFMAN
Date: 2025.12.03 17:12:03 -05'00'

**Benjamine C. Huffman**
Senior Official Performing the Duties of the
Under Secretary for Management