# In the United States Court of Federal Claims

**BID PROTEST**
(Filed: December 30, 2025)

| | |
|---|---|
| **CSI AVIATION, INC.,** | **Redacted Version** |
| *Plaintiff,* | |
| v. | Case No. 25-1338C |
| **THE UNITED STATES,** | |
| *Defendant,* | Judge Solomson |
| and | ███████████████ |
| **SALUS WORLDWIDE SOLUTIONS CORPORATION,** | |
| *Defendant-Intervenor.* | |

---

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO DEFENDANTS' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTIONS TO DISMISS**

---

Jennifer S. Zucker
        *Counsel of Record*
Christopher M. O'Brien
Cassidy Kim
GREENBERG TRAURIG, LLP
2101 L Street, NW,
Suite 1000
Washington, DC 20037
Tel: (202) 331-3114
Fax: (202) 331-3101
zuckerjs@gtlaw.com

*Counsel for CSI Aviation, Inc.*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................ 1

II.     MOTION TO DISMISS ........................................................................................... 3

   A.  Jurisdiction and Standard of Review ................................................................. 3

   B.  The Pre-Award "Non-Trivial Competitive Injury" Standard Applies ............... 4

III.    MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD ...................... 10

   A.  The Record Confirms Agency Did Not Have an Unusual and Compelling Urgency to Issue a Limited Procurement ................................................................................. 10

      1. Defendants Identify No Unusual and Compelling Urgency For This Procurement ..... 10

      2. Defendants' Vague References To National Security Do Not Justify DHS's Actions  14

      3. DHS Would Suffer No Serious Injury From Delay ...................................................... 15

   B.  The Record Confirms the Agency Violated FAR 6.302-2's Requirement to Solicit as Many Offers as Practicable .......................................................................... 17

   C.  The Agency Violated FAR 6.302-2's Limitation on the Period of Performance ............ 19

   D.  DHS Failed to Publish the Solicitation and Synopsis ....................................... 21

   E.  DHS Continues to Violate 41 CFR Part 102-33.5 by Conducting Aviation Operations Without Approved Flight Program Standards .................................................. 23

   F.  CSI Is Entitled to Injunctive Relief ................................................................... 25

IV.     CONCLUSION ........................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acetris Health, LLC v. United States*,
    949 F.3d 719 (Fed. Cir. 2020)............................................................................................4

*Advanced Sys. Develop., Inc. v. United States*,
    72 Fed. Cl. 25 (2006) ........................................................................................................16

*Am. Relocation Connections, L.L.C. v. United States*,
    789 F. App'x 221 (Fed. Cir. 2019) ....................................................................................6

*Baude v. United States*,
    955 F.3d 1290 (Fed. Cir. 2020)..........................................................................21, 22, 25

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012)..........................................................................................3

*Cal. Indus. Fac. Res., Inc. v. United States*,
    100 Fed. Cl. 404 (2011) ................................................................................................9, 17

*Cardinal Maint. Serv. v. United States*,
    63 Fed. Cl. 98 (2004) ........................................................................................................28

*Ceres Env't Servs., Inc. v. United States*,
    158 Fed. Cl. 547 (2022) ..............................................................................................15, 18

*CGI Federal, Inc. v. United States*,
    118 Fed. Cl. 337 (2014) ......................................................................................................8

*CHE Consulting, Inc. v. United States*,
    78 Fed. Cl. 380 (2007) ................................................................................................14, 15

*Cosette Pharms., Inc. v. United States*,
    2025 U.S. Claims LEXIS 3341 (Fed. Cl. Oct. 31, 2025)..............................................10, 19

*CW Government Travel, Inc. v. United States*,
    110 Fed. Cl. 462 (2013) ....................................................................................................27

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020)..............................................................................................................11

*Filtration Dev. Co., LLC v. United States*,
    60 Fed. Cl. 371 (2004) ......................................................................................................15

iii

*Focus Revision Partners v. United States*,
   161 Fed. Cl. 711 (2022) ................................................................................14

*Gemini Tech Servs., LLC v. United States*,
   No. 25-1337C, 2025 U.S. Claims LEXIS 2680 (Fed. Cl. Sept. 8, 2025) ................................15

*Google, Inc. v. United States*,
   95 Fed. Cl. 661 (2011) ..................................................................................6

*GovCIO, LLC v. United States*,
   177 Fed. Cl. 579 (2025) ...........................................................................10, 16

*Green Tech. Group, LLC v. United States*,
   147 Fed. Cl. 231 (2020) ................................................................................27

*Groundbreaker Dev. Corp. v. United States*,
   163 Fed. Cl. 619 (2023) ..................................................................................3

*GTA Containers, Inc. v. United States*,
   103 Fed. Cl. 471 (2012) ................................................................................27

*Info. Tech. & Applications Corp. v. United States*,
   316 F.3d 1312 (Fed. Cir. 2003)...........................................................................5

*Innovation Dev. Enters. of Am., Inc. v. United States*,
   108 Fed. Cl. 711 (2013) .............................................................................7, 23

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986)......................................................................................14

*Novosteel SA v. United States*,
   284 F.3d 1261 (Fed. Cir. 2002)..........................................................................20

*Palantir Techs., Inc. v. United States*,
   128 Fed. Cl. 21 (2016) ..............................................................................6, 7

*Per Aarsleff A/S v. United States*,
   123 Fed. Cl. 147 (2015) ..................................................................................5

*Piedmont Propulsion Sys., LLC v. United States*,
   167 Fed. Cl. 72 (2023) ..................................................................................26

*Red River Holdings, LLC v. United States*,
   87 Fed. Cl. 768 (2009) ..............................................................................28, 29

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006)..........................................................................20

*Superior Waste Mgmt. LLC v. United States*,
   169 Fed. Cl. 239 (2024) ...............................................................................5

*Vargas v. United States*,
   114 Fed. Cl. 226 (2014) ...............................................................................3

*Weeks Marine, Inc. v. United States*,
   575 F.3d 1352 (Fed. Cir. 2009)...................................................4, 5, 7, 25

**Statutes**

28 U.S.C. § 1491 ..............................................................................................4

5 U.S.C. § 706 ................................................................................................14

**Regulations**

41 C.F.R. § 102-33.5 .........................................................................23, 24, 25

FAR 1.704 ......................................................................................................21

FAR 5.202 .................................................................................................21, 22

FAR 5.203 .................................................................................................21, 22

FAR 6.302-2 .......................................................................................... *passim*

FAR 15.201 ......................................................................................................8

**Other Authorities**

Department of Justice, HOW TO APPLY FOR VOLUNTARY DEPARTURE (Oct. 2011) ...................12

EO 14159 ...................................................................................................11, 12

90 Fed. Reg. 8327 ..........................................................................................19

90 Fed. Reg. 20358 ........................................................................................13

90 Fed. Reg. 58425 ........................................................................................25

RCFC Rule 12(b)(1) .........................................................................................3

## I.    <u>INTRODUCTION</u>

Plaintiff, CSI Aviation, Inc. ("CSI"), respectfully submits this Reply in support of its Motion for Judgment on the Administrative Record, ECF No. 26 (hereinafter "Pl.'s MJAR") and response in opposition to Defendant, the United States' (the "Government"), and Defendant-Intervenor, Salus Worldwide Solutions Corp.'s ("Salus") (collectively, "Defendants"), combined motions to dismiss, or in the alternative, cross-motions for judgment on the administrative record and responses, Def.'s Mot. for J. on Admin. R., ECF No. 33 (hereinafter, "Def.'s MJAR"), Def.-Intervenor's Mot. for J. on Admin. R., ECF No. 32 (hereinafter, "Salus's MJAR").

