███████████████████████████████

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

████████████████

| | |
|---|---|
| **Redacted Version** | |

CSI AVIATION, INC.

     Plaintiff,

v.                                                                No. 25-1338C (MHS)

UNITED STATES,

     Defendant,

v.

SALUS WORLDWIDE SOLUTIONS
CORPORATION,

     Defendant-Intervenor.

---

**REPLY IN SUPPORT OF DEFENDANT-INTERVENOR'S MOTION TO DISMISS AND
CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Scott N. Flesch
  *Counsel of Record*
Alejandro L. Sarria
Connor W. Farrell
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC 20006
Tel. (202) 626-5800
sflesch@milchev.com

*Counsel for Salus Worldwide Solutions
Corporation*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... II

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    MOTION TO DISMISS .......................................................................................... 2

    A.    CSI Articulates the Wrong Standard in Claiming It Is an Interested Party ............ 2

    B.    CSI Has Not Shown a Competitive Interest Under Either Standard ...................... 3

II.   MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD ......................... 5

    A.    The Government Is Entitled to Judgment on Count I Because the Agency
        Reasonably Determined Its Needs for CSRO Services Were Unusually
        and Compellingly Urgent............................................................................... 5

        1.    The Unusual and Compelling Urgency is Clearly Identified..................... 5

        2.    The Record Establishes a Reasonable Acquisition Planning Effort,
            Not a Lack of Advanced Planning ............................................................ 8

        3.    Deference to the Interest of National Security is Required and
            Appropriate ............................................................................................ 9

        4.    Delay Would Impose Serious Injury to the Government.......................... 10

    B.    The Government Is Entitled to Judgment on Count II Because the Agency
        Complied with FAR 6.302-2's Requirement to Solicit Offers from as
        Many Potential Sources as Practicable Under the Circumstances....................... 11

    C.    The Government Is Entitled to Judgment on Count III Because the Agency
        Reasonably Determined a Need For a Three-Year Period of Performance
        and That Exceptional Circumstances Applied ................................................. 12

    D.    The Government Is Entitled to Judgment on Count IV Because the
        Agency Properly Invoked the Unusual and Compelling Urgency
        Exception to Publication Requirements........................................................... 15

    E.    The Government Is Entitled to Judgment on Count VI Because the Court
        Lacks Protest Jurisdiction Over Matters of Contract Administration and
        Because CSI Has Not Shown a Clear Violation of Applicable Regulations ........ 16

CONCLUSION............................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alisud - Gesac Handling - Servisair 2 Scarl v. United States*,
    161 Fed. Cl. 655 (2022) ................................................................................5

*B.H. Aircraft Co. v. United States*,
    158 Fed. Cl. 750 (2022), *aff'd*, 89 F.4th 1360 (Fed. Cir. 2024) ...........................................3, 5

*Bailey Tool & Mfg. Co. v. United States*,
    117 Fed. Cl. 457 (2014) ................................................................................2, 3

*Brandt Dev. v. United States*,
    177 Fed. Cl. 353 (2025) .................................................................................17

*Cardinal Maint. Serv., Inc. v. United States*,
    63 Fed. Cl. 98 (2004) ...................................................................................20

*Ceres Env't Servs., Inc. v. United States*,
    158 Fed. Cl. 547 (2022) .................................................................................12

*CGI Fed., Inc. v. United States*,
    118 Fed. Cl. 337 (2014) ..................................................................................3

*CliniComp Int'l, Inc. v. United States*,
    134 Fed. Cl. 736 (2017), *aff'd*, 904 F.3d 1353 (Fed. Cir. 2018)......................................2, 3, 4

*Crowley Tech. Mgmt., Inc. v. United States*,
    123 Fed. Cl. 253 (2015) .................................................................................19

*Deknatel Div., Pfizer Hosp. Prods. Grp., Inc.*,
    70 Comp. Gen. 652 (1991) ..............................................................................16

*Electro-Methods, Inc.*,
    B-250931, 1993 CPD ¶ 107,366 (Comp. Gen. Feb. 26, 1993)...............................................16

*Frazier v. United States*,
    79 Fed. Cl. 148 (2007), *aff'd*, 301 F. App'x 974 (Fed. Cir. 2008) ........................................18

*G4S Secure Integration LLC v. United States*,
    159 Fed. Cl. 249 (2022) .................................................................................19

*Gemini Tech Services, LLC v. United States*,
    No. 25-1337C, 2025 WL 2674585 (Fed. Cl. Sept. 8, 2025).........................................9, 10, 11

*Golden IT, LLC v. United States*,
177 Fed. Cl. 118 (2025) ............................................................................6, 8

*Harmonia Holdings Grp., LLC v. United States*,
157 Fed. Cl. 292 (2021) ................................................................................17

*Magnum Opus Techs., Inc. v. United States*,
94 Fed. Cl. 512 (2010) ...................................................................................2

*Med. Dev. Int'l, Inc. v. United States*,
89 Fed. Cl. 691 (2009) ...................................................................................3

*Palantir Techs., Inc. v. United States*,
128 Fed. Cl. 21 (2016) ...................................................................................3

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004)....................................................................18

*Red River Holdings, LLC v. United States*,
87 Fed. Cl. 768 (2009) .................................................................................20

*RLB Contracting, Inc. v. United States*,
118 Fed. Cl. 750 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015) ....................18

*Specialty Marine, Inc.*,
B-296988, 20 CPD ¶ 112,041 (Comp. Gen. Oct. 11, 2005) ...................................16

*SSI Tech., Inc. v. United States*,
148 Fed. Cl. 147 (2020) ................................................................11, 13, 14

*Trace Systems Inc. v. United States*,
165 Fed. Cl. 44 (2023) ...................................................................................5

*Vanquish Worldwide, LLC v. United States*,
163 Fed. Cl. 57 (2022) ...................................................................................4

