Redacted Version

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

No. 25-1338C
(Chief Judge Matthew H. Solomson)

CSI AVIATION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

SALUS WORLDWIDE SOLUTIONS CORPORATION,

Defendant-Intervenor.

## DEFENDANT'S REPLY IN SUPPORT OF ITS
## MOTION TO DISMISS, AND, IN THE ALTERNATIVE,
## CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

DOUGLAS K. MICKLE
Acting Deputy Director

OF COUNSEL:
Charlene T. Storino
Assistant General Counsel
for Procurement Operations
General Law Division
Office of the General Counsel
Department of Homeland Security
Tel:  (202) 357-9936
charlene.storino@hq.dhs.gov

RETA E. BEZAK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-5633
Reta.E.Bezak@usdoj.gov

January 13, 2026

*Attorneys for Defendant*

**<u>TABLE OF CONTENTS</u>**

ARGUMENT ................................................................................................................1

I.     CSI Has Failed to Demonstrate It Has Standing to Protest The CSRO
Procurement ................................................................................................1

II.    The CSRO Procurement Processes Were Lawful And Reasonable .........................5

    A.  DHS Justified Its Procurement Strategy Based on A Showing of Unusual
And Compelling Urgency ...................................................................5

    B.  The Record Demonstrates The Harm That Would Flow to The Government
Had The Procurement Been Delayed ....................................................9

    C.  DHS Competed The CSRO Procurement Among as Many Vendors as Was
Practicable .......................................................................................10

    D.  DHS Justified The CSRO Period of Performance ...........................................11

    E.  DHS Was Not Required to Publish A Synopsis ...............................................12

    F.  DHS's Policies Address Applicable Flight Program Standards .......................12

III.   CSI Has Failed To Demonstrate Entitlement To Injunctive Relief.......................14

CONCLUSION ........................................................................................................15

i

## TABLE OF AUTHORITIES

**Cases Page(s)**

*Aero Corp., S.A. v. United States*,
  38 Fed. Cl. 237 (1997) .......................................................................................... 15

*Cal. Indus. Fac. Res., Inc. v. United States*,
  100 Fed. Cl. 404 (2011) ........................................................................................ 10

*Career Training Concepts, Inc. v. United States*,
  83 Fed. Cl. 215 (2008) .......................................................................................... 14

*CliniComp Int'l, Inc. v. United States*,
  904 F.3d 1353 (Fed. Cir. 2018).......................................................................... 2, 3

*Info. Tech. & Applications Corp. v. United States*,
  316 F.3d 1312 (Fed. Cir. 2003)............................................................................... 2

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)............................................................................................... 14

*Myers Investigative & Sec. Servs., Inc. v. United States*,
  275 F.3d 1366 (Fed. Cir. 2002)............................................................................... 3

*Percipient.ai, Inc. v. United States*,
  153 F.4th 1226 (2025), *petition for cert. denied*, No. 25-428 (Jan. 12, 2026)............................ 2

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011).............................................................................. 14

*Sirius Fed., LLC v. United States*,
  153 Fed. Cl. 410 (2021) ........................................................................................... 3

*Weeks Marine, Inc. v. United States*,
  575 F.3d 1352 (Fed. Cir. 2009)................................................................................ 2

*Worldwide Language Res., LLC v. United States*,
  127 Fed. Cl. 125 (2016) ........................................................................................... 8

**Regulations**

41 C.F.R. § 102-33.5.................................................................................................. 12

41 C.F.R. § 102-33.105 (2025) ................................................................................. 13

FAR 5.202(a)(2)..........................................................................................................................12

**Other Authorities**

Exec. Order No. 14159, Sec. 12, 90 Fed. Reg. 8443-8448 (Jan. 29, 2025)....................................6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| CSI AVIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25-1338C |
| | ) | (Chief Judge Matthew H. Solomson) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SALUS WORLDWIDE SOLUTIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**MOTION TO DISMISS, AND, IN THE ALTERNATIVE,**
**CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to the Court's order dated November 17, 2025 (ECF No. 30), defendant, the

United States, respectfully submits this reply in support of its motion to dismiss the complaint

filed by plaintiff, CSI Aviation, Inc. (CSI), for lack of standing or, in the alternative, for

judgment on the administrative record in favor of the United States and deny the motion for

judgment on the administrative record filed by CSI (ECF No. 33).

