# Exhibit C

U.S. House of Representatives Committee on Oversight and Government Reform
2157 Rayburn House Office Building
Washington, DC, 20515-6143


Representative Robert Garcia, Ranking Member


April 8, 2026


Dear Ranking Member Garcia:

I am writing in reply to your letter dated April 2. I recognize and respect Congress' authority to conduct inquiries in furtherance of its legislative powers, and will respond to the best of my recollection, based on available documents, in accordance with the law and our constitutional and legal rights.

Let me start by saying I wholeheartedly share your belief that the process and manner by which our government awards contracts must be scrupulously fair, absolutely transparent, and conducted upon a bedrock of uncompromising integrity. Ensuring the system acts as designed is the only way a company the size of Salus can compete with far larger competitors.

That said, much has been misreported in the press as of late regarding Salus Worldwide Solutions, and that reporting seems to have influenced your inquiry[1].  It echoes a distorted media portrayal of both my company and me, and I welcome the opportunity to provide the truth and facts of the matter as I know them to be – starting with this most important reality: the 300 employees that work at Salus and our affiliated companies do so in support of the United States of America, conduct themselves professionally, and fully abide by the law.

Much of the specific misreporting revolves around Corey Lewandowski, advisor to former Secretary Kristi Noem. With respect to the specific questions posed in your letter about Lewandowski (*italicized*), let me answer each directly and unequivocally:

*1. Did Salus Worldwide Solutions, any subsidiary or related entity, or any representative of Salus Worldwide Solutions or its related entities receive a request for anything of value from Mr. Lewandowski or any person affiliated with Mr. Lewandowski in exchange for favorable treatment?*

**No**.

---

[1] https://www.nbcnews.com/news/us-news/dhs-contractors-told-white-house-officials-asked-pay-corey-lewandowski-rcna263744

*2. Did Salus Worldwide Solutions, any subsidiary or related entity, or any representative of Salus Worldwide Solutions or its related entities offer anything of value to Mr. Lewandowski or any person affiliated with Mr. Lewandowski in exchange for favorable treatment?*

**No.**

*3. Did Salus Worldwide Solutions, any subsidiary or related entity, or any representative of Salus Worldwide Solutions or its related entities deliver anything of value to Mr. Lewandowski or any person affiliated with Mr. Lewandowski in exchange for favorable treatment, whether directly or indirectly?*

**No.**

*4. Did Salus Worldwide Solutions, any subsidiary or related entity, or any representative of Salus Worldwide Solutions or its related entities facilitate or offer to facilitate communications between Mr. Lewandowski or any person affiliated with Mr. Lewandowski and any persons or companies seeking or considering contracting with the Department of Homeland Security?*

**No.**

*5. Did Salus Worldwide Solutions, any subsidiary or related entity, or any representative of Salus Worldwide Solutions or its related entities receive any notification from a prospective subcontractor concerning communications from a purported representative of Salus about conditions on contract awards?*

**No.**

Neither I nor any authorized representative of Salus nor any affiliated corporate entity ever received anything of value from Mr. Lewandowski or any person affiliated with Mr. Lewandowski in exchange for favorable treatment of any kind, nor offered anything, nor ever sought any favor or consideration from him. Neither I nor any authorized representative of Salus nor any affiliated corporate entity ever facilitated or offered to facilitate communications between Mr. Lewandowski or any person affiliated with Mr. Lewandowski with any person or company seeking to contract with the Department of Homeland Security. After an extensive internal review of all email, from all affiliated companies, we have not found a single email to or from Mr. Lewandowski. We are wholly unaware of any of the alleged improper behavior and were never party to any aspect of that type of improper behavior. In the wake of the spurious allegations made in the media and reflected in your letter, we have found no evidence of impropriety by any officer or member of our staff. Mr. Lewandowski never asked me or to the Company's knowledge, anyone at Salus for a consulting arrangement or any other type of favor or benefit in exchange for a contractual award from DHS.  Had he made such a request, I would have immediately rejected it and reported the request to the appropriate authorities.

Over the last four years, the team of dedicated professionals have rescued over 70,000 Afghan allies under Operations Allies Welcome and Enduring Welcome under a State Department

contract after making it possible to fully vet them in Kabul[2,3], facilitated the voluntary departure of over 80,000 illegal aliens under Project Homecoming[4] with dignity and self-determination under a DHS contract, rescued more than 2,600 American citizens from countries in the Middle East under a DHS contract in the earliest days of the current war with Iran when the airspace was closed and State was struggling to respond, and rescued more than 1,000 young women and girls that would otherwise be subject to a very dark fate in forced marriages rather than enjoying a new life and education in a new home under State and private contracts.  As you read about us generally, I urge you to keep them all in mind as they are the ones ultimately affected by the baseless accusations made against us and the damage that has been done to our credibility and security.  We are a company that managed to stay out of the spotlight, so much so that our competitors attempted to cast us as neophytes as a basis of their bid protest[5].  Where new problems presented themselves, Salus evolved.  Where Salus could find no other companies willing to operate in places like Afghanistan, we formed new companies with distinct capabilities, separate corporate leadership, and highly talented staff.  When those competitors could not win in a fair contract competition that they were not qualified for, and when DHS had the temerity to push back against their bid protest in federal court, they turned to lobbyists and unethical "reporters" to mislead you and accuse us of crimes as implausible as they are outrageous and mischaracterize the normal evolution of corporate affiliations as shadowy "shell companies" with nefarious intent[6].

With the election of President Trump, three points were clear.  First, there would be a pause in the admission of refugees and Special Immigrant Visa applicants[7], which would effectively bring Salus' role in Operation Enduring Welcome to an end.  Second, there would be a shift to focus on the deportation of individuals unlawfully present in the United States.  Third, there would be a significant disruption in the expenditure of foreign assistance funding with an emphasis on the alignment of foreign assistance to the new Administration's priorities[8].  Bringing those three points together, the team at Salus – nearly all former career civil servants from the national security sector – developed an approach that focused on increasing the options for individuals that wished to leave the United States voluntarily and on increasing the absorption capacity of countries that would be receiving an unprecedented wave of returning people.  That approach was formed into an unsolicited proposal, in accordance with Federal Acquisition Regulation (FAR) Part 15.6, and that proposal was submitted in strict compliance with Department requirements[9], first to FEMA on January 20, 2025 (Attachment 1), and then DHS Headquarters on January 23, 2025, (Attachment 2) before any of the senior political appointees had been appointed to their positions.  In accordance with federal regulations and Department policy, DHS career contracting officials acknowledged receipt of the proposal and, on February 24, 2025 (Attachment 3), responded that, "…your unsolicited proposal will be accepted for a

---

[2] U.S. Department of State Report to Congress https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q3-July-2024.pdf

[3] FY2024 USRAP Report to Congress https://www.rpc.state.gov/documents/FY-2024-USRAP-Report-to-Congress_FINAL-Accessible-11.02.2023.pdf

[4] https://www.cnn.com/2026/03/18/us/dhs-self-deport-project-homecoming-invs

[5] https://pacer.uscourts.gov/file-case/court-cmecf-lookup/court/USFCC

[6] https://gillianbrockell.com/noems-luxury-d-jet-for-deportations-is-the-tip-of-the-ice-berg/

[7] Ahead of Donald Trump's inauguration, a sprint to rescue refugees

[8] https://www.devex.com/news/special-saturday-edition-the-donald-trump-development-playbook-108933

[9] https://www.dhs.gov/unsolicited-proposals

comprehensive evaluation". In accordance with the FAR and DHS policy, Salus was then put in direct contact with a career program analyst from the Office of International Affairs to evaluate the applicability of the novel approach to the Department's requirements. That evaluation took the form of discussions and meetings between mid-February and mid-April, as is customary and appropriate in the evaluation of a valid unsolicited proposal[10]. Ultimately, the Department chose to compete the requirement after the President announced his requirement for Project Homecoming on May 9, 2025, through Presidential Proclamation 10935, with a 60-day implementation goal. During that competition, which involved at least six competitors and was based on a unique pricing scenario that neither Salus nor the other competitors had foreknowledge of, Salus emerged with both the highest technical score and the lowest price. There were no political favors here. Just a group of individuals with a unique perspective and the technical background needed to innovate.

The processes that are required under the Competition in Contracting Act (CICA) and articulated in the FAR exist to provide the Government with the best possible solutions for the best possible price. Without those processes, and the flexibilities that they provide, the Government could not respond to urgent or unforeseen requirements and innovative companies like Salus could not exist. Salus worked within those regulations to bring an innovative solution to the Government through an unsolicited proposal, in accordance with law and regulation, before any political appointee was even in a position to involve themselves, in part because we believed, then and more so now, that such a solution would challenge the status quo that puts billions of taxpayer dollars in the pockets of "traditional" Contractors and such a disruption could face significant political resistance.

Yet here we stand accused – by unscrupulous "reporters" who have misled your Committee – of leveraging political favors to win a no-bid contract. Certainly, the nuances of the submission and evaluation of an unsolicited proposal could be misunderstood, and perhaps the fact that the contract was fairly competed could be missed, if not for the fact that all of these details are publicly available in the pleadings and briefings of an ongoing pre-award protest filed by a competitor in the U.S. Court of Federal Claims[11]. Had any of the reporters bothered to do the research necessary, they would have found the following:

- On January 20, 2025, Salus submitted an unsolicited proposal to FEMA, and then on January 23, 2025, Salus submitted the same unsolicited proposal to DHS to "collaborate with DHS to provide the necessary contingency logistics, pre-travel coordination, manifesting, medical, and aviation support services" and support the Agency "in responding to the unprecedented emergency brought on by years of unchecked illegal immigration." CSI Bid Protest Doc. 34, Brief of Salus at 3 (citing administrative record).

- On May 9, 2025, the President's announcement of Project Homecoming dramatically increased the urgency for DHS to source removal services. Doc. 35, Brief of DHS at 5-6 (citing administrative record). Still, the agency worked within the time constraints to solicit and review proposals from multiple companies, including through "informational meetings and exchanges with [] seven vendors identified in the market research". Doc.

---

[10] https://oprtt.org/wp-content/uploads/2021/06/Treatment-of-Unsolicited-Proposals-pdf.pdf
[11] *CSI Aviation, Inc. v. United States et al.*, No. 25-1338C (MHS) (Fed. Cl.)

4

35, Brief of DHS at 6 (citing administrative record). Ultimately, "after the offerors' technical and price factors were evaluated, the contracting officer determined that Salus's proposal represented the best value to the Government." Doc. 35, Brief of DHS at 6 (citing administrative record).

- Not only did DHS comply with procurement regulations in a declared emergency, but it also thoroughly addressed complaints about its interactions with Salus. Salus submitted an unsolicited proposal that was accepted by the career contracting officials at DHS in accordance with the FAR, and the conversations between Salus and DHS surrounding that proposal are not only allowed but actually required by regulation to determine the ultimate disposition of that accepted proposal. Any allegation of impropriety associated with conversations between Salus and DHS in April 2025 can only make sense if one ignores the fact that the approach was first described by Salus in January of that same year. DHS's Office of General Counsel ("OGC") investigated claims that communications between DHS and Salus risked an appearance of undue collaboration in scoping the work and drafting the objectives required to support the President's immigration agenda. Doc. 34, Brief of Salus at 5; Doc. 35, Brief of DHS at 6-7 (citing administrative record).

- Ultimately, the OGC investigation determined that any "potential [conflicts of interest] and appearance of impropriety could be—and had been—eliminated or mitigated by DHS sharing cost and requirements information with all offerors, engaging in one-on-one sessions with each offeror, and creating a Pricing Scenario for evaluation purposes that was created by and known only to DHS personnel until it was released simultaneously to all offerors." Doc. 35, Brief of DHS at 7; see also Doc. 34, Brief of Salus at 5 (quoting the OGC determination that "the communications with the vendor were simply the result of well-meaning conversations with a vendor concerning their 'unsolicited proposal' and not an attempt to undermine the federal procurement rules") (citing administrative record).

- As the Government has repeatedly made clear—including in the Department of Justice brief filed on March 6, 2026 in defense of this procurement—DHS's rejection of CSI's proposals was based solely on CSI's lack of qualifications to perform the required work. Doc. 35, Brief of DHS at 6-7; Doc. 59 at 5 (noting that "the contracting officer made a reasonable determination that CSI, the ICE AIR contractor, had 'flight capability with limited capability to provide temporary staging solutions to meet the scope of the program.' [T]he contracting officer further determined that the existing ICE AIR requirement involves air operations logistics only, not detention logistics or coordination with foreign countries. [T]he contracting officer concluded that the ICE AIR vendors (i.e., CSI) 'do not have the experience either as Prime or subcontractors conducting this type of work.'").

On December 8, 2025, a group of six Senators and three Congressmen sent a letter to the Inspectors General from DHS and DOD raising concerns regarding contract irregularities (Attachment 4). In this well written and deeply researched letter, Salus was not one of the companies cited. Between 2022 and 2025, four of those companies that have built their business around private detention centers and forced deportation flights, have received

5

more than $7 billon in contract awards which is more than the next 43 ICE contractors <u>combined</u> (Attachment 5).  As stated above, under Project Homecoming, Salus has facilitated the voluntary departure of more than 80,000 people with an approach that has saved DHS more than $2 billion over forced deportation (Attachment 6).  That $2 billion is not only recognized as a savings to the taxpayer but also as a revenue loss to the companies that take a less humane approach. By parroting the reporting of online bloggers and disreputable journalists that lacked the academic curiosity and professional integrity necessary to do the simplest of research, you've inadvertently given credence to the spurious reporting and have increased the political cost of a more humane and dignified approach to the departure of illegal aliens.

Of course, journalists are a vital part of civil society, including investigating possible abuse of taxpayer funds. Investigating, though, is not merely its right; doing so accurately is its responsibility. In this instance, NBC News did not meet that most basic journalistic standard. As we believe their reporting is defamatory and has harmed our business, we have a responsibility to correct the record – including through litigation if necessary.  In the article cited by the Committee, which has since been only partially corrected by NBC, the "reporter" describes a series of calls in September 2025 allegedly involving an <u>unnamed</u> "representative from Salus" speaking to  an <u>unnamed</u> "marketing firm owner" from an <u>unnamed</u> marketing firm that NBC describes as having "…no previous federal contracting experience…" relayed second hand by an <u>unnamed</u> "federal official" in which the Salus representative allegedly offered the marketing firm a subcontract, provided that it hired a consulting firm tied to Mr. Lewandowski. Salus advised NBC before publication that this was untrue (Attachment 7).  Specifically, and among other things, Salus informed NBC of a number of hard facts:

- "Salus was able to contact every 'marketing company' with whom it had any contact, for any purpose, in September, 2025.  Each of them confirmed to Salus that no one from Salus had any discussion of the sort described in your email."  (March 17, 2026 Email from D. Panzer to J. Ainsley).