This case presents an egregious departure from the fundamental principles of federal procurement law. At stake is not only the integrity of a procurement valued at nearly $1 billion, but also the public's confidence that government contracts will be awarded in accordance with law, transparency, and fair competition—even when the government invokes "urgency" and "national security."

The facts are not in dispute. The Department of Homeland Security ("DHS") orchestrated a noncompetitive procurement for commercial air services under the guise of "unusual and compelling urgency," issuing a solicitation to a handpicked group of vendors, refusing to publish the solicitation or respond to expressions of interest from qualified firms like CSI, and then awarding a sprawling multi-year contract to Salus after excluding CSI and other capable competitors from competing. Since then, the contract has ballooned through a series of opaque modifications, funneling hundreds of millions of dollars in taxpayer funds to a single contractor with virtually no oversight or competition. This is precisely the type of conduct that the Competition in Contracting Act ("CICA") and the Federal Acquisition Regulation ("FAR") are designed to prevent.

1

DHS's actions cannot be justified by post hoc invocations of national security or urgency. The record is clear: the agency was aware of its requirements for months, yet failed to plan, failed to conduct meaningful market research, and failed to pursue competition to the maximum extent practicable. Instead, DHS's procurement strategy was defined by a lack of advance planning, arbitrary decision-making, and a systematic effort to foreclose competition. The government's various attempts to manufacture "urgency" after the fact—whether by citing executive orders, presidential proclamations, or shifting policy priorities—find no support in the contemporaneous record.

Defendants' responses are equally unavailing. Rather than addressing the manifest legal violations, Defendants recycle vague references to national security, unsupported assertions of "serious injury," and dire warnings of financial loss should the Court issue injunctive relief. But neither urgency nor efficiency can excuse DHS's flagrant disregard of the FAR's competition requirements or the agency's wholesale exclusion of qualified bidders. The law is clear: national security concerns must be balanced against the overriding public interest in preserving the integrity of the procurement process. The Court is not required to "blindly accede" to executive branch assertions; instead, it must rigorously scrutinize the administrative record and ensure the government's actions are lawful, rational, and supported by evidence.

The government's arguments on standing are equally misplaced. This is a pre-award protest, and the Federal Circuit has made clear that CSI need only allege a non-trivial competitive injury—which it has done. DHS's efforts to apply a post-award "substantial chance" standard are not only contrary to binding precedent, but circular and self-serving given that CSI was excluded from the process altogether.

Finally, the public interest could not be clearer or more compelling. If this case is allowed to stand, it will set a dangerous precedent, effectively allowing agencies to evade competition for contracts of unprecedented magnitude by invoking vague claims of urgency and national security. The Court's intervention is not just warranted—it is necessary to ensure that the law is followed, competition is preserved, and the public's trust in federal contracting is restored.

For all these reasons, and as detailed below, the Court should deny Defendants' motions to dismiss, grant judgment for CSI on the administrative record, and issue appropriate injunctive relief to remedy DHS's unlawful actions.

## II.    MOTION TO DISMISS

### A. Jurisdiction and Standard of Review

To prevail on a motion to dismiss under RCFC 12(b)(6), the defendant must show that the facts, as pleaded, fail to state a claim upon which relief may be granted. In determining whether a plausible claim has been stated, the court should "generally construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012); *see also Vargas v. United States*, 114 Fed. Cl. 226, 232 (2014) (same).

Likewise, this "plausibility" requirement "also applies to facial challenges to subject-matter jurisdiction under rule 12(b)(1)"—including challenges to standing. *Groundbreaker Dev. Corp. v. United States*, 163 Fed. Cl. 619, 627 (2023) (quoting *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354–55 (Fed. Cir. 2018)). As with RCFC 12(b)(6) challenges, in the RCFC 12(b)(1) context the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.*

3

**B. The Pre-Award "Non-Trivial Competitive Injury" Standard Applies**

Defendants wrongly argue that CSI lacks standing to challenge DHS's failure to conduct a competitive procurement, asserting that CSI must show a "substantial chance of receiving the award"—a standard that applies only in post-award protests. Def.'s MJAR at 10–14; Salus's MJAR at 11–15. This argument is both circular and contrary to binding Federal Circuit precedent.[1] In a pre-award protest, CSI need only allege a non-trivial competitive injury, which it has done. Under the correct standard, CSI has clearly established standing.

The Tucker Act confers jurisdiction on the Court of Federal Claims over actions brought "by an interested party objecting to ... the award of a contract [by a federal agency]." 28 U.S.C. § 1491(b)(1). As the Federal Circuit has explained, two requirements define the scope of this jurisdiction: (1) the protest must be "in connection with a procurement or a proposed procurement," and (2) the protestor must qualify as an "interested party." *Acetris Health, LLC v. United States*, 949 F.3d 719, 727 (Fed. Cir. 2020). While the first requirement is straightforward, the second requires a party to establish both that it is "an actual or prospective bidder" and that it "possesses the requisite direct economic interest." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)). Here, defendants do not dispute that CSI is a "prospective bidder."

With respect to the "direct economic interest" prong of the "interested party" analysis, the Federal Circuit has clarified that "in a pre-award protest"—such as this case—a "prospective bidder or offeror must establish 'a non-trivial competitive injury which can be redressed by judicial

---

[1] The Government references RCFC 12(b)(6), failure to state a claim upon which relief may be granted, in the first sentence of its motion. Def.'s MJAR at 1. However, the Government fails to articulate the applicable standard of review for a 12(b)(6) motion, apply that standard to its argument, or otherwise explain the grounds upon which it is seeking dismissal under this theory. *See id.* at 8–14. The only other time the Government mentions dismissal is in the second-to-last sentence of its brief. *Id.* at 40. The Government thus fails to provide a legal basis for granting its motion.

relief' to satisfy standing under § 1491(b)(1)." *Weeks Marine*, 575 F.3d at 1363 (quoting *WinStar*

*Communications, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)). This standard differs from

post-award protests, where a disappointed bidder must show "a substantial chance" of receiving

the contract award but for the alleged procurement error. *Info. Tech. & Applications Corp. v.*

*United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United*

*State*s, 175 F.3d 1365, 1367 (Fed. Cir. 1999). The Federal Circuit has explained that the

"substantial chance" standard is inapplicable to pre-award protests because, at that stage, there

have been neither bids nor a contract award, and thus "***there is no factual foundation for a 'but***

***for' prejudice analysis***. *Weeks Marine*, 575 F.3d at 1361 (emphasis added). Accordingly, the

Federal Circuit has affirmed, in pre-award protests, standing is established by alleging a non-trivial

competitive injury that can be remedied by judicial relief. *Per Aarsleff A/S v. United States*, 123

Fed. Cl. 147, 155 (2015) (quoting *Weeks Marine*, 575 F.3d at 1361); *see also Superior Waste*

*Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 272 (2024) (noting the "non-trivial competitive

injury" test applies, for example, to challenges to the terms of a solicitation).