*Veteran Shredding, LLC v. United States*,
140 Fed. Cl. 759 (2018) .................................................................................2

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009)...................................................................2, 4

**Statutes**

5 U.S.C. § 706....................................................................................5, 15

28 U.S.C. § 1491 ...............................................................................9, 16, 17

31 U.S.C. § 3553................................................................................10

## Other Authorities

41 C.F.R Part 102................................................................................................17, 18

41 C.F.R. § 102-33.80........................................................................................17

41 C.F.R. § 102-33.105...................................................................................17, 18

41 C.F.R. § 102-33.130........................................................................................17

41 C.F.R. § 102-33.140........................................................................................18

FAR 5.202.....................................................................................................15, 16

FAR 6.302-2 ...............................................................10, 11, 12, 13, 15, 16

FAR Subpart 15.6 ............................................................................................11

FAR 15.603 ....................................................................................................11

FAR 15.606-1 .................................................................................................11

HSAR 3015.602 ...............................................................................................11

Black's Law Dictionary (12th ed. 2024)........................................................................15

Executive Order 14159, Protecting the American People Against Invasion (Jan.
    20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025)..............................................1, 6, 10

Executive Order 14165, Securing Our Borders (Jan. 20, 2025), 90 Fed. Reg. 8467
    (Jan. 30, 2025).................................................................................1, 6, 10, 18

Harbor Diversified, Inc., Form 8-K (Dec. 18, 2025),
    http://pdf.secdatabase.com/1958/0001193125-25-324816.pdf.................................................5

Proclamation 10886, Declaring a National Emergency at the Southern Border of
    the United States (Jan. 20, 2025), 90 Fed. Reg. 8327 (Jan. 29, 2025)................................1, 6

Proclamation 10935, Establishing Project Homecoming (May 9, 2025), 90 Fed.
    Reg. 20,357 (May 14, 2025) ............................................................1, 6, 7, 8, 9, 13

Pursuant to the Rules of the Court of Federal Claims ("RCFC"), Defendant-Intervenor Salus Worldwide Solutions Corporation ("Salus") respectfully submits its reply to Plaintiff CSI Aviation, Inc.'s ("Plaintiff" or "CSI") Response brief (ECF No. 36), and in support of Salus' Motion to Dismiss and Cross-Motion for Judgment (ECF No. 32).

## <u>INTRODUCTION</u>

CSI's protest fails because it maintains a view of the Comprehensive Support to Removal Operations ("CSRO") procurement that is untethered to the record—whether by repeating its mischaracterization of the procurement as "sole-source" or "non-competitive," its assertions that the Agency's needs and justifications are "manufactured" and "post hoc invocations of national security or urgency," or its self-serving claim that CSRO is "unrelated" to the charges, policies, and threats documented in the underlying Executive Directives.[1] In reality, the record shows that DHS conducted a limited competitive procurement that was rational, properly documented, and in accordance with applicable procurement regulations. CSI's contentions amount to no more than mere disagreement with the Agency and CSI fails to demonstrate a clear and prejudicial violation of law. As explained more fully below, the Court (1) should dismiss the protest for lack of standing because CSI has not demonstrated it is a qualified bidder and interested party, or alternatively, (2) should grant judgment for the United States on the administrative record or find that injunctive relief is not warranted because the harm to the United States' national security interests far outweigh CSI's pecuniary interests in the procurement.

---

[1] *See* Executive Order 14159, Protecting the American People Against Invasion (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025) ("EO 14159"); Executive Order 14165, Securing Our Borders (Jan. 20, 2025), 90 Fed. Reg. 8467 (Jan. 30, 2025) ("EO 14165"); Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States (Jan. 20, 2025), 90 Fed. Reg. 8327 (Jan. 29, 2025) ("Proc. 10886"); Proclamation 10935, Establishing Project Homecoming (May 9, 2025), 90 Fed. Reg. 20,357 (May 14, 2025) ("Proc. 10935") (collectively, the "Executive Directives").

## ARGUMENT

## I.    MOTION TO DISMISS

### A.    CSI Articulates the Wrong Standard in Claiming It Is an Interested Party

CSI claims it has standing because it says it meets the "non-trivial competitive injury" standard established in *Weeks Marine, Inc. v. United States*, which, according to CSI, applies in all pre-award protests. 575 F.3d 1352 (Fed. Cir. 2009); Pl. Reply at 5. But *Weeks Marine* does not go so far, and it does not apply here.

This Court has limited application of *Weeks Marine* to pre-award protests where there has "been neither bids/offers, nor a contract award" such that "no factual foundation for a 'but for' prejudice analysis" exists. 575 F.3d at 1361; *see, e.g., Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759, 764 (2018); *Magnum Opus Techs., Inc. v. U.S.*, 94 Fed. Cl. 512, 531 (2010).

Here, however, the Court has "sufficient factual development . . . to apply the primary 'substantial chance' standard" because the record includes the solicitation, evaluation, contract award, *and* the Agency's determination that CSI lacked the capabilities to be a qualified bidder. *Veteran Shredding*, 140 Fed. Cl. at 764; Tab194_AR2925; Tab106_AR915. This Court has applied the substantial chance standard in similar cases. For instance, in *Bailey Tool & Manufacturing Co. v. United States*, the Court applied the substantial chance standard in a pre-award protest challenging a non-responsibility determination made before the agency evaluated the protestor's proposal. 117 Fed. Cl. 457, 462 (2014). Likewise, in *CliniComp Int'l, Inc. v. United States*, the Court applied the higher standard because the standing inquiry turned on whether the protester was a qualified bidder. 134 Fed. Cl. 736, 750 (2017), *aff'd*, 904 F.3d 1353,

1359 (Fed. Cir. 2018).[2] The Court should do the same here because the record contains ample evidence to question CSI's ability to even compete for the CSRO procurement.