## ARGUMENT

**I.      CSI Has Failed to Demonstrate It Has Standing to Protest The CSRO Procurement**

CSI argues that the Government identified the wrong standard for standing in this pre-

award protest, and in particular, for the direct economic interest prong of the standing inquiry.

*See* Pl. Resp. at 4-8.  CSI's position misses the point of the Government's motion, which was not

that CSI had no substantial chance of winning the contract as compared to other offerors, but

1

rather that CSI failed to demonstrate that it had the capability to perform the contract *at all*, and thus failed to show prejudice, a separate inquiry from direct economic interest.  Because CSI failed to demonstrate its capability, it lacks standing to contest the Department of Homeland Security's (DHS's) Comprehensive Support for Removal Operations (CSRO) procurement.

To have standing to bring a bid protest in the Court, a protester must demonstrate that it is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Percipient.ai, Inc. v. United States*, 153 F.4th 1226, 1243 (2025) (*en banc*), *petition for cert. denied*, No. 25-428 (Jan. 12, 2026); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  To demonstrate direct economic interest, a party typically must show that, but for the alleged procurement errors, it had a substantial chance of winning the contract.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  However, the Court of Appeals for the Federal Circuit has recognized that, in certain pre-award cases, direct economic interest can be shown by establishing a "non-trivial competitive injury which can be redressed by judicial relief."  *Weeks Marine*, 575 F.3d at 1362.

Regardless of the applicable standard for direct economic interest, a protesting party must also demonstrate prejudice.  *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (explaining that, to demonstrate standing, a party must show (1) that it is an interested party and (2) that it was prejudiced by a significant error in the procurement process).

Here, because CSI was not invited to submit a proposal in this limited-competition procurement, we analogized the prejudice inquiry to a challenge to a sole-source award.  That is, we do not contend CSI must show "that it would have received the award in competition with other hypothetical bidders, [but rather that] it must show that it would have been a qualified

2

bidder." *Id.* (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002)).[1]

As we demonstrated in our opening brief, CSI offered conclusory allegations in its complaint that it was qualified without actually alleging that it had the capabilities to perform the requirements of the CSRO contract. It stated that, had there been a full and open competition, it would have competed and it would have had a substantial chance of winning the contract, Compl. ¶ 51, and that it "has performed similar work for other government agencies," *id.* ¶ 63.

In an effort to cure the insufficiency of the allegations in its complaint, CSI submitted a declaration in response to the Government's motion to dismiss. ECF No. 36-1.[2] Although it provides certain details about CSI's capabilities, this declaration still does not demonstrate that CSI has the capabilities to perform the CSRO contract. In particular, CSI's declaration highlights CSI's experience as a charter passenger service and its experience providing airlift and rescue operations. *Id.* ¶¶ 5-12. As demonstrated by the solicitation and the declarations from DHS and Salus, charter flights are a very small part of the CSRO contract. *See* Tab 112a, AR 1041; ECF No. 32-1 ¶¶ 4-7; ECF No. 33-1 ¶¶ 9-11. More significant are the contract's requirements to provide logistical and program management support for DHS for outreach to

---

[1] We do not contend that CSI must meet the substantial chance test—*i.e.*, that it would have bested Salus had it been invited to compete—but CSI's protestations regarding the applicable standard for standing fall flat where it identified the substantial chance standard in its complaint. Compl. ¶ 51 (alleging that, had CSI had the opportunity to compete in a full and open competition, it "would have had a substantial chance of receiving the award").

[2] As we demonstrate, CSI's declaration does not establish that CSI is capable of performing the CSRO contract. But even if it did, CSI failed to offer any substantive allegations or evidence supporting its standing to bring this protest until its final brief. Typically, this Court will not consider arguments raised for the first time in a reply. *See, e.g.*, *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 425-26 (2021).