- "Salus was never funded to perform work involving a subcontract to a marketing firm." (March 16, 2026 Email from D. Panzer to J. Ainsley).

- "[A]t the time this all was supposed to have taken place, neither Dr. Walters nor any other employee of Salus had ever met or spoken to Mr. Lewandowski or any firm allegedly associated with him. Dr. Walters' first contact with Mr. Lewandowski was in December, 2025." (March 16, 2026 Email from D. Panzer to J. Ainsley).

Salus has notified NBC directly of its concerns regarding the false statements in the article. Since publication, NBC has conceded its accusations against Salus are mere allegations rather than established facts and now says that it did not accuse me or other Salus executives of having knowledge of the alleged proposals.  It is already plain from its description of its own reporting that NBC's account of the relevant facts is unreliable.

As elected officials, you are accustomed to political attacks, often baseless. We at Salus are not. In hindsight, we were not as aggressive and forceful as we needed to be from the outset in

6

refuting what to us were such obviously groundless attacks that nobody would believe. There are companies who believe that billions of dollars saved under Project Homecoming were saved at the expense of their bottom line. It is no coincidence this is happening at a pivotal point in our engagement with the Department, just as Secretary Markwayne Mullin begins his tenure running DHS and when the current Project Homecoming contract is up for renewal.

As for my interactions with Lewandowski, they were limited to a handful of phone calls and in-person interactions related to the procurement of aircraft and were completely unrelated to media work or any company other than the companies that I control. My first in-person interactions with Mr. Lewandowski involved the inspection of an aircraft used by the Department that had been specifically modified to support the Secretary's requirements under PPD-40 and other federal directives. That interaction was a technical discussion involving the capabilities of the aircraft. When the aircraft was first delivered, Mr. Lewandowski came to Joint Base Andrews to see it. As the senior corporate official responsible for delivering this capability, and the member of my team with the most time aboard U.S. Air Force Special Air Mission aircraft, I was present for the inspection and presented the briefing. As the only person qualified as cabin crew and holding current Sensitive Compartmented Information access with DHS at the time, I also crewed the first flight of the aircraft. Mr. Lewandowski was among the Secretary's traveling package of more than a dozen aides and security. As a member of the crew, my interactions with the Secretary and her team, beyond initial greetings, were cordial but sparse. I had no meaningful conversation with any of them, let alone on any other work Salus was undertaking for the department.

Regarding the purchase of aircraft, on November 21, 2025, Daedalus Aviation Corporation, not Salus, was contracted to find, inspect, procure, and provide aircraft from a commercial airline to DHS. As is customary and prudent in the aircraft sales industry[12,13], aircraft were procured by Daedalus through a holding company to segregate the liabilities and risk associated with the purchase of any major capital item. What has been characterized as a series of "shell companies" is really a reflection of standard business practices. DHS did not contract directly with any affiliated company beyond Salus Worldwide Solutions and Daedalus Aviation Corporation.

Again, I want to reiterate my commitment to an ethical and entirely legal contracting process within our government. Abuse of that trust serves to profit few at the expense of the rest of us. These costs are not merely financial, but also the cost to the mission we are tasked to perform. Executing those missions in uniform as an Army surgeon and during a decade of career service at the State Department left me not only qualified to lead those missions from the private sector, but also in a position to respect the immense responsibility we are entrusted with.

Salus is eager to continue our work with the full confidence of the Congress. To that end, I would like to meet with you at your earliest convenience in-person, as schedules may allow, to discuss the above at greater length, explain the vital work we currently perform in service of the nation's

---

[12] https://www.conyers.com/publications/view/10-things-you-need-to-know-about-utilising-a-cayman-islands-spv-for-aviation-finance-transactions/

[13] https://www.lawdebenture.com/news-insights/special-purpose-vehicles-spvs-in-the-aviation-sector-structure-compliance-and-operational-realities

national security, and to answer any other questions that I can. I hope you agree that meeting is the most direct and surest way to carry out your oversight of the Department.

We hope you will make this response available to the public, and in the spirit of transparency please know that given the intense interest in this issue and our ongoing attempt to create an accurate record, we will be sharing this letter with interested media.


Very respectfully,

William Walters, M.D., MBA
Chief Executive Officer
Salus Worldwide Solutions Corporation

8

# Attachment 1

**From:** William Walters - SalusWorldwide ████████████████████
**Sent:** Monday, January 20, 2025 8:23 AM
**To:** FEMA-OCPO-UNSOLICITED-PROPOSAL@fema.dhs.gov
**Cc:**
**Subject:** Unsolicited Proposal - Contingency Logistics Support Services - Salus Worldwide Solutions

Dear Sir or Madam,

Please find attached our unsolicited proposal to support the Federal Emergency Management Agency in meeting President Trump's objectives in the new administration.  We stand ready to explore options for collaboration in meeting the Agency's mission requirements in the future.


Sincerely,


William A. Walters, M.D., MBA
Chief Executive Officer
Salus Worldwide Solutions Corporation
██████████████

# Attachment 2

| | |
|---|---|
| **From:** | William Walters - SalusWorldwide |
| **To:** | QABReview@hq.dhs.gov |
| **Cc:** | |
| **Subject:** | Unsolicited Proposal - Attn: Office of International Engagement - Multi-Mission Logistics and Engagement Support Services |
| **Date:** | Thursday, January 23, 2025 8:54:35 PM |
| **Attachments:** | DHS IE - CLSS Cover Letter v01232025.pdf |
| | Salus Worldwide Solutions - Unsolicited Proposal for Multi-Mission Logistics and Engagement 01232025.pdf |

Dear Procurement Team,

Please find attached an unsolicited proposal for services to support the unique mission of the Office of International Engagement for your review and consideration.

Very respectfully,

William A. Walters, M.D., MBA

Chief Executive Officer

Salus Worldwide Solutions Corporation

# Attachment 3

**From:** ████████, FRANCIS ████████████████████
**Sent:** Monday, February 24, 2025 3:06 PM
**To:** William Walters - SalusWorldwide ████████████████████
**Cc:** ██████████████████████████████
**Subject:** RE: Resubmission - Unsolicited Proposal for the DHS Office of International Affairs - Multi-Mission Logistics and Engagement Support Services

Mr. Walters,

Thank you for providing your organization's revised proposal dated February 18, 2025. An initial review has been conducted by DHS and it has been determined that your unsolicited proposal will be accepted for a comprehensive evaluation. The process is expected to take approximately sixty (60) days. During that timeframe, DHS may contact your organization for additional information and/or clarifications regarding your proposal. You will be notified of the final results at the completion of the comprehensive evaluation.

If you have any questions, please let me know.

**Frank** ████████
Procurement Analyst / Audit Liaison
DHS Office of the Chief Procurement Officer
Office of Procurement Operations

██████████████

# Attachment 4

# Congress of the United States

## Washington, DC 20515

December 8, 2025

Joseph V. Cuffari                          Steven A. Stebbins
Inspector General                          Acting Inspector General
U.S. Department of Homeland Security       U.S. Department of Defense
245 Murray Lane SW                         4800 Mark Center Drive
Washington, D.C. 20528                     Alexandria, VA 22350

Dear Inspector General Cuffari and Acting Inspector General Stebbins:

President Trump's plans to deport millions of non-violent immigrants have ushered in a "gold rush" for private contractors that provide immigration detention, surveillance, and deportation services.[1] The influx of $170 *billion* in new immigration enforcement and border militarization funding through Trump's "Big Beautiful Bill" has resulted in a historic transfer of taxpayer dollars to immigration contractors.[2]

We are concerned that some contractors are potentially receiving lucrative, no-bid contracts because of their close ties to high-level Trump administration officials. Notably, President Trump's "Border Czar" Tom Homan previously ran a firm that helped contractors secure homeland security contracts and, now from inside the government, may be helping his former clients secure federal contracts. Before the election, he allegedly accepted $50,000 in cash in a Cava bag in exchange for the promise that, if President Trump took office, Mr. Homan would help certain companies win contracts.[3] Since entering government, Mr. Homan reportedly has participated in meetings with immigration contractors about contracts, potentially in violation of ethics rules, and some companies with ties to Mr. Homan have been short-listed to compete for lucrative contracts.[4]

---

[1] PBS News, "Trump administration using no-bid contracts, boosting big firms, to get more ICE detention beds," Heather Hollingsworth and John Hanna, June 16, 2025, https://www.pbs.org/newshour/nation/trump-administration-using-no-bid-contracts-boosting-big-firms-to-get-more-ice-detention-beds.

[2] The Atlantic, "ICE's Mind-Bogglingly Massive Blank Check," Caitlin Dickerson, July 31, 2025, https://www.theatlantic.com/politics/archive/2025/07/ice-budget-immigration-enforcement/683678/; The Intercept, "The Private Prison Industry Looks Forward to Soaring Profits Thanks to Trump's Budget," Matt Sledge, July 10, 2025, https://theintercept.com/2025/07/10/corecivic-trump-big-beautiful-bill/; American Immigration Council, "What's in the Big Beautiful Bill? Immigration and Border Security Unpacked," July 14, 2025, https://www.americanimmigrationcouncil.org/fact-sheet/big-beautiful-bill-immigration-border-security/.

[3] MSNBC, "Tom Homan was investigated for accepting $50,000 from undercover FBI agents. Trump's DOJ shut it down," Carol Leonnig and Ken Dilanian, Sept. 20, 2025, https://www.msnbc.com/msnbc/news/tom-homan-cash-contracts-trump-doj-investigation-rcna232568; The New Republic, "Tom Homan Suddenly Changes His Story on That $50,000 Cash Bribe," Malcolm Ferguson, October 16, 2025, https://newrepublic.com/post/201852/tom-homan-50000-cash-bribe.

[4] Bloomberg, "Trump's Border Czar Involved in Detention Contract Talks Despite Recusal," Fola Akinnibi, Rachel Adams-Heard, and Sophie Alexander, September 24, 2025, https://www.bloomberg.com/news/features/2025-09-24/trump-s-border-czar-tom-homan-involved-in-detention-contract-talks; Mother Jones, "Border Czar's Former Clients Cash in on Trump's Immigration Crackdown," Dan Friedman, Russ Choma, and Nick Schwellenbach, December 5, 2025,

But Mr. Homan is not the only senior official with ties to immigration contractors. Several top officials crafting the administration's immigration policies appear to have financial and professional ties to the private contractors profiting from the system they are helping create — including through stock investments, past lobbying and employment backgrounds, and campaign contributions.[5] These ties not only foster potential corruption but further weaken public faith in a contracting system that has previously enabled serious civil rights abuses.[6]

To ensure that federal contracts are free from conflicts of interest and above reproach, we ask that the Department of Homeland Security (DHS) and Department of Defense (DoD) Offices of Inspector General investigate the nature of the ties between DHS and DoD immigration contractors and Trump officials, whether officials have improperly assisted such companies in securing government contracts, and whether they have bypassed the standard procurement process to do so.

### Private Contractors are Profiting from President Trump's Immigration Policies

Numerous private contractors are experiencing a historic windfall due to the Administration's immigration enforcement system, including through the following channels:

- *Detention:* Immigration detention is increasingly privatized, with over 90 percent of detention beds managed by private companies, up from 81 percent at the end of the first Trump Administration.[7] Two companies, CoreCivic and GEO Group, dominate the immigration detention market and make roughly a third of their revenue from contracts with Immigration and Customs Enforcement (ICE).[8] And now, the Trump Administration is paying contractors to detain immigrants on military bases.[9] For example, one company, Disaster Management Group, will be paid a "substantial chunk of the more than $1.2 billion"

https://www.motherjones.com/politics/2025/12/tom-homan-trump-border-patrol-ice-immigration/.

[5] Project On Government Oversight, "Stephen Miller's Financial Stake in ICE Contractor Palantir," Nick Schwellenbach, June 24, 2025, https://www.pogo.org/investigations/stephen-miller-conflicts-of-interest; Miami Herald, "Florida's GEO Group plays central role in Trump's mass deportation plan," Shirsho Dasgupta, October 5, 2025, https://www.miamiherald.com/news/local/immigration/article312211888.html; ABC News, "Lobbying firm with close ties to Trump is poised to profit from new administration, experts say," Peter Charalambous and Laura Romero, December 4, 2024, https://abcnews.go.com/US/lobbying-firm-close-ties-trump-poised-profit-new/story?id=116417198.

[6] New York Times, "Concerns Grow Over Dire Conditions in Immigrant Detention," Miriam Jordan and Jazmine Ulloa, June 28, 2025, https://www.nytimes.com/2025/06/28/us/immigrant-detention-conditions.html.

[7] ACLU, "Unchecked Growth: Private Prison Corporations and Immigration Detention, Three Years Into the Biden Administration," Eunice Hyunhye Cho, August 7, 2023, https://www.aclu.org/news/immigrants-rights/unchecked-growth-private-prison-corporations-and-immigration-detention-three-years-into-the-biden-administration.

[8] *Id.*

[9] Politico, "Trump allies circulate mass deportation plan calling for 'processing camps' and a private citizen 'army,'" Dasha Burns and Myah Ward, February 25, 2025, https://www.politico.com/news/2025/02/25/documents-military-contractors-mass-deportations-022648; CNN, "Looking to speed up building network of migrant detention centers, Trump administration turns to the US Navy," Natasha Bertrand and Priscilla Alvarez, October 24 2025, https://www.cnn.com/2025/10/24/politics/navy-building-ice-detention-facilities; New York Times, "Trump Administration Aims to Spend $45 Billion to Expand Immigrant Detention," Allison McCann, Alexandra Berzon, and Hamed Aleaziz, April 7, 2025, https://www.nytimes.com/2025/04/07/us/politics/trump-administration-immigrant-detention-facilities-services.html.

allocated for detention at the Fort Bliss military base.[10] CoreCivic has also said that it is "very capable" of executing the Administration's vision of detention on "military reservations around the country."[11]

- *Deportation flights:* To operate deportation flights, ICE Air Operations contracts with the company CSI Aviation,[12] which in turn subcontracts with several airlines, including Avelo Airlines and GlobalX Air.[13]

- *Surveillance:* Several companies provide DHS with surveillance technology and data-analysis services. For example, the software giant Palantir for years has helped ICE determine the identities and locations of immigrants to target for arrests and deportation, but is seeing an increased influx in cash during this Administration.[14] Meanwhile, the "Big Beautiful Bill" contained an obscure provision that essentially established defense contractor Anduril as the only possible recipient of a major contract; under that provision, Customs and Border Protection (CBP) will pay Anduril over *$6 billion* to construct data surveillance towers.[15] Furthermore, contractors that supply ankle monitors and other electronic surveillance devices, such as GEO Group's subsidiary BI Incorporated, also stand to profit — particularly as ICE directs its agents to "sharply increase the number of immigrants they shackle with GPS-enabled ankle monitors."[16]

---

[10] ProPublica, "His Former Company Got Caught Employing Undocumented Workers. Now He's Profiting Off an Immigrant Detention Camp.," Avi Asher-Schapiro and Jeff Ernsthausen, July 25, 2025, https://www.propublica.org/article/nathan-albers-fort-bliss-immigration.