      Here, there is no "factual foundation" to support application of the post-award "but for"

standard. CSI's protest challenges the Solicitation itself, specifically DHS's improper invocation

of unusual and compelling urgency to circumvent full and open competition; failure to solicit

offers from as many potential sources as practicable; violation of the limitation on the period of

performance; failure to publish the Solicitation and required synopsis; and issuance of a solicitation

for the procurement of Commercial Air Services in violation of law. *See* Compl. at 12–28. CSI

pleaded that "DHS refused to respond to CSI['s expression of interest in the acquisition], refused

to provide CSI with a copy of the Solicitation, and otherwise refused to allow CSI to compete [in

the acquisition]," and also failed to publish a copy of the Solicitation. *Id.* at ¶¶ 61, 80–81. Further,

CSI asserted that it has performed similar work for other government agencies, expressed a desire to compete for this procurement, and, had DHS properly conducted a full and open competition, CSI would have participated and the pool of eligible offerors would have been substantially different. *Id.* at ¶¶ 51, 63. CSI timely filed its protest at GAO before the deadline for receipt of proposals, thus preserving its pre-award challenges—none of which are contested by the Government or Salus contest. *Id.* at 5; *see generally*, Def.'s MJAR; Salus's MJAR. Under these circumstances, the post-award "but for" standard is inapplicable.

Taking these allegations as true, CSI has sufficiently alleged a "non-trivial competitive injury." DHS non-competitive procurement precluding CSI from bidding, despite CSI's experience performing similar work for other government agencies, and failed to conduct the Solicitation in accordance with applicable laws and regulations. *See Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019) ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by ... [an] agency's actions"); *see also Google, Inc. v. United States*, 95 Fed. Cl. 661, 673 (2011) ("[I]t is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals") (internal citation omitted).

With respect to Defendants' argument for application of the "substantial chance" test, this Court has previously declined to adopt that standard in similar circumstances and should do so again. *See Palantir Techs., Inc. v. United States*, 128 Fed. Cl. 21, 37–38 (2016). In *Palantir*, the Government insisted that "the Federal Circuit [has] applied the 'substantial chance' prejudice standard to a protest challenging the rejection of a proposal prior to the issuance of a contract award." *Palantir*, 128 Fed. Cl. at 37 (citing *Orion Tech., Inc. v. United States*, 704 F.3d 1344 (Fed.

Cir. 2013)). The Court, however, distinguished *Orion*, explaining that for Palantir, the agency had not evaluated a proposal from the protestor because none had been submitted; thus, unlike *Orion*, there was no basis for the agency to assess the bid or provide reasons for rejection. *Id.* Accordingly, the Court found the protest more akin to the *Weeks Marine* line of cases, as it challenged the terms of the solicitation itself rather than the application of solicitation criteria to a particular proposal. *Id.* at 37–38. The Court further held that the plaintiff established standing by alleging its capability to meet the requirements, including evidence of similar contracts with other agencies. *Id.* at 38.

As in *Palantir*, DHS never evaluated a proposal from CSI—because CSI was never given the chance to submit one. There is no factual basis for a "substantial chance" analysis when DHS affirmatively prevented CSI from participating and withheld the Solicitation. Defendants do not dispute that DHS ignored CSI's request for the Solicitation, excluded CSI from the procurement process, and failed to publicly publish the Solicitation. *See* Def.'s MJAR at 6 n.1 ("The RFP was issued to six vendors"), 7 ("[t]he contracting officer . . . did not respond to CSI's inquiry"), 28 ("DHS was not required to publish a synopsis"); Salus's MJAR at 8, 24, 27 (same). As of the date of this filing—seven months after proposals were due—DHS still has not publicly posted or provided CSI with a copy of the Solicitation.[2]

Defendants' assertion that DHS evaluated CSI as unqualified to perform the SOW is unfounded. DHS prevented CSI from submitting a proposal and never assessed CSI's qualifications. *See* Def.'s MJAR at 12–14;[3] Salus's MJAR at 11–12. The record contains no

---

[2] Salus claims "an adequate factual predicate exists because proposals were submitted, evaluated, and contract award has been made." Salus's MJAR at 11. The submission and evaluation of other offerors' proposals is irrelevant to the standard applied in CSI's pre-award protest of the RFP itself where CSI was prevented from submitting a proposal.
[3] Despite CSI filing this protest in August, Defendants contend for the first time in their briefs in December, that CSI has not demonstrated it is a qualified bidder. As such, CSI has not had occasion to address this argument until now.

evaluation of CSI's ability to perform. *Cf. Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. 711, 732–33 (2013) (("[a]lthough the government, during the course of this protest, has suggested that [the plaintiff] was not a qualified, responsible source for [the procurement], the record is devoid of any assessment of [the plaintiff's] qualifications by the [agency]"). Defendants' reliance on a brief mention of ICE Air contractors in the May 15, 2025 Market Research is misplaced; that document *does not reference CSI and cannot be construed as an evaluation of CSI's capabilities. See* Tab 106, AR 905–19; *see also CGI Federal, Inc. v. United States*, 118 Fed. Cl. 337, 350–51 (2014) ("the Government is jumping the gun—evaluating [plaintiff's] hypothetical compliance with the RFQs and attempting to make a nonresponsibility determination for the purposes of litigation without a contracting officer doing the analysis"), *rev'd on other grounds*, 779 F.3d 1346 (Fed. Cir. 2015).

It is unreasonable for DHS to exclude offerors based solely on the scope of a different contract, as an offeror's experience under one contract does not define the full extent of its capabilities. The RFI process exists to "improve the understanding of Government requirements and industry capabilities, thereby allowing potential offerors to judge whether or how they can satisfy the Government's requirements." FAR 15.201(b). In this case, DHS failed to solicit input from ICE Air contractors and barred CSI from demonstrating its broader experience, including work in the commercial sector and with numerous governmental and international organizations. *See e.g.* DeLucia Decl. at ¶¶ 10, 24 (noting CSI has experiences coordinating with embassies through work with the State Department and its ability to seamlessly coordinate travel as an IATA Accredited Travel Agency). By contrast, DHS summarily concluded—without reasonable inquiry—that "[t]he vendors of ICE Air do not have the experience either as Prime or subcontractors conducting this type of work." Tab 106, AR 915.

Had DHS allowed CSI to participate at the RFI or RFP stages, CSI would have demonstrated its substantial aviation and immigration experience and its ability, with teaming partners, to meet all CSRO RFP requirements. *See* DeLucia Decl. ¶¶ 19–29. CSI's team includes former ICE Senior Deportation Detention Officers, Deportation Detention Officers, and ICE liaisons with worldwide partner nation experience. *Id.* at ¶ 22. CSI also supports rescue operations in Africa and collaborates with USAID and the U.S. Department of State, requiring close coordination with embassies and deployed personnel. *Id.* ¶¶ 7, 10.

As the prime contractor for ICE Air, CSI manages worldwide involuntary removal operations, including complex logistics, global flight coordination, medical and security support, scheduling, passenger management, data reporting, and coordination of travel documents, licenses, and permits. *Id.* ¶ 12. CSI handles ▮▮▮▮▮▮▮ passengers annually—far exceeding the 38,000 passengers assisted by Salus under the CSRO contract. *See id.* ¶ 18; Huffman Decl., ECF No. 33-1, ¶ 11; Cappel Decl., ECF No. 32-1, ¶ 6.

CSI is also an IATA Accredited Travel Agency, enabling seamless coordination of travel and commercial ticketing for escorted and unescorted returns, utilizing enterprise-level travel systems well-suited to CSRO program needs. DeLucia Decl. ¶ 25. CSI regularly provides program management and data reporting under multiple contracts, and its partners have expertise in ground transportation, international operations, staging facilities, and supporting donations to host nations. *Id.* ¶¶ 27–28. Thus, CSI is fully capable of meeting all RFP requirements and would have demonstrated this if given the opportunity. Defendants' arguments to the contrary are unfounded.