CSI argues that the "record contains no evaluation of [its] ability to perform" because DHS did not solicit or evaluate a proposal from CSI.[3] Pl. Reply at 7-8. But the record demonstrates otherwise. *See* Tab106_AR915 (evaluating ICE AIR commercial vendors, including CSI, but concluding "[t]he vendors of ICE Air do not have the experience either as Prime or subcontractors conducting this type of work"); *see also* Tab194_AR2926. And it makes no difference either way because, under *Bailey Tool* and *CliniComp Int'l*, this Court can apply the higher substantial chance standard even without a full evaluation of the protestor's proposal on the merits. *See* 117 Fed. Cl. at 462; 134 Fed. Cl. at 750.

## B.    CSI Has Not Shown a Competitive Interest Under Either Standard

Regardless of the applicable standard, CSI has not alleged a competitive interest sufficient to establish standing. "A plaintiff must allege *facts*—not mere conclusory assertions of law—demonstrating prejudice" and must "at least be qualified to compete for the contract it

---

[2] While CSI frames its protest as a pre-award challenge, in reality, "it is effectively challenging the *absence* of an entirely different contract drafted to its preferences." *B.H. Aircraft Co. v. United States*, 158 Fed. Cl. 750, 764 (2022), *aff'd*, 89 F.4th 1360 (Fed. Cir. 2024) (analyzing standing under both standards). It also functions as a challenge to the contract award. *See* CSI Mot., ECF No. 26, at 30 (alleging a "sham competition with a predetermined outcome: an award to Salus"). These circumstances favor adoption of the "substantial chance" standard. *See B.H. Aircraft Co.*, 158 Fed. Cl. at 764; *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 701 (2009).

[3] CSI's reliance on *CGI Federal, Inc. v. United States*, 118 Fed. Cl. 337 (2014) is misplaced because here the evaluation record is sufficiently developed. *Compare id.* at 350-51 (explaining Government's post-hoc evaluation of protestor's "hypothetical compliance" without contracting officer involvement "predicated on speculation, not on a sufficiently developed record") *with* Tab106 (DHS's evaluation of CSI's capabilities). CSI's analogy to *Palantir Technologies, Inc. v. United States* fails for the same reason. *See* 128 Fed. Cl. 21, 37-38 (2016) (finding that the agency did not evaluate the protestor's capabilities and that the protestor "amply alleged its capability to supply the Army's requirements").

seeks." *Vanquish Worldwide, LLC v. United States*, 163 Fed. Cl. 57, 69 (2022); *CliniComp*, 904 F.3d at 1358-61. That is true under both the *Weeks Marine* and substantial chance standards. As we explained before, CSI has not met this burden because its complaint fails to allege that it can perform the full scope of work for the CSRO procurement. *See* Salus Mot., ECF No. 32, at 12 (citing Compl. ¶¶ 1, 25, 51, 63); *see also* Gov't Mot., ECF No. 33, at 13.

CSI —for the first time—now claims that it "would have demonstrated its substantial aviation and immigration experience and its ability, with teaming partners, to meet all CSRO RFP requirements." Pl. Reply at 9. This late-breaking revelation does not cure its standing defect, however. CSI admits it only has the ability to perform[4] what it characterizes as two of the six "CSRO Core Requirement[s]," and posits that it would have used three teaming partners to do the rest. DeLucia Decl., ECF No. 36-1, ¶¶ 20-21. In so doing, CSI confirms the Agency's assessment of CSI's capabilities—that CSI does not itself have the experience and expertise to perform the full scope of work. *See* Tab106_AR915; Tab194_AR2926. CSI also confirms the reasonableness of DHS's determination that CSI would be overly reliant on teaming partners, inviting unacceptable operational risk and potential delay. *See* Tab106_AR915-16.

---

[4] CSI's allegations do not align with CSRO's actual scope of work. Plaintiff emphasizes its expertise in dedicated aircraft and air chartering services. *See,* DeLucia Decl. ¶¶ 5, 7, 10, 18. But CSRO's removal operations are primarily conducted through commercial ticketing. *See* Cappel Decl., ECF No. 32-1, ¶ 6. And CSI merely asserts, without support, that it has "several decades" of travel coordination experience and has been an "IATA Accredited Travel Agency for several years." DeLucia Decl. ¶ 24. Likewise, with respect to the second focus of CSRO, foreign capacity building, CSI conclusively claims that it employs ICE and CBP retirees with "decades of specialized experience in immigration processing and embassy coordination," but does not otherwise claim to have relevant past performance for this type of work. *Id.* ¶ 22.

In other words, even with its self-serving declaration[5], CSI still fails to show it could perform the full scope of CSRO without undue operational risk and delay. Those are essential elements required to establish qualified bidder status and standing. *See Trace Systems Inc. v. United States*, 165 Fed. Cl. 44, 69 (2023) (finding protester failed to "directly address the key [standing] question: could Plaintiff, with only a little more than seventy days between award and commencement of [] bridge contract work . . . have performed the required services 'without mission critical failure and risk of a substantial break in service and support . . . ?'"); *B.H. Aircraft Co. Inc.*, 158 Fed. Cl. at 766 (citation omitted)

## II.    MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A.    The Government Is Entitled to Judgment on Count I Because the Agency Reasonably Determined Its Needs for CSRO Services Were Unusually and Compellingly Urgent

#### 1.    *The Unusual and Compelling Urgency is Clearly Identified*

CSI claims the record does not support DHS's finding of unusual and compelling urgency. Pl. Reply at 10-13. In so doing, however, CSI asks the Court to ignore the full record, the history of the procurement, the admitted valid requirement[6], and the Executive Directives that shaped and justified this limited competition. CSI's attempt to reframe the record must be seen for what it is—desperation—and must be rejected. To start, this Court reviews the entire record before the agency, not only those records and facts cherry-picked by CSI. *See* 5 U.S.C. § 706; *see also Alisud - Gesac Handling - Servisair 2 Scarl v. United States*, 161 Fed. Cl. 655, 670

---

[5] In support that it has the capabilities to perform CSRO, CSI alleges it "recently acquired a large Part 121 air carrier, adding over 50 aircraft to support our diverse customer base." DeLucia Decl. ¶ 5. This acquisition occurred on December 10, 2025, months after the Agency's market research and the CSRO award. *See* Harbor Diversified, Inc., Form 8-K (Dec. 18, 2025), http://pdf.secdatabase.com/1958/0001193125-25-324816.pdf.