3

individuals eligible for voluntary removal, enrollment in the voluntary removal program,

commercial ticketing, foreign assistance coordination, and establishment of international staging

areas.  Tab 112a, AR 1041; ECF No. 32-1 ¶¶ 4-5; ECF No. 33-1 ¶¶ 9-10.  CSI offers no

experience that reflects these types of services.

      CSI attempts to draw a parallel between the requirements of the ICE Air program, for

which it is a prime contractor, and the CSRO effort.  ECF No. 36-1 ¶ 12.  However, DHS

explained in its market research memorandum that the ICE Air program is distinctly different in

scope from the services sought under the CSRO contract.  Tab 106, AR 915.  This is largely

because ICE Air involves deportation and removals, not voluntary returns.  CSI's cited success

rate and passenger numbers are not directly relevant to the CSRO contract's requirements, which

are fundamentally different and require additional services and coordination.  Missing from

CSI's ICE Air effort is the significant coordination required between voluntary return

participants and the United States Government, commercial airlines, and foreign governments, as

well as the logistical support to foreign governments to establish and maintain staging areas.

      Moreover, DHS explained that,

> Considering the high complexity of this requirement and the need to immediately
> ramp up and be able to start performing the services within days of contract award,
> it is significantly riskier to award this contract to a contractor that does not have
> direct experience and expertise with the major aspects of the requirement and
> operating within a foreign environment.

Tab 106, AR 910.  In describing its approach, CSI takes responsibility for "Flight Coordination

& Management," "Healthcare Provision," and unspecified "Logistics and Administrative

Support."  ECF No. 36-1 ¶ 21.  CSI proposes to assign many other core responsibilities for the

requirement to teaming partners, including all aspects of international staging, facilities

management, and security.  *Id.*  The extent of teaming CSI proposes is at odds with DHS's

needs. Moreover, CSI does not offer any evidence—either its own or its partners'—that suggests the contractor has prior experience with the capabilities needed for the CSRO contract.

Put simply, CSI argues that the fact that it has expressed an interest in the procurement means it has standing to challenge it. While it is true that, were the CSRO competition full and open, any contractor could submit a bid regardless of their experience or capabilities, that does not necessarily mean any interested contractor would have standing to bring a protest. As part of the standing inquiry, a protester is required to demonstrate prejudice; CSI has failed to do so here.

## II.    The CSRO Procurement Processes Were Lawful And Reasonable

CSI attempts to cast the CSRO procurement as "noncompetitive," Pl. Resp. at 1, 19, 26, 27, 29, and "sole-source," *id.* at 15, 30. It is neither. Despite the urgent need for voluntary removal coordination and facilitation of services and infrastructure to foreign partners, DHS conducted market research to identify as many likely offerors as practicable and competed the CSRO contract among those sources. It justified both the method of procurement and the duration of the contract, and CSI's complaints largely reflect its disagreement with DHS's rationales. The record supports a limited competition and DHS's procurement actions thus comport with applicable regulations.

### A.  DHS Justified Its Procurement Strategy Based on A Showing of Unusual And Compelling Urgency

CSI contends that the agency's justification for a finding of unusual and compelling urgency is post hoc and unsupported by the contemporaneous record. Pl. Resp. at 10-12. To the contrary, the record, through numerous documents developed at the time of the procurement actions, demonstrates the circumstances giving rise to DHS's urgency.

As CSI explains, the President's January 20 Executive Order establishing a national emergency related to illegal immigration briefly referenced efforts to adopt policies and procedures to encourage voluntary removals. *See* Pl. Resp. at 12; Exec. Order No. 14159, Sec. 12, 90 Fed. Reg. 8443-8448, 8445 (Jan. 29, 2025). It did so, however, in the context of ordering the Secretary of Homeland Security to "promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law . . . to ensure the efficient and expedited removal of aliens from the United States." Exec. Order No. 14159, Sec. 9, 90 Fed. Reg. 8445. In response, DHS began to consider avenues for supporting dramatically scaled up removal efforts. Notably, the early records of the CSRO effort were not focused on *voluntary* removals, nor was Salus's unsolicited proposal. *See, e.g.*, Tab 4a, AR 255-56; Tab 20a, AR 578-79; Tab 63, AR 730-31. DHS began development of a requirement that would enhance its ability to accomplish *all* removal efforts. The first reference to voluntary returns comes in the letter of intent from the Department of State on April 26, 2025. Tab 65, AR 733-34. In the letter, State does not reference any particular program or contract but simply confirms its intent to provide funds for DHS to carry out voluntary return efforts. *Id.*