[11] Roic AI, CoreCivic, Inc. Q1 2025 Earnings Call Transcript, May 8, 2025, https://www.roic.ai/quote/CXW/transcripts/2025/1.

[12] U.S. General Services Administration, Limited Source Justification for Chartered Flights, February 27, 2025, https://sam.gov/opp/a532873313ff4de8848e913d152e658d/view; Project on Government Oversight, "Meet the ICE Contractor Running Deportation Flights," Nick Schwellenbach, March 20, 2025, https://www.pogo.org/investigations/meet-the-ice-contractor-running-deportation-flights.

[13] GEO Group Inc., "The GEO Group Announces Five-Year Contract to Provide Air Operations Support Services for U.S. Immigration and Customs Enforcement," March 12, 2024, https://investors.geogroup.com/news-releases/news-release-details/geo-group-announces-five-year-contract-provide-air-operations; Al Jazeera, "Houston-based Avelo Airlines faces backlash for deportation flights," Andy Hirschfeld, May 28, 2025, https://www.aljazeera.com/economy/2025/5/28/houston-based-avelo-airlines-faces-backlash-for-deportation-flights; Tuscon Sentinel, "Which air carriers are positioned to benefit from increased deportations?," Indy Scholtens, May 14, 2025, https://www.tucsonsentinel.com/nationworld/report/051425_carrier_deportations/which-air-carriers-are-positioned-benefit-from-increased-deportations/.

[14] 404 Media, "Leaked: Palantir's Plan to Help ICE Deport People," Joseph Cox, April 17, 2025, https://www.404media.co/leaked-palantirs-plan-to-help-ice-deport-people/; Wired, "ICE Is Paying Palantir $30 Million to Build 'ImmigrationOS' Surveillance Platform," Caroline Haskins, April 18, 2025, https://www.wired.com/story/ice-palantir-immigrationos/; The Guardian, "Documents offer rare insight on ICE's close relationship with Palantir," Johana Bhuiyan, September 22, 2025, https://www.theguardian.com/us-news/ng-interactive/2025/sep/22/ice-palantir-data.

[15] The Intercept, "Trump's Big Beautiful Gift to Anduril," Sam Biddle, July 9, 2025, https://theintercept.com/2025/07/09/trump-big-beautiful-bill-anduril/.

[16] Washington Post, "ICE moves to shackle some 180,000 immigrants with GPS ankle monitors," Douglas MacMillan and Silvia Foster-Frau, July 24, 2025, https://www.washingtonpost.com/immigration/2025/07/24/ice-check-in-ankle-monitor-immigrants/; Letter from Senator Elizabeth Warren, et al., to GEO Group CEO Brian R. Evans, et al., July 26, 2024, https://www.warren.senate.gov/imo/media/doc/warren_cardenas_letter_to_bi_incorporated_072624.pdf.

3

- *Arrests:* Perhaps most concerning, the Trump Administration is reportedly considering a novel plan to outsource immigration arrests to private contractors. Erik Prince, former CEO of Blackwater (now rebranded "ACADEMI") — the military contractor infamous for its role in the 2007 massacre of civilians in Iraq[17] — has proposed that the Trump Administration pay his new company 2USV to create a "private citizen 'army'" of up to 100,000 employees to arrest immigrants.[18] ACADEMI has similarly pitched high-level Administration officials on plans to transport ten thousand migrants to El Salvador and avoid American due process protections by designating part of the infamous CECOT prison as American soil.[19]

For these contractors, President Trump's second term has been enormously lucrative. Soon after the 2024 election, private detention contractors' stock values skyrocketed.[20] Earlier this year, CoreCivic proudly announced: "Never in our 42-year company history have we had so much activity and demand for our services as we are seeing right now."[21] In 2025, the company informed shareholders that its "first quarter revenue of $488.6 million exceeded our expectations," and it expects to activate "idle facilities" to meet ICE's demand.[22] Similarly, during a 2025 earnings call with shareholders, GEO Group reported that it had entered new

[17] PBS News, "How the Blackwater pardons could have a lasting impact: 'The Americans got away with it,'" Ali Rogin, December 23, 2020, https://www.pbs.org/newshour/world/how-the-blackwater-pardons-could-have-a-lasting-impact-the-americans-got-away-with-it; Politico, "Trump appears open to using private forces to help deport millions of undocumented immigrants," Myah Ward, February 27, 2025, https://www.politico.com/news/2025/02/27/trump-private-forces-immigration-00206560.

[18] The Hill, "Think Trump's deportations have been bad? Wait until his civilian army gets started.," Brandon Bolte and Isabel Skinner, June 2, 2025, https://thehill.com/opinion/immigration/5325548-erik-prince-paramilitary-proposal-immigration/; Politico, "Trump allies circulate mass deportation plan calling for 'processing camps' and a private citizen 'army,'" Dasha Burns and Myah Ward, February 25, 2025, https://www.politico.com/news/2025/02/25/documents-military-contractors-mass-deportations-022648.

[19] Politico, "Military contractors pitch unprecedented prison plan for detained immigrants," Dasha Burns and Myah Ward, April 11, 2025, https://www.politico.com/news/2025/04/11/military-contractors-prison-plan-detained-immigrants-erik-prince-00287208; La Voce di New York, "Military Contractors Propose El Salvador's CECOT Prison Becomes U.S. Territory," Emanuele La Prova, April 12, 2025, https://lavocedinewyork.com/en/news/2025/04/12/military-contractors-propose-el-salvadors-cecot-prison-becomes-u-s-territory/.

[20] Fortune, "Trump's election win sends private prisons stocks soaring as investors anticipate hard crackdown on migration," Christiaan Hetzner, November 7, 2024, https://fortune.com/2024/11/07/president-donald-trump-election-immigration-border-detention-ice-geo-group-corecivic/; Forbes, "The Stocks Are Outperforming Tesla As The Biggest Trump Trade Winners," Derek Saul, November 11, 2024, https://www.forbes.com/sites/dereksaul/2024/11/11/these-stocks-are-outperforming-tesla-as-the-biggest-trump-trade-winners/.

[21] Wall Street Journal, "Private Prisons Count on 'Big Beautiful Bill' for Immigration Payday," Victoria Albert and Elizabeth Findell, May 8, 2025, https://www.wsj.com/politics/policy/private-prisons-count-on-big-beautiful-bill-for-immigration-payday-b3912262?.

[22] S&P Global Market Intelligence, "CoreCivic, Inc. NYSE:CXW FQ1 2025 Earnings Call Transcripts," May 8, 2025, p. 4, on file with the Office of Senator Elizabeth Warren; Quiver Quantitative, "CoreCivic, Inc. Reports Strong First Quarter 2025 Financial Results and Increases Annual Guidance," May 7, 2025, https://www.quiverquant.com/news/CoreCivic%2C+Inc. +Reports+Strong+First+Quarter+2025+Financial+Results+and+Increases+Annual+Guidance#:~:text=Quiver %20AI%20Summary,in%20the%20correctional%20services%20sector; Global Newswire, CoreCivic Reports First Quarter 2025 Financial Results, May 7, 2025, https://www.globenewswire.com/news-release/2025/05/07/3076627/0/en/CoreCivic-Reports-First-Quarter-2025-Financial-Results.html.

contracts worth over $130 million with ICE, and it anticipated that increased detention "could generate between $500 million and $600 million" for the company each year, while increased deportation flights would mean yet another $40 million to $50 million each year.[23] Given these "unprecedented business opportunities," GEO recently boosted the multi-million-dollar compensation of its top executives.[24] Likewise, surveillance and deportation flight contractors have profited; for example, since the beginning of 2025, Palantir has seen its stock value increase by a whopping 80 percent, and GlobalX Air's stock has risen by almost 40 percent.[25]

### Trump Administration Officials Appear to Have Improper Ties to the Immigration Contractors That Are Profiting

The conflicts of interest posed by this windfall are substantial, unprecedented, and worthy of serious investigation. Such ties create at least the appearance that federal contracts are potentially being awarded on the basis of personal relationships rather than federally mandated contracting procedures. Examples of companies with financial and personal ties to the Trump Administration include:

- *GEO Group:* Numerous high-profile U.S. officials have ties to GEO Group, a top federal detention contractor. Tom Homan, the President's Border Czar, worked as a paid consultant for GEO Group prior to joining the government, has called for expanding ICE's detention capacity to "at least 100,000 beds," and has seemingly failed to honor his promise to recuse himself from contracting decisions—with his former colleagues reportedly "trading on Tom Homan."[26] Given that Mr. Homan reportedly accepted $50,000 cash in exchange for a promise for future immigration-related contracts, we have substantial concerns that Mr. Homan has not followed ethical best practices and may have intervened on behalf of his former client. Meanwhile, David Venturella recently departed his role as a Vice President at GEO Group to become a top ICE official overseeing immigration detention centers like those run by GEO; Mr. Venturella reportedly even received a waiver to work on matters involving GEO Group.[27]

---

[23] S&P Global Market Intelligence, "The GEO Group, Inc. NYSE:GEO FQ1 2025 Earnings Call Transcripts," May 7, 2025, p. 5, on file with the Office of Senator Elizabeth Warren.

[24] United States Securities And Exchange Commission, Form 8-K for GEO Group INC filed 07/10/2025, July 10, 2025, https://investors.geogroup.com/static-files/5520606c-df51-4bf2-8331-d500c3a4e798; Justia, Amendment to Executive Chairman Employment Agreement between George C. Zoley and The GEO Group, Inc., July 7, 2025, https://contracts.justia.com/companies/geo-group-inc-578/contract/1332941/; Justia, Executive Employment Agreement between The GEO Group, Inc. and J. David Donahue (CEO), January 1, 2025, https://contracts.justia.com/companies/geo-group-inc-578/contract/1306401/.

[25] Bloomberg, "Airline at Center of Brazil Fiasco Key to Trump's Deportations," Michael D McDonald, February 1, 2025, https://www.bloomberg.com/news/articles/2025-02-01/airline-at-center-of-brazil-fiasco-key-to-trump-s-deportations; Motley Fool. "How Palantir Stock Soared 80% in the First Half of 2025 to Become the Best S&P 500 Stock -- and Why the Next Big Move Could Come in August," Beth McKenna, July 3, 2025, https://www.fool.com/investing/2025/07/03/best-stocks-2025-pltr-stock-ai-stocks/.

[26] ProPublica, Trading on Tom Homan: Inside the Push to Cash in on the Trump Administration's Deportation Campaign, October, 1, 2025, https://www.propublica.org/article/tom-homan-border-czar-trump-mark-hall-charles-sowell; Washington Post, "Trump's border czar earned consulting fees from immigrant detention firm," May 27, 2025, https://www.washingtonpost.com/business/2025/05/27/border-czar-ethics-consulting-fees/.

[27] Project on Government Oversight, "Private Prison Giant Hired ICE Detention Chief," Nick Schwellenbach and Rene Kladzyk, January 17, 2025, https://www.pogo.org/investigations/private-prison-giant-hired-ice-detention-

5

- **_Palantir_:** Palantir offers data services for ICE to identify and target immigrants, and as the company secures immigration contracts, it appears to have both personal and financial ties to the Administration. The OMB's Federal Chief Information Officer Gregory Barbaccia is a former Palantir employee who reportedly "call[s] himself the first 'federal chief artificial intelligence officer,'"[28] and it is unclear whether he may have played a role in Palantir obtaining DHS's single-sourced contract to provide the AI-based ImmigrationOS system that will reportedly track immigrants' movements—as well as other Palantir contracts.[29] Stephen Miller, President Trump's Deputy Chief of Staff and architect of the White House's immigration enforcement agenda, holds between $100,000 and $250,000 worth of stock in Palantir. Mr. Miller's senior policy advisor Kara Frederick similarly owns between $50,000 and $100,000 in Palantir stock.[30] For Palantir's part, both the company and its executives and founders have donated to benefit President Trump; for example, the company is a donor to the White House ballroom and its CEO donated to President Trump's campaign.[31]

- **_Blackwater aka ACADEMI_**: Defense contractor and ACADEMI founder Erik Prince has sought a role in immigration arrests and detentions,[32] yet has conflicts of interests that could make any role in federal contracting or immigration detention appear improper. Beyond Mr. Prince's close relationship with Defense Secretary Hegseth and a donation to President Trump's Inaugural Fund from a company apparently linked to Mr. Prince,[33] Mr. Prince routinely signs contracts with foreign governments including Haiti, the Democratic Republic of the Congo, and Ecuador, and is seeking contracts elsewhere, meaning secure U.S. facilities

---

chief; Washington Post, "The former private prison exec behind ICE's immigrant detention surge," Douglas MacMillan and Aaron Schaffer, August 1, 2025, https://www.washingtonpost.com/business/2025/08/01/ice-david-venturella-geo-immigration-detention/.

[28] Project on Government Oversight, "Gold Rush: Top Trump Officials' Silicon Valley Ties," August 25, 2025, https://www.pogo.org/investigations/gold-rush-top-trump-officials-silicon-valley-ties.

[29] Business Insider, "ICE just ordered $30 million worth of new technology from Palantir to track immigrants," Rosemarie Ho, April 17, 2025, https://www.businessinsider.com/ice-palantir-new-technology-30-million-visa-overstays-self-deportation-2025-4.

[30] Project on Government Oversight, "Stephen Miller's Financial Stake in ICE Contractor Palantir," Nick Schwellenbach, June 24, 2025, https://www.pogo.org/investigations/stephen-miller-conflicts-of-interest; Wired, "ICE Is Paying Palantir $30 Million to Build 'ImmigrationOS' Surveillance Platform," Caroline Haskins, April 18, 2025, https://www.wired.com/story/ice-palantir-immigrationos/.

[31] CBS News, "Who's paying for the White House ballroom and what's in it for them," September 19, 2025 https://www.cbsnews.com/news/trump-white-house-ballroom-donor-names/; The Denver Post, "Colorado's most valuable company is among donors for Trump's White House ballroom," Seth Klamann, October 24, 2025, https://www.denverpost.com/2025/10/24/colorado-donald-trump-palantir/.