At bottom, Defendants contend that because DHS blocked CSI from demonstrating its capabilities, CSI cannot prove it is qualified—a circular and self-serving argument that exemplifies the "gamesmanship to avoid any review of an improper … award" condemned by this Court. *Cal.*

9

*Indus. Fac. Res., Inc. v. United States*, 100 Fed. Cl. 404, 412 (2011) ("the Court is not inclined to ignore principles of integrity, fairness, and openness where they directly apply to government actions"). This circularity is highlighted by the Agency's own prior acknowledgment that CSI would have been a qualified bidder if given the chance to compete: "[h]ad this requirement not been an urgent matter, DHS would have conducted a full and open competition, and the Protester ***would have seen the notice and had a chance to compete***—but that is not what happened here." Tab 161, AR 2320–21 (Agency's Memorandum of Law from GAO protest) (emphasis added). Defendants' newfound claim that CSI is not a qualified bidder is therefore meritless.

## III.    MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A.  The Record Confirms Agency Did Not Have an Unusual and Compelling Urgency to Issue a Limited Procurement

#### 1.  Defendants Identify No Unusual and Compelling Urgency For This Procurement

Defendants' claim of "unusual and compelling urgency" under FAR 6.302-2 is ***unsupported by the contemporaneous record***.  As CSI explained, there is nothing in the record that corroborates a valid finding of urgency. *See generally* Pl.'s MJAR at 17–22.  The record shows unequivocally from the Acquisition Planning Forecast System record that DHS was aware of its requirements by April 10, 2025, Tab 102, AR 878, yet failed to conduct adequate market research, issue a Request for Information, or otherwise plan for the hyper-accelerated procurement until May 13, 2025. There is no explanation for this lack of advance planning, and Defendants cannot retroactively rely on a panoply of executive directives to reframe their actions. *See Cosette Pharms., Inc. v. United States*, 2025 U.S. Claims LEXIS 3341, 41 (Fed. Cl. Oct. 31, 2025) ("[I]t is well-established that post hoc assertions in litigation cannot substitute for contemporaneous agency reasoning" (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 23 (2020))); *GovCIO, LLC v. United States*, 177 Fed. Cl. 579, 584–85 (2025) (where the record

demonstrates "the Agency did not adequately explain how the relevant Executive Order created an urgent and compelling need," this Court has held "it cannot defer to an Agency's conclusion that is absent from the record.").

Despite the clear omission of documented Agency rationale, Defendants now ask the Court to make improper inferences to support their retroactive reasoning that a limited procurement was justified. For example, the Government contends that the Agency's actions should be viewed as an "evolv[ing]" response to the different policy announcements, including the May 9, 2025 Presidential Proclamation 10935 that supposedly "necessitated immediate action by DHS." Def.'s MJAR at 5, 18; *see also id*. at 16 (arguing that the J&A's reference to "an immediate need to address the significant case of Voluntary Removals" actually "stemmed from the President's May 9, 2025 proclamation"). Salus similarly alleges "changed circumstances caused by Proc. 10935." Salus's MJAR at 36 n.19. Critically, however, ***the Agency's J&A does not reference this May 9 Proclamation at all***.[4] *See* Tab 110; Pl.'s MJAR at 11 (explaining that "[t]he J&A . . . cites the January 20, 2025 EO 14159 as the primary basis of the urgency").[5]

Indeed, the Government's position is belied by its reliance on the Agency's CICA override memorandum, which was issued only in response to CSI's protest, not the contemporaneous J&A. *See e.g.*, Def.'s MJAR at 21 (citing only Tab 183 for the proposition that "DHS moved immediately

---

[4] Defendants include no citations to the record, other than the CICA override memorandum, in arguing that the unusual and compelling urgency arose from the panoply of policy pronouncements. *See* Def.'s MJAR at 15–18; Salus's MJAR at 16–18. These belated arguments are mere post-hoc rationalizations that should be rejected. *See Dep't of Homeland Sec.*, 591 U.S. at 23. As the Supreme Court has explained, "[c]onsidering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Id.* (citation omitted). Additionally, "[p]ermitting agencies to invoke belated justifications…can upset 'the orderly functioning of the process of review,' forcing both litigants and courts to chase a moving target." *Id.* (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

[5] Defendants' reliance on the panoply of Executive Orders and Presidential Proclamations that are uncited in the Agency's J&A would, if accepted, effectively treat those pronouncements as a class justification that there exists "unusual and compelling urgency" for any immigration-related activities under this Administration.

to operationalize Project Homecoming, to effectuate the rapid departure of illegal aliens from the county, and to support the imminent ramp-up of immigration enforcement operations"); *see also id*. at 17, 20–21 (largely citing Tab 183). Salus's brief fares no better, relying on post-award and non-contemporaneous documents. *See* Salus's MJAR at 17–18 (citing Tab 98 (Determination and Findings for the inclusion of option periods), Tab 102 (Acquisition Planning Forecast System record that was taken down before the award date), Tab 130 (Business Evaluation Report issued on the award date), and Tab 191 (Agency's Statement of Facts before GAO)).

Additionally, Defendants' post hoc position ignores that, before the May 9 Proclamation, the January 20 Executive Order already called for efforts to *"adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible."* E.O. 14159 § 12. Defendants fail to explain why the earlier directive did not amount to the same alleged "immediate need" that they attribute to the May 9 Proclamation.

In an effort to establish a nexus between the May 9 Proclamation and the alleged urgency, Defendants contend that "the 60 day deadline to remove any remaining illegal aliens who failed to self-deport would be meaningless if there was no deadline . . . to begin executing voluntary deportations in the first place." Salus's MJAR at 18; Def.'s MJAR at 18 ("the Project Homecoming proclamation . . . provided a 60-day deadline after which involuntary removal efforts could overtake voluntary removal efforts"). This argument fails for two reasons. First, this procurement did not create the first opportunity for voluntary departure—such departures have always been available, regardless of any new contract.[6] Second, by Defendants' own logic, any "unusual and compelling urgency" would have ceased at the end of the 60-day period, when involuntary removal

---

[6] *See* Department of Justice, HOW TO APPLY FOR VOLUNTARY DEPARTURE (Oct. 2011), https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Voluntary%20Departure%20-%20English%20%2813%29.pdf

efforts would overtake voluntary efforts. Nevertheless, the contract at issue is structured to continue for three years—and Defendants expect it to continue for three years—which plainly demonstrates that voluntary and involuntary removal efforts can—and do—occur simultaneously. The continued existence and expected duration of this contract thus belies any claim that the 60-day deadline created urgent and compelling circumstances justifying the procurement.

Defendants also mischaracterize that § 3(b) of the May 9 Proclamation, 90 Fed. Reg. 20358, asserting it set a 60-day deadline for this procurement. *See* Pl.'s MJAR at 20; Def.'s MJAR at 18; Salus's MJAR at 18–19. In reality, that section sets a deadline for DHS to *"increase the enforcement and removal operations force of the [Department of Homeland Security] by no less than 20,000 officers"* to support involuntary removals—*which has nothing to do with this procurement.* Procl. 10935 § (3)(b), 90 Fed. Reg. 20358. Defendants' strained attempt to connect this deadline to the need for a rapid voluntary departure contract is unsupported by the record.