[6] *See* CSI Mot. at 19.

(2022). The Court also recognizes that agencies are not held to perfection in documenting their decision-making process; instead, agency action will be upheld if its rationale can be reasonably discerned from the record. *Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 131-32 (2025).

Here, the record shows that the Agency's needs are inextricably tied to exceptional circumstances involving an ongoing national emergency and threats to the national security of the United States. The record also demonstrates that DHS considered all the Executive Directives—including those issued in January 2025 *and* May 2025—to structure a lawful limited competition. The Agency's proper justification of those actions is unambiguous, or at the very least, can be reasonably discerned from the record.

On January 20, 2025, the President declared a national emergency at the southern border due to persistent and imminent national security threats caused by illegal immigration. *See* Tab110_AR949-52 (referencing EO 14159, EO 14165, and Proc. 10886). The declaration announced the Government's policy "to take all appropriate action to secure the borders of our Nation" including through "[r]emoving promptly all aliens who enter or remain in violation of Federal law." EO 14165 § 2. And DHS was directed specifically to take urgent action to help resolve these threats. *See id.* § 6 (directing DHS "[a]s soon as practicable" to ensure that, certain aliens "are returned to the territory from which they came"); EO 14159 § 9 (directing DHS to "promptly take appropriate action . . . to ensure the efficient and expedited removal of aliens").

The President's May 9, 2025 Proclamation, "Establishing Project Homecoming," was even more pointed, directing the "creat[ion of] seamless processes for illegal aliens to rapidly depart the United States." Proc. 10935 § 1. Those processes included, among others, Federally-funded flights and financial incentives for illegal aliens voluntarily departing the U.S. and

actions to enable the departure of illegal aliens who lack valid travel documents. *See id.* §§ 1-2. In other words, significant portions of the CSRO scope of work. *See id.*

Hearing this urgent call to action from the Executive, DHS, within days of Proc. 10935, identified the unusual and compellingly urgent circumstances justifying limited competition. Tab110. DHS also recognized the relevance of these Directives to the CSRO scope of work, which by that time were informed by Salus' unsolicited proposal, associated market research, and the OCI waiver process. Proc. 10935. Tabs95a_AR838; 107; 111a_AR962-63.[7]

Consistent with that, the Government's May 15, 2026, Justification and Approval ("J&A") for Other than Full and Open Competition cited the Solicitation and unambiguously explained that a key basis for limiting competition was "the highly complex integration of national emergency declaration priorities, domestic DHS-run initiatives, and deterrence efforts within international host nations." Tab110_AR951; *see also id.* at AR949. The J&A also described "[t]he purpose of this requirement is to obtain all logistical support requirements to receive, stage, process and expedite removal/return cases [], as well as provide capability and capacity to partnering countries to curtail illegal immigration within their borders." *Id.* at AR950.

It is true that the J&A does not cite Proc. 10935, but that is only one part of the picture because the requirements specified by Proc. 10935 are expressly included and the Solicitation specifically cites Proc. 10935 as authority for the procurement. Tab110; Tab111a_AR962-63; *see also* Tab 95a_AR838. CSI does not address any of these facts, apparently inviting the Court to do the same. But the facts here are not so easily dispatched and the Court can both see and reasonably discern that the Government pursued a limited competition based, in part, on Proc.

---

[7] The solicitation identified the requirement to support both the "CBP Home app" and "Project Homecoming." Tabs95a_AR838; 111a_AR962-63; *see also* Proc. 10935. Also, the Contracting Officer stated that Proc. 10935 featured heavily in the Government's decision. Tab160_AR2295.

10935. *See Golden IT, LLC*, 177 Fed. Cl. at 131-32.[8]

>    2.    *The Record Establishes a Reasonable Acquisition Planning Effort, Not a Lack of Advanced Planning*

CSI claims that an Acquisition Planning Forecast System (APFS) record "unequivocally" proves that DHS was aware of its requirements by April 10, 2025, but "failed to conduct adequate market research, issue a Request for Information, or otherwise plan for the hyper-accelerated procurement until May 13, 2025." Pl. Reply at 10. Yet again, CSI fails to accept the context of the procurement and how it came to be. First off, the specific nature of the "requirements" cited in the APFS record are hardly clear, and their connection (if any) to the CSRO procurement even less so. There is no proof—and CSI fails to identify any—that the record's "requirements" included those later announced in Proc. 10935 or otherwise encompassed the full scope of CSRO requirements. On the contrary, the Solicitation's incorporating reference to Proc. 10935 suggests that the early April "requirements" referenced by CSI did not include all the CSRO requirements. Nor does the APFS evince a lack of planning for the CSRO; it is only one preliminary record and that record is just not particularly relevant to the procurement at issue. Moreover, it was not until mid-April 2025 that DHS became aware of concerns regarding the Agency's handling of Salus' unsolicited proposal and ultimately shifted

---

[8] CSI asks the Court to ignore references to Executive Directives in the pleadings because their consideration does not exist in DHS's contemporaneous decision-making process. Pl. Reply at 11-12. On the contrary, the J&A references the Solicitation, Presidential issuances, and unambiguously cites as a basis for limited competition "the highly complex integration of national emergency declaration priorities, domestic DHS-run initiatives, and deterrence efforts within international host nations." Tab110_AR949, AR951. CSI's further argument that the Court should consider DHS's reliance on Presidential directives "as a class justification that there exists 'unusual and compelling urgency' for any immigration-related activities under this Administration" is tantamount to CSI questioning the underlying validity of the Executive Directives themselves and Agency compliance with them. This Court should decline the invitation to debate the validity of the United States' immigration crisis in this bid protest action.

to a competitive acquisition strategy including additional market research efforts. *See*

Tab107_AR921-23. In short, the Agency's planning was an ongoing process—especially after

Proc. 10935. The APFS record proves nothing.