The President's May 9, 2025, Proclamation, Establishing Project Homecoming, gave the CSRO requirements form in addition to starting a clock. *See* Proclamation No. 10935, 90 Fed. Reg. 20357 (May 14, 2025). The Proclamation established incentives to encourage illegal aliens to voluntarily leave the United States and provided a framework for notification to those individuals, facilitation of their rapid departure from the country, and payment of financial

incentives.  *Id.* at 20357-58.[3]  It also demanded a ramp-up of immigration enforcement within 60

days to promptly deport those illegal aliens who had failed to voluntarily leave.  *Id.* at 20358.

 This Proclamation is not a post hoc justification for the CSRO procurement and its

procedures.  *See* Pl. Resp. at 11-12.  Indeed, the CSRO solicitation prominently references

Project Homecoming and the Proclamation.  Tab 111a, AR 962 ("The Government requires a

solution to be delivered to ensure voluntary return efforts are coordinated for the release of the

CBP Home app/Project Homecoming . . . ."), AR 963 ("Reference Documents").  The

contemporaneous documentation—to include the solicitation on May 15, 2025 (Tab 111a), the

Justification & Approval (J&A) for Other Than Full and Open Competition on May 20, 2025

(Tab 110), the Determination & Findings (D&F) in support of DHS's decision to proceed with

the procurement despite a GAO protest on May 20, 2025 (Tab 183)—demonstrates that the

Proclamation was the driving force behind the urgent requirement.  See Tab 110, AR 951

("Coupled with this [national] emergency, there is an immediate need to address the significant

cases of Voluntary Removals and provide immediate capability and capacity to partnering

countries to curtail illegal immigration within their borders.").  CSI attempts to cast DHS's D&F

as a post hoc rationalization, *see* Pl. Resp. at 11, yet it was issued the *same day* as the J&A

describing the unusual and compelling urgency of the requirement.  *Compare* Tab 110, AR 955,

*with* Tab 183, AR 2808.

---

  [3]  CSI contends that voluntary departures have been available for years.  Pl. Resp. at 12.
CSI conflates voluntary departures, which have long been available, with voluntary returns—a
new initiative under Project Homecoming and the CSRO contract.  Voluntary returns include
additional services such as registration in the CBP Home App, Government-funded travel, and
stipends paid after return, none of which are typically provided under voluntary departures or
removals.  The May 9 Proclamation specifically authorizes and encourages financial incentives
to facilitate voluntary returns, further distinguishing this program from prior practices.

CSI also attempts to undermine the agency's reliance on the fact that the Proclamation called for a 60-day deadline for DHS to dramatically increase the number of immigration enforcement officers and the rate of involuntary removals. Pl. Resp. at 12-13. CSI's contentions that voluntary removals were available before the Proclamation and that the need for such removals would end after the 60-day window misconstrue the Government's argument and the nature of the procurement. The ramp-up of enforcement both created the need for immediately increasing the facilitation of voluntary removals—since those who failed to self-deport within that window would be subject to involuntary removal—and the need to immediately undertake the other primary objective of the CSRO contract—facilitating the acceptance of removals to other countries and assisting in the establishment of international staging areas, given the anticipated surge in deportation efforts. Contrary to CSI's contention, involuntary removals are very relevant to the CSRO contract; the efforts to build foreign capacity to accept removals addresses involuntary as well as voluntary removals.