[32] Politico, "Military contractors pitch unprecedented prison plan for detained immigrants," Dasha Burns and Myah Ward, April 11, 2025, https://www.politico.com/news/2025/04/11/military-contractors-prison-plan-detained-immigrants-erik-prince-00287208.

[33] Brennan Center, "Million-Dollar Donors Flooded Trump's Second Inauguration," Anna Massoglia, July 1, 2025, https://www.brennancenter.org/our-work/research-reports/million-dollar-donors-flooded-trumps-second-inauguration; CNN, "The return of Erik Prince: How a notorious military contractor maneuvered his way back inside Trump's orbit," March 13, 2025, https://www.cnn.com/2025/03/13/politics/erik-prince-return-maneuvered-inside-trump-orbit.

and pseudo-military operations could be run by a former "mercenary" with explicit defense ties to foreign governments.[34]

- *Anduril*: There appear to exist numerous concerning ties between the Trump Administration and Anduril. For example, Trae Stephens, Anduril's co-founder and executive chairman, has been a Trump donor, served on President Trump's first transition team, and was considered for senior Administration posts.[35] Michael Obadal, President Trump's Under Secretary of the Army, worked at Anduril until June 2025 and reportedly he originally refused to divest from his stock in the company.[36]

- ***CoreCivic, CSI Aviation, CDR Companies***: CoreCivic, which like GEO Group has benefited from the skyrocketing demand for detention facilities, donated significantly to both President Trump's campaign and Inaugural Fund.[37] Meanwhile, CSI Aviation's corporate leadership have collectively given about $840,000 to Trump-aligned political action committees, and hosted a rally for the President.[38] CDR Companies gave nearly $1 million to support Trump's 2024 campaign and 2025 inauguration and was chosen to provide medical services at the costly "Alligator Alcatraz" detention camp in Florida.[39]

---

[34] The Economist, "The return of Erik Prince," November 1, 2025, https://www.economist.com/podcasts/2025/11/01/the-return-of-erik-prince; CNN, "The return of Erik Prince: How a notorious military contractor maneuvered his way back inside Trump's orbit," March 13, 2025, https://www.cnn.com/2025/03/13/politics/erik-prince-return-maneuvered-inside-trump-orbit; NPR, "Blackwater founder to deploy nearly 200 personnel to Haiti as gang violence soars," August 15, 2025, https://www.npr.org/2025/08/15/nx-s1-5503316/blackwater-erik-prince-haiti-gang-violence; Reuters, "Exclusive: Trump supporter Prince reaches deal with Congo to help secure mineral wealth," Jessica Donati and Sonia Rolley, April 17, 2025, https://www.reuters.com/world/trump-supporter-prince-reaches-deal-with-congo-help-secure-mineral-wealth-2025-04-17/.

[35] New York Times, "Trump Boosters Expect Big Returns on Their Investment: 'The Shackles Are Off,'" Eric Lipton, November 17, 2024, https://www.nytimes.com/2024/11/17/us/politics/trump-presidency-billionaires.html; New York Times, "A.I. Military Start-Up Anduril Close to Deal That Would Value It at $28 Billion," February 7, 2025, https://www.nytimes.com/2025/02/07/technology/anduril-funding-valuation-28-billion.html; Responsible Statecraft, "Thiel pal and venture capitalist eyed for 2nd highest post in Pentagon," Stavroula Pabst, November 27, 2024, https://responsiblestatecraft.org/trae-stephens-trump/; Forbes, "Mega Funding Round Makes Anduril Cofounder A Billionaire," David Jeans and Phoebe Liu, June 10, 2025, https://www.forbes.com/sites/davidjeans/2025/06/10/trae-stephens-anduril-billionaire/.

[36] The Intercept, "Trump's Big Beautiful Gift to Anduril," July 9, 2025, https://theintercept.com/2025/07/09/trump-big-beautiful-bill-anduril/.

[37] Citizens for Responsibility and Ethics in Washington, "Trump's budget bill benefits private immigration detention companies that donated to Trump," Katherine Culliton-Gonzalez and Lama Elsharif, July 23, 2025, https://www.citizensforethics.org/reports-investigations/crew-investigations/trumps-budget-bill-benefits-private-immigration-detention-companies-that-donated-to-trump/.

[38] Project on Government Oversight, "Meet the ICE Contractor Running Deportation Flights," March 20, 2025, https://www.pogo.org/investigations/meet-the-ice-contractor-running-deportation-flights; Tucson Sentinel, "Which air carriers are positioned to benefit from increased deportations?," Indy Scholtens, May 14, 2025, https://www.tucsonsentinel.com/nationworld/report/051425_carrier_deportations/which-air-carriers-are-positioned-benefit-from-increased-deportations/.

[39] Miami Herald, "Contractors building Alligator Alcatraz have donated money to Florida GOP, DeSantis," Alexandra Glorioso, Romy Ellenbogen, and Lawrence Mower, July 4, 2025, https://www.miamiherald.com/news/politics-government/state-politics/article309886225.html#storylink=cpy; Rolling Stone, "Republican Donors Cash In on 'Alligator Alcatraz' Immigrant Camp," Anderw Perez and Nikki McCann Ramirez, July 1, 2025, https://www.rollingstone.com/politics/politics-features/trump-desantis-donors-

- ***Strategy Group:*** Strategy Group is an advertising company that won a DHS contract to publicize the Trump Administration's anti-immigration messaging, and DHS awarded the contract by "bypassing the normal competitive bidding process designed to prevent waste and corruption."[40] The company has multiple ties to top DHS officials; it worked on Secretary Kristi Noem's 2022 gubernatorial campaign and, reportedly, "[n]o firm has closer ties to Noem's political operation than the Strategy Group."[41] DHS's spokesperson, Tricia McLaughlin, is also married to the company's CEO[42] — meaning that DHS just delivered taxpayer funds directly to the household of its chief spokesperson without going through the usual contracting process. Furthermore, Strategy Group's owner is a former colleague of Corey Lewandowski, DHS's "de facto chief of staff" who reportedly has been given "veto power over DHS contracts,"[43] and who similarly has ties to another advertising company that recently won a fast-tracked DHS contract.[44]

These are just select examples of immigration-related contractors with concerning personal, professional, and financial ties to Trump Administration officials.

### The DoD and DHS OIGs Should Investigate Potential Conflicts of Interest and Undue Influence on Policy and Contracting Decisions

These circumstances raise serious concerns about conflicts of interest within DHS and DoD, and the extent to which those conflicts may be influencing the federal government's immigrant detention policies. When Executive Branch officials determining immigration policy have a personal stake in their decision-making, they may be improperly influenced to enact policies that generate billions for their favored immigration contractors. These apparent conflicts of interest risk the further erosion of public confidence in DoD and DHS at a time when taxpayer dollars are being funneled toward ICE practices that are increasingly regarded as inhumane.

It is your offices' responsibility to investigate violations of federal conflict-of-interest laws, including 18 U.S.C. § 208 and associated regulations,[45] which direct employees not to participate in particular matters in which they or someone with whom they have a "covered relationship" — including recent and prospective employers — have a financial interest.[46] We ask that your investigation address the following questions:

---

alligator-alcatraz-immigrant-camp-1235376856/.

[40] ProPublica, "Firm Tied to Kristi Noem Secretly Got Money From $220 Million DHS Ad Contracts," Justin Elliott, Joshua Kaplan and Alex Mierjeski, November 14, 2025, https://www.propublica.org/article/kristi-noem-dhs-ad-campaign-strategy-group.

[41] *Id.*

[42] *Id.*

[43] *Id.*; Politico, "Lewandowski's veto power over DHS contracts frustrates admin officials: 'Corey is part of the problem,'" Myah Ward and Zack Colman, August 27, 2025, https://www.politico.com/news/2025/08/27/tk-00527043; Wall Street Journal, "How Corey Lewandowski Became Kristi Noem's Gatekeeper at DHS," Tarini Parti, Michelle Hackman, Josh Dawsey, Jack Gillum, April 17, 2025, https://www.wsj.com/politics/policy/how-corey-lewandowski-became-kristi-noems-gatekeeper-at-dhs-6c08d996.

[44] Wall Street Journal, "How Corey Lewandowski Became Kristi Noem's Gatekeeper at DHS," Tarini Parti, Michelle Hackman, Josh Dawsey, Jack Gillum, April 17, 2025, https://www.wsj.com/politics/policy/how-corey-lewandowski-became-kristi-noems-gatekeeper-at-dhs-6c08d996.

[45] *See, e.g.*, 5 C.F.R. § 2635.402, and 5 C.F.R. § 2635.502.

[46] 18 U.S.C. § 208; 5 C.F.R. § 2635.402; 5 C.F.R. § 2635.502.

1. Have Tom Homan or any other Trump administration officials participated in particular matters related to immigration contracting involving their former clients?
   a. Have any Trump officials recused under 18 U.S.C. § 208 from matters involving immigration-related contractors?
   b. Have any Trump officials received ethics waivers under 18 U.S.C. § 208(b) to work on matters involving their former clients?

2. Have any Trump Administration officials with any other financial or personal ties to any immigration-related contractors taken part in any decisions or discussions affecting the awarding of such contracts?
   a. For example, have Gregory Barbaccia, Stephen Miller, Kara Frederick, or other Trump Administration officials with financial or personal ties to Palantir taken part in any decisions or discussions affecting the awarding of a contract to Palantir?
   b. Have Gregory Barbaccia, Michael Obadal, or other Trump Administration officials with financial or personal ties to Anduril taken part in any decisions or discussions affecting the awarding of a contract to Anduril?

3. Do officials at your agencies have financial, professional, personal, or campaign finance-related connections to immigration-related contractors that present potential conflicts of interest?
   a. If so, please describe the scope and nature of these conflicts among agency staff.
   b. Do any of those conflicts — regardless of whether they violate current law — affect the efficiency and integrity of federal programs?

4. How do agency ethics officials determine whether officials' financial, professional, personal, or campaign finance-related connections to immigration-related contractors create a conflict of interest or otherwise violate federal ethics laws?

5. Have officials at your agency violated federal conflict-of-interest rules as a result of their financial, professional, personal, or campaign finance-related connections to immigration-related contractors?
   a. Have there been any investigations into such potential violations or relevant findings?

6. Are federal ethics rules and the implementation of these rules by agency officials adequate? Specifically, are there cases in which agency officials' financial, professional, personal, or campaign finance-related connections to immigration-related contractors create conflicts of interest or appear to create such conflicts, despite the fact that they do not appear to violate current federal or agency-level rules and regulations?

9

7. Have any immigration-related contracts bypassed the standard bidding process since January 20, 2025? If so, did conflicts of interest have any potential influence over the outcome of these contracts?

Thank you for your attention to this important matter.

Sincerely,

Elizabeth Warren
United States Senator

Jamie Raskin
Ranking Member
House Committee on the
Judiciary

Andy Kim
United States Senator

Shri Thanedar
Member of Congress

Chris Van Hollen
United States Senator

Dan Goldman
Member of Congress

Richard Blumenthal
United States Senator

Jeffrey A. Merkley
United States Senator

Cory A. Booker
United States Senator

10

# Attachment 5

# Executive Synthesis: Recurring Contract Patterns

## RECURRING CONTRACT CYCLE

**OPERATIONAL NEED NEARS EXPIRATION**

Known detention, transport, or facility requirement need is approaching expiration or experiencing disruption –

**MATERIALLY NON-COMPETITIVE AWARD**

Contract awards placed either using non-competitive authorities to same companies – sole-sourced, limited-source, urgent and compelling, follow-on, other materially non-competitive bases *or* solicitation issued and only the incumbent responds highlighting potential unfair competitive advantage

**LACK OF JUSTIFICATION AS REQUIRED BY FAR**

Key details supporting circumstances or vendor's unique capabilities not made public. The required Justification for Other than Full and Open Competition (JOFOC) is not transmitted via SAM.gov or other governmentwide point of entry as required by the FAR.



## RECURRING CONTRACT AWARDEES

From FY2022 to FY2026, just five companies accounted for $7.04B in ICE obligations – **41.6% of all award dollars**. GEO Group and affiliate B.I. Inc. alone represented **$3.44B (20.3%).** Even CoreCivic, the smallest of the top five at $879.04M, outpaced the next-largest contractor outside the group by $280.6M (46.8%)

# Sole-Source / Materially Non-Competitive Patterns

Across four contractors and multiple DHS components, the record shows the same recurring pattern: the repeated use of sole-source, limited source, follow-on bridge contracts, solicitations with one offeror, or other materially noncompetitive vehicles to keep known Agency requirements going, without any effort to provide the required notifications or plan for future competition.

## REAPPEARING MODALITIES

 

**Serial Bridges (CSI)**

**Urgency for Known Ops (CoreCivic)**

 

**Perpetual Extension (MVM)**

**Facility Lock-In (GEO)**

### CSI: SERIAL LIMITED-SOURCE AND BRIDGE PATTERN



ICE Air continuity is carried through successive noncompetitive or materially noncompetitive vehicles rather than a stable competed path.

ICE Air's contract timeline has been influenced, in no small part, by repeated protests. CSI and others have created an environment in which any alternative aviation approach is met with protest and stop-work order, forcing additional extensions and bridge contracts back to CSI Aviation.



## CoreCivic: Urgency-Based Noncompetition for Known Operations



- **70CDCR25FR0000033 (Leavenworth):** Not competed, only one source, urgency under FAR 6.302-2
- **70CDCR23P00000013:** Only one source, urgency under FAR 6.302-2

**The pattern is not a sudden unknown need. It's urgency authority used to preserve known detention operations.**

## MVM: Perpetual Extension



- **70CDCR23C00000001** began as interim sole-source under FAR 6.302-2 (Guantanamo Bay Migrant Operations Center).
- **Apr 2023:** Shifted to FAR 6.302-1, "only one responsible source" to avoid lapse.
- **Sep 2023, Apr 2024, Sep 2024:** Continued the same incumbent-continuity logic; replacement award/transition pending.