DHS's awareness of its requirements months before May 2025 further undercuts Defendants' position. The Government itself concedes that DHS "could have awarded directly [to Salus] on the basis of the unsolicited proposal," but chose instead to compete the requirement to address Salus's organizational conflicts of interest. Def.'s MJAR at 30. If DHS was prepared to award the contract to Salus based on its unsolicited proposal, it necessarily knew its requirements for months while evaluating Salus's proposal. Coupled with the April 10, 2025 Acquisition Planning Forecast Record, Tab 102, AR 878, this demonstrates that DHS was fully aware of its needs well before the May 9 Proclamation. Defendants' failure to conduct any procurement planning until the eleventh hour, and only after discovering substantial conflict of interest issues with Salus, is nothing more than a textbook example of lack of advance planning—not evidence of "unusual and compelling urgency" as required under FAR 6.302-2.

13

2. <u>Defendants' Vague References To National Security Do Not Justify DHS's Actions</u>

Rather than defending DHS's actions on the basis of the actual record, Defendants attempt to shield the Agency's conduct by invoking executive directives and invoking national security, asserting that such concerns merit "extraordinary deference." Def.'s MJAR at 18; Salus's MJAR at 19–29 ("This Court must give due consideration to national security concerns implicated by CSRO"). This is nothing more than an improper effort to insulate DHS from judicial review of its compliance with the FAR, based on vague and unsubstantiated references to national security. Def.'s MJAR at 18-19.[7] Nevertheless, Defendants essentially urge the Court to abdicate its responsibility to ensure that agency actions are lawful whenever the words "national security" are uttered. Def.'s MJAR at 18–19.

That argument is fundamentally inconsistent with both the Administrative Procedure Act, 5 U.S.C. § 706, and the Court's well-established role. Regardless of the policy at stake, it is the Court's duty to determine whether an agency's actions are arbitrary, capricious, or otherwise contrary to law. As this Court has made clear, "[t]he APA . . . requires that the agency do more than invoke generic, talismanic deference principles or repeat *ipse dixit*." *Focus Revision Partners v. United States*, 161 Fed. Cl. 711, 718 (2022) (internal quotation omitted). Deference is not a blank check, and it cannot be used to excuse or conceal a lack of reasoned decision-making.

Defendants' perfunctory invocation of national security concerns is not only insufficient, it is misleading. The Government's reliance on *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007), for the proposition that "wider deference" is due where acquisitions involve

---

[7] The Government's reliance on *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) is unavailing. There, the Court acknowledged the general scope of the political question doctrine and exclusions from judicial review but easily found a justiciable controversy, reasoning "courts have authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *Id*. at 230.

national defense, is misplaced. *CHE Consulting* itself cautioned that the record must still demonstrate that the procurement reflected the agency's "minimum need," and that the challenged decision was "rationally related to that need." *Id*. Here, the record contains no explanation—let alone evidence—of how the Agency's decision to restrict competition, rush the solicitation, or establish an extended three-year performance period served a legitimate minimum need. *CHE Consulting* thus underscores, rather than excuses, the Government's failure to justify its actions.

Salus's reliance on *Gemini Tech Servs., LLC v. United States*, No. 25-1337C, 2025 U.S. Claims LEXIS 2680 (Fed. Cl. Sept. 8, 2025), is equally unavailing. In that case, the Army's CICA override related to a narrowly tailored, three-month task order for a short-term detention facility—arising from many of the same directives cited here. *Id*. at *2, **17–18. Unlike the limited, time-bound override in *Gemini Tech*, DHS here seeks to justify a sweeping, three-year sole-source contract under the guise of urgency and national security. The contrast is stark and telling: nothing in *Gemini Tech* supports what Defendants attempt here.

3. DHS Would Suffer No Serious Injury From Delay

Defendants' responses continue to fall woefully short of demonstrating that the Agency gave any meaningfully consideration to what "serious injury, financial or other" would actually result from a delay in contract award, as explicitly required by FAR 6.302-2(b)(2). Their arguments are a transparent attempt to sidestep the clear legal standard. *See Ceres Env't Servs.*, 158 Fed. Cl. at 559–60 (finding "serious injury" where radioactive contamination  threatened to irreparably harm the environment and surrounding population); *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 382 (2004) (recognizing monetary harm as "serious injury" where the Army faced a $300 million loss). Here, by contrast, Defendants can only muster the J&A's vague and conclusory references to "operational impact on US enforcement operations," "delay[ed] return actions,"

15

"burden [on] resources," and "hampering [of] the operational effectiveness of ICE Air and the U.S. government's approach to removal flights supporting final order cases." Def.'s MJAR at 20 (citing Tab 110, AR 953). These generic assertions do not even approach the level of specificity or severity required to invoke this extraordinary exception to competition.

The law is unequivocal: generalized operational concerns, unmoored from concrete facts or imminent harm, are categorically insufficient to justify circumventing the FAR's competition requirements. *See Advanced Sys. Develop., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006) ("[A] justification that cites no specialized and unique consequences of delay beyond a generic desire to get on with the procurement" is inadequate.); *GovCIO, LLC*, 177 Fed. Cl. at 592–93 (rejecting J&A that failed to articulate a specific, urgent, and compelling need, citing an Executive Order with no explanation of how the EO changed the landscape beyond "generic references to administration priorities or mandates" even though the agency had already taken steps toward its goals prior to the cited directive).

Defendants' reliance on post hoc rationalizations in the CICA override memorandum is equally unavailing. *See* Def.'s MJAR at 20. Those after-the-fact justifications are simply not present in the contemporaneous J&A and cannot cure the Agency's failure to comply with FAR 6.302-2. *See* Tab 110, AR 948–53. Indeed, even the post hoc arguments fall flat: the Government's claim that delays would result in harm to individuals "being removed as criminals," or that delays would "perpetuate the unnecessary threats and acts of violence directed at U.S. citizens and DHS front line personnel," are wholly unsubstantiated. Def.'s MJAR at 20. Defendants make no attempt to explain what these supposed "threats and acts of violence" entail, how they rise to the level of "serious injury" to the Government, or—critically—how any such harm is remotely connected to conducting this procurement with full and open competition. *Id.*

16

In short, the record is bereft of any credible, contemporaneous evidence that the Government would suffer serious injury absent immediate contract award. The Agency's actions are thus arbitrary, capricious, an abuse of discretion, and in clear violation of law. The Court should categorically reject Defendants' attempt to manufacture justifications after the fact or read them into the record where none exist. The FAR's "unusual and compelling urgency" exception is an extraordinary measure, not a license to disregard advance planning or the requirements of fair competition. Defendants' failure to meet even the minimum threshold for this exception is both glaring and fatal to their position.

## B. The Record Confirms the Agency Violated FAR 6.302-2's Requirement to Solicit as Many Offers as Practicable

The Government's claim that DHS "competed the CSRO requirement among the vendors it identified 'to further assess their capabilities'" and that "market research [was] conducted in the months leading up to the procurement" is a gross distortion of the record and mischaracterizes the Agency's compliance with FAR 6.302-2(c)(2). Def.'s MJAR at 23.

First, the Government does not refute CSI's showing that the supposed months of market research consisted almost entirely of investigating Salus's capabilities and potential conflicts—not the broader marketplace. *See* Pl.'s MJAR at 23–24. There is no answer to CSI's argument that, despite claims of "interviews with industry representatives and meetings with vendors," the record contains no evidence of engagement with any offeror other than Salus before May 13, 2025. *Id.* Nor has any proffer been made.  In fact, all external correspondence prior to that date is with the State Department or Salus. The Government cannot point to a single communication with ███, ████████████████████, or any non-Salus vendor before Industry Day. *See generally* Def.'s MJAR; *Cal. Indus. Fac. Res., Inc.*, 100 Fed. Cl. at 411 ("no evidence the Government contacted…any other shelter system supplier…failure to take these actions violated the

17

requirement…that the Government request offers from as many sources as practicable"). This glaring omission calls the thoroughness and impartiality of the Agency's market research into serious question. *See* Pl.'s MJAR at 24.