      3.    *Deference to the Interest of National Security is Required and Appropriate*

      CSI also asks the Court to ignore the obvious national security concerns at the heart of

the CSRO procurement. Pl. Reply at 14-15; *see also* 28 U.S.C. § 1491(b)(3). We agree the Court

should not rely on national security considerations alone, but CSI is also not free to ignore the

obvious connection between this procurement action and the national security concerns

expressed in the Executive Directives. In other words, CSI may disagree with the validity or

reasons for the declared emergency, but it cannot deny that the Agency's decisions were

fundamentally grounded in national security and public safety concerns.

      In this regard, CSI questions the relevance of *Gemini Tech Services, LLC v. United

States*, No. 25-1337C, 2025 WL 2674585 (Fed. Cl. Sept. 8, 2025). It is true that *Gemini* did not

address the validity of limited competition. At the same time, CSI overlooks the significance of

the *Gemini* decision to this procurement, evinced by the Army's similar "align[ment] with

priorities of Executive Order 14159, which directs for the efficient and expedited removal of

aliens from the United States." *Id.* at *5. Notably, the *Gemini* court recognized the

reasonableness of the Army's action because "a continued stay will directly exacerbate the

existing detention capacity crisis, hindering ICE's ability to effectively manage the influx of

detainee apprehensions." *Id.* at *6. The *Gemini* court further found, much like here, that the

justification "involve[d] threats to health, welfare or safety and were not speculative

consequences, and thus qualify as 'urgent and compelling,' circumstances which warrant

overriding the stay." *Id.* Finally, the *Gemini* court acknowledged the agency's responsibilities,

much like DHS here, "were charged with 'an urgent and compelling requirement to enforce U.S.

immigration laws and ensure public safety as outlined in the President's Executive Orders 14159 [] and 14165 . . . .'" *Id.* This Court should apply the same national security deference to DHS's need for CSRO and its decision to utilize FAR 6.302-2's limited competitive procedures.

4.    *Delay Would Impose Serious Injury to the Government*

CSI argues that DHS's articulated harms do not satisfy the level of specificity or severity required to comply with FAR 6.302-2(b)(2). Pl. Reply at 15-16. That is wrong. The Agency unambiguously established that any delay considering the unusual and compellingly urgent circumstances presented would cause the United States serious injury. DHS explained that the limited competition was required because the CSRO requirement directly supported the efficient and expedited removal of illegal aliens required by the Executive Directives and necessitated by the "present significant threats to national security and public safety." EO 14159 § 1; EO 14165 § 1; Tab 110_AR951; *see also* EO 14165 § 6; EO 14159 § 9.

The J&A further demonstrated that delay in the CSRO award would: (1) impair rapid removals/returns of illegal aliens; (2) inhibit the support and scale required to have a significant operational impact on US enforcement operations; (3) delay return actions to illegal aliens seeking assistance through the CBP Home application; (4) inhibit efforts to build stronger, more coordinated partnerships with our neighbors and international allies; and (5) significantly delay the establishment of International Staging Areas to serve as reception areas for domestic removal flight further hampering the operational effectiveness of ICE Air and the U.S. government's approach to removal flights supporting final order cases. Tab110_AR951-53. These injuries directly impact DHS' efforts to protect national security and public safety. *Id.*

While the *Gemini* Court reviewed whether an urgent and compelling basis under 31 U.S.C. § 3553(d)(3) was reasonable as opposed to the unusual and compellingly urgent grounds cited by DHS under FAR 6.302-2—the *Gemini* court's conclusions are appropriately considered

here. That decision explained, "it would seem that a threat of immediate harm to health, welfare or safety would appear to qualify as 'urgent and compelling circumstances' for the purposes of CICA stay overrides, just as a threat of immediate harm to health, welfare or safety would create a situation where the 'unusual and compelling urgency' of agency needs permits a sole-source procurement." *Gemini,* 2025 WL 2674585, at *4 (cleaned up). Here, the serious injuries to the Government and U.S. citizens from any delay are patent and adequately explained by the record.

> **B.      The Government Is Entitled to Judgment on Count II Because the Agency Complied with FAR 6.302-2's Requirement to Solicit Offers from as Many Potential Sources as Practicable Under the Circumstances**

CSI again contorts the record before the Court and conveniently ignores the history and circumstances underlying DHS's reasonable compliance with the requirement to solicit offers from potential sources in this limited competition. Pl. Reply at 17.

First, CSI's misplaced scrutiny on DHS's months long direct interaction with Salus ignores that Salus submitted an unsolicited proposal pursuant to FAR Subpart 15.6. Tab2a_AR4; Tab2; Tab2b; *see also* FAR 15.603(a); HSAR 3015.602. Any market research conducted by DHS during the unsolicited proposal phase was consistent with FAR 15.606-1, and not an indication DHS improperly failed to conduct market research or failed to solicit proposals from other offerors. *See* Tab6_AR509; Tab8_AR548.

Second, once DHS determined that competing the requirement was appropriate, it undertook reasonable market research efforts to identify potential sources for CSRO, considering capability, experience, and urgency. *See* Tab106; Tab110_AR952-53. Ultimately, DHS issued a request for proposals and thoroughly explained its decision to invite seven vendors to compete and why it was practicable under urgent circumstances. Tab106; Tab110_AR952-53. This meets FAR 6.302-2. *See also SSI Tech., Inc. v. United States*, 148 Fed. Cl. 147, 161-62 (2020).