CSI additionally contends that the Government is attempting to "shield" the procurement from judicial oversight. Pl. Resp. at 14-15. As the Government's opening brief demonstrates, there are aspects of this procurement that fall well within the Court's purview to consider. However, to the extent CSI's protest challenges the substance of Administration policy priorities, particularly where, as here, those priorities touch on national security, the Court affords even greater deference to the agency to determine its needs and to select its procurement vehicle. *See, e.g.*, *Worldwide Language Res., LLC v. United States*, 127 Fed. Cl. 125, 132 (2016) (finding agency's decision not to provide the current location of linguists in Afghanistan due to the national security-related nature of those locations rational).

8

In sum, CSI's attempts to undermine the agency's rationale for limited competition are not supported by the record and reflect CSI's mere disagreement with DHS's and the Administration's priorities. DHS provided a coherent and reasonable rationale for limiting the pool of potential offerors.

### B. The Record Demonstrates The Harm That Would Flow to The Government Had The Procurement Been Delayed

CSI next argues that DHS has failed to demonstrate specific harm that would flow from delaying the CSRO procurement to allow for full and open competition. Pl. Resp. at 15-17. CSI again ignores the rationale present in the record and attempts to wave away some of that rationale by baselessly labeling it "post hoc." The contemporaneous record describes real harm that would have resulted from a delay in implementation of the CSRO contract.

CSI repeats two misapprehensions of critical aspects of the record: first, that the May 9 Proclamation—and its 60-day window—are unconnected to the CSRO procurement; and second, that the D&F rationalizing the override of the GAO stay was somehow not contemporaneous to the J&A describing the unusual and compelling urgency of the procurement, despite the execution of those two documents on the *same day*. The harm described in both the D&F and the J&A reflects the fact that DHS had been ordered to immediately facilitate voluntary removals in advance of a dramatic escalation of involuntary removal efforts. Tab 110, AR 951; Tab 183, AR 2803-04, 2807. That harm includes unnecessary risk to the safety of the public and immigration enforcement personnel, as well as harm to individuals eligible for voluntary removals who would be unable to take advantage of the program. *Id.* These harms were tangible and imminent in light of the agency's implementation of Project Homecoming.

9

**C.  DHS Competed The CSRO Procurement Among as Many Vendors as Was Practicable**

CSI next argues that DHS did not open the CSRO competition to as many vendors as was practicable.  CSI argues that DHS's market research was insufficient, that the agency conceded that CSI was a qualified bidder, and that the agency's justification for restricting competition was inconsistent.  Pl. Resp. at 17-19.  None of these arguments are compelling.

First, the record demonstrates that DHS reviewed other vendors that had experience with the type of requirements sought.  *See* Tab 106, AR 910-15.  CSI's primary complaint is that DHS did not directly communicate with the prospective vendors until Industry Day.  Pl. Resp. at 17.  It is unclear why CSI finds this problematic.  The agency thoroughly considered each offeror's capabilities, Tab 106, AR 910-15, and then invited all of them to compete.  CSI cites as support a case in which the Government solicited a sole-source contract despite knowing there were other sources available and with no explanation as to why quotes could not be sought from those other sources.  Pl. Resp. at 17 (citing *Cal. Indus. Fac. Res., Inc. v. United States*, 100 Fed. Cl. 404, 410-11 (2011)).  This case provides no support at all, as DHS here did exactly what the Court expected of the Government in *California Industrial*.

CSI next contends that DHS conceded CSI was "qualified."  Pl. Resp. at 18.  As explained above, the fact that DHS conceded that, had there been full and open competition, CSI would have had the opportunity to compete is no concession regarding CSI's capability or qualifications; it speaks to the nature of the process, not DHS's view of any vendor.  The admission that anyone could compete if the competition were full and open does not suggest that DHS believes CSI is qualified.