**An interim emergency award became a recurring sole-source continuation vehicle.**

## GEO: Facility-based noncompetitive reliance



- **70CDCR21P00000004:** Intent to Sole Source for detention at Post, TX; emergency use during inclement weather in Dallas AOR. Awarded to The GEO Group
- **70B03C25P00000029:** CBP follow-on action expressly coded as noncompetitive under FAR 6.302-1(a)(2((ii/iii)

**Once DHS tied the need to a GEO-linked site, noncompetitive authority kept the work there.**

## CONSEQUENTIAL LABOR PICTURE

Below the prime level, GEO Transport (GEO's in-house transportation subsidiary, established in 2007) is the real operating force under CSI Aviation's ICE Air contract. Although the FY2024 Service Contract Inventory lists GEO Transport as CSI's Subcontractor #3, the invoicing record shows it performing the majority of the labor hour work.

| CONTRACT 70CDCR23FR0000035 | HOURS (124,640.94) | FTEs (59.98) |
|---|---|---|
| GEO Transport (Sub) | 84.5% (105,287) | 84.4% (50.61) |
| CSI (Prime) | 7.1% (8,884.32) | 7.1% (4.27) |
| Other 2 Subs (Total) | 8.4% (10,468.62) | 8.5% (5.10) |

➡ **GEO performed nearly 12x the prime alone and more than 5x the prime + other subs combined.**

| CONTRACT 70CDCR24FR0000024 | HOURS (212,338.03) | FTEs (102.07) |
|---|---|---|
| GEO Transport (Sub) | 59.3% (125,899) | 59.3% (60.52) |
| CSI (Prime) | 5.0% (10,526.71) | 5.0% (5.06) |
| Other 2 Subs (Total) | 35.8% (75,912.32) | 35.7% (36.49) |

➡ **GEO performed nearly 12x the prime alone and ~1.5x more than the prime + other subs combined.**

 **This is not prime-led performance. It was GEO-dominant work under a CSI prime vehicle – raising questions under FAR limitations on pass-through charges.**

# Attachment 6

# DELIVERING FISCAL DISCIPLINE IN IMMIGRATION ENFORCEMENT: VOLUNTARY DEPARTURE REDUCES COSTS FROM $32,533 TO $4,693 PER CASE

| | |
|---|---|
| Cost of Traditional Deportation: | $32,533 |
| Cost of Supported Relocation: | $4,693 |
| **Net Cost Savings per Deportee:** | **$27,840** |

Number Supported Relocations to Date: 76,881

Net Cost Savings to Date: **$2,140,367,040**

Projected Relocations in Year 1: **108,000**

Projected Net Savings Year 1: **$3,006,720,000**

Projected Project Cost in Year 1: **$507,712,232**

**Benefit Cost Ratio:   6.92:1**

**ROI: 422%**

*January 2026 DHS cost estimates reflected an average removal cost of $18,245 per alien and a Project Homecoming cost of $4,693 per participant, based on FY25 assumptions of **44 detention days** at $152 per day.*

*Current data as of March 25, 2026, indicates the average duration has increased to **138 detention days** at the same daily rate, with additional enforcement costs estimated at $11,557 per alien. Updated cost calculations reflect these revised detention metrics. Project Homecoming costs have also been refined, with the current average cost per participant estimated at $4,693.*

1

# MEASURING IMPACT: FACILITY ENROLLMENT MANAGERS

| Detained  - Removal Pathway | Average Time in Detention (Days) |
|---|---|
| Final Order Deportation | 138 |
| Voluntary Departure Without Salus Support | 77 |
| Detained Applicants Enrolled and Processed by Salus | 34 |

| Detained  - Salus Impact | Total |
|---|---|
| Enrollments | 50,553 |
| Intensive Case Management | 1,891 |



| Detained Population Cost ($152/Day) | Detention Cost Only |
|---|---|
| Final Order Deportation | $21,468.48 |
| Voluntary Departure Without Salus Support | $11,776.96 |
| Detained Applicants Enrolled and Processed by Salus | $5,161.92 (↓76%) |

For cases managed through ICM, from **initial enrollment to departure, Salus averages 15 days across all facilities.**

2

# REALIZED SAVINGS: COMMERCIAL TICKETING VS. ICE AIR OPERATIONS

| Pathway | Average Cost per Person |
| --- | --- |
| ICE Air International Flights | $6,045.49 |
| Salus Commercial Ticketed Flights | $831.69 |

Average Cost Savings per Person

**$5,213.80**





*In FY25, the contract cost for ICEAir charter deportations was $1.7 billion. 59% of the ICEAir flight hours in FY25 were used for international deportation flights, so the extrapolated cost of international deportation flights was $1.0 billion. That program moved 166,365 passengers, resulting in a cost per passenger of $6,045.49.*

3

# Attachment 7



(703) 590-1234 Tel    1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax    Tysons, VA 22102
www.fluet.law

**VIA ELECTRONIC MAIL**                                        April 2, 2026

Kimberley D. Harris
General Counsel
NBCUniversal Media, LLC
Kimberley.harris@nbcuni.com


      **Re:**    **Retraction of Libelous Statements about Salus Worldwide Solutions Corp.**

Dear Ms. Harris,

      The First Amendment does not protect NBCUniversal Media, LLC ("NBC")'s malicious reporting based on unreliable sources.

      This firm represents Salus Worldwide Solutions Corp. ("Salus").  As you know, there is no protection for media outlets for the publication of purported "facts" known to be false or asserted as true with a reckless disregard for whether the purported "facts" actually are true.  Yet on March 19, 2026, NBC violated this well-established principle by publishing a story falsely accusing Salus of participation in an alleged pay-to-play scheme involving DHS contracts and Cory Lewandowski (the "False Article").[1] Prior to NBC publishing the story, Salus investigated the allegations and provided NBC reporter Julia Ainsley with specific facts demonstrating that her purported anonymous "sourcing" was fiction, yet NBC published the story anyway.  We demand that NBC retract the false statements and cease all further defamation of Salus.

---

[1] **Exhibit 4**.  Julia Ainsley, Matt Dixon, Jonathan Allen and Laura Strickler, *Some DHS contractors told White House officials they were asked to pay Corey Lewandowski*, NBC NEWS (Mar. 19, 2026), https://www.nbcnews.com/news/us-news/dhs-contractors-told-white-house-officials-asked-pay-corey-lewandowskircna263744.  For ease of reference, attached to this Retraction Demand is an indexed compilation of relevant emails, publications and other correspondence in chronological order.



(703) 590-1234 Tel                    1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax                   Tysons, VA 22102
                                     www.fluet.law

I.     **NBC asserts that Salus engaged in criminal conduct, despite having no sources to back that up, despite extensive and publicly available contradictory information, and despite Salus providing actual facts showing that NBC's preconceived narrative was false.**

First, NBC's False Article contains a number of demonstrably false statements and defamatory inuendoes:

- The False Article implies that Dr. Walters was awarded a contract as some sort of political favor, ignoring that, on January 20, 2025, Salus submitted an unsolicited proposal to FEMA, and then on January 23, 2025, Salus submitted the same unsolicited proposal to DHS to "collaborate with DHS to provide the necessary contingency logistics, pre-travel coordination, manifesting, medical, and aviation support services" and support the Agency "in responding to the unprecedented emergency brought on by years of unchecked illegal immigration." *CSI Aviation, Inc. v. United States et al.*, No. 25-1338C (MHS) (Fed. Cl.), Doc. 34, Brief of Salus at 3 (citing administrative record).  These proposals were submitted before any of the politically appointed leadership was in place and was approved by career DHS staff before any political appointee was involved.  Career contract officials at DHS reviewed Salus's proposal and determined that it "met the requirements of [Federal Acquisition Regulation ('FAR')] 15.606-1" before engaging with Salus about the proposed work consistent with the FAR.  Doc. 35, Brief of DHS at 4-5 (citing administrative record).

- The False Article implies that Salus was awarded a $1 billion contract as some sort of political favor, ignoring that, "[o]n May 20, 2025, DHS determined that Salus represented the best value to the Government, providing a superior technical approach compared to other offerors, as well as the lowest total evaluated price under the pricing scenario." Doc. 34, Brief of Salus at 8 (citing administrative record). This was after a proposal competition that included some of the largest and most sophisticated federal contractors in the market. Through market research, a contracting officer for DHS identified "multiple firms that have the capacity and experience to perform certain segments of the overall requested scope outlined within the Statement of Work but lack the experience to deliver the requested complete integrated solution within the SOW."  Doc. 35, Brief of DHS at 5 (citing administrative record).

- On May 9, 2025, the President's announcement of Project Homecoming dramatically increased the urgency for DHS to source removal services.  Doc. 35, Brief of DHS at 5-6 (citing administrative record).  Still, the agency worked within the time constraints to solicit and review proposals from multiple companies, including through "informational meetings and exchanges with [] seven vendors identified in the market research".  Doc. 35, Brief of DHS at 6



(703) 590-1234 Tel          1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax          Tysons, VA 22102
                            www.fluet.law

(citing administrative record).  Ultimately, "after the offerors' technical and price factors were evaluated, the contracting officer determined that Salus's proposal represented the best value to the Government."  Doc. 35, Brief of DHS at 6 (citing administrative record).

- Not only did DHS comply with procurement regulations in a declared emergency, but it also thoroughly addressed complaints about its interactions with Salus.  Salus submitted an unsolicited proposal that was accepted by the career contracting officials at DHS in accordance with the Federal Acquisition Regulation, and the conversations between Salus and DHS surrounding that proposal are not only allowed but actually required by regulation to determine the ultimate disposition of that accepted proposal.  Any allegation of impropriety associated with conversations between Salus and DHS in April 2025 can only make sense if one ignores the fact that the approach was first described by Salus in January of that same year.  DHS's Office of General Counsel ("OGC") investigated claims that communications between DHS and Salus risked an appearance of undue collaboration in scoping the work and drafting the objectives required to support the President's immigration agenda. Doc. 34, Brief of Salus at 5; Doc. 35, Brief of DHS at 6-7 (citing administrative record).  Ultimately, the OGC investigation determined that any "potential [conflicts of interest] and appearance of impropriety could be—and had been— eliminated or mitigated by DHS sharing cost and requirements information with all offerors, engaging in one-on-one sessions with each offeror, and creating a Pricing Scenario for evaluation purposes that was created by and known only to DHS personnel until it was released simultaneously to all offerors."  Doc. 35, Brief of DHS at 7; see also Doc. 34, Brief of Salus at 5 (quoting the OGC determination that "the communications with the vendor were simply the result of well-meaning conversations with a vendor concerning their 'unsolicited proposal' and not an attempt to undermine the federal procurement rules") (citing administrative record).  All of this was knowable by NBC had Ms. Ainsley shown a modicum of journalistic curiosity or integrity.  All of this could have been asked of Salus by NBC, but Ms. Ainsley was not interested.  Ms. Ainsley had been given her pre-formed narrative by her "sources" and she ran with it unimpeded by the facts.

- In fact, in the weeks immediately preceding Ms. Ainsley's March 19 False Article, filings in the bid protest litigation further clarified DHS's sound basis for selecting Salus as a contractor.  As the Government has repeatedly made clear—including in its brief filed on March 6, 2026—its rejection of CSI's proposals was based solely on CSI's lack of qualifications to perform the required work.  Doc. 35, Brief of DHS at 6-7; Doc. 59 at 5 (noting that "the contracting officer made a reasonable determination that CSI, the ICE AIR contractor, had 'flight capability with limited capability to provide temporary

staging solutions to meet the scope of the program.' [T]he contracting officer further determined that the existing ICE AIR requirement involves air operations logistics only, not detention logistics or coordination with foreign countries. [T]he contracting officer concluded that the ICE AIR vendors (i.e., CSI) 'do not have the experience either as Prime or subcontractors conducting this type of work.'").

- The False Article describes a series of calls in September 2025 allegedly involving an unnamed "representative from Salus"  speaking to  an unnamed "marketing firm owner" from an unnamed marketing firm that Ms. Ainsley describes as having "…no previous federal contracting experience…" in which the Salus representative allegedly offered the marketing firm a subcontract, provided that it hired a consulting firm tied to Mr. Lewandowski.  Salus advised NBC before publication that this was untrue.  Specifically, and among other things, Salus informed NBC of a number of hard facts:

    o "Salus was able to contact every 'marketing company' with whom it had any contact, for any purpose, in September, 2025.  While we cannot disclose the names of the companies, each of them confirmed to Salus that no one from Salus had any discussion of the sort described in your email."  **Exhibit 3** (March 17, 2026 Email from D. Panzer to J. Ainsley).

    o "Salus was never funded to perform work involving a subcontract to a marketing firm." **Exhibit 2** (March 16, 2026 Email from D. Panzer to J. Ainsley).

    o "[A]t the time this all was supposed to have taken place, neither Dr. Walters nor any other employee of Salus had ever met or spoken to Mr. Lewandowski or any firm allegedly associated with him. Dr. Walters' first contact with Mr. Lewandowski was in December, 2025." **Exhibit 2** (March 16, 2026 Email from D. Panzer to J. Ainsley).

More broadly, prior to NBC publishing the piece, Salus informed Ms. Ainsley that her assertions regarding these purported telephone calls between an anonymous "marketing firm owner" and an anonymous "Salus representative" are "entirely false." **Exhibit 1** (March 13, 2026 Email from D. Panzer to J. Ainsley) at 2.  Salus also raised the possibility that whomever she was relying upon may be pursuing an alternate agenda. We informed her that if the anonymous "marketing firm owner" existed (we hold that such a person did not exist), and if that person ever actually had such conversations, the conversations _did not_ involve Salus.  If Ms. Ainsley was interested in the truth (or at least wanted to avoid reckless disregard of the truth), she would have at least provided



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

Salus with the name of the anonymous "Salus representative," which presumably she could have obtained from the anonymous "marketing firm owner" since she was able to assert that the unnamed Salus representative held an email address on the Salus domain and since there is no suggestion that the referenced (fictional) Salus representative was one of her relied upon sources that enjoyed protection.   Yet she did not even confirm whether the purported "Salus representative" was employed by Salus, nor the scope of that employment.  In essence, NBC did not need to name Salus in the False Article at all, and should not have done so after Salus informed Ms. Ainsley that there was no such "Salus representative" and that Salus had taken the step to contact each of their known associates in the media industry that affirmatively denied any such activity.

NBC's piece further (falsely) states that in September 2025, Salus endeavored to obtain kick-backs for Mr. Lewandowski from the same anonymous "marketing firm owner" with respect to two subcontracts, one for $20 million and one for $40-50 million. Yet before NBC published the piece, we informed Ms. Ainsley that "Salus has never had any government contract to provide marketing or anything similar to a '$20 million [contract] to create materials for an agency that falls under DHS;'" that "no such contract was ever awarded by Salus to any subcontractor for marketing" and that "in September 2025, Salus only held one contract with DHS – and it was not a contract worth $40-$50 million, nor was it for 'an outreach campaign from DHS.'"  **Exhibit 1** (March 13, 2026 Email from D. Panzer to J. Ainsley) at 2.  Such marketing activity would have been outside the scope of the only contract with DHS that Salus held or currently holds.