Salus fares no better. Rather than addressing the lack of documented market research, Salus argues the Agency exercised "reasonable discretion" in choosing limited competition, citing *Ceres Env't Servs., Inc. v. United States*, 158 Fed. Cl. 547 (2022). But *Ceres* involved a three-month, sub-$30 million sole-source contract for tornado debris removal—facts nothing like the three-year, nearly $1 billion contract here. *Id.* at 553–54, 556. Neither Defendants nor CSI have found any precedent where FAR 6.302-2 was used to justify a sole-source or limited competition contract of this size, scope, and duration. What Defendants attempt here is without parallel and cannot be justified by reference to *Ceres* or any comparable authority.

Second, Defendants' effort to marginalize CSI is unavailing in light of the Agency's own concession that CSI would have been a qualified bidder if given the opportunity. *See* Tab 161, AR 2320–21 (Agency's GAO protest memorandum: "Had this requirement not been an urgent matter, DHS would have conducted a full and open competition, and the Protester would have seen the notice and had a chance to compete – but that is not what happened here"). Defendants cannot now claim otherwise.

Finally, Defendants ignore the Agency's inconsistent justifications for restricting competition. The record alternately asserts that only Salus possessed the required qualifications (Tab 106, AR 914), and that "multiple vendors" could perform the work (Tab 183, AR 2806). While DHS discounted other vendors on grounds they would need teaming partners, it ignored that Salus also relied heavily on teaming partners. Tab 106, AR 910–13; Tab 118b, AR 1341–42.

These contradictions are classic evidence of arbitrary and capricious decision-making. *Cosette Pharms., Inc.*, 2025 U.S. Claims LEXIS 3341, at *37.

The Agency's exclusion of CSI was arbitrary, capricious, and a clear failure to seek competition to the maximum extent practicable. The record cannot support Defendants' post hoc rationalizations.

### C.  The Agency Violated FAR 6.302-2's Limitation on the Period of Performance

FAR 6.302-2(d)(ii) permits an extension of performance beyond one year for non-competitive contracts based on "unusual and compelling urgency" only in "exceptional circumstances." The record is devoid of any evidence supporting such circumstances here, as CSI detailed in its opening brief. *See* Pl.'s MJAR at 25–30. Instead, Defendants rely on broad policy statements unrelated to the actual services being procured, which cannot satisfy the "exceptional circumstances" standard. *See* Def.'s MJAR at 25–28; Salus's MJAR at 29–32.

Defendants principally cite the D&F's reference to "immediate and significant harm to Americans caused by 'cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics' caused by illegal immigration through the southern border." Def.'s MJAR at 26; Salus's MJAR at 32–33. Yet, neither brief explains how these concerns relate to this procurement. The Scope of Work makes clear they do not, and the cited D&F language simply paraphrases Proclamation 10886 of January 20, 2025—not any "exceptional circumstances" unique to this contract. See Procl. 10886, 90 Fed. Reg. 8327–29.

The D&F language Defendants cite simply restates the circumstances underlying the President's January 20, 2025 national emergency declaration—not any "exceptional circumstances" warranting a three-year, noncompetitive contract. Tab 98, AR 860 (citing

19

Proclamation 10886, 90 Fed. Reg. 8327). These broad references to "cartels, criminal gangs, known terrorists," and similar threats are entirely unrelated to this procurement, which is limited by its own terms to supporting "voluntary return efforts." Tab 112a, AR 1040–43. The Solicitation specifically provides for initial screening and eligibility for voluntary return, making it baseless to suggest that "known terrorists" or "criminal gangs" would self-deport and qualify for program benefits. *Id.* at AR 1042.

Defendants point to only one additional sentence in the D&F in support of their claim of "exceptional circumstances": "Due to shifts in illegal immigration patterns, locations, and populations, the contract requires two (2) one-year option periods to immediately stop newly identified sources of illegal immigrations and ramp up operations." *See* Def.'s MJAR at 26; Salus's MJAR at 30. This rationale fails for the same reasons set forth in CSI's opening brief and above— this contract does not "stop newly identified sources of illegal immigration"; it is expressly limited to supporting voluntary return operations. *See* Pl.'s MJAR at 27, 29. Defendants make no effort to explain how voluntary return services would "immediately stop" illegal immigration, nor do they rebut CSI's argument beyond Salus's conclusory dismissal that this is "merely an example of CSI's incorrect view and understanding of the procurement." [8] *See* Def.'s MJAR at 25–28; Salus's MJAR at 29–34. This unsupported assertion cannot substitute for the required showing of "exceptional circumstances."

Beyond this, Defendants identify nothing else in the D&F that DHS relied upon to establish exceptional circumstances. *See* Def.'s MJAR at 26; Salus's MJAR at 32–33. Instead, they attempt

---

[8] Defendants' failure to respond to CSI's argument in this regard constitutes waiver. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised in the opening brief are waived"); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration").

to rely on the J&A, but that document addresses only the purported "unusual and compelling urgency"—not the separate and heightened requirement for "exceptional circumstances" necessary to justify a three-year performance period.[9] *See* Tab 110, AR 948–95. Defendants' approach would render FAR 6.302-2(d)(1)(ii) meaningless by conflating "urgency" with "exceptional circumstances," contrary to basic canons of regulatory interpretation. *See Baude v. United States*, 955 F.3d 1290, 1305 (Fed. Cir. 2020) (regulations must be read to give effect to all provisions).

In sum, nothing in the record remotely supports the existence of "exceptional circumstances" justifying a three-year performance period. DHS's actions were therefore improper under the FAR.

### D. DHS Failed to Publish the Solicitation and Synopsis

The FAR unambiguously requires agencies to publish solicitations publicly, providing only narrow exception under FAR 6.302-2 only where "the Government would be seriously injured if the agency complies with the time periods specified in FAR 5.203." FAR 5.202(a)(2). As set forth in CSI's opening brief, DHS failed to publish the Solicitation and cannot demonstrate—nor has it even attempted to show—that it would have been seriously injured by doing so. *See* Pl.'s MJAR at 30–34. Defendants utterly fail to establish otherwise.

The Government's only response is a conclusory claim that "[t]his argument rises or falls with DHS's justification for less than full and open competition" coupled with a blanket assertion

---

[9] Apart from the considerations discussed above as to why review of agency action must be based on the contemporaneous record, *see supra* § III(A), the FAR requires that each D&F "set forth enough facts and circumstances to clearly and convincingly justify the specific determination made" and mandates that each D&F include certain prescribed categories of information, such as the "[c]itation of the appropriate statute and/or regulation upon which the D&F is based" and "[f]indings that detail the particular circumstances, facts, or reasoning essential to support the determination." FAR 1.704. A failure to include the prescribed categories of information means the D&F does not "clearly and convincingly justify the specific determination" and that the D&F is therefore improper.