████████████████████████████

Third, CSI's scrutiny of applying *Ceres Environmental Services, Inc. v. United States*, 158 Fed. Cl. 547 (2022) to the present case fares no better. CSI complains that because *Ceres* involved a three-month sole-source contract, it is irrelevant to the present situation. CSI is right in that *Ceres* involved a sole-source contract—but it also highlights that DHS promoted increased competition through a limited competition here.[9] Also, the CSRO contract only guarantees performance for one year, not the three years that CSI suggests. *See* Pl. Reply at 18.

Finally, CSI fails to meaningfully rebut DHS's assessment that CSI was not a potential source for CSRO under these urgent circumstances. *See* Tab106_AR915. While CSI attempts to resurrect its standing for this protest through post-hoc testimony, as well as DHS's acknowledgement that CSI may have had a chance to compete in a non-urgent full and open competition, that does not mean that DHS's decision to limit competition to sources it identified as capable was unreasonable or inconsistent with FAR 6.302-2(c)(2). *See* DeLucia Decl., ECF No. 36-1, ¶¶ 19-30. Simply, CSI cannot hide from the fact that DHS is afforded significant discretion in expediting such acquisitions under the circumstances. *Ceres Env't Servs., Inc.*, 158 Fed. Cl. at 559.

**C.    The Government Is Entitled to Judgment on Count III Because the Agency Reasonably Determined a Need For a Three-Year Period of Performance and That Exceptional Circumstances Applied**

As Defendants previously explained, the Agency's determination that it required a three-year period of performance satisfies FAR 6.302-2(d)(1)(i)'s requirement that performance may not exceed the time necessary to meet its urgent requirements. *See* Salus Mot. at 29-32; Gov't

---

[9] CSI speculates about ways in which DHS could have obtained even more competition than it did by including CSI. *See* Pl. Reply at 6-9. Those hypotheticals add nothing, however. DHS could have sole-sourced the contract in several different ways. But instead, DHS chose to compete the CSRO procurement, and it did so in accordance with applicable regulations.

Mot. at 25-26. The Agency properly understood CSRO's role in supporting the objectives of the

Executive Directives to solve the national emergency and illegal immigration, that those

problems were dynamic and evolving with an undefined response scope, and balanced those

unknowns against the seriousness of the issues in determining the necessary performance period.

*See* Salus Mot. at 29-30; *see also* Gov't Mot. at 26. In other words, the record "'evinc[es]

rational reasoning and consideration of relevant factors'" that the Court should not disturb. *SSI*

*Tech., Inc.*, 148 Fed. Cl. at 158 (citation omitted). On reply, CSI fails to rebut these arguments,

effectively conceding that the three-year period of performance satisfies FAR 6.302-2(d)(1)(i)'s

requirements.

Instead, CSI focuses solely on FAR 6.302-2(d)(1)(ii), contending the record lacks the

"exceptional circumstances" required for a period of performance beyond one year. *See* Pl.

Reply at 19-21. FAR 6.302-2 permits performance beyond one year if the head of the agency

determines and documents that exceptional circumstances apply. *See* FAR 6.302-2(d)(1)(ii). The

Agency met that mandate. First, it explained the "exceptional circumstances include among other

circumstances, the immediate and significant harm to Americans caused by 'cartels, criminal

gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign

adversaries, and illicit narcotics' caused by illegal immigrations through the southern border."

Tab98_AR860. Second, it acknowledged the relationship between the exceptional circumstances,

the CSRO requirement, and its need for performance beyond one year. *See id.* at AR860-61

(stating "[a]s part of its plan to comply with the President's declaration and address these

exceptional circumstances caused by illegal immigration, and in accordance with [Proc. 10935],

DHS is launching CRSO to facilitate the removal of illegal immigrants within the United

States"). That should be the end of the inquiry.

CSI's arguments do not demonstrate otherwise. Principally, CSI contends that the D&F's cited exceptional circumstances "are entirely unrelated" to the CSRO procurement.[10] *See* Pl. Reply at 19-20. According to CSI, the "Scope of Work makes clear they do not" relate. *Id.* at 19. Not so. The SOW provides that DHS is procuring CSRO "[t]o enable DHS to meet U.S. border security and immigration enforcement goals" and that doing so will "enhance[e] the ability to identify and stop U.S. bound illegal immigration long before illegal aliens reach U.S. borders." Tab112a_AR1040; *see also* AR1041 (citing Procs. 10886 and 10935). And as just explained, the D&F articulated the relationship between the Executives Directives, the exceptional circumstances therein, and the CSRO requirement. Tab98_AR860-61. CSI's attempt to disconnect CSRO with the exceptional circumstances described in the Executive Directives is an improperly narrow view of the procurement, in conflict with the record.[11] *See* Salus Mot. at 34.

Next, CSI goes a step further, audaciously asserting that the circumstances described in the Executive Directives are not exceptional. *See* CSI Mot. at 19. Put mildly, CSI advances mere disagreement with the Agency's determination of what constitutes exceptional circumstances. *See SSI Tech.*, 148 Fed. Cl. at 164 (finding urgent need for a 20-month sole-source award "discretionary determination of procurement officials that a court will not second guess") (cleaned up). At most, CSI asks the Court to second-guess the policies of the Executive. Either way, CSI's argument is futile.

---

[10] As purported further evidence, Plaintiff insists it is "baseless to suggest that 'known terrorists' or 'criminal gangs' would self-deport" because the Solicitation "provides for initial screening and eligibility for voluntary return." Pl. Reply at 20. Setting aside that CSI seems to suggest it knows what actions these bad actors will take, this assertion once again fails to acknowledge that CSRO is part of and plays a crucial role in the Government's broader effort to stop the threats of illegal immigration. *See* Tab112a_AR1040; Tab98_AR860-61.