10

Finally, CSI argues that DHS stated inconsistently that "only Salus" could perform the work under the CSRO contract and also that "multiple vendors" could perform the work.  Pl. Resp. at 18-19.  CSI misstates DHS's market research and mischaracterizes Salus's proposal (although that proposal is not relevant to CSI's challenge).  DHS's market research report explained that only one vendor—Salus—had the experience necessary to address the complete requirement, but several others could perform certain segments of the scope of work and DHS would therefore compete the requirement among those vendors to "further assess their capabilities."  Tab 106, AR 914.  Regarding Salus's proposal, although Salus describes the use of several subcontractors (a relationship not questioned by DHS), it identified only one teaming partner who would provide "integrated onboard security, medical, and linguistic support" for dedicated flight operations.  Tab 118b, AR 1341.  This does not demonstrate that Salus "relied heavily on teaming partners," Pl. Resp. at 18.

CSI thus has failed to demonstrate that DHS's procurement was not competed among as many offerors as was practicable.

### D.  DHS Justified The CSRO Period of Performance

CSI argues that DHS failed to justify extending the CSRO period of performance beyond one year.  Pl. Resp. at 19-21.  This argument is based on the (incorrect) assumption that the CSRO contract "is expressly limited to supporting voluntary return operations."  Pl. Resp. at 19.  But one of the primary purposes of the CSRO contract is to "enhanc[e] the ability [of foreign partners] to identify and stop U.S. bound illegal migration long before illegal aliens reach U.S. borders."  Tab 111a, AR 962.  The solicitation explains that "DHS will leverage foreign partner resources and create a network of anti-illegal immigration enforcement efforts, extending U.S. border security and serving as an international virtual wall."  Tab 111a, AR 962.  And in addition

11

to helping foreign partners halt illegal immigration, the contract further provides for facilitating the foreign staging of involuntary—as well as voluntary—removals.  Tab 111a, AR 962.

CSI's argument that DHS's references to the threats from illegal immigration are unrelated to this procurement is thus inaccurate.  *See* Pl. Resp. at 20.  The CSRO contract is expressly directed at curbing illegal immigration, and the justification for extending it beyond one year is therefore rational.

### E.  DHS Was Not Required to Publish A Synopsis

CSI next argues that DHS was required to publish the solicitation publicly and that it failed to demonstrate that the exception in FAR 5.202(a)(2) applied.  Pl. Resp. at 21-23.  The record shows otherwise and that DHS faced circumstances of unusual and compelling urgency.  That urgency necessitated a four-day turnaround between the distribution of the solicitation and the close of bidding, followed by an award one day later.  As we demonstrated in our opening brief, the same rationale that justified the stated urgency supports the agency's conclusion that it could not wait 30 days to allow for publication of the solicitation.

### F.  DHS's Policies Address Applicable Flight Program Standards

Finally, CSI argues that DHS is conducting aviation operations under the CSRO contract without approved flight program standards in violation of 41 C.F.R. § 102-33.5.  Pl. Resp. at 23-25.  This argument relates to DHS's administration of the contract and therefore falls outside the bid protest jurisdiction of this Court.  Moreover, as we demonstrated in our opening brief, ECF No. 33 at 31-32, DHS policy is consistent with the applicable regulations.

As we pointed out in our opening brief, flight program standards impose oversight requirements on DHS with respect to its contractors, and are therefore matters of contract administration that do not fall within this Court's bid protest jurisdiction.  This is all the more

true with respect to CSI's current argument, which relies on revisions to the applicable standards that occurred in December 2025, seven months after the CSRO contract was awarded.  *See* Pl. Resp. at 25 n.10.  How DHS implements new regulations with respect to existing contracts is a matter of contract administration that CSI has no grounds to protest.

Indeed, CSI apparently used this regulatory change as an excuse to not engage with our primary substantive argument with respect to the flight program standards.  In the version in effect when the CSRO contract was awarded, the regulation states,

> At a minimum, your CAS contracts and agreements must require that any provider of CAS comply with—
>
> (a) Civil standards in 14 CFR that are applicable to the type of operation(s) you are asking the contractor to conduct;
>
> (b) Applicable military standards; or
>
> (c) Your agency's Flight Program Standards (see §§ 102-33.140 through 102-33.185 for the requirements for Flight Program Standards).