Not only were the details about Salus's contracts from Ms. Ainsley's "sourcing" purely fictional, but we further informed Ms. Ainsly that during September 2025 when these fabricated events allegedly occurred, no Salus executive or employee "had ever met or spoken to Mr. Lewandowski or any firm allegedly associated with him."  **Exhibit 1** (March 13, 2026 Email from D. Panzer to J. Ainsley).  Yet, NBC proceeded to publish the False Article.

Beyond the fact that NBC's reporting is false, it appears that NBC acted with reckless disregard for the truth (at best).  We have been informed that the different authors on the False Article applied different levels of scrutiny with respect to sourcing.  While the GEO Group aspects of the article provide names and context in a well-documented fashion, the Salus component of the story appears as if it were added



(703) 590-1234 Tel    1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax    Tysons, VA 22102
www.fluet.law

as an after-thought without the same level of journalistic rigor.  Instead, we are told, the (false) information Ms. Ainsley contributed was all second or third-hand hearsay, and she does not even have a name for the so-called "Salus representative" or her source.  It would appear that NBC had a preconceived notion that Salus somehow was awarded a $1 billion contract as a political favor, rather than on merit – but the facts alleged by NBC couldn't be further from the truth.  And, when Ms. Ainsley was faced with legitimate factual problems in her intended narrative, she actually amplified the attack on Salus with further lies.

## II.      Salus has been harmed by NBC's False Article.

That NBC proceeded to publish falsehoods, smears, and innuendos about Salus without performing a rudimentary investigation into the truth, and disregarding contrary evidence provided by Salus, shows that NBC's intention was to damage the reputation of Salus.  At any other time, this would be journalistically irresponsible and libelous; given the timing of this report and its proximity to the pending ruling by the Court of Federal Claims and contract decisions by DHS, we are left to consider the possibility that the story was deliberately planted by competitors and happily accepted by NBC, which would open NBC to additional exposure for business conspiracy and tortious interference of contract.

Without even investigating whether the alleged "Salus representative" worked for Salus, or had authority to represent Salus, NBC inserted Salus into a political battle in which Salus has no interest nor any involvement.  NBC could have included Salus's entire rebuttal to your false allegations, or simply told the same story without mentioning Salus.  That NBC did not demonstrates your intent to harm Salus.  In fact, in Ms. Ainsley's March 25, 2026 email – sent only four hours before publishing the Second False Article – Ms. Ainsley concedes that NBC has not yet included in its reporting "Salus's previous response to our reporting." **Exhibit 6**.

Salus has suffered actual damages, as the False Article was the direct cause of multiple letters Salus received from certain Democratic Congressmen[2] that require

---

[2] **Exhibit 5** (Letter from Sen. Adam B. Schiff et al. dated March 24, 2026, https://www.schiff.senate.gov/wp-content/uploads/2026/03/20260324-Letter-to-Salus-Worldwide-re-Lewandowski.pdf) (the "First Senate Letter") ("New reporting states that a representative of Salus engaged in communications about financial payments for Mr. Lewandowski related to his support or assistance with Salus's federal contracting business.") (citing the False Article).  Indeed, like the proverbial "self-licking ice cream cone," the next day



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

significant resources to address and, separately, have damaged the credibility (and therefore the negotiating position) of Salus in a very competitive marketplace.  Further, Salus can prevail against NBC in a defamation *per se* suit as NBC has falsely accused it of a crime of moral turpitude.[3]

---

after Salus received the First Senate Letter (at the close of business) based on the False Article, on March 25, 2026, NBC reached out stating that it was "preparing to publish a story about a letter three Democratic Senators **are planning to send to Salus today** asking them to preserve 'personal records, corporate records, and all communications with Mr. Lewandowski, any person representing or purporting to be acting on behalf of Mr. Lewandowski, or any consulting firms associated with Mr. Lewandowski.'" **Exhibit 6** (March 25, 2026 Email from J. Ainsley to D. Panzer). NBC then published its Second False Article, linking to the False Article and stating: "NBC News previously reported that a marketing firm was contracted by a representative for Salus, asking that the firm pay a portion of a potential contract to a consultant tied to Lewandowski, according to a person familiar with the discussions." **Exhibit 7**, Julie Ainsley, Laura Strickler, and Ryan Nobles, *Democratic Senators Want Two Companies to Preserve Communications with Corey Lewandowski*, NBC NEWS (Mar. 25, 2026), https://www.nbcnews.com/politics/trump-administration/democratic-senators-want-two-companies-preserve-communications-corey-l-rcna265152.  Following the Second False Article, Salus received a Second Senate Letter also explicitly predicated on the False Article.  **Exhibit 8**, Letter from Sen. Ruben Gallego et al. dated March 30, 2026, https://www.gallego.senate.gov/wp-content/uploads/2026/03/Quill-Letter-L35145-Letter-to-Salus-Worldwide-re-Lewandowski-Corruption-Allegations-Version-1-03-30-2026-@-05-01-PM1.pdf ("We write regarding allegations that Corey Lewandowski, who until recently served as a Special Government Employee (SGE) and chief advisor at the Department of Homeland Security (DHS), repeatedly solicited personal payments from government contractors, including Salus Worldwide Solutions (Salus), in exchange for favorable contract decisions."), citing the False Article.  And damages continue to mount.  Earlier today, Salus received a letter from Congressman Robert Garcia, Ranking Member of the House Committee on Oversight and Government Reform.  **Exhibit 9**, https://oversightdemocrats.house.gov/imo/media/doc/2026-04-02garciatosalusworldwiderelewandowski.pdf.

[3] Many of the statements in the False Article are just accusations of criminal conduct couched as "according to the person familiar with the discussions." *See, e.g.*, **Exhibit 4** at 12 ("In both cases, the Salus representative made it clear to the marketing firm owner that hiring a Lewandowski-linked consultant was a condition of winning the contract, according to the person familiar with the discussions").  This is akin to a child hurling insults and they saying "Just kidding!" and it will not shield NBC or its reporters from liability.  *See, e.g.*, *Hatfill v. New York Times Co.*, 416 F.3d 320, 333-34 (4th Cir. 2005) (holding that reporter could not shield himself from defamation by baldly attributing allegations to unnamed sources or "simply by pairing a charge of



(703) 590-1234 Tel    1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax    Tysons, VA 22102
www.fluet.law

III.   **The False Article meets all the elements of defamation;**
       **Salus will prevail in its lawsuit against NBC.**

As a threshold matter, the mere fact that Salus performed work for DHS as a contractor does not make the company a "public figure" for defamation purposes.  *E.g., Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001) ("One does not become a limited - purpose public figure merely by contracting with the government or accepting public money….") (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979)).  Before NBC's poorly sourced reporting thrust Salus into the media spotlight, the company did not seek out publicity for its work.  After over three years of performing incredibly complex and dangerous work in Afghanistan under a U.S. Department of State contract, Salus was unknown (by design) to the point that their competitors attempted to use their lack of (known) federal contracting experience as a basis for award protest.  The company did not offer policy advice or purport to resolve the immigration crisis.  Although Salus received a contract to provide services to the government, it did not "thrust [itself] into the vortex of [a] public issue, nor did [it] engage the public's attention in an attempt to influence its outcome." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974); *see also Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 688 (4th Cir. 1989) ("The attainment of general public figure status is not to be lightly assumed, even if the plaintiff is involved in community affairs….").

Because Salus is neither a general nor limited purpose "public figure" under the First Amendment, NBC will face liability for its false reporting "on a less demanding showing than that required by [*New York Times v. Sullivan*]." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348 (1974).

But regardless of the applicable legal standard, Salus can and will prove actual malice in support of its claims.  Journalists are not free to disregard contrary evidence or rely on sources that they know to be biased or otherwise untrustworthy.  E.g., *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (upholding a finding of actual malice where the reporter demonstrated "purposeful avoidance of the truth" by failing to interview key witnesses); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1979) (subjective awareness of probable falsity may be found if "there are obvious reasons to

---

wrongdoing with a statement that the subject must, of course, be presumed innocent"). Moreover, we believe that discovery in the lawsuit will show that there was no actual "person familiar with the discussions," and NBC had reason to know that.



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

doubt the veracity of the informant or the accuracy of his reporting"); *Wells v. Liddy*, 186 F.3d 505, 542 (4th Cir. 1999) (journalist's reporting based on a single, unreliable, and untrustworthy source could support finding of actual malice); *Sroufe v. Scripps Media, Inc.*, No. 3:23-cv-548, 2024 WL 1494753, at *4 (E.D. Va. Apr. 5, 2024) (journalist's notice that a source was unreliable, combined with evidence of a preconceived narrative, supported potential finding of actual malice); *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021) (finding that a reasonable juror could find actual malice where a spokesperson "recklessly disregarded the truth by relying on obviously problematic sources to support a preconceived narrative he had crafted for his own profit.").

Further, a profit motive can be highly relevant to a finding of actual malice, especially where, as here, journalists abandon professional judgment in service of a preconceived narrative. *Eramo v. Rolling Stone*, LLC, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.") (quoting *Harris v. City of Seattle*, 152 Fed. Appx. 565, 568 (9th Cir. 2005)); *Gilmore v. Jones*, No. 3:18-cv-00017, 2021 WL 68684, at *8 (W.D. Va. Jan. 8, 2021) ("specific profit motive to publish stories about Plaintiff is permissible because such evidence is relevant to, even if not sufficient to prove, actual malice"); *Jordan v. Kollman*, 269 Va. 569, 581 (2005) (noting that a jury may find actual malice where a defendant has abandoned all judgment and reason in composing and publishing false statements).

As Ms. Ainsley was specifically aware when she published her False Articles, the facts surrounding Salus's interactions with DHS are a matter of public record. *See generally CSI Aviation, Inc. v. United States et al.*, No. 25-1338C (MHS) (Fed. Cl.). As the official record in the bid protest shows, the award to Salus followed agency procedures, including open competition, and was based on the company's unique ability to address critical government needs. Ms. Ainsley seemingly ignored the extensive and available facts to push forward a damaging pre-conceived narrative that was apparently developed by and on behalf of unscrupulous competitors that could not win in court or in contract competition and so used her eagerness to have something, anything, to say about Cory Lewindowski to damage Salus in the court of public opinion.

Despite relying on Washington Post reporting that specifically cited the bid



(703) 590-1234 Tel      1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax      Tysons, VA 22102
www.fluet.law

protest litigation,[4] none of the context appears in any of Ms. Ainsley's False Articles. Instead, Ms. Ainsley cited to an anonymous "marketing firm owner" (who apparently does not exist, as the real entities have denied the allegations attributed to them), as support for her allegations against Salus, despite being informed that all of the marketing firms with which Salus conferred in 2025 had denied that any improper conversations regarding Mr. Lewandowski occurred.

Further, despite claiming that her article "is based on seven months of reporting," Ms. Ainsley did not contact Salus until March 12, 2026 — only one week before her False Article ran.  There is only one reasonable explanation for Ms. Ainsley's failure to consult information in the public record and follow up on information seriously compromising her source: after seven months of work, she was committed to a specific narrative surrounding DHS, and she had predetermined that Salus would be part of that scoop.

NBC is not free to profit from injecting allegations of criminal conspiracies into Salus's legitimate government business.  In light of the extensive factual record available to the public, and the specific pre-publication communications from Salus's counsel, Ms. Ainsley knew that her unnamed source was "obviously problematic" and that record evidence before a federal court contradicted her theory of corruption. Ms. Ainsley consciously or recklessly disregarded this information when she dragged Salus, at the last minute, into a story arising from the alleged conduct of completely unrelated parties.

The falsehoods in your original False Article have succeeded in damaging Salus's reputation.  NBC has **48 hours** to retract the False Article and the Second False Article and admit that the reporting from unnamed sources failed to meet journalistic standards and should not be relied upon.[5]  The harm to Salus is ongoing and damages increase daily.  Do the right thing, or be sued.  It's your call.

---

[4] Ms. Ainsley's March 19 article cites and links to a Washington Post article in support of its claims regarding Dr. Walters. That Washington Post article (*DHS fast-tracked $1 billion contract to pro-Trump donor's company*, Washington Post (Dec. 17, 2025), https://www.washingtonpost.com/politics/2025/12/17/dhs-contract-trump-donor/) bases its reporting on "a lawsuit challenging the Project Homecoming contract."

[5] Please note, Ms. Ainsley waited exactly four hours between her last outreach and publishing the Second False Article, despite not noting any deadline for that false article.



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

Sincerely,

David S. Panzer

cc:     Julia Ainsley
        Reporter
        julia.ainsley@nbcuni.com

        Rebecca Blumenstein
        NBC News President, Editorial
        Rebecca.Blumenstein@nbcuni.com

        Noreen Gillespie
        Senior Vice President, Head of Standards
        NBC Universal
        NoreenGillespie@nbcuni.com

        Richard Chacon
        Director, News Standards & Practices at NBC News Group
        Richard.Chacon@nbcuni.com

        Chloe Arensberg
        NBC News Washington Bureau Chief
        Chloe.Arensberg@nbcuni.com



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

## Chronological Index of Exhibits

| Exhibit Number | Date | Description |
|---|---|---|
| 1 | March 13, 2026 | Email from D. Panzer to J. Ainsley re: Waiting for Response (to D. Panzer's response to email re: NBC News/ Corey Lewandowski and Salus) |
| 2 | March 16, 2026 | Email from D. Panzer to J. Ainsley re: D. Panzer's responses to follow-up questions |
| 3 | March 17, 2026 | Email from D. Panzer to J. Ainsley re: D. Panzer's follow-up regarding "marketing company" |
| 4 | March 19, 2026 | The First False Article<br>Julia Ainsley, Matt Dixon, Jonathan Allen and Laura Strickler, *Some DHS contractors told White House officials they were asked to pay Corey Lewandowski*, NBC NEWS (Mar. 19, 2026), https://www.nbcnews.com/news/us-news/dhs-contractors-told-white-house-officials-asked-pay-corey-lewandowskircna263744 |
| 5 | March 24, 2026 | The First Senate Letter<br>https://www.schiff.senate.gov/wp-content/uploads/2026/03/20260324-Letter-to-Salus-Worldwide-re-Lewandowski.pdf |
| 6 | March 25, 2026 | Email from J. Ainsley to D. Panzer re: Requesting response to First Senate Letter prior to publication of the Second Fals Article |
| 7 | March 25, 2026 | The Second False Article<br>Julia Ainsley, Laura Strickler and Ryan Nobles, *Democratic senators want two companies to preserve communications with Corey Lewandowski*, NBC NEWS (Mar. 25, 2026), https://www.nbcnews.com/politics/trump-administration/democratic-senators-want-two-companies-preserve-communications-corey-l-rcna265152 |
| 8 | March 30, 2026 | The Second Senate Letter<br>https://www.gallego.senate.gov/wp-content/uploads/2026/03/Quill-Letter-L35145-Letter-to-Salus-Worldwide-re-Lewandowski-Corruption-Allegations-Version-1-03-30-2026-@-05-01-PM1.pdf |
| 9 | April 2, 2026 | House Letter from Congressman Robert Garcia<br>https://oversightdemocrats.house.gov/imo/media/doc/2026-04-02garciatosalusworldwiderelewandowski.pdf |

# Exhibit 1

## David Panzer

| | |
|---|---|
| **From:** | David Panzer |
| **Sent:** | Friday, March 13, 2026 1:45 PM |
| **To:** | julia.ainsley@nbcuni.com |
| **Subject:** | RE: NBC News/ Corey Lewandowski and Salus |

| | |
|---|---|
| **Categories:** | Waiting for Response |

Dear Ms. Ainsley,

Salus Worldwide Solutions Corporation ("Salus") responds to your questions below in red.  Please do not hesitate to contact me if clarification is needed.