21

that "[f]or the same reasons described in the J&A, adhering to the time frames for publishing the synopsis and solicitation would have caused serious injury to the American public as well as to illegal aliens seeking to avail themselves of DHS's voluntary removal program." Def.'s MJAR at 28–29; *see also* Salus's MJAR at 36. This argument is fundamentally flawed and directly contradicts "one of the most basic interpretative canons:' that a statute or regulation 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ….'" *Baude*, 955 F.3d at 1305 (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

The exception on which DHS relies, FAR 5.202(a)(2), is clear: a notice of proposed contract action need not be publicized only when the contracting officer determines that "[t]he proposed contract action is made under the conditions described in 6.302-2 . . . ***and the Government would be seriously injured if the agency complies with the time periods specified in 5.203***." Defendants' reading, that it is sufficient for the contract merely to be "under the conditions described in [FAR 6.302-2]," impermissibly renders the second, independent requirement of FAR 5.202(a)(2) superfluous. This is a fatal flaw: FAR 5.202(a)(2) demands not just urgency, but a showing that the Government would be "seriously injured if the agency ***complies with the time periods specified in [FAR 5.203]***"—distinct from FAR 6.302-2, which applies where "[d]elay in contract award would result in serious injury, financial or other, to the Government." FAR 6.302-2(b)(2) (emphasis added). Defendants' conflation of these distinct requirements violates the fundamental interpretive canon that "a statute or regulation should be construed so that effect is given to all its provisions." *Baude*, 955 F.3d at 1305 (citation omitted).

Rather than directly rebutting CSI's argument—advanced in its opening brief—that DHS would not have suffered "serious injury" had it complied with the required posting timeline, *see*

Pl.'s MJAR at 30–34, Defendants deflect, focusing instead on their purported justification for competing the requirement only after discovering the OCI issue with Salus. *See* Def.'s MJAR at 29–31; Salus's MJAR at 35–36. These arguments only reinforce what CSI has demonstrated throughout this protest and what the record plainly reveals: "DHS never intended to conduct a competitive procurement for this nearly $1 billion contract." Pl.'s MJAR at 1. Further, the record confirms that DHS was aware of the requirement since January 20, 2025, yet took no meaningful action to conduct market research or to plan and prepare for a competitive procurement. Such inaction constitutes a textbook case of lack of advance planning. *See Innovation Dev. Enters. of Am.*, 108 Fed. Cl. at 727 (finding lack of advance planning where there was "no evidence in the record of any efforts ... to conduct adequate market research, or to plan and prepare for a competitive procurement, before [the predecessor] contract expired").

In sum, Defendants have failed to meet their burden to show that DHS's failure to publicly post the Solicitation was compliant with the FAR's clear requirements.

### E. DHS Continues to Violate 41 CFR Part 102-33.5 by Conducting Aviation Operations Without Approved Flight Program Standards

The governing regulations for "all federally funded aviation activities" allow an executive branch agency to "[a]cquire [Commercial Aviation Services ('CAS')]" only if "the requirements are met for operating an in-house aviation program." 41 C.F.R. § 102-33.35(a)(2). If those baseline requirements are met, the regulations then impose specific obligations that an agency wishing to operate an in-house aviation program must meet *before* acquiring CAS. *See generally* §§ 102-33.5 *et seq.* For example, the regulations are specific that "[w]hen purchasing, leasing, or awarding a CAS contract for a federal aircraft, you must follow [the FAR], unless your agency is exempt." § 102-33.50. They are also specific that "[w]hen hiring CAS, you must . . . [e]stablish agency-

23

specific Flight Program Standards as applicable and require compliance with these standards in your contracts and agreements." § 102-33.80(a).

Despite these clear directives, DHS is hiring CAS and operating an in-house aviation program without having first established the requisite Flight Program Standards in violation of 41 C.F.R. § 102-33.80(a). Defendants do not point to any alleged Flight Program Standards that would bring DHS's acquisition of CAS through this procurement in line with regulatory requirements. *See* Def.'s MJAR at 31–32; Salus's MJAR at 38–45. Instead, Defendants seek to sweep this matter of public safety under the rug and contend that DHS's regulatory compliance is a matter of contract administration.  Def.'s MJAR at 31–32; Salus's MJAR at 38–40.

Contrary to Defendants' position, Flight Program Standards are one of the many policies and procedures that must be in place before an agency is even authorized to conduct an acquisition for CAS through a procurement like the one at issue. Section 102-33.5 imposes pre-contractual requirements that cannot logically operate as a matter of contract administration, which is apparent from the requirements of Section 102-33.80(a) mandating that agencies "require compliance with [Flight Program Standards] in [their] contracts." Necessarily, the Flight Program Standards must exist before an agency can require that the contractor comply with those standards. Accordingly, there is no merit to Defendants' assertion that compliance with 41 C.F.R. § 102-33.5 *et. seq* is a matter of contract administration.

 Nor is there any merit to Salus's contention that CSI lacks prejudice by DHS's failure to have approved Flight Program Standards. *See* Salus's MJAR at 40–45. DHS's failure to have approved Flight Program Standards means that it cannot acquire CAS through this procurement and the Agency will need to acquire such services through a different vehicle. Presently, CSI operates as the Prime Contractor for ICE Air operations providing charter aircraft services in

support of involuntary removal operations, which was awarded against CSI's GSA Schedule contract **because DHS does not have approved Flight Program Standards**. *See* Tab 113, AR 1117; DeLucia Decl. at ¶¶ 16–18 . DHS could utilize CSI's ICE Air contract for CAS operations, establishing CSI's direct economic interest in the remediation of DHS's violation. *Cf. Weeks Marine*, 575 F.3d at 1362 (finding plaintiff had a "definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations").

Finally, Salus's arguments regarding the actual requirements of Part 102 are wholly meritless. In particular, Salus contends, without any citation or other support, that Part 102 "does not require an agency to adopt extra standards" and "an agency may rely exclusively on applicable FAA regulations for its CAS operations." Salus's MJAR at 41–42. However, as CSI articulated in its opening brief, Part 102 ***does*** expressly require that Flight Program Standards "meet or exceed applicable civil or military rules . . . and applicable FAA regulations." Pl.'s MJAR at 35 (quoting § 102-33.140). Moreover, Salus's argument that Flight Program Standards are not necessary would again render superfluous the regulatory requirements that "***[i]f you hire CAS, you are responsible for . . . Establishing agency-specific Flight Program Standards***." § 102-33.130(a) (Dec. 15, 2025);[10] *Baude*, 955 F.3d at 1305.

Accordingly, Defendants have failed to rebut CSI's showing that DHS's procurement of CAS without having agency-specific Flight Program Standards is arbitrary, capricious, and abuse of discretion, and otherwise contrary to the law, and prejudicial to CSI.

### F.  CSI Is Entitled to Injunctive Relief

Defendants' attempt to minimize the harm to CSI by claiming that exclusion from this acquisition is not sufficiently injurious is entirely unpersuasive. Instead of addressing the manifest

---

[10] The 41 C.F.R. Part 102 regulations were amended on December 16, 2025. *See* 90 Fed. Reg. 58425.

unlawfulness of DHS's actions, Defendants retreat to vague and unsupported references to "national security," asserting that enjoining performance of this contract would cause catastrophic harm to DHS and result in a purported loss of $500 million. They further contend that conducting a lawful procurement would require at least three months and $85 million—ignoring that DHS itself managed to conduct a competition in less than one week just months ago. These contentions are not only speculative and unsupported by evidence, but they also highlight the arbitrary and opaque manner in which this contract has been managed. Indeed, Defendants' arguments only raise further questions, as the record shows Salus has facilitated just 38,000 voluntary departures since May, meaning DHS has paid an astonishing $13,000 per departure—an outcome that cries out for scrutiny, not deference.

As CSI demonstrated in its opening brief, and as Defendants have failed to rebut, injunctive relief is both appropriate and necessary here.

*First,* the record is clear—and unchallenged by Defendants—that the Agency violated multiple procurement laws and regulations by conducting an unduly restrictive, noncompetitive procurement. This process excluded qualified bidders, including CSI, and will continue to do so through an excessively long performance period. As detailed both in CSI's opening brief and herein, CSI has established a strong likelihood of success on the merits of its protest.