[11] For the same reason, CSI's claim that the D&F is deficient because CSRO "does not 'stop newly identified sources of illegal immigration'" is wrong. Pl. Reply at 20. Defendants previously addressed this argument. *See* Salus Mot. at 30 n. 14; Gov't Mot. at 26-27.

Finally, CSI claims that the facts underlying "unusual and compelling urgency" cannot also constitute "exceptional circumstances." Pl. Reply at 21 (describing "exceptional circumstances" as a "separate and heightened requirement"). Because the D&F alone demonstrates that DHS satisfied FAR 6.302-2(d)(1), it is of no matter whether the J&A's justifications for unusual and compelling urgency may also be considered in assessing DHS's exceptional circumstances determination. And at any rate, CSI's argument disregards the fact that the whole record—including the J&A—is before the Court. *See* 5 U.S.C. § 706. CSI's word games are irrelevant and unconvincing. *Compare Unusual*, Black's Law Dictionary (12th ed. 2024) ("Extraordinary; abnormal") *with Extraordinary*, Black's Law Dictionary (12th ed. 2024) ("Beyond what is usual . . . ."). Simply put, DHS rationally determined the required period of performance for CSRO in accordance with FAR 6.302-2(d)(1). Count III fails as a result.

## D. The Government Is Entitled to Judgment on Count IV Because the Agency Properly Invoked the Unusual and Compelling Urgency Exception to Publication Requirements

FAR 5.202 provides an exception to publication requirements when (i) "[t]he proposed contract action is made under the conditions described in 6.302-2," and (ii) "the Government would be seriously injured if the agency complies with the time periods specified in 5.203." FAR 5.202(a)(2).

On reply, CSI does not address the first requirement beyond reiterating—without support—that DHS's actions constitute "a textbook case of lack of advance planning." Pl. Reply at 23. CSI does not dispute Defendants' showing of DHS's market research efforts, instead continuing to misplace its focus on the Agency's research efforts when evaluating Salus' unsolicited proposal, before determining to conduct a limited competition. CSI also does not rebut Defendants' showing that the Agency's "sudden shift" in the urgency of its needs was not manufactured or solely caused by OCI concerns, but due to changed circumstances—including

15

the issuance of Project Homecoming. *See* Salus Mot. at 35-36. Satisfaction of the first

requirement plainly "'rises or falls with DHS's justification for less than full an open

competition.'" Pl. Reply at 21 (quoting Govt Mot. at 28). As such, that justification was proper.

CSI's argument regarding the second requirement, serious injury, strains credulity. CSI

draws a distinction without a difference between FAR 5.202(a)(2)'s showing that "the

Government would be seriously injured if the agency complies with the time periods specified in

5.203" and FAR 6.302-2(b)(2)'s showing that "[d]elay in award of a contract would result in

serious injury, financial or other, to the Government."

Tribunals have repeatedly held that, upon a proper invocation of the unusual and

compelling urgency exception, the agency is excepted from the publication requirements. *See,*

*e.g., Electro-Methods, Inc.*, B-250931, 1993 CPD ¶ 107,366 (Comp. Gen. Feb. 26, 1993);

*Specialty Marine, Inc.*, B-296988, 20 CPD ¶ 112,041, n.1 (Comp. Gen. Oct. 11, 2005); *Deknatel*

*Div., Pfizer Hosp. Prods. Grp., Inc.*, 70 Comp. Gen. 652, 653 and n.1 (1991). In other words, if

the Government would be seriously injured if contract award was delayed, it follows that the

Government would be seriously injured if required to comply with time periods specified in

5.203 because compliance with said time periods would necessarily delay contract award. *See*

Salus Mot. at 37; Gov't Mot. at 26. Because the Agency has shown serious injury would result

from the delay in contract award, the serious injury inquiry under FAR 5.202(a)(2) is also

satisfied. Accordingly, Count IV fails.

    **E.**    **The Government Is Entitled to Judgment on Count VI Because the Court**
            **Lacks Protest Jurisdiction Over Matters of Contract Administration and**
            **Because CSI Has Not Shown a Clear Violation of Applicable Regulations**

The Court should also enter judgment for the Government on Count VI because CSI fails

to meet its dual burden of establishing subject matter jurisdiction under 28 U.S.C. § 1491(b)(1)

and a clear and prejudicial violation of the regulations applicable to Commercial Aviation Services ("CAS") contracts.

On the jurisdictional issue, CSI says its allegations under 41 C.F.R Part 102 do not concern matters of contract administration, even as it confirms that the regulations "'require compliance'" with Flight Program Standards in CAS "'contracts and agreements,'" but impose no requirements for CAS solicitations like the one CSI purports to challenge in this self-styled pre-award protest. *See* Pl. Reply at 23-24 (quoting 41 C.F.R. § 102-33.80(a)). CSI cannot have it both ways. The Part 102 regulations are plain and unambiguous: they require agencies to adopt and enforce compliance with Flight Program Standards only in the performance of awarded "contracts and agreements." *See* 41 C.F.R. §§ 102-33.105, 102-33.130. As a consequence, alleged violations of Part 102, like those raised by CSI, necessarily involve questions "about contract performance [that] relate to contract administration, not procurement" and "cannot be brought under section 1491(b)(1). *Brandt Dev. v. United States*, 177 Fed. Cl. 353, 360 (2025).

Undeterred, CSI insists that Part 102 "imposes pre-contractual requirements that cannot logically operate as a matter of contract administration" and that Flight Program Standards must "exist before an agency can require that the contractor comply with those standards." Pl. Reply at 24. And yet CSI fails to cite any regulatory provision to support its contention that the Solicitation was per se defective because it did not adopt the kind of pre-existing Flight Program Standards CSI prefers. *See* Compl. ¶¶ 97, 108, 114-16. Nor does CSI identify any regulation imposing a deadline to create and enforce such standards even after a CAS contract is awarded. Those holes are fatal to CSI's count VI arguments because CSI cannot establish protest jurisdiction under section 1491(b)(1) "***simply by alleging*** violations of statutory or regulatory provisions" that can only be violated during contract performance (or not at all). *Harmonia*

*Holdings Grp., LLC v. U.S.*, 157 Fed. Cl. 292, 299 (2021) (emphasis added); *Frazier v. United States*, 79 Fed. Cl. 148, 160 (2007), *aff'd*, 301 F. App'x 974 (Fed. Cir. 2008).