41 C.F.R. § 102-33.105 (2025).  At that time, DHS's Management Directive No. 0020.1, Aviation Management and Safety, stated:

> DHS [Organizational Elements] that use Commercial Aviation Services (CAS) exclusively for the performance of governmental missions or passenger operations must require the vendor or contractor to comply with the civil aviation standards [Title 14 CFR, Chapter 1 and 49 CFR Chapter XII] applicable to the type of operations conducted while in service to the Department or its contractor.

AR 2830, Tab 188.  DHS's policy required that CAS contracts comply with relevant civil aviation standards, consistent with 41 C.F.R. § 102-33.105.  CSI failed to address this argument at all in its response.  *See* Pl. Resp. at 23-25.

III.    **CSI Has Failed To Demonstrate Entitlement To Injunctive Relief**

CSI has failed to demonstrate any prejudicial error in DHS's procurement; it has

therefore failed to establish entitlement to injunctive relief.  *Career Training Concepts, Inc. v.*

*United States*, 83 Fed. Cl. 215, 219 (2008).  However, even if CSI could demonstrate error, the

Court should still decline to award injunctive relief because the balance of the harms weighs

against it.

As an initial matter, CSI has offered no evidence that it would be irreparably harmed if

injunctive relief were not awarded.  As we demonstrated in our opening brief, the Supreme Court

has explained that it is the plaintiff's burden to prove irreparable; a court may not presume it.

*See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-58 (2010).  We thus urged the

Court not to follow the line of cases finding a protester presumptively suffers irreparable harm if

deprived of the opportunity to compete for a contract.  ECF No. 33 at 36.  Contrary to CSI's

statement, Pl. Resp. at 27, these cases are not "binding precedent" that the Court is required to

follow.  Rather, they have been overtaken by binding—that is, Supreme Court and Federal

Circuit—precedent that "jettisoned the presumption of irreparable harm as it applies to

determining the appropriateness of injunctive relief."  *Robert Bosch LLC v. Pylon Mfg. Corp.*,

659 F.3d 1142, 1149 (Fed. Cir. 2011).

Moreover, CSI poses no substantive challenge to the sworn testimony offered by DHS

describing the national security harms that would result from enjoining the CSRO contract.  *See*

ECF No. 33-1.[4]  CSI characterizes the averments in the declaration provided by DHS as

---

[4]  CSI's assertion that DHS paid $13,000 per departure under the CSRO contract is
unsupported and misleading. The record does not substantiate this calculation, nor does it reflect
the full scope of services provided under the contract.

"amorphous," "speculative," and "exaggerated"—they are not. DHS's declarant described concrete and severe national security implications of an injunction, and CSI has offered no evidence to refute them.[5] The significant national security implications "clearly place[] the weight of the balance-of-harms factor on defendant's side of the scale." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241-42 (1997).

Finally, there is significant public interest in enforcing the immigration laws of the United States and expediting the removal of illegal aliens. Thus, the public interest and the balance of harms weigh strongly in favor of rejecting CSI's request for an injunction.

## CONCLUSION

For these reasons and those in our opening brief, the United States respectfully requests that the Court dismiss CSI's complaint for lack of standing. In the alternative, we respectfully request that the Court grant judgment on the administrative record in favor of the Government and deny CSI's motion for judgment upon the administrative record.

---

[5] CSI states that "DHS's own declarant acknowledges the feasibility of a bridge contract to maintain continuity of services while a lawful procurement is conducted." Pl. Resp. at 29. The cited testimony is from Salus's declarant, not DHS's.

15

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Acting Deputy Director

OF COUNSEL:                          s/ Reta E. Bezak
Charlene T. Storino                  RETA E. BEZAK
Assistant General Counsel            Senior Trial Counsel
for Procurement Operations           Commercial Litigation Branch
General Law Division                 Civil Division
Office of the General Counsel        Department of Justice
Department of Homeland Security      P.O. Box 480
Tel:  (202) 357-9936                 Ben Franklin Station
charlene.storino@hq.dhs.gov          Washington, D.C.  20044
                                     Tele: (202) 305-5633
                                     Reta.E.Bezak@usdoj.gov

January 13, 2026                     *Attorneys for Defendant*

16