Best regards,
David

**David Panzer**
*Partner + Government Contracts Chair*



1751 Pinnacle Drive, Suite 1000, Tysons, VA 22102

 | [fluet.law](fluet.law)



NOTICE: This message (including any attachments) from Fluet may constitute an attorney-client communication and may contain information that is PRIVILEGED WORK PRODUCT. If you are not an intended recipient, you are hereby notified that any dissemination of this message is strictly prohibited. If you have received th copy or forward this message. Please permanently delete all copies and any attachments and notify the sender immediately by sending an e-mail to the sender.

**From:** Ainsley, Julia (NBCUniversal) <[julia.ainsley@nbcuni.com](mailto:julia.ainsley@nbcuni.com)>
**Sent:** Thursday, March 12, 2026 2:26 PM
**To:** David Panzer
**Subject:** Fwd: NBC News/ Corey Lewandowski and Salus

Good afternoon,

We have been investigating the allegations below and would like to hear what you have to say about them, and we also welcome any other information you wish to share on these issues. In addition, if you would like to comment broadly on the record regarding Mr. Lewandowski's work in handling DHS contracts, that would be appreciated.  **Our deadline is 2 pm Eastern on Friday.**

1

1. Has Corey Lewandowski ever asked for payment from Salus in return for the award of government contracts? No.

2. Our sourcing tells us that in September 2025, Salus contacted a marketing firm about two separate DHS contracts Salus had obtained. According to our sources, Salus offered the marketing firm an opportunity to be a subcontractor on the contracts. The first totaled $20 million to create materials for an agency that falls under DHS. After the conference call, the marketing firm was contacted by a subcontractor representing for Salus telling them that they would need to hire consultants to manage the relationship. Accoridng to our sources, the subcontractor told the firm that paying an LLC with ties to Corey Lewandowski was a condition for the contract. The representative explicitly stated that the contract was guaranteed, but the person who guaranteed the contract needed to be thanked. They explained that person was Lewandowski. The marketing firm refused and the representative for Salus told the marketing firm that they would not be getting the contract. As far as you're aware, did this take place?  This is entirely false.  First, Salus would never entertain this type of arrangement.  Second, Salus has never had any government contract to provide marketing or anything similar to a "$20 million [contract] to create materials for an agency that falls under DHS."  Third, no such subcontract was ever awarded (or offered) by Salus to any subcontractor for marketing.  Fourth, Salus never had any of these alleged communications with any marketing firm (or anyone else).  Finally, had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement.

3. Also in September, after the first contract was refused, Salus contacted the same marketing firm to talk about the second contract. This time, the subcontractor representing Salus said they needed the marketing firm to be a subcontractor on an outreach campaign from DHS. The marketing firm was allegedly told the contract was worth $40-50 million but that they would only be receiving $20 million because the rest would be going to a consulting firm tied to Lewandowski. The marketing firm refused. As far as you're aware, did this take place? This is entirely false.  First, Salus would never entertain this type of arrangement. Second, no such contract was ever awarded by Salus to any subcontractor for marketing. Third, in September 2025, Salus only held one contract with DHS – and it was not a contract worth $40-50 million, nor was it for "an outreach campaign from DHS." Fourth, Salus never had any of these alleged communications with any marketing firm (or anyone else). Finally, had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement.

4. We understand that the owner of the marketing firm complained verbally to at least one official at DHS. Were you ever contacted by DHS about this matter? No.

5. The Washington Post previously reported that Dr. William Walters is a donor to America First Policy Institute, which supports causes aligned with the Trump administration. Do you have a comment on that? We do not comment on the lawful private activity of our employees.

6. What is the extent of Mr. Walters' relationship with Mr. Lewandowski? Dr. Walters has no relationship with Mr. Lewandowski.

7. Did Lewandowski tell Salus they would be favored in the contracting process for any contracts? No.

8. The Washington Post also reported that Salus won a fast-tracked DHS deal to help carry out deportations that was worth nearly $1 billion. Do you have a response to their reporting? Salus is not authorized to make statements to the media regarding any actual contract with DHS.

Thank you,

Julia Ainsley

NBC News

Senior Homeland Security Correspondent

347-978-6592

# Exhibit 2

## David Panzer

| | |
|---|---|
| **From:** | David Panzer |
| **Sent:** | Monday, March 16, 2026 2:52 PM |
| **To:** | julia.ainsley@nbcuni.com |
| **Subject:** | RE: NBC News/ Corey Lewandowski and Salus |

Hi Julia,

Please see below in red.  Additionally, in light of the false and defamatory (but specific) allegations, Salus has concerns that you may be being fed false information.  While we of course assume you are doing your own due diligence, are you sure you actually have been speaking to a representative of an actual "marketing company" that in fact spoke with Salus about some sort of potential subcontract? Without further information, it is hard to investigate further; but if you have any more information to share, Salus would be happy to consider it.

Best regards,
David


**David Panzer**
*Partner + Government Contracts Chair*



1751 Pinnacle Drive, Suite 1000, Tysons, VA 22102

 | [fluet.law](fluet.law)



NOTICE: This message (including any attachments) from Fluet may constitute an attorney-client communication and may contain information that is PRIVILEGED WORK PRODUCT. If you are not an intended recipient, you are hereby notified that any dissemination of this message is strictly prohibited. If you have received th copy or forward this message. Please permanently delete all copies and any attachments and notify the sender immediately by sending an e-mail to the sender.

**From:** Ainsley, Julia (NBCUniversal) <[julia.ainsley@nbcuni.com](mailto:julia.ainsley@nbcuni.com)>
**Sent:** Monday, March 16, 2026 12:23 PM
**To:** David Panzer
**Subject:** NBC News/ Corey Lewandowski and Salus


Hi David,

Thank you for your earlier responses, and the information you provided. We wanted to write back to clarify some of the allegations based on additional information we received from our sourcing. Please let us know if these questions change your responses or if you'd like to add anything to the information you sent on Friday.

Salus contacted a marketing firm in September of 2025 about two different contracts. Salus wanted to bid on the first contract, which would would have included  $20 million to create materials for an agency

that falls under DHS. Salus representatives asked the marketing firm if they would be interested in pursuing the contract and laid out most of the details on a September conference call with the marketing firm. After the conference call, the marketing firm was contacted by phone by a Salus representative (someone with an @ salusworldwide.com email address). This person allegedly told the firm that hiring a consulting firm was a condition for receiving the contract. Then the person explicitly stated that the contract was guaranteed if they did so, but that Lewandowski needed to be thanked for securing the contract and that paying these consulting firms would ensure that he was paid. The marketing firm refused and the person with the @ salusworldwide.com email address told the marketing firm that they would not get the contract.

The second contract I referred to in my questions was Project Homecoming. It has been publicly reported that Salus won that contract. In September, Salus contacted the same marketing firm to take on a small part of the contract. The same Salus representative allegedly followed up with the marketing firm to say the subcontract was worth $40-50 million but that the marketing firm would receive $20 million. The person said the rest would be paid to a consulting firm tied to Lewandowski. The marketing firm refused.

1. Does Salus have any additional comment on these allegations? Salus stands by the March 13, 2026 response to your question #2 in your email of March 12, 2026: This is entirely false.  First, Salus would never entertain this type of arrangement.  Second, Salus holds a project-specific contract at the DHS Headquarters level and has never had any government contract to provide marketing or anything similar to a '$20 million [contract] to create materials for an agency that falls under DHS.'  Third, no such subcontract was ever awarded (or offered) by Salus to any subcontractor for marketing.  Fourth, Salus never had any of these alleged communications with any marketing firm (or anyone else).  Finally, had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement.   In terms of additional comment, Salus was never funded to perform work involving a subcontract to a marketing firm.  Salus did not authorize anyone to hire or promise to hire any consultant in connection with any Salus subcontract, let alone as a condition of issuing such a subcontract.

With respect to the second contract (referred to in question #3 in your email of March 12, 2026), we appreciate you clarifying that you are talking about Project Homecoming.  As stated on March 13, 2026, "Salus is not authorized to make statements to the media regarding any actual contract with DHS." But we also stand by original response to the question: This is entirely false.  First, Salus would never entertain this type of arrangement. Second, no such contract was ever awarded by Salus to any subcontractor for marketing. Third, in September 2025, Salus only held one contract with DHS. Fourth, Salus never had any of these alleged communications with any marketing firm (or anyone else). Finally, had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement. In terms of additional comment, Salus was never funded to perform work involving a subcontract to a marketing firm.  Salus did not authorize anyone to hire or promise to hire any consultant in connection with any Salus subcontract, let alone as a condition of issuing such a subcontract.

Finally, at the time this all was supposed to have taken place, neither Dr. Walters nor any other employee of Salus had ever met or spoken to Mr. Lewandowski or any firm allegedly associated with him.  Dr. Walters' first contact with Mr. Lewandowski was in December, 2025.

2.   Has Salus ever mandated that a consultant be hired as a condition for a subcontractor? No.

2

3. Do Salus employees and/or contractors use @salusworldwide.com email addresses? Salus employees do use email addresses @salusworldwide.com.

We also have one follow up question:

5. You said Mr. Walters has no relationship with Mr. Lewandowski. When I spoke to Mr. Lewandowski on the phone, he said he met Mr. Walters once. When I spoke to Mr. Walters on the phone, before he directed me to send questions to you, he said he met   Mr. Lewandowski twice. Others familiar with their relationship have told us they frequently speak by phone. Have Mr. Walters and Mr. Lewandowski ever met or spoken?  If so, how often do they speak? Dr. Walters has met Mr. Lewandowski twice.  Dr. Walters has spoken to Mr. Lewandowski on the phone twice; both times for less than 10 minutes and both times to respond to questions from Mr. Lewandowski on operational issues related to Salus's DHS contract.  They are not friends.  They are not social acquaintances.  They have no personal relationship.  Neither works for the other.  To Dr. Walters' knowledge, the two are not involved in any of the same professional associations.  They have no professional relationship.  Therefore, as stated previously, Dr. Walters has no relationship with Mr. Lewandowski.

 **Please respond to these questions by 5 pm Eastern today, Monday, March 16.**
Thank you,
Julia

3

# Exhibit 3

## David Panzer

| | |
|---|---|
| **From:** | David Panzer |
| **Sent:** | Tuesday, March 17, 2026 4:58 PM |
| **To:** | Ainsley, Julia (NBCUniversal) |
| **Subject:** | FW: NBC News/ Corey Lewandowski and Salus |

Hi Julia,

Based on the specific (false) allegations you shared, Salus was able to contact every "marketing company" with whom it had any contact, for any purpose, in September, 2025. While we cannot disclose the names of the companies, each of them confirmed to Salus that no one from Salus had any discussion of the sort described in your email. We won't speculate on the motivation of your "sourcing," but the allegations simply are not true.

Best regards,
David

**From:** David Panzer █████████████
**Sent:** Monday, March 16, 2026 2:52 PM
**To:** julia.ainsley@nbcuni.com
**Subject:** RE: NBC News/ Corey Lewandowski and Salus

Hi Julia,

Please see below in red. Additionally, in light of the false and defamatory (but specific) allegations, Salus has concerns that you may be being fed false information. While we of course assume you are doing your own due diligence, are you sure you actually have been speaking to a representative of an actual "marketing company" that in fact spoke with Salus about some sort of potential subcontract? Without further information, it is hard to investigate further; but if you have any more information to share, Salus would be happy to consider it.

Best regards,
David

**David Panzer**
*Partner + Government Contracts Chair*



1751 Pinnacle Drive, Suite 1000, Tysons, VA 22102

 | fluet.law



NOTICE: This message (including any attachments) from Fluet may constitute an attorney-client communication and may contain information that is PRIVILEGED a WORK PRODUCT. If you are not an intended recipient, you are hereby notified that any dissemination of this message is strictly prohibited. If you have received th copy or forward this message. Please permanently delete all copies and any attachments and notify the sender immediately by sending an e-mail to the sender.

1

**From:** Ainsley, Julia (NBCUniversal) <julia.ainsley@nbcuni.com>
**Sent:** Monday, March 16, 2026 12:23 PM
**To:** David Panzer ███████████████████
**Subject:** NBC News/ Corey Lewandowski and Salus

Hi David,

Thank you for your earlier responses, and the information you provided. We wanted to write back to clarify some of the allegations based on additional information we received from our sourcing. Please let us know if these questions change your responses or if you'd like to add anything to the information you sent on Friday.

Salus contacted a marketing firm in September of 2025 about two different contracts. Salus wanted to bid on the first contract, which would would have included  $20 million to create materials for an agency that falls under DHS. Salus representatives asked the marketing firm if they would be interested in pursuing the contract and laid out most of the details on a September conference call with the marketing firm. After the conference call, the marketing firm was contacted by phone by a Salus representative (someone with an @ salusworldwide.com email address). This person allegedly told the firm that hiring a consulting firm was a condition for receiving the contract. Then the person explicitly stated that the contract was guaranteed if they did so, but that Lewandowski needed to be thanked for securing the contract and that paying these consulting firms would ensure that he was paid. The marketing firm refused and the person with the @ salusworldwide.com email address told the marketing firm that they would not get the contract.

The second contract I referred to in my questions was Project Homecoming. It has been publicly reported that Salus won that contract. In September, Salus contacted the same marketing firm to take on a small part of the contract. The same Salus representative allegedly followed up with the marketing firm to say the subcontract was worth $40-50 million but that the marketing firm would receive $20 million. The person said the rest would be paid to a consulting firm tied to Lewandowski. The marketing firm refused.