*Second,* it is undisputed that CSI has suffered—and will continue to suffer—irreparable harm due to the Agency's unlawful exclusion of qualified bidders from the competition. As the law makes clear, "in a pre-award bid protest, [as here,] the 'lost opportunity to compete in fact constitutes irreparable harm for purposes of injunctive relief.'" *Piedmont Propulsion Sys., LLC v. United States*, 167 Fed. Cl. 72, 91 (2023) (citations omitted); *see also* Pl.'s MJAR at 38 (collecting cases). Salus's only rejoinder is to assert, without basis, that "CSI has not demonstrated it was a

26

qualified bidder for the procurement[.]" Salus's MJAR at 46. This is flatly contradicted by the record and by CSI's demonstrated qualifications and standing. *See* Sec. II.B, *supra*.

The Government's response fares no better. It merely asserts that this Court should abandon binding precedent such as *CW Government Travel, Inc. v. United States*, 110 Fed. Cl. 462 (2013), and "similar cases," holding a "protester suffers irreparable harm if it is deprived of an opportunity to compete fairly for a contract" on the ground that they "appear[] to date back to the early 1990's." [11] Def.'s MJAR at 36. The Government offers no rationale or legal authority for disregarding this well-established line of cases. *See* Def.'s MJAR at 35–37. Nor does it attempt to refute CSI's reliance on more recent decisions, including *Green Tech. Group, LLC v. United States*, 147 Fed. Cl. 231, 246 (2020). *See* Pl.'s MJAR at 38.

In short, the record is clear and the law is well-settled: CSI has suffered irreparable harm and was prejudiced as a direct result of the Agency's decision to proceed with a noncompetitive procurement in violation of FAR 6.302-2 and CICA. Defendants' arguments to the contrary are nothing more than post hoc rationalizations unsupported by the facts or the law.

***Third***, Defendants' argument regarding the balance of harms is fundamentally flawed and unpersuasive. Defendants now urge the Court to afford sweeping deference to amorphous claims of "national security" in an attempt to overshadow the concrete and irreparable harm suffered by CSI. However, as the Government itself concedes, it is well established that the Court "will not 'blindly accede' to claims of national security implication[s]." Def.'s MJAR at 38 (citing *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 493 (2012)). The law is clear: "[n]ational security concerns must be balanced with the 'overriding public interest in preserving the integrity

---

[11] It is unclear why the Government makes this argument when CSI did not cite *CW Government Travel* in its opening brief. *See* Pl.'s MJAR at 38–40.

of the procurement process by requiring the government to follow its procurement regulations.'" *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 791 (2009) (citation omitted). The Court must evaluate alleged national security harms with the "same analytical rigor as other allegations of potential harm," and may tailor injunctive relief to avoid unduly impinging upon legitimate national security interests. *Id.* at 791–92.

Defendants' attempt to frame the Court's decision as an all-or-nothing proposition is both misleading and unsupported by precedent. The Government's assertion that enjoining the CSRO contract would result in the loss of nearly $500 million—much of which is purportedly "unrecoverable"—is not only speculative but also entirely unexplained. Def.'s MJAR at 39 (citing Huffman Decl.). Defendants fail to address how, in only a few months, DHS has already obligated more than half of the contract's not-to-exceed value, which was intended to cover a three-year performance period. Nor do Defendants provide any credible evidence or rationale to support their claim that "transitioning urgent requirements to alternative vehicles would cost an estimated $85,700,000 over three months." Def.'s MJAR at 39.[12] These unsupported assertions only serve to underscore the lack of transparency and accountability surrounding this procurement.

More importantly, Defendants ignore the well-established authority of this Court to craft tailored injunctive relief that protects both the public interest and the integrity of the procurement process without causing undue disruption. *See, e.g., Red River Holdings*, LLC, 87 Fed. Cl. at 792 (limiting contract performance to an initial period and requiring reprocurement to cure deficiencies); *Cardinal Maint. Serv. v. United States*, 63 Fed. Cl. 98, 110 (2004) ("The Court can

---

[12] *Compare with* Tab 183, AR 2807 (Agency noting in the CICA override memorandum, which considered the implications of a successful GAO protest, that "[b]ecause no contract or task order has been awarded yet, it is not possible to accurately calculate the potential termination costs" but concluding that "DHS does not view these costs as significant given the benefits associated with overriding the stay[.]").

28

fashion relief which will be of minimal disruption to the government [and the performing parties].”). Indeed, even DHS’s own declarant acknowledges the feasibility of a bridge contract to maintain continuity of services while a lawful procurement is conducted. *See* Cappel Decl. at ¶ 11.

In sum, Defendants’ exaggerated claims of harm do not withstand scrutiny and cannot outweigh the paramount public interest in ensuring that the government complies with its procurement obligations. The Court has both the authority and the obligation to enforce those obligations while safeguarding all legitimate interests, including national security, through appropriately tailored relief.

***Fourth***, there is a compelling and overriding public interest in safeguarding the integrity of the procurement process and in holding the Agency strictly accountable to the procurement regulations—especially where, as here, the Government invokes national security to justify its actions. *Red River Holdings, LLC*, 87 Fed. Cl. at 791-92. As CSI has emphasized, “[a]ny countervailing interest in efficiency of operations cannot come at the expense of providing a fair and level playing field for all competitors and preserving the integrity of the public procurement process.” Pl.’s MJAR at 40 (citing *Mangi Env’t Grp., Inc. v. United States*, 47 Fed. Cl. 10, 19–20 (2000)). Permitting the Agency to bypass fundamental procurement requirements under the guise of urgency or efficiency threatens not only fair competition, but also the foundational public trust in government contracting.

Notably, there appear to be no comparable cases before GAO or the Court of Federal Claims where the Government has relied on FAR 6.302-2 to force through a noncompetitive contract of this unprecedented magnitude, value, and accelerated timeline. This case should not set such a dangerous precedent. The record is alarming: since CSI filed its protest, Salus’s task order under this contract has already been modified sixteen times—resulting in hundreds of

millions of dollars in additional or realigned funding, as well as significant changes to the PWS. This pattern of unchecked contract expansion, absent the protections of competition and transparency, only heightens the public interest in judicial intervention.

The public interest is not served by rubber-stamping after-the-fact justifications for massive sole-source awards. Rather, it is best served by a tailored re-solicitation that reflects the Agency's actual needs, ensures meaningful competition, and restores confidence in the integrity of the procurement process. The Court's intervention is not only warranted, it is essential to uphold the rule of law and protect the public's interest in transparent, accountable government contracting.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above and in CSI's opening brief, CSI respectfully requests that this Court grant Plaintiff's Motion for Judgment on the Administrative Record, grant CSI the relief requested in its Complaint, and deny Defendants' Motions to Dismiss and Cross-Motions for Judgment on the Administrative Record.


Dated: December 30, 2025                 Respectfully submitted,

                                                          /s/ *Jennifer S. Zucker*
                                                          Jennifer S. Zucker
                                                          Greenberg Traurig, LLP
                                                          2101 L Street, NW,
                                                          Suite 1000
                                                          Washington, DC 20037
                                                          (202) 331-3114
                                                          zuckerjs@gtlaw.com

                                                          *Counsel for CSI Aviation, Inc.*

*Of Counsel*:

Christopher M. O'Brien
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000

Washington, DC  20037
(202) 533-2306
obriencm@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
cassidy.kim@gtlaw.com