On the merits, CSI has not shown a clear and prejudicial violation of regulation because it has no answer for the fact that Part 102 authorizes CAS contracts to rely on applicable FAA regulations when the procuring agency determines that doing so is safe, efficient, effective and consistent with its aviation mission. *See* Salus Mot. at 41-42 (citing 41 C.F.R. § 102-33.25(a)). As Salus explained in its opening brief, DHS appropriately determined that it would apply its Management Directive for "Aviation Management and Safety" (MD 0020.1)—which relies on applicable FAA regulations—to the CSRO contract. *See id.* 42-44.

But CSI does not address MD 0020.1 on reply or the fact that the FAA regulations incorporated in MD 0200.01 address ***all*** the substantive policies and procedures that CSI says are mandatory for the CSRO contract. *Compare id.* at 44, *with* Pl. Reply at 23-25. Instead, CSI misconstrues the plain language of Part 102, which authorized DHS to require compliance under the CSRO contract with aviation standards—like MD002.01—that "***meet*** . . . applicable ***FAA regulations***." *Compare* 41 C.F.R. § 102-33.140 (emphasis added) and § 102-33.105 (authorizing agencies to apply "[c]ivil standards in 14 CFR [FAA regulations] that are applicable to the type of operation(s) [the agency is] asking the contractor to conduct"), *with* Pl.'s Reply at 25.

## F.    Injunctive Relief

CSI has not met its burden to establish entitlement to injunctive relief by clear and convincing evidence. First, CSI has not demonstrated success on the merits. *See supra* Section II. This warrants denial of injunctive relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004). Second, CSI's attempts to establish qualified bidder status are insufficient, fatal to its claim of irreparable harm. *See supra* Section I.B; *see also RLB Contracting, Inc. v. United*

*States*, 118 Fed. Cl. 750, 761 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015) ("the loss of an opportunity to compete for an award . . . is sufficient injury to warrant relief," but only when the "party would not otherwise be disqualified").

For the balance of harms, CSI first posits that Defendants "urge the Court to afford sweeping deference to amorphous claims of 'national security.'" Pl. Reply at 27. Quite the opposite, Defendants acknowledge that the Court should not "blindly" accede to national security concerns but must give them "due consideration." Salus Mot. at 19, 47; *see also* Gov't Mot. at 38. And the national security concerns are far from "amorphous," instead well-articulated in the record and further supported by the sworn declaration of DHS's declarant. *See* Huffman Decl., ECF No. 33-1, ¶¶ 12-29. CSI ignores the record and, instead resorts to attacking the detailed explanations of harm made by DHS's declarant as "speculative" and "unsupported." Pl. Reply at 28. This is insufficient to carry its burden.[12] Fourth, while it is true that national security concerns must be balanced with the "overriding public interest in safeguarding the integrity of the procurement process," CSI does not dispute that "when interests raise national security concerns they 'place the weight of . . . the public interest . . . firmly on defendant's side of the scale.'" Pl. Reply at 29; *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 267 (2015) (citation omitted). Given the documented national security concerns at play, the public interest does not favor injunctive relief.

Finally, CSI attempts to save its request by advocating for "tailored" relief.[13] Pl. Reply at 28-29. What CSI fails to recognize—as evidenced by the cases it relies upon—is that tailored

---

[12] CSI does not dispute the harms that injunctive relief would cause Salus, a consideration under the analysis. *See G4S Secure Integration LLC v. United States*, 159 Fed. Cl. 249, 263 (2022).

[13] In support of tailored relief, CSI claims "even DHS's own declarant acknowledges the feasibility of a bridge contract to maintain continuity of services while a lawful procurement is

relief is only warranted when competing harms have been established, which is not the case here. *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 788 (2009); *see also Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004). Moreover, as CSI confesses, tailored relief is only appropriate when it would not impinge on national security interests. Pl. Reply at 28. Again, that is not the case here. *See* Huffman Decl. ¶¶ 13-20.

CSI concludes its request for an injunction by once again exaggerating reality, mischaracterizing DHS's actions as "forc[ing] through a noncompetitive contract," and asserting the "public interest is not served by rubber-stamping after-the-fact justifications for massive sole-source awards." Pl. Reply at 29-30. These statements illustrate the shortcomings of CSI's request, and the Court should decline to grant injunctive relief in this case.

**CONCLUSION**

For these reasons, we respectfully request that the Court dismiss CSI's complaint, or in the alternative, deny CSI's motion for judgment on the administrative record and request for injunctive relief and grant Salus' cross-motion for judgment on the administrative record.

January 13, 2026                                      Respectfully submitted,

                                                       */s/ Scott N. Flesch*
                                                      Scott N. Flesch
                                                      Alejandro L. Sarria
                                                      Connor W. Farrell
                                                      MILLER & CHEVALIER CHARTERED
                                                      900 Sixteenth St. NW
                                                      Washington, DC 20006
                                                      Tel. (202) 626-5800
                                                      sflesch@milchev.com

                                                      *Counsel for Defendant-Intervenor Salus
                                                      Worldwide Solutions Corporation*

---

conducted. *See* Cappel Decl. ¶ 11." Pl. Reply at 29. The referenced declaration, made by Salus, does not discuss the *feasibility* of a bridge contract. Likewise, DHS's declarant makes no such admission, instead articulating the alternatives considered and why those measures would be insufficient. Huffman Decl. ¶¶ 18, 21-25.