1. Does Salus have any additional comment on these allegations? <span style="color:red">Salus stands by the March 13, 2026 response to your question #2 in your email of March 12, 2026: This is entirely false.  First, Salus would never entertain this type of arrangement.  Second, Salus holds a project-specific contract at the DHS Headquarters level and has never had any government contract to provide marketing or anything similar to a '$20 million [contract] to create materials for an agency that falls under DHS.'  Third, no such subcontract was ever awarded (or offered) by Salus to any subcontractor for marketing.  Fourth, Salus never had any of these alleged communications with any marketing firm (or anyone else).  Finally, had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement.   In terms of additional comment, Salus was never funded to perform work involving a subcontract to a marketing firm.  Salus did not authorize anyone to hire or promise to hire any consultant in connection with any Salus subcontract, let alone as a condition of issuing such a subcontract.</span>

<span style="color:red">With respect to the second contract (referred to in question #3 in your email of March 12, 2026), we appreciate you clarifying that you are talking about Project Homecoming.  As stated on March 13, 2026, "Salus is not authorized to make statements to the media regarding any actual contract with DHS." But</span>

2

we also stand by original response to the question: This is entirely false.  First, Salus would never entertain this type of arrangement. Second, no such contract was ever awarded by Salus to any subcontractor for marketing. Third, in September 2025, Salus only held one contract with DHS. Fourth, Salus never had any of these alleged communications with any marketing firm (or anyone else). Finally, had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement. In terms of additional comment, Salus was never funded to perform work involving a subcontract to a marketing firm.  Salus did not authorize anyone to hire or promise to hire any consultant in connection with any Salus subcontract, let alone as a condition of issuing such a subcontract.

Finally, at the time this all was supposed to have taken place, neither Dr. Walters nor any other employee of Salus had ever met or spoken to Mr. Lewandowski or any firm allegedly associated with him.  Dr. Walters' first contact with Mr. Lewandowski was in December, 2025.

2.   Has Salus ever mandated that a consultant be hired as a condition for a subcontractor? No.

3. Do Salus employees and/or contractors use @salusworldwide.com email addresses? Salus employees do use email addresses @salusworldwide.com.

We also have one follow up question:
5. You said Mr. Walters has no relationship with Mr. Lewandowski. When I spoke to Mr. Lewandowski on the phone, he said he met Mr. Walters once. When I spoke to Mr. Walters on the phone, before he directed me to send questions to you, he said he met  Mr. Lewandowski twice. Others familiar with their relationship have told us they frequently speak by phone. Have Mr. Walters and Mr. Lewandowski ever met or spoken?  If so, how often do they speak? Dr. Walters has met Mr. Lewandowski twice.  Dr. Walters has spoken to Mr. Lewandowski on the phone twice; both times for less than 10 minutes and both times to respond to questions from Mr. Lewandowski on operational issues related to Salus's DHS contract.  They are not friends.  They are not social acquaintances.  They have no personal relationship.  Neither works for the other.  To Dr. Walters' knowledge, the two are not involved in any of the same professional associations.  They have no professional relationship.  Therefore, as stated previously, Dr. Walters has no relationship with Mr. Lewandowski.

 **Please respond to these questions by 5 pm Eastern today, Monday, March 16.**
Thank you,
Julia

# Exhibit 4

Case 1:25-cv-01338-MHS    Document 65-3    Filed 04/17/26    Page 60 of 71

# Some DHS contractors told White House officials they were asked to pay Corey Lewandowski

By Julia Ainsley, Matt Dixon, Jonathan Allen and Laura Strickler

12 min read

https://www.nbcnews.com/news/us-news/dhs-contractor…

More than a year ago, The GEO Group founder George Zoley asked for a meeting with Corey Lewandowski, a close ally of President Donald Trump who had just started a powerful position as a top adviser to Homeland Security Secretary Kristi Noem.

As a titan of the private prison industry, GEO Group stood to benefit from Trump's mass deportation agenda, which would require the federal government to spend tens of billions of dollars to transport, detain, monitor and deport undocumented immigrants. The company's federal contracts in those areas already totaled more than $1 billion per year.

But Zoley and his advisers were worried that the road to securing new government contracts now ran through Lewandowski. The

two had history: Lewandowski and Zoley had butted heads during the transition between Trump's November 2024 election and his January 2025 inauguration, before Lewandowski officially worked for the government, according to two industry sources and one senior DHS official familiar with the matter.

During the transition, Lewandowski told Zoley that he wanted to be paid in exchange for protecting and growing GEO Group's DHS contracts, according to a senior DHS official and three people familiar with their discussion. Zoley, concerned about the propriety of the ask, told Lewandowski he would have no part of it, the sources said, describing the confrontation as tense.

Lewandowski took a role as an unpaid "special government employee" at DHS once the new administration was sworn in, where he advised and acted as a "de facto chief of staff" to Noem and, sources said, influenced contract awards. Zoley scrambled to find a way to assuage tensions from the meeting during the transition, two industry sources familiar with the matter said. He secured a follow-up with Lewandowski in late February or early March 2025.

That second meeting did not go much better.

Zoley offered to put Lewandowski on retainer — a recurring consulting fee — with GEO Group, according to two industry sources familiar with the matter.

Lewandowski balked, saying he wanted to be compensated based on the company's new or renewed contracts with DHS, the two sources said.

"He wanted payments — what some people would call a success fee," said a person with knowledge of the meeting.

Zoley declined, the two sources said. In the months that followed, the length of two of GEO Group's federal contracts shrank, and currently several of its facilities that could house migrants sit idle, even as Congress and Trump have poured money into DHS to execute the mass deportation campaign. GEO Group officials believe that is tied to their not agreeing to Lewandowski's solicitations, said a source familiar with the GEO Group officials' thinking.

A senior DHS official told NBC News that within weeks of Lewandowski's second meeting with Zoley, Lewandowski told him not to award more contracts to GEO Group. Lewandowski, through a spokesperson, denied that. Months later, in December 2025, GEO Group did receive a new contract for $121 million for services that help locate immigrants DHS is trying to find.

Lewandowski's spokesperson denied this account of his interactions with GEO Group. "This is absolutely false and did not happen — Mr. Lewandowski never demanded any payment or compensation from the Geo Group, at any time," his representative said.

Asked whether he has ever received "any money from any of the contracts" he has signed off on, Lewandowski previously told NBC News in an interview, "zero, not one penny."



Homeland Security Secretary Kristi Noem and Corey Lewandowski at a meeting in San Jose, Costa Rica, on June 25, 2025. Anna Moneymaker / Getty Images

Now, lawmakers are asking about Lewandowski. Noem testified at a congressional hearing earlier this month in which lawmakers asked about her and Lewandowski's role in government contracts. Trump called them both after and asked Lewandowski questions about his role in DHS contracting decisions, a source with knowledge of the call told NBC News.

The president fired Noem after the hearings, saying she would depart as secretary on March 31. Lewandowski told NBC News he has not decided whether he will leave DHS with her.

On Wednesday, Trump's nominee to replace Noem, Sen. Markwayne Mullin, R-Okla., was asked during a congressional hearing if he would cooperate with a probe by Democratic senators into three businesses that received a $220 million advertising contract featuring Noem. The probe is looking into whether she or Lewandowski financially benefited from the agreements. Mullin said he would cooperate with any DHS inspector general investigation.

Trump has also recently asked aides whether Lewandowski profited personally from the advertising campaign, NBC News has reported, at one point allegedly remarking to advisers, "Corey made out on that one."

Lewandowski's request to GEO Group during the transition was made known to some incoming ICE officials, according to two senior DHS officials involved in conversations about the matter.

And GEO Group and several other companies in government contracting have complained to officials in Trump's inner circle that Lewandowski, as a special government employee, has directly or indirectly stood to personally profit from the DHS contracting process, according to four senior White House officials, a former White House official and a person familiar with the conversations.

One senior White House official raised the issue with Trump during an unrelated meeting in October, two current administration officials said, before the conversation was cut short by superseding business. And another senior White House

official told NBC News they had received a "dozen" complaints from at least four companies about Lewandowski's involvement in the contracting process during the second Trump administration.

Such complaints are rare in the defense contracting industry, in which relationships are often carefully built over years and across political parties. The reports of requests to pay Lewandowski, a government contracting expert told NBC News, raise "red flags."

This account is based on seven months of reporting, including interviews with nearly two dozen people who expressed concern about Lewandowski's role in the contracting process — including current administration officials, current DHS officials, industry sources who have done business with DHS and lobbyists. These sources were interviewed on the condition of anonymity because they were not authorized to speak to the media or because they wanted to protect their relationships with an agency critical to their business.

It is not clear whether Lewandowski received any money from businesses contracting with the government; he has denied it. The DHS General Counsel's Office told NBC News that Lewandowski is in "compliance with all required ethics financial disclosure reporting and training requirements" and that he filed a confidential financial disclosure report that "is not subject to media disclosure," given his special government employee status.

The White House declined to comment. DHS and GEO Group did not return requests for comment.

White House officials have not taken any action against Lewandowski, in part out of fear that Trump will come to his defense, according to three sources familiar with the thinking inside the West Wing. That does not mean they have not taken stock of the situation.

"We are aware of the allegations of pay to play," a senior White House official said, acknowledging that the complaints touched off discussions among White House aides. Some of the president's aides, the senior White House official said, are troubled by the reports they have heard about Lewandowski.

Lewandowski, who has been referred to as "chief" inside DHS headquarters, has had broad authority over the contract process, three current DHS officials said. In an internal policy change last year, Noem decided that she should review and sign off on any deal worth more than $100,000. DHS officials and private industry sources say Noem had largely delegated that review to Lewandowski. His spokesperson denied that, saying Noem "has delegated no authorities to Mr. Lewandowski."

Previously, $25 million was the trigger for the DHS secretary's approval, a former ICE official in the Biden administration said.

Jessica Tillipman, the associate dean for government procurement law studies at George Washington University, told NBC News that in general, if a special government employee had control over which companies got contracts and sought payment

from companies in exchange for winning contracts, that would "raise bright red flags of illegality."

Federal law describes a special government employee — Lewandowski's designation at DHS — as "an officer or employee of the executive or legislative branch" of government whose role is temporary.

Federal law states it is illegal for any public official, "or person who has been selected to be a public official," to "corruptly" demand, seek, receive, accept or agree to receive or accept "anything of value personally or for any other person or entity in return for being influenced in the performance of any official act."

"If I was a special government employee and I turned to a company and I said, 'I want to consult,' and I'm also then going to be directly involved in personally and substantially overseeing the award of that contract, I would say that that would be a blazing red flag of procurement integrity concern," she added.

Tillipman said federal contracting regulations are designed to prevent those scenarios.

"We want to make sure that awards are made based on the merit of a company and their product or service, not because the company bidding on the contract is paying off the person in charge of awarding it," she said.

One marketing firm abandoned plans to pursue two lucrative DHS contracts after it received requests to indirectly pay Lewandowski, according to a person familiar with the

Some DHS contractors told White House officials they were asked to pay Corey Lewandowski

discussions. The marketing firm official recounted the experience to an official in the Trump administration about two months later. That Trump administration official later confirmed the discussion with NBC News.

The firm, which had no previous federal contracting experience, was contacted by Salus Worldwide Solutions, according to a person familiar with the discussions. Salus is run by William Walters, who The Washington Post reported is a donor to the America First Policy Institute, a nonprofit that promotes causes aligned with the Trump administration.

Salus in May 2025 won a fast-tracked DHS deal to help carry out deportations — a contract ultimately worth nearly $1 billion, the Post reported.

A person representing Salus asked the owner of the marketing firm whether he was interested in pursuing a $20 million contract to create materials for an agency that falls under DHS, according to the person familiar with the discussions. Getting in as a government subcontractor, which could lead to future deals, seemed to the marketing firm owner like a potentially lucrative opportunity, the person said. Salus representatives laid out most of the details on a September conference call with the marketing firm, according to the person familiar with the discussions.

But there was one final detail. A representative from Salus called the marketing firm owner after the conference call, according to the person familiar with the discussions.

Case 1:25-cv-01338-MHS    Document 65-3    Filed 04/17/26    Page 69 of 71

"You're going to have to bring in a consultant to manage it," the representative told the marketing firm owner, according to the person familiar with the discussions.

"Manage what exactly?" the firm's owner replied.

"Manage the relationship," the representative said.

The marketing firm owner said he still did not understand. He blamed it on his lack of experience in federal contracting and asked the representative to explain it to him.

"We are guaranteed this contract, but we need to make sure we are properly thanking the person who gave it to us," the Salus representative said, naming Lewandowski as the one who had secured the contract and deserved gratitude, according to the person familiar with the discussions. The marketing firm owner was told that he could hire one of several consulting firms tied to Lewandowski, the person familiar with the discussions said.

That tripped an alarm bell, and the marketing firm owner ended the call. He phoned two friends who work in federal contracting and asked whether such an arrangement was normal, according to the person familiar with the discussions. One of them called it a "giant red flag," and the other raised legal concerns, according to the person familiar with the discussions.

The Salus representative told the marketing firm owner that because he refused to hire a consultant, the marketing firm did not get the deal, according to the person familiar with the discussions. The contract was not ultimately awarded to Salus.

A short time later, according to the person familiar with the discussions, Salus reached back out to see whether the marketing firm owner would be interested in working on a DHS outreach campaign.

The representative in a follow-up call told the marketing firm owner that this contract would be worth $40 million to $50 million, but that the marketing company would get only $20 million, according to the person familiar with the discussions. The representative would direct the rest to a consulting company tied to Lewandowski, the person said.

"We will make sure the consultant is handled," the representative said, according to the person familiar with the discussions.

In both cases, the Salus representative made it clear to the marketing firm owner that hiring a Lewandowski-linked consultant was a condition of winning the contract, according to the person familiar with the discussions.

A spokesperson for Lewandowski called the allegations "patently false. Mr. Lewandowski had no conversations with anyone regarding a marketing contract."

The spokesperson added, "Any insinuation that someone was speaking on behalf of Mr. Lewandowski was completely unauthorized and if undertaken, it was done so without his knowledge."

A lawyer for Salus denied the accounts of both meetings as "entirely false" and said, "Salus would never entertain this type of

4/1/26, 12:28 PM
Case 1:25-cv-01338-MHS   Document 65-3   Filed 04/17/26   Page 71 of 71
Some DHS contractors told White House officials they were asked to pay Corey Lewandowski

arrangement." Salus "was never funded to perform work involving a subcontract to a marketing firm," the lawyer added.

In both cases, "had a prospective subcontractor made us aware of such an alleged communication, Salus would have taken every step to identify whomever had misrepresented themselves as an agent of the company and turned that individual over to law enforcement," the lawyer said. "Salus did not authorize anyone to hire or promise to hire any consultant in connection with any Salus subcontract, let alone as a condition of issuing such a subcontract."

The marketing firm turned down the second offer, too, the person familiar with the discussions said, worried again that it might run afoul of the law.