# In the United States Court of Federal Claims

No. 25-1338C

(Originally filed under seal: May 4, 2026)

(Public version filed: May 12, 2026)

|  |  |
|---|---|
| **CSI AVIATION, INC.,** | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
| **THE UNITED STATES,** | ) |
| *Defendant,* | ) |
| **and** | ) |
| **SALUS WORLDWIDE SOLUTIONS CORPORATION,** | ) |
| *Defendant-Intervenor.* | ) |

*Jennifer S. Zucker* and *Tyler E. Robinson*, Vinson & Elkins, LLP, Washington, D.C., for Plaintiff. With them on the briefs were *Christopher M. O'Brien*, Vinson & Elkins, LLP, and *Cassidy Kim*, Greenberg Traurig, LLP, Washington, D.C.

*Reta Emma Bezak*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With her on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Acting Deputy Director, and *Charlene T. Storino*, Office of the General Counsel, Department of Homeland Security.

*Scott Nicholas Flesch*, Miller & Chevalier Chartered, Washington, D.C., for Defendant-Intervenor. With him on the briefs were *Alejandro L. Sarria*, and *Connor W. Farrell*.

**OPINION AND ORDER**[*]

*SOLOMSON*, **Chief Judge.**

Just several weeks ago, this Court warned plaintiffs that they must "plead, and then prove, *facts* demonstrating both standing and prejudicial error" in bid protest cases. *Noblis MSD, LLC v. United States*, -- Fed. Cl. --, 2026 WL 851951, at *1 (Mar. 25, 2026). Indeed, plaintiffs in this Court have often made the fundamental error of assuming that the ability to prepare and submit a proposal in response to a solicitation is sufficient *per se* to confer standing to challenge the terms of a procurement or its outcome. There is some logical appeal to that assumption: why would any rational offeror challenge the terms or result of a procurement that it didn't think it could win? But the assumption is wrong: an actual or prospective offeror may believe in its ability to compete for, and perform, a contract but that does not equate to standing. As our appellate court, the United States Court of Appeals for the Federal Circuit, has held, any plaintiff challenging the terms of a procurement has the burden of *alleging* and ultimately *proving* facts that show it can perform the contract at issue. If a plaintiff fails to meet its burden at the complaint stage, its case must be dismissed for lack of Article III standing or statutory standing. If a plaintiff fails to prove its "interested party" status, 28 U.S.C. § 1491(b), or prejudice, it loses on the merits.

In this case, Plaintiff, CSI Aviation, Inc. ("CSI"), challenges the decision of the Defendant, the United States — acting by and through the Department of Homeland Security ("DHS") — to conduct a limited competition procurement for a contract exceeding $1 billion. DHS effectively excluded CSI from the competition and awarded the contract to Salus Worldwide Solutions Corp. ("Salus"). The fatal problem for CSI, however, is that it neither alleged nor proved that it could perform the contract.

---

[*] On May 4, 2026, this Court issued this opinion and order under seal and provided the parties the opportunity to propose redactions for a public version of the opinion. ECF No. 67. This Court incorporates the parties' proposed redactions, ECF No. 69, in this public version. Redacted words and phrases have been replaced with [* * *], except for an individual's name that was replaced with [SVP]. Other minor typographical errors and omissions are also corrected in this version.

I.    **FACTUAL, PROCEDURAL, AND LEGAL BACKGROUND**[1]

A.  **Pre-Solicitation Activity**

1.  **The President's Executive Orders regarding illegal immigration and associated directives to DHS.**

On January 20, 2025, President Donald J. Trump issued Executive Order ("EO") 14159, finding that "[e]nforcing our Nation's immigration laws is critically important to the national security and public safety of the United States."  90 Fed. Reg. 8443, 8443 (Jan. 29, 2025).  To carry out this critical mission, President Trump directed "the Secretary of Homeland Security [to] *promptly* take appropriate action . . . to ensure the efficient and expedited removal of aliens from the United States," and to "adopt policies and procedures to encourage aliens unlawfully in the United States to *voluntarily* depart *as soon as possible*[.]"  *Id.* at 8445 (emphasis added).  While the President did not provide a deadline for those objectives, he directed the ramp-up of both voluntary and involuntary removals to begin "promptly" and "as soon as possible."  *Id.*

That same day, President Trump also issued EO 14165, emphasizing how "over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level . . . . including [by] potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent."  90 Fed. Reg. 8467, 8467 (Jan. 30, 2025).  President Trump directed DHS to ensure that certain illegal aliens "are returned to the territory from which they came . . . [a]s soon as practicable."  *Id.* at 8468.

2.  **Salus's unsolicited proposal.**

On January 23, 2025 — three days after the issuance of EOs 14159 and 14165 — Salus submitted an unsolicited proposal to DHS's Office of Procurement Operations

---

[1] This background section constitutes this Court's findings of fact drawn from the administrative record.  Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires courts to "make factual findings from the record evidence as if [they] were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Other factual findings are contained in the Discussion section of this opinion, *infra*.  Citations to the administrative record, ECF No. 23, are denoted as "AR" followed by its page number.

("OPCO") pursuant to Federal Acquisition Regulation ("FAR") Subpart 15.6 ("Unsolicited Proposals").[2]  AR 3, 5-121.  The unsolicited proposal explained that Salus "offers a unique, comprehensive solution to address the urgent need . . . to support the President's mandate of quickly removing undocumented immigrants from the United States."  AR 7.  Salus offered to "develop, maintain, refine, and manage an integrated collection of commercial services to meet the Department's removal, deportation, and other national security needs."  AR 556 (§ C.3).

DHS did not immediately acknowledge receipt of Salus's unsolicited proposal. Accordingly, on February 10, 2025, Salus re-submitted its proposal to DHS in order "to bring [it] back to the top of [OPCO's] inbox[.]"  AR 381.  Salus explained that it also had updated "the pricing and scope to address what [they saw] as rapidly emerging challenges in meeting the President's stated objectives."  *Id.*  On February 18, 2025, DHS sent an email to Salus, acknowledging its unsolicited proposal.  AR 380.

On February 22, 2025, DHS's Office of Strategy, Policy, and Plans ("PLCY") conducted an initial review of Salus's unsolicited proposal, in accordance with FAR 15.606-1.  AR 509; *see* FAR 15.606-1(a) (requiring the agency to consider seven criteria "[b]efore initiating a comprehensive evaluation [of an unsolicited proposal]").  PLCY's initial review of Salus's unsolicited proposal was favorable.  PLCY determined that Salus's proposal was "not for a known agency requirement," but "could benefit the agency's . . . other mission responsibilities."  AR 509; *see* FAR 15.603(c)(4)-(5) ("A valid unsolicited proposal must . . . [n]ot be an advance proposal for a known agency requirement that can be acquired by competitive methods[,]" and must also "[i]nclude sufficient  detail to permit a determination that . . . the proposed work could benefit the agency's . . . other mission responsibilities[.]").

On February 24, 2025, DHS notified Salus of PLCY's favorable initial review of Salus's unsolicited proposal and that it was "accepted for a comprehensive evaluation."[3]

---

[2] The FAR is codified at Title 48, Ch. 1, of the Code of Federal Regulations.  FAR Part 15 "prescribes policies and procedures governing competitive and noncompetitive negotiated acquisitions."  FAR 15.000 ("Scope of part").  FAR Subpart 15.6, in turn, "sets forth policies and procedures concerning the submission, receipt, evaluation, and acceptance or rejection of unsolicited proposals."  FAR 15.600 ("Scope of subpart").

[3] *See* FAR 15.606-2(a) (providing mandatory factors for an agency's consideration as part of a comprehensive evaluation of an unsolicited proposal).

AR 548. DHS anticipated the comprehensive evaluation to take approximately 60 days. *Id.*

One day later, on February 25, 2025, Salus sent DHS a draft Statement of Objectives ("SOO") for its unsolicited proposal. AR 554. Salus, in its draft SOO, pitched its unsolicited proposal as including "comprehensive support [for] removal operations (CSRO)[.]" AR 555 (§ C.1). DHS started using the term "CSRO" to refer to Salus's unsolicited proposal, DHS's subsequent limited competitive solicitation, and the contract DHS ultimately awarded to Salus.

On March 7, 2025, DHS notified Salus of PLCY's favorable comprehensive review of Salus's unsolicited proposal. AR 576. PLCY concluded that Salus's "proposal would be an innovative approach to augmenting DHS['s] ability to remove illegal aliens at scale as directed by President Trump." AR 578. PLCY found that Salus's proposal: (1) "[i]n addition to directly supporting [] air removal operations . . . includes various administrative and logistic support necessary to provide safe, secure deportations"; (2) "includes a useful measure to expand the absorptive capacity of foreign counterparts using regional staging areas that, in effect, will expand overall U.S. capability to deport illegal aliens while simultaneously reducing the overall inherent risk of deportation operations by working with key foreign counterparts on enforcement action"; (3) "would directly support accomplishment of [DHS's] mission by enabling DHS to more effectively and efficiently deport illegal aliens, the current top security priority for the United States"; and (4) "demonstrated [Salus's] ability to build and maintain bed-down facilities, provide necessary life support (food, water, medical, etc.), coordinate and integrate flight operations, and support U.S. planners in the large-scale movement of migrants[.]" *Id.* PLCY further noted that "[c]urrent Salus leadership and personnel have recently performed most of the actions described in the proposal," with near-perfect success rates. AR 578-79. PLCY explained that "[t]he ability to perform the level of integrated logistics and delivery of high risk and high visibility missions with zero failure or missed windows[,] demonstrates the strong experience in achieving results and direct program objectives while providing necessary humanitarian\life support through the entire process." AR 578.

DHS cautioned Salus that a favorable comprehensive evaluation "d[id] not, in itself[,] justify a contract without providing for full and open competition[.]" AR 576; *see* FAR 15.607(a) ("A favorable comprehensive evaluation of an unsolicited proposal does not, in itself, justify awarding a contract without providing for full and open

competition."). DHS explained that it would need to return Salus's unsolicited proposal if, at any point, one of four "conditions" specified in FAR 15.607(a) were met. AR 576. One such condition is when the "substance" of the unsolicited proposal becomes "available to the Government without restriction from another source[.]" FAR 15.607(a)(1). In that case, the government must compete the work and may not issue a sole-source order to the party that submitted the unsolicited proposal. FAR 15.607(a) (referencing "full and open competition" as the default procurement method).

### 3. DHS and Salus discuss the CSRO project.

Throughout March 2025, DHS and Salus engaged in conversations, refining elements of Salus's unsolicited proposal, including various pricing elements. *See, e.g.*, AR 582, 600, 614. PLCY and Salus further discussed potential avenues for DHS to fund the CSRO project. *See, e.g.*, AR 613, 646. Based on Salus's suggestion, *see* AR 646-47, on March 21, 2025, PLCY began exploring with the United States Department of State ("State") whether State could fund the CSRO project via Migration and Refuge Assistance ("MRA") funds. On March 28, 2025, PLCY updated Salus, explaining how it had "made some progress with State." AR 685.

On April 4, 2025, PLCY provided Salus with additional refinements to the contemplated CSRO project, including, for the first time, segmenting the project into two discrete missions: (1) conducting involuntary removal operations; and (2) facilitating voluntary returns (*i.e.*, self-deportations). AR 682-84. Support for involuntary removals included, among other things, the "[c]onstruction and [] support for 1000-bed minimum security immigration detention and processing facilities at four international staging areas ('ISAs')." *Id.* Voluntary returns included "[s]creening [] services, ticketing, and other necessary support to Operation Homecoming." *Id.*

Also on April 4, 2025, Salus sent PLCY a Concept of Operations ("CONOP"), proposing a "four-phase" CSRO project. *See* AR 690-93. Salus estimated that "[o]ver a 12-month operational period," it would "move 276,000 illegal aliens to a final destination outside of the United States [] and provid three [ISAs]." AR 692. Salus's CONOP projected phase 1 of the CSRO to begin on April 15, 2025. *Id.* DHS did not immediately respond to Salus's CONOP submission. On April 7, 2025, in response to multiple follow-ups from Salus, PLCY explained that "everything[] [is] as lined up as it's going to get[,] short of having an agreement with State on funding." AR 702.

6

On April 17, 2025, Salus sent PLCY an unsolicited white paper.  AR 706.  Among other things, Salus requested that DHS determine "Salus is the only contractor currently operating with a fully integrated mission management model" concerning "relocation missions," with experience that "translates directly to the demands of CSRO[.]"  AR 714.  Thus — in Salus's opinion — only Salus had the ability to perform the CSRO project in a timely manner, and therefore was the only "responsible perspective contractor" for the CSRO, pursuant to FAR Subpart 9.1 ("Responsible Prospective Contractors").  *See* AR 714; FAR 9.104-1(b) ("To be determined responsible, a prospective contractor must . . . [b]e able to comply with the required or proposed delivery or performance schedule . . . .").  DHS did not respond to Salus's white paper submission.

Based on the record before this Court, Salus's April 17, 2025, white paper submission appears to have been the last communication between Salus and DHS prior to the agency's abandoning any sort of sole source negotiation with Salus.

### 4.  DHS moves from a sole source to a competitive procurement.

DHS decided to move the CSRO project to a competitive procurement pursuant to FAR Part 6.[4]  As discussed above, "[a] favorable comprehensive evaluation of an unsolicited proposal does not, *in itself*, justify awarding a contract without providing for full and open competition."  FAR 15.607(a) (emphasis added).  A "contracting officer may [not] commence negotiations on a sole source basis" even after completing a favorable comprehensive evaluation of an unsolicited proposal, *until* the contracting officer *also* executes a justification and approval for the sole source, and complies with relevant synopsis requirements.  FAR 15.607(b).  On the other hand, the government must *return* an unsolicited proposal to the offeror — even after a favorable compressive evaluation — when the "substance" of the unsolicited proposal becomes "available to the Government without restriction from another source[.]"  FAR 15.607(a)(1).  Here, as noted above, DHS explained to Salus that — despite the favorable evaluation of its unsolicited proposal — DHS may not be able to contract with Salus directly.  AR 576.  Indeed, DHS appears to have *implicitly* decided that it could secure CSRO services "without restriction from another source," FAR 15.607(a)(1), and therefore abandoned a sole source negotiation with Salus.

---

[4] FAR Part 6 prescribes policies and procedures governing various types of competitive procurements, including "full and open competition in the acquisition process and . . . other than full and open competition[.]"  FAR 6.000 ("Scope of part").

On April 18, 2025, however, a DHS employee "inadvertently revealed an email sent from Salus [to DHS] titled RE: Draft SOO for [CSRO]," during a DHS Team meeting. AR 921. Specifically, the email revealed a conversation between two DHS employees and Salus discussing Salus's unsolicited proposal for CSRO support. *Id.* Accordingly, DHS's Office of General Counsel ("OGC") promptly opened an investigation into the information shared between DHS and Salus to evaluate it for potential organizational conflict of interests ("OCIs").[5]  *Id.*  The CO and OGC reviewed all communications between Salus and the two DHS employees. *Id.*

The CO and OGC identified several key events relevant to the OCI investigation: (1) "Salus named the requirement 'Comprehensive Support for Relocation Operations' in a February 25, 2025 meeting invitation, portions of which the Department subsequently adopted"; (2) "Department employees routinely engaged with Salus after receiving the unsolicited proposal from February through April 17, 2025, to discuss procurement requirements and status"; (3) "Department personnel emailed Salus with high-level task information (email dated April 4, 2025), to which Salus responded with support details and associated costs"; and (4) a "comparison of Salus's draft SOO and the Department's draft SOO dated April 11, 2025, shows similarities in multiple areas, including background, objectives, mission integration, regional engagement support, capacity building, travel and logistics, identity verification, medical care, data integration, aircraft support, and lodging services." AR 921.

Based on the foregoing, the CO and OGC determined DHS's handling of Salus's unsolicited proposal raised several *potential* OCIs, including biased ground rules, *see* FAR 9.505-2, and unequal access to information, *see* FAR 9.505-4.  AR 921-22.  The CO and OGC also determined that the communications between Salus and DHS created an appearance of impropriety.  AR 920.

### 5. President Trump establishes Project Homecoming and directs DHS to immediately ramp up voluntary return operations.

On May 9, 2025, President Trump issued a public proclamation, titled "Establishing Project Homecoming[,]" in which the President directed State and DHS to

---

[5] FAR Subpart 9.5 tasks Contracting Officers ("COs") with identifying whether a procurement — or an offeror participating in the procurement — suffers from any of three general types of OCIs: biased ground rules, unequal access to information, and impaired objectivity.  FAR 9.505-1 — 9.505-4.

"take all appropriate actions" and "create seamless processes" for illegal aliens to rapidly, *voluntarily*, depart the United States. Proclamation No. 10935, 90 Fed. Reg. 20357, 20357-58 (May 14, 2025). The proclamation further directed that "[n]o later than 60 days after the date of this proclamation, [DHS] shall . . . increase the enforcement and removal operations force [] by no less than 20,000 officers in order to conduct an intensive campaign to remove illegal aliens who have failed to depart voluntarily." 90 Fed. Reg. at 20358.

### 6.    Salus learns of DHS's decision to compete the CSRO project.

On May 13, 2025, Salus wrote OPCO, acknowledging that although "DHS [] completed a favorable comprehensive evaluation of [Salus's unsolicited proposal]. . . . it appears [] DHS has chosen to compete [the CSRO project]." AR 735. Salus cautioned "DHS that it 'shall not use any data, concept, idea, or other part of an unsolicited proposal as the basis, or part of the basis, for a solicitation or in negotiations with any other firm unless the offeror is notified of and agrees to the intended use.'" *Id.* (citing FAR 15.608(a)). Salus further emphasized that despite the changeover to a competitive procurement, Salus "look[s] forward to participating in the competition, and feel[s] confident in [its] approach[.]" AR 735. Finally, Salus reminded DHS that its unsolicited proposal — which had been resubmitted on February 18, 2025, *see supra* — remained valid for a period of 90 days, which was set to expire on May 19, 2025. AR 735.

### B.    The CSRO Solicitation: Initial Steps, the Request for Proposals, and Contract Award

#### 1.    DHS initiates the CSRO procurement process with an "industry meeting."

On May 13, 2025, DHS launched the CSRO services solicitation process, by conducting a CSRO services "industry meeting" with selected potential vendors. *See* AR 740. DHS anticipated "awarding a single award Indefinite Delivery Indefinite Quantity (IDIQ) contract based on *limited competition* to immediately launch Comprehensive Support to Removal Operations [] to remove record-high levels of illegal aliens from the United States."[6] AR 860 (emphasis added). The CSRO contract would have a one-year

---

[6] FAR Subpart 6.3 ("Other Than Full and Open Competition") governs "contracting without providing for full and open competition." FAR 6.300. FAR 6.302-2 ("Unusual and compelling urgency") permits less than full and open competition when an "agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously

base period and two one-year option periods "in case the urgent need for [the CSRO] services persist[ed] beyond a year." *Id.* The expected maximum value of the CSRO contract was set at $915,000,000.00. *See* AR 1038.

The CSRO contract would include six distinct tasks to assist DHS with both voluntary returns and involuntary removals:

> **Flight Coordination & Management:** Organize and manage chartered and commercial flights for illegal alien repatriations to countries of origin, ensuring flights are timely, safe and compliant with all international aviation and immigration regulations[;]
>
> **International Staging Areas:** Provide logistics and support for establishing and maintaining secure, functional, and humane staging facilities[;]
>
> **Facilities Management:** Develop, maintain, and operate secure staging areas where illegal aliens will be housed temporarily. This includes the provision of food, water, medical assistance, and emergency services as required[;]
>
> **Security Management:** Ensure that the staging facilities are secure, monitoring for potential threats, and maintaining a safe environment for all illegal aliens and staff[;]
>
> **Healthcare Provision:** Provide medical services at the staging facilities to ensure the health and safety of all illegal aliens, including the management of potential

---

injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals[.]" FAR 6.302-2(a). Here, DHS relied on FAR 6.302-2 for a limited competition. *See* AR 860, 933. As discussed *supra*, DHS decided it would compete the CSRO services contract *prior* to the President's May 9, 2025, proclamation. It is unclear from the record whether the agency's original plan was to conduct a full and open competition — in which case the President's May 9, 2025, proclamation *may have* been the catalyst for pivoting, and invoking the unusual and compelling urgency exception — or DHS planned on a limited competition *all along* given the President's January 20, 2025, declarations.

> health risks such as communicable diseases or medical
> emergencies[;]
>
> **Logistics and Administrative Support:** Provide logistics
> and administrative support to DHS Technical Assistance
> Teams (DTAT) deployed in host governments, DHS
> PLCY in support of operational outcomes.

AR 950-51 (emphasis added).

PLCY conducted the CSRO services "industry meeting," which included six vendors[7] identified during market research. *See* AR 740-56. As part of the meeting, PLCY provided a high-level overview of the CSRO project, as outlined *supra*, and reviewed the planned expedited timeline of the procurement, AR 740-56, as follows: DHS would send the vendors a draft Statement of Work ("SOW") and pricing schedule later that same day (*i.e.*, May 13, 2025); DHS would hold pre-solicitation conferences and one-on-one sessions with offerors on May 14, 2025; questions from offerors would be due later that same day at 4:30 PM EST; DHS would release the Request for Proposals ("RFP") on May 15, 2025; questions from offerors regarding the RFP (and any amendments to the RFP in response to those questions) would be due on May 15-16, 2025; proposals would be due on May 19, 2025; and DHS would make its award of the CSRO contract on May 22, 2025. AR 747.

### 2. DHS's Market Research Report ("MRR") explains why certain vendors were permitted to compete for the CSRO contract, while others were excluded.

On May 15, 2025, DHS finalized the CSRO MRR, explaining why DHS selected the six firms to participate in the CSRO industry meeting and to compete in the procurement.[8] The MRR explained that DHS identified "multiple firms that ha[d] the

---

[7] At least five firms were present at the industry meeting: [* * *], [* * *], [* * *], [* * *], and [* * *]. AR 913-14. Another firm, [* * *], also apparently attended the industry meeting, but subsequently notified DHS that it did not intend to submit a proposal for the CSRO procurement. AR 794.

[8] The record is somewhat lacking with respect to DHS's market research efforts. First, while the MRR notes that "market research [for the CSRO project] was conducted from February 2025" through March 2025, AR 906, there is no indication in the record that DHS performed *any* market research prior to DHS's deciding to move the CSRO to a competitive acquisition sometime in April 2025. In fact, there is no documentation in the record even tending to show that any market research was done at all, other than the actual MRR itself, executed on May 15, 2025. Second, the MRR explains that DHS "interviewed knowledgeable individuals [from] industry" including

capability and experience to perform **certain segments of the overall requested scope outlined** within the [SOW] but lack[ed] the experience to deliver the requested complete integrated solution within the SOW." AR 914 (emphasis in original). And, while "only one vendor was identified with the unique mix of experience and skills to address the complete requirement as prescribed in the SOW, DHS intend[ed] to compete the requirement among the vendors identified within this market research to further assess their capabilities."[9] *Id.*

The MRR compared relevant capabilities of three out of the six firms that were selected to participate in the CSRO-related industry meeting — [* * *], [* * *], and Salus.[10] *See* AR 910-13. With respect to [* * *]'s CSRO capabilities, DHS concluded: [* * *] "[d]emonstrated past experience coordinating [] charter international flights . . . [and] possesses experience conducting construction[.]" AR 910. Moreover, "[* * *] has experience . . . [in] commercial tickets and build out to operate staging facilities." *Id.* With respect to [* * *]'s CSRO capabilities, DHS concluded: (1) [* * *] is "[o]ne of the largest immigration Prime Contractor support services for housing[,]"and "provide[s] full wrap-around services (security, food service, medical service, logistics management: clothing, warehouse, asset tracking, laundry)"; (2) [* * *] has experience with air charter services; and (3) "[* * *] has significant experience developing temporary facilities for government use and need," and has "experience with domestic movement of unaccompanied children to shelter locations within HHS, which includes medical screens, medication, escorting as necessary, and final placement." AR 911-12.

As to *both* [* * *] and [* * *], DHS opined that they "[do] not have demonstrated experience with the significant coordination required for voluntary returns." AR 910, 912. Critically, DHS evaluated whether either [* * *] or [* * *] could be a more viable option for CSRO services were they able to team with experienced partners:

_____

individuals at the firms selected to participate in the May 13, 2025, CSRO industry meeting. AR 909. But the record contains no evidence documenting any pre-industry day meeting communications between DHS and potential offerors.

[9] While DHS does not name Salus as the vendor it believed could successfully carry out the full scope of the CSRO services, other portions of the MRR make clear that DHS was referring to Salus. *See* AR 912-15.

[10] The MRR *does not* discuss why [* * *], [* * *], or [* * *] were selected to participate in the CSRO industry meeting and CSRO procurement more generally. However, [* * *] ultimately submitted a proposal for the CSRO contract, *see* AR 1447, and thereafter DHS documented that it believed [* * *] could perform certain aspects of the CSRO contract, but not its entire scope of work, *see* AR 1708-10.

12

> It was considered whether [* * *] [or [* * *]] could be more viable as a prime contractor if it were able to team and/or subcontract with other vendors to fill the gaps within its experience and expertise. Considering the high complexity of this requirement and the need to immediately ramp up and be able to start performing the services within days of contract award, it is significantly riskier to award this contract to a contractor that does not have direct experience and expertise with the major aspects of the requirement and operating within a foreign environment. . . . ***To be viable, [* * *] [or [* * *]] would be required to setup teaming arrangements and subcontracts*** that could cause delays and increase the risk of not being able to perform the services as needed.

AR 910, 912 (emphasis added).

On the other hand, with respect to Salus's CSRO services capabilities, DHS concluded that "*Salus has significant experience facilitating the complex logistics for all facets of the governments scope.*" AR 913 (emphasis added) (describing Salus's past experience). The MRR provided significant support for the conclusion that Salus could successfully carry out the full scope of CSRO services. The MRR highlighted discussions between DHS and State's contracting officer for the Afghan CARE program,[11] given the similarity between the two contracts — in both scope and breadth — and given that Salus served as a subcontractor for portions of that program. *See* AR 914. Through those discussions, DHS learned that: (1) "*[c]apability in the market of people that say that they can do this [kind of work] is significantly broader than those that can actually do it*"; (2) "*companies either have this experience of operating in a denied or difficult area with significant risk [] due to project exposure in the press or locally, or they do not*"; (3) Contractor Performance Assessment Reporting System ("CPARS") ratings of Task Order No. 19AQMM23F0766 (CARE Logistics Support Services), "in which Salus performs as a subcontractor, have been Exceptional as a direct

---

[11] State's "Office of the Coordinator for Afghan Relocation Efforts (CARE) is the center for the U.S. government's interagency effort to relocate Afghan allies with whom we have an enduring commitment." *See https://www.state.gov/afghanistan-inquiries.* "CARE handles the planning and logistics of relocating eligible Afghans on flights or by ground transportation to overseas case processing sites" and "manages those case processing sites in third countries where the paperwork and related processing for eligible Afghans occurs. CARE works closely with a broad range of partners at home and abroad to advance this vital mission." *Id.*

result of Salus performing the missions"; and (4) despite Salus only serving as a subcontractor for CARE Logistics Support Services, Salus is effectively the "primary operator, to conduct all work in the movement of Afghans."  AR 914 (emphasis in original).  Accordingly, given Salus's involvement — and success — with the Afghan CARE program, DHS determined that it would "be in the best interest of the Government to select Salus as one of the potential offerors that are invited to respond to the [RFP]."  AR 915.

Finally, the MRR expressly ruled out United States Immigration and Customs Enforcement Air Operations ("ICE AIR") commercial vendors from participating in the CSRO procurement.  AR 915.  DHS concluded ICE AIR commercial vendors would be unable to successfully deliver the full scope of CSRO services "due to the distinct difference in scope and nature of the work being performed."  *Id.*  Specifically, DHS concluded that while ICE AIR vendors have "flight capability with limited capability to provide temporary staging solutions to meet the scope of the program. . . . [,] [t]he required experience for voluntary return coordination which require coordination with consulates/embassies for travel documents is not a required function of the contractor or prospective contractors of ICE Air."  *Id.*  In other words, DHS concluded that ICE AIR "centers around logistics movements for air operations *solely*."  *Id.*  (emphasis added). In reaching that conclusion, DHS explained that "ICE conducts all the detention capability domestically [and] therefore [it is] not scoped into [ICE AIR's] effort[.]"  *Id.* Additionally, "ICE AIR/Removals [] conducts all the coordination with foreign consulates/embassies to coordinate the receipt of travel documents to facilitate removal missions" *itself — not via its commercial vendors.  Id.*  Simply put, ICE AIR *vendors* are tasked with flight operations only; they are not involved in any of the coordination and staging aspects of successfully completing removal and/or return operations.

Accordingly, DHS determined that ICE Air vendors did "not have the experience either as Prime or subcontractors conducting [the] type of work" the CSRO contract contemplated.  AR 915.

### 3. Salus expresses interest in competing for the CSRO contract.

On May 13, 2025 — after the CSRO industry meeting concluded — Salus sent an email to the CO "reaffirm[ing]" Salus's "continued interest and capability to perform [the CSRO] requirement."  AR 760.  Salus referenced its unsolicited proposal as reason for Salus's confidence in its ability to perform the CSRO: "As the CSRO initiative *builds upon*

14

*the scope of an unsolicited proposal previously submitted by Salus Worldwide Solutions*, we remain confident in our ability to deliver responsive, mission-aligned solutions and are eager to participate in the forthcoming competitive process." *Id.* (emphasis added). Salus further explained that it "take[s] no issue with the procurement timeline as outlined during today's call and appreciate[s] the clarity and structure provided." *Id.* Salus appears to have been alluding to the anticipated CSRO services award date, May 22, 2025, three days after Salus's unsolicited proposal was set to expire. *See* AR 735.

### 4. DHS continues the solicitation process per the schedule outlined in the industry meeting.

In the afternoon of May 13, 2025, DHS sent a draft SOW and pricing schedule to the six vendors who participated in the industry meeting earlier that day. AR 766. DHS also forwarded the draft SOW and pricing schedule to a seventh firm, [* * *]. AR 792-93. In response to [* * *]'s inquiry into the content of the email, OPCO explained that it "received [[* * *]'s] contact information from the DHS Program Office regarding a requirement for DHS." AR 799-800. Precisely *why* DHS chose to include [* * *], as a substantive matter, is not explained in the administrative record.

On the morning of May 14, 2025, [* * *] notified DHS that it did not intend to submit a proposal for the CSRO procurement. AR 794. That same day, DHS held a presolicitation conference with the six firms that apparently intended to participate in the CSRO procurement. AR 798. Only three firms apparently submitted questions relating to the draft CSRO SOW and pricing schedule by the May 14, 2025, deadline: Salus, [* * *], and [* * *]. AR 805-07, 808-10, 811-12.[12]

On May 15, 2025, [* * *] emailed DHS requesting to take part in the CSRO procurement. AR 834.[13] [* * *] explained that, as a prime contractor for Afghan

---

[12] The CSRO procurement's Business Evaluation Report (executed by the CO on May 20, 2025) notes that *five* firms submitted questions relating to the draft CSRO services SOW and subsequent RFP.

[13] [* * *] acquired [* * *] in 2022. *See* [* * *]. While [* * *] requested to take part in the CSRO procurement (not [* * *]), the administrative record refers to [* * *] and [* * *] interchangeably. *Compare* AR 834 (email from [* * *] to DHS pertaining to CSRO procurement) *with* AR 1856 (explaining that [* * *] submitted questions to DHS relating to the draft CSRO services SOW and RFP).

CARE, [* * *] is "intimately familiar with procedures and requirements for support of removal operations." *Id.* DHS granted [* * *]'s request. AR 956.

> **5. DHS executes a Justification and Approval and a Determination and Findings to support both the use of limited competition and the inclusion of two one-year option periods.**

On May 15, 2025, the CO executed a Justification and Approval for Other Than Full and Open Competition (the "J&A") pursuant to FAR 6.303. AR 948-54. The CO explained the contours of the CSRO services procurement and the "unusual and compelling urgency" supporting the need for a limited competition pursuant to FAR 6.302-2. This Court quotes the J&A at length because this analysis is precisely what CSI challenges:

> To enable DHS to meet U.S. border security and immigration enforcement goals, DHS proposes to implement Comprehensive Support to Removal Operations (CSRO), a foreign assistance-funded program leveraging Department of State authorities that will increase DHS's domestic throughput for voluntary returns, building the capacity of foreign partners to assist the U.S. in removal operations, building the capacity of foreign partners to conduct their own removal operations, and enhancing the ability to identify and stop U.S. bound illegal migration long before illegal aliens reach U.S. borders. . . .
>
> On January 20, 2025, the President of the Unites States declared a national emergency at the Southern border of the U.S. to stop the illegal entry of aliens. Coupled with this emergency, there is an immediate need to address the significant cases of Voluntary Removals and provide immediate capability and capacity to partnering countries to curtail illegal immigration within their borders. Continued illegal entries at the Southern border not only poses significant threats to national security, but it also places an overwhelming burden on our law enforcement, border control agencies, and vital resources, to include increased burden on American

16

immigration facilities. Additionally, a delay in award inhibits the building a stronger, more coordinated partnerships with our neighbors and international allies. The CSRO enhances the capabilities of foreign governments to accept, process, and remove/return illegal aliens who have been apprehended in the United States.

By leveraging the CSRO, the United States can expedite the removal/return of individuals who have unlawfully entered the country, [and] work in close collaboration with governments in countries of origin to ensure that illegal aliens are returned in a manner that is both efficient and humane. This approach empowers foreign governments to take responsibility for their citizens, while also ensuring that the United States remains steadfast in its mission to safeguard its borders and uphold its immigration policies.

To reduce any delays to the rapid removals/returns of illegal aliens, a limited competition is needed. A limited competition preserves the intent of the Competition in Contracting Act while permitting the Government to quickly solicit and award a contract by using a reduced pool of vendors that are positioned, based on available resources and capabilities, to respond to this immediate need. . . .

If the J&A is not approved, it will directly inhibit the support and scale required to have a significant operational impact on US enforcement operations. It will delay return actions to illegal aliens seeking assistance through the CBP Home application, which will further burden resources internal to the United States. Separately, it will significantly delay the establishment of International Staging Areas to serve as reception areas for domestic removal flight further hampering the operational effectiveness of ICE Air and the U.S.

17

> government's approach to removal flights supporting
> final order cases.

AR 948-53.

Like the MRR, the J&A provided limited insight into why the six specific firms were chosen to compete for the CSRO. The J&A explained that "[g]iven the immediate need to significantly reduce the illegal immigration population within the United States, DHS identified five potential offerors [during its market research] that specialize in the services requested."[14] AR 952. DHS concluded that those five firms "possess[ed] the expertise, ha[d] established relationships domestically and internationally for charter flights and logistical support services, and [were] able to *immediately* support [the CSRO] requirement." AR 953 (emphasis added). The appropriate DHS executives approved the J&A as required. AR 954-55; *see* FAR 6.304 (describing the J&A process).

The CO also executed a Determination and Findings ("D&F") for the inclusion of option periods beyond the one-year base period, pursuant to FAR 6.302-2(d)(1)(ii).[15] AR 860-61. The CO began with noting that DHS was "launching [CSRO]" as "part of [DHS's] plan to comply with the President's [January 20, 2025,] declaration" concerning illegal immigration within the United States. AR 860-61. According to the CO, the CSRO project would "address [the] exceptional circumstances caused by illegal immigration" by "facilitate[ing] the removal of illegal immigrants within the United States." AR 860-61. The CO further cited "President Trump's May 9, 2025[,] Executive Order titled 'Establishing Project Homecoming,'" as an additional basis for the urgent need of CSRO services. AR 861. In justifying the inclusion of two one-year option periods, the CO explained:

> Due to shifts in illegal immigration patterns, locations,
> and populations, the contract requires two (2) one-year

---

[14] As discussed above, DHS initially identified *six* firms as potential offerors, and subsequently invited them to the CSRO services industry meeting. [* * *] dropped out of the CSRO procurement, however. AR 794. DHS appears to have left [* * *] out of its count.

[15] FAR 6.302-2(d)(1)(ii) provides that when utilizing the urgent and compelling urgency exception to full and open competition, *see generally* FAR 6.302-2, the period of performance "[m]ay not exceed one year, including all options, unless the head of the agency determines that exceptional circumstances apply." FAR 6.302-2(d)(1)(ii). Moreover, should the head of the agency determine "exceptional circumstances" require performance to exceed one year, "[that] determination *must be* documented in the contract file." *Id.* (emphasis added).

18

> option periods to immediately stop newly identified sources of illegal immigrations and ramp up operations. The option periods permit the continuous operation of deportation services which will continue to address the exceptional circumstances that drove the national emergency declaration.

AR 861. The CO further explained that the two one-year option periods were included "*in case* the urgent need for [CSRO] services persist[ed] beyond a year." (emphasis added). AR 860. The D&F provided no further justification for the inclusion of option periods in the CSRO services contract. The CO concluded with noting that "[a] separate determination and findings [would] be prepared prior to the exercise of each option under this contract."[16] AR 861.

### 6.   DHS issues the RFP for CSRO support services.

On May 15, 2025, DHS distributed RFP No. 70RDA225R0000008 (the "RFP" or "Solicitation") to seven potential offerors: (1) [* * *]; (2) [* * *]; (3) [* * *]; (4) [* * *]; (5) Salus; (6) [* * *]; and (7) [* * *]. AR 956-57. As initially contemplated, the RFP was for a single award IDIQ contract for CSRO Support Services. AR 959. The CSRO contract would

---

[16] The CO may have misinterpreted the relevant FAR provisions. As discussed *supra*, when an agency relies on the urgent and compelling urgency exception to full and open competition, the period of performance *generally* "[m]ay not exceed one year, including all options, unless the head of the agency determines that exceptional circumstances apply," *and* "[that] determination [is] documented in the contract file." FAR 6.302-2(d)(1)(ii). Separately, FAR 6.302-2(d)(2)(i) provides that "[a]ny *subsequent modification* using [the urgent and compelling] authority, which will extend the period of performance beyond one year . . . requires a separate determination." FAR 6.302-2(d)(2)(i) (emphasis added). However, the latter subsection expressly provides that "[t]his [documentation] requirement does not apply to the exercise of options previously addressed in the determination required at paragraph (d)(1)(ii) of this section." FAR 6.302-2(d)(2)(i). Simply put, should a contracting officer determine — at the time of the initial, limited competition — that performance beyond one year is necessary and accordingly include options to extend the contract past the one year mark, the determination for those options must be fully documented contemporaneously pursuant to FAR 6.302-2(d)(1)(ii), and *not* later (*i.e.*, at the time of the exercise of those options). Here, the CO appears to have included only a minimal justification for the two CSRO option periods beyond the one-year base period, and justified that limited explanation by noting that a separate D&F would be issued should DHS eventually decide to exercise either of the two one-year option periods. CSI does not identify this possible error, however; and, in any event, this Court would not reach it given its conclusions *infra* regarding "interested party" and prejudice (*i.e.*, standing).

19

include a one-year base period and two one-year option periods, with an estimated maximum value of $915,000,000.00.  AR 959, 962.  In describing DHS's urgent need for the CSRO services, the RFP — like the D&F — expressly referenced both the President's January 20, 2025, declarations and the President's May 9, 2025, proclamation.  AR 963. The RFP explained that proposals would be evaluated using the following three criteria: (1) Technical Approach; (2) Prior Corporate Experience; and (3) Price.  AR 1022-23.[17] Proposals were due by 10:00 AM EST on Monday, May 19, 2025.  AR 956.

While the RFP permitted offerors to propose the use of subcontractors, via Contractor Team Arrangements ("CTAs"), to perform the full scope of the CSRO contract, the RFP set forth specific, detailed conditions for offerors contemplating CTAs.[18]  AR 1020-21.  To propose using a CTA, an offeror in its proposal had to:

> **(1)** "submit a complete copy of the CTA agreement that established the CTA relationship, disclosing the legal identity of each team member . . . the relationship between the team members, the form of ownership of each team member . . . and a specific statement of what resources each team member provides the CTA";
>
> **(2)** "identify the entities which make up the [CTA relationship] including disclosure of the primary point of contact for each member of the team";
>
> **(3)** "[d]isclose whether or not the [CTA agreement] designates a particular entity as the 'Team Lead', and if

---

[17] DHS subsequently issued two amendments to the RFP on May 17, 2025, Amendment 0001, *see* AR 1035, and Amendment 0002, *see* AR 1118.

[18] *See* FAR 9.601 (defining "Contractor team arrangement" as "an arrangement in which (1) [t]wo or more companies form a partnership or joint venture to act as a potential prime contractor; or (2) [a] potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program"); *see also Noblis MSD,* 2026 WL 851951, at *22, *24 (discussing "four solicitation permutations" regarding how "agencies [] structure their solicitation vis-à-vis subcontractors and affiliates[,]" including where an agency "permit[s] the use of subcontractors or affiliates . . . , but require[s] proof that the offeror has actually entered into agreements with its proposed subcontractors or a demonstration of how the affiliate will be used").  "When an agency requires documented teaming agreements, it is seeking assurance that the proposed arrangement is more than aspirational — that the offeror has secured commitments from its teammates and that the proposed relationships are genuine and enforceable." *Id.* at *24.

so, . . . clearly explain the specific duties and responsibilities of the 'Team Lead' to the other members of the team and to the Government";

**(4)** "[d]escribe the specific duties and responsibilities of each [CTA team member] as they relate to each other and explain the specific duties and responsibilities that each team member will have for purposes of contract performance under the IDIQ contract and meeting all contractual requirements";

**(5)** "[a]ddress the circumstances and procedures for replacement of any team member, including the 'Team Lead', and whether or not the approval of the Government is required prior to replacing any team members"; and

**(6)** "[a]ddress the duration of the [CTA relationship] including when it became effective, when it expires, and the basis for termination."

AR 1020-21.

### 7. CSI requests the opportunity to submit a proposal for the CSRO procurement.

In the evening of Saturday, May 17, 2025, CSI wrote DHS, explaining its understanding that DHS "ha[s] an urgent need for charter airlift operations under 481211 for Comprehensive Support to Removal Operations." AR 1117. CSI highlighted how it is "the Prime Contractor for all ICE Air Operations flights," and that CSI therefore believed it is "well-positioned to support [DHS's] new program quickly." *Id.* CSI touted its flight capabilities, including aircraft size and its reliable flight schedules. *Id.* CSI further emphasized that it maintains "a 24/7 CSI operational control center supporting ICE air operations globally." *Id.* CSI requested a copy of the CSRO services RFP, and inquired about the procurement timeline. *Id.* While there were many other facets of the CSRO SOW — *e.g.*, establishing/maintaining staging facilities, providing commercial ticketing for voluntary returnees, providing support for DHS staff engaging with host governments — CSI did not mention them.

21

### 8.  DHS waives any potential OCIs for Salus.

On May 18, 2025, the CO executed an OCI waiver request ("OCI Waiver") for potential OCIs identified with respect Salus, *see* AR 920-22, apparently out of an abundance of caution, due to its unsolicited proposal and subsequent communications with DHS.  Indeed, the CO's OCI Waier explained that "[i]n light of the fact that Salus submitted an 'unsolicited proposal' the communications with [Salus] were not irregular or improper."  AR 922.  Moreover, "based on communications with Program Officials, [the CO believed] there [did] not appear to be any attempt to intentionally subvert federal procurement rules."  *Id.*  The CO thus determined that "the communications with [Salus] were simply the result of well-meaning conversations with a vendor concerning their 'unsolicited proposal' and not an attempt to undermine the federal procurement rules."  AR 923.  The CO further explained that DHS took steps "to ensure, to the maximum extent possible, a fair process during this competitive procurement."  AR 923.  In that regard, any appearance of an OCI would be neutralized "or at worse significantly mitigated by actions taken by the Government during th[e] competitive procurement."  AR 923.  The OCI Waiver enumerated specific steps DHS had taken to mitigate or neutralize the appearance of Salus's OCI, assuming one existed, with respect to the CSRO procurement.  *See* AR 922-23.

Later that same day, DHS's Head of Contracting Activity ("HCA") approved the OCI Waiver.  AR 924.  In so doing, the HCA first acknowledged "the appearance of potential 'biased ground rules' and 'unequal access to information' OCI's, . . . the appearance of potential impropriety concerns[,]" and the "potential appearance of impropriety that may be perceived in this acquisition, even if a thorough examination were to ultimately determine that no actual conflicts occurred or that any informational advantages were immaterial."  *Id.*  The HCA determined, however, that "[t]he mission-critical nature of [the CSRO] procurement for removal operations and the urgent need to deploy these capabilities to support national security and immigration enforcement objectives necessitate [the OCI Waiver]."  *Id.*  The HCA concluded that "[t]he measures and remedial actions taken represent, under the circumstances, common sense, good judgement, and sound discretion to resolve the appearance of an OCI while balancing the immediate urgency and national security implications associated with this urgent procurement based on recent Presidential Executive Orders."  *Id.*  In sum, the HCA determined that "applying the OCI restrictions in [the CSRO] procurement would not be in the Government's best interest."  *Id.*

22

### 9.  DHS ultimately awards the contract to Salus.

Four firms submitted timely proposals in response to the CSRO RFP:  Salus, [* * *], [* * *], and [* * *].  AR 1129 ([* * *]'s proposal), AR 1334 (Salus's proposal), AR 1447 ([* * *]'s proposal), AR 1555 ([* * *]'s proposal).

With respect to the Technical Approach factor (Factor I), Salus received a "high confidence" rating, while the other three firms received either "low" or "some confidence" ratings.  AR 1716-17.  For the Prior Corporate Experience factor (Factor II), all four firms received a "some confidence" rating.  AR 1717-18.  Salus submitted the lowest overall total evaluated price, at $1,409,688.00.  AR 1879.

Concerning DHS's bottom-line assessment of [* * *]'s capabilities to deliver on the full scope of CSRO services, the CSRO Technical Consensus Evaluation Report ("TCER") essentially echoed DHS's concerns with [* * *] already expressed in the MRR:  DHS did not believe [* * *] could successfully deliver on the full scope of the CSRO.  *Compare* AR 1712-14 (TCER analysis of [* * *]'s CSRO capabilities) *with* AR 910 (MRR analysis of [* * *]'s CSRO capabilities).  The TCER expressed similar concerns with [* * *] and [* * *].  *See generally* AR 1708-10 ([* * *]); AR 1714-16 ([* * *]).  As to Salus, however, the TCER concluded that DHS "ha[d] high confidence that Salus will be successful in performing the requirements of the [CSRO] contract."  AR 1711.

On May 20, 2025, DHS finalized its decision to award Salus the CSRO support services contract.[19]  *See* AR 1887, 1954.  DHS, in its Award Decision Memorandum, succinctly explained its rationale: "comparing each of the four proposals under each factor, Salus is the only offeror rated High Confidence in Factor I and is found to be technically superior to the other offerors. Salus also proposed the lowest overall total evaluated price."  AR 1885.  DHS thus determined "that Salus's proposal offers the best value to the Government over the others."  *Id.*  Pursuant to the executed CSRO contract, AR 1887-98, Salus's performance on the base year began that same day; the base year concludes this month: on May 19, 2026.  *See* AR 1888.

---

[19] DHS initially anticipated not awarding the CSRO contract until May 22, 2025, *see* AR 747; the record does not indicate why the award date was moved up to May 20, 2025.

### C. CSI's Protest to the Government Accountability Office ("GAO")

#### 1. CSI files a pre-award bid protest.

At approximately 9:00AM EST on Monday May 19, 2025, the date the CSRO proposals were due, CSI filed a pre-award bid protest with the GAO, challenging the CSRO Solicitation.  AR 2053.[20]

CSI asserted that: (1) DHS failed to properly publish the CSRO solicitation and synopsis; (2) DHS failed to provide a reasonable opportunity to respond to the solicitation; (3) DHS was required to set aside the CSRO requirement for small businesses; and (4) the CSRO procurement does not have an approved Flight Program Standards for Commercial Air Service, contrary to the requirements of 41 C.F.R. §§ 102-33.  AR 2056-68. CSI requested an automatic stay of the procurement triggered by the Competition in Contracting Act ("CICA"), AR 2066, which DHS implemented.  *See* AR 2066-67.

#### 2. DHS overrides the CICA stay.

On May 20, 2025, in a letter to GAO, DHS's HCA "determined that based on urgent and compelling circumstances that significantly affect the interests of the United States, the Government [would] not permit waiting for a decision of the Comptroller General[,] and [] authorized the [CO] to proceed with the award [for CSRO services]."  AR 2288.

Although this Court has jurisdiction to decide challenges to CICA stay override decisions, *see RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1291 (Fed. Cir. 1999) ("[T]he Court of Federal Claims has jurisdiction to entertain an action based on an objection to a violation [of the statute which grants an agency limited CICA override power]."), CSI did not file such a suit here.  Accordingly, DHS and Salus commenced performance.  AR 1888.

#### 3. CSI withdraws its GAO protest.

On July 17, 2025, GAO wrote DHS and CSI, indicating that it intended to conduct outcome-predictive alternative dispute resolution ("ADR") to help resolve CSI's bid

---

[20] The CO reviewed CSI's email from Saturday evening May 17, 2025, only "minutes before receiving notification of [CSI's GAO] protest."  AR 2300.  Therefore, the CO did not have a fair opportunity to consider and respond to CSI's email.  *Id.*

protest. AR 2963. On July 21, 2025, GAO conducted outcome-predictive ADR with DHS and CSI. *See* AR 2968. According to CSI, during the ADR, GAO "advised the parties . . . that it expected to deny CSI's protest and asked CSI to withdraw its protest." ECF No. 1 ("Compl.") ¶ 30.

On August 4, 2025, in light of the outcome prediction, CSI notified GAO of CSI's intent to withdraw its protest. AR 2970. On August 6, 2025, GAO emailed the parties, confirming CSI's protest had been withdrawn. AR 2972

### D. CSI's Complaint in This Court

On August 11, 2025, CSI filed its bid protest in this Court, challenging the legality of DHS's CSRO Solicitation. Compl.

CSI claims that it was wrongfully precluded from competing for the CSRO contract. According to CSI, "[h]ad [DHS] properly conducted a full and open competition, CSI would have competed for the Solicitation and there would have been a substantially different pool of eligible offerors." Compl. ¶ 55. Specifically, CSI alleges, among other things, that: (1) DHS's "decision to limit competition [pursuant to] FAR 6.302-2 for alleged unusual and compelling urgency is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law because there is no unusual and compelling urgency" (Count I); (2) "[b]y failing to solicit an offer from CSI after CSI expressed an interest in competing in the procurement, DHS committed a clear violation of FAR 6.302-2(c)(2) by failing to solicit offers from as many sources as was practicable" (Count II); [21] and (3) "[e]ven if [DHS] properly and reasonably articulated a basis for invoking FAR 6.302-2, which it did not, [DHS] completely disregarded the requirement to limit the total period of performance" to a period not to exceed one year pursuant to FAR 6.302-2(d)(1)(ii) (Count III). Compl. ¶¶ 33, 65, 68. CSI did *not* challenge the CSRO procurement on the grounds that DHS treated CSI unfairly or disparately as compared to the other offerors that were permitted to participate in the procurement.

As discussed *supra*, the challenged RFP — and the contract ultimately awarded to Salus — covered a one-year base period and two one-year option periods. *See* AR 962, 1887-98.[22] The one-year base period began on May 20, 2025. AR 1888. CSI's complaint

---

[21] When an agency invokes the unusual and compelling urgency provision to limit competition, *see* FAR 6.302-2**,** the agency must "request offers from as many potential sources as is practicable under the circumstances." FAR 6.302-2(c)(2).

[22]  Count III is essentially a challenge to DHS's having included the two one-year option periods.

— in the prayer for relief — requests that this Court enjoin the performance on the base-period and, "at minimum," enjoin "performance of the contract beyond the one-year mark after performance began[.]"  Compl. at 28.  CSI did not seek a preliminary injunction, nor did the government agree to a voluntary stay of performance.

On September 9, 2025, CSI filed its motion for judgment on the administrative record ("MJAR").  ECF No. 26 ("Pl. MJAR").  The government and Salus filed timely cross-MJARs.  ECF No. 33 ("Def. MJAR"), ECF No. 32 ("Salus MJAR").  Salus's MJAR also includes a motion to dismiss pursuant to RCFC Rule 12(b)(6), arguing that CSI lacks "interested party" status and standing pursuant to 28 U.S.C. § 1491(b).  Salus MJAR at 21-25.  In that regard, Salus argues that "CSI's complaint is devoid of any representation that it is capable of performing the full CSRO scope of work."  *Id.* at 22.  Instead, according to Salus, CSI's complaint "[a]t most [] makes vague allegations that it is a 'longtime provider of air charter services,' has performed 'similar ICE Air Operations' to the U.S. Government, that it is 'a current ICE prime contractor,' and that it has 'significant experience in this field.'"  *Id.* (citations omitted).  Salus thus argues that "CSI fails to address the key standing question: does it have the 'capability and experience to . . . deliver the requested completed integrated solution within the SOW' and do so in a timeframe that meets [DHS's] urgent needs."  *Id.* at 24. (quoting AR 914).[23]  While the government also challenges CSI's "interested party" status, *see* Def. MJAR at 19-23, the government does not specify whether it is seeking dismissal pursuant to RCFC 12(b)(1), RCFC 12(b)(6), or a ruling on merits prejudice.  *See also* ECF No. 38 at 5-9.

All parties filed timely reply briefs.  ECF No. 36 ("CSI Rep."), ECF No. 38 ("Def. Rep."), ECF No. 39 ("Salus Rep.").

On February 5, 2026, this Court held oral argument on the parties' cross-MJARs and Salus's motion to dismiss.  ECF No. 50 ("Tr.").

During oral argument, the government indicated that DHS might not exercise the CSRO contract option years and, in that case, would compete them in a new procurement. Tr. 77:20-24.  Indeed, counsel of record for the United States informed this Court that DHS intended to imminently issue a presolicitation notice for a CSRO replacement contract that would be solicited via full and open competition.  Tr. 111:12-14.  This development yielded the possibility that this entire case would be moot.  That was particularly true

---

[23] CSI had 21 days to amend its  complaint *as a matter of right* following Salus's motion to dismiss, *see* RCFC 15(a)(1)(B).  CSI did not do so.

because CSI now seeks injunctive relief only with regard to the option years, and abandons its request for this Court to enjoin the performance of the base period Salus is currently preforming.  Tr. 67:12-21.

Accordingly, immediately after oral argument, this Court determined that there was a path to moot the pending case and motions.  ECF No. 48.  That is, in light of CSI's now-narrowed request for injunctive relief in conjunction with DHS's purported imminent plan to release a presolicitation notice for a replacement CSRO contract, an ironclad commitment from DHS to proceed with such a procurement would likely have rendered the protest moot.  This Court thus directed the parties "to meet-and-confer regarding whether and how DHS may intend to moot the pending motions[.]"  *Id.* at 2.  The parties were directed to "file a joint status report ["JSR"], indicating whether the parties were able to reach an agreement . . . rendering moot CSI's request for injunctive relief."  *Id.* at 3.  This Court provided the parties with 14 days to meet-and-confer; the JSR was due on or before February 19, 2026.  *Id.* at 2-3.

Consistent with this Court's order, ECF No. 48, the parties filed a JSR on February 19, 2026.  ECF No. 51.  DHS concluded that it "cannot commit to foregoing exercise of the option years on the contract."  *Id.* at 1.  In that regard, the JSR noted that on February 5, 2026 (*i.e.*, the day this Court held oral argument on the parties' motions), DHS issued a presolicitation notice for a replacement CSRO contract that would cover the option periods in the CSRO contract awarded to Salus.  ECF No. 51 at 1.  However, "DHS ultimately retracted the notice by the next day and has not committed to further action with respect to a replacement contract."  *Id.* at 1-2.  The JSR explained that the government informed CSI of its final decision the day prior (*i.e.*, February 18, 2026).  *Id.* at 2.

On February 23, 2026, CSI, *for the first time*, filed a motion to leave to amend its complaint pursuant to RCFC 15(a)(2).[24]  ECF No. 52.  Specifically, CSI "seeks leave to amend its Complaint to add factual allegations that have already been presented to the Court, have already been fully addressed in the parties' briefing, and that would not alter either CSI's protest allegations and arguments relating to DHS's procurement here or Defendants' responses to those challenges."  *Id.* at 2.  The point of the proposed amendment is to cure any standing defect in CSI's complaint.  CSI argues that this Court

---

[24] Aside from a party's limited opportunities to amend its pleadings as a matter of course, *see* RCFC 15(a)(1), "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."  RCFC 15(a)(2).

can grant CSI's motion "without [the need for] any [subsequent] additional briefing" on the merits of its protest claims. ECF No. 52 at 5.

The government opposes CSI's motion for leave to file an amended complaint. ECF No. 54. The government argues CSI's motion to amend should be denied, ECF No. 52, because CSI cannot meet its burden to demonstrate that "justice . . . requires" the amendment, *see* RCRC 15(a)(2). ECF No. 54 at 3. The government further argues that: (1) CSI's amendments would be futile "because even if the standing allegations CSI seeks to include would cure the *pleading* deficiency, they do not cure the prejudice problem on the merits"; and (2) "CSI's decision to file a motion seeking leave to amend now, despite having all the relevant information needed to include these allegations in the original complaint . . . [constitutes] undue delay that has imposed burdens upon both the Court and the United States." *Id.* at 3-4 (emphasis in original).

Salus similarly argues this Court should deny CSI's motion to amend its complaint. ECF No. 56. Salus emphasizes CSI's many earlier opportunities to have amended its complaint — either as a matter of right or via motion. *See* ECF No. 56 at 4-5. Accordingly, argues Salus, CSI's motion would impose undue delay on the parties and this Court. *Id.* at 2-6. Moreover, Salus contends that CSI's amendments would be futile at this stage in the litigation, because they would not cure CSI's failure to prove prejudice *on the merits. See id.* at 6-8.

On March 13, 2025, CSI filed its reply brief in support of its motion to amend the complaint, ECF No. 58.

## II.    JURISDICTION AND STANDING

This Court has an independent duty to verify both that it possesses subject matter jurisdiction and that the plaintiff has constitutional standing, regardless of whether the parties raise those questions. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen v. Wright*, 468 U. S. 737, 750 (1984))). In addressing CSI's claims here pursuant to 28 U.S.C. § 1491(b), a critical "distinction is [the one] required between the question of whether a court has subject matter jurisdiction as defined by Congress and the question of whether a plaintiff has failed to state a claim or lacks standing to invoke that jurisdiction." *Rhone Poulenc, Inc. v. United States*, 880 F.2d

28

401, 402 (Fed. Cir. 1989).  As discussed *infra*, this is the fundamental distinction between a court's competence to hear a particular type of case and a specific plaintiff's ability to bring it.

### A. Subject Matter Jurisdiction

This Court's "jurisdiction is generally defined by the Tucker Act," 28 U.S.C. § 1491. *Bibbs v. United States*, 230 F.3d 1378 (Fed. Cir. 2000).[25]  Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat. 3870, this Court has exclusive jurisdiction[26] over — amongst other types of claims — actions challenging an agency's procurement process or decision, colloquially referred to as bid protests.[27]  *See* 28 U.S.C. § 1491(b).  This Court's bid protest jurisdiction "covers a broad range of potential disputes arising during the course of the procurement process." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012).  In particular, the Tucker Act expressly waives sovereign immunity for challenges to federal procurements and vests this Court with:

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute

---

[25] *See also RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009) (noting that, generally, "[t]he jurisdiction of the Court of Federal Claims is defined by the Tucker Act, which gives the court authority to render judgment on certain monetary claims against the United States" (citing 28 U.S.C. § 1491)).

[26] While the Federal Circuit wrote that "federal district courts have jurisdiction to review bid protests under the [APA]," *SEKRI, Inc. v. United States*, 34 F.4th 1063, 1071 n.7 (Fed. Cir. 2022), such jurisdiction has been sunset by statute (at least for those actions filed by an "interested party"), *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The jurisdiction of the district courts subsequently terminated on January 1, 2001, pursuant to a sunset provision in the ADRA." (citing Pub.L. No. 104–320, § 12(d), 110 Stat. at 3876)).

[27] *See Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 n.18 (2021) (explaining that "Section 1491(b) actions are typically referred to as 'bid protests'"); *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 96 (2020).  Procurements, however, may solicit bids, proposals, or quotations.  *See* FAR 2.101 ("Offer means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids'; responses to requests for proposals (negotiation) are offers called 'proposals'; however, responses to requests for quotations (simplified acquisition) are 'quotations', not offers.").

or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).[28]  For the latter type of protest — involving an alleged "statutory or regulation violation" — the Federal Circuit has held that "[a]ny 'nonfrivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish [subject matter] jurisdiction.'" *LAX Elecs., Inc. v. United States*, 835 F. App'x 553, 557 (Fed. Cir. 2020) (quoting *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008)).

Accordingly, for subject matter jurisdiction at least with respect to an alleged "statutory or regulation violation," *LAX Elecs., Inc.*, 835 F. App'x at 557, this Court asks only whether a plaintiff's complaint contains non-conclusory *factual* allegations that, if true, constitute a Tucker Act bid protest claim.[29]  In this case, CSI's central claim that DHS's CSRO procurement violated CICA and FAR 6.302-2, Compl. ¶¶ 4, 33, 54, 68, is squarely within this Court's subject matter jurisdiction.

The standing question, however, as it relates to both Constitutional and statutory standing, is more complicated — both for bid protests, generally, and for CSI's case here in particular.

## B.  Constitutional Standing

Article III (§ 2, cl. 1) of the Constitution limits the exercise of the judicial power to "Cases" and "Controversies." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017).  "This fundamental limitation preserves the 'tripartite structure' of our Federal Government, prevents the Federal Judiciary from 'intrud[ing] upon the powers given to the other branches,' and 'confines the federal courts to a properly judicial role.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–338 (2016)); *see Salazar v. Buono*, 559 U.S.

---

[28] The Federal Circuit has recognized that "the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests" pursuant 28 U.S.C. § 1491(b). *Sys. Application & Techs.*, 691 F.3d at 1380; *see also ECC Int'l Constructors, LLC v. Sec'y of Army*, 79 F.4th 1364, 1378 n.12 (Fed. Cir. 2023).

[29] A complaint "raises a question within the court's subject matter jurisdiction as long as the asserted basis of jurisdiction is not pretextual, *i.e.*, as long as the jurisdictional ground asserted in the complaint," *Lewis v. United States*, 70 F.3d 597, 603 (Fed. Cir. 1995), does not "appear[ ] to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

700, 734 (2010) (Scalia, J., concurring) ("Article III's case-or-controversy requirement is not merely a prerequisite to relief, but a restraint on judicial power."). The Supreme Court has developed "specific but overlapping doctrines rooted in the same [case-or-controversy] Article III inquiry, which must be met for a controversy to be justiciable, ***including standing***, ripeness, and a lack of mootness." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008) (emphasis added); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does.").

Although Article III's requirements are jurisdictional in a broad sense, they are more accurately characterized as prerequisites to subject matter jurisdiction. *See, e.g., Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020) (discussing "Article III's jurisdictional prerequisites," including standing); *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) "([S]tanding is a prerequisite to a federal court's subject matter jurisdiction[.]"); *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) ("Article III standing is a prerequisite to a federal court's exercise of subject-matter jurisdiction." (citation omitted)); *Rivera v. Internal Revenue Serv.*, 708 F. App'x 508, 513 (10th Cir. 2017) ("Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction that we must address, *sua sponte* if necessary, when the record reveals a colorable standing issue." (citation omitted)); *California Valley Miwok Tribe v. Salazar*, 281 F.R.D. 43, 46 (D.D.C. 2012) ("[A] party's Article III standing is a prerequisite to subject matter jurisdiction."); *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *10 (S.D.N.Y. June 2, 2020) (concluding that "Article III standing is a necessary, non-waiveable prerequisite to subject matter jurisdiction" such that "[i]n the absence of standing, it is irrelevant that the Court generally has federal question jurisdiction").

The Federal Circuit has implicitly recognized this fundamental distinction between Article III prerequisites and other jurisdictional considerations: "*Assuming the presence of a constitutionally required case or controversy*, federal court jurisdiction comes in many shapes and sizes . . . . There are significant distinctions, for example, between subject matter jurisdiction, in personam jurisdiction, in rem jurisdiction, geographic jurisdiction, diversity jurisdiction, and pendent jurisdiction." *Rhone Poulenc,* 880 F.2d at 402 (emphasis added).

31

"To establish a case or controversy, a party invoking federal jurisdiction must meet the 'irreducible constitutional minimum of standing.'" *Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics, LLC*, 85 F.4th 1377, 1380 (Fed. Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, (1992)). In general, the Article III standing inquiry asks whether the plaintiff has "demonstrate[d] a concrete and particularized injury caused by the defendant[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Specifically, "a plaintiff must show (i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan*, 504 U.S. at 560-61).[30] "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

In contrast to other Article III standing requirements, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).[31] To establish injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Standing is evaluated not only at the inception of litigation, but throughout the entire dispute. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S.Ct. 792, 796 (2021) ("At all stages of litigation, a plaintiff must maintain a personal interest in the dispute.").

Because the concepts of standing and subject matter jurisdiction share some characteristics, and one (*i.e.*, standing) is considered a prerequisite to the other (*i.e.*, subject matter jurisdiction), they are often at risk of conflation. But as courts across the nation have recognized, parties and courts should not "conflate[] separate and distinct concepts: standing and subject matter jurisdiction." *Wendland v. Gutierrez*, 580 F. Supp. 2d 151, 153 n.2 (D.D.C. 2008) (rejecting argument that "the court has subject matter jurisdiction because [plaintiff] satisfies the requirements for standing"); *see also Nat'l*

---

[30] *See also BASF Corp. v. Ingevity S.C., LLC*, 2023 WL 4115908, at *3 (Fed. Cir. June 22, 2023) ("To establish Article III standing, [a plaintiff] must show:  (1) it 'suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" (quoting *Spokeo*, 578 U.S. at 338, *as revised* (May 24, 2016))).

[31] "It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997), *quoted in Spokeo*, 578 U.S. at 339.

*Health Plan Corp. v. Teamsters Loc. 469*, 585 F. App'x 832, 834 n.2 (3d Cir. 2014) ("The question of whether the district court had subject-matter jurisdiction is, however, distinct from the question of whether [a plaintiff] ha[s] 'standing to invoke the authority of a federal court.'" (quoting *DaimlerChrysler,* 547 U.S. at 342)).[32]

Reasserting the difference between the two is therefore an important task of courts seeking to ameliorate the confusion.  The United States Court of Appeals for the Second Circuit succinctly explained the distinction:

> [S]tanding and *subject matter* jurisdiction are separate questions.  While standing, which is an issue of justiciability, addresses the question whether a federal court may grant relief to a party in the *plaintiff's* position, subject matter jurisdiction addresses the question whether a federal court may grant relief to *any* plaintiff given the claim asserted.  Thus, although both subject matter jurisdiction and standing (as well as other questions of justiciability) act to limit the power of federal courts to entertain claims, that is, act to limit the courts' "jurisdiction" in the broadest sense of the term, the two must be treated distinctly.

*Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 n.2 (2d Cir. 1993) (internal citations omitted) (citing *Baker v. Carr,* 369 U.S. 186, 198–208 (1962), and *Flast v. Cohen,* 392 U.S. 83, 98–99  (1968)); *Impress Communications v. Unumprovident Corp.*, 335 F.

---

[32] In contrast to standing, subject matter jurisdiction "refers to the class of cases that the court is authorized to hear."  *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1052 (Fed. Cir. 2012) (citing *Rhone Poulenc*, 880 F.2d at 402–03)); *see also Palmer v. United States*, 38 Fed. Cl. 316, 320 (1997) ("Subject matter jurisdiction relates to the area of substantive law that Congress has empowered the court to adjudicate."), *aff'd*, 168 F.3d 1310 (Fed. Cir. 1999); *CYR Const. Co. v. United States*, 27 Fed. Cl. 153, 161 (1992) ("Subject matter jurisdiction relates to the court's general powers to adjudicate in specific areas of substantive law.").  Supreme Court decisions support this formulation.  *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("Subject matter jurisdiction defines the court's authority to hear a given type of case[.]" (quoting *United States v. Morton,* 467 U.S. 822, 828 (1984)); *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 316 (2006) ("Subject-matter jurisdiction . . . concerns a court's competence to adjudicate a particular category of cases[.]"); *Henderson v. United States*, 517 U.S. 654, 671 & n.19 (1996) (explaining that the "court's jurisdiction to adjudicate a controversy of a particular kind" is known as "subject-matter jurisdiction").

Supp. 2d 1053, 1057 (C.D. Cal. 2003) ("While the issue of standing is distinct from that of subject matter jurisdiction, standing also poses a critical jurisdictional limitation.").

The United States Court of Federal Claims, "though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III." *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)).  The Federal Circuit has expressly applied Article III justiciability requirements to Tucker Act claims.  *Glass v. United States*, 258 F.3d 1349, 1355 (Fed. Cir. 2001).  That makes sense as the Court of Federal Claims is empowered to enter final judgments on any "claim, suit, or demand against the United States arising out of the matters involved in the *case or controversy*."  28 U.S.C. § 2519 (emphasis added).  That statute clearly tracks the Article III "case-or-controversy requirement," *Lujan*, 504 U.S. at 560, and thus imports its minimum standards.  There are yet additional reasons for applying Article III requirements in this Court.  *Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 677 n.5 (2002).[33]

 In a bid protest case, like any other, "[t]he party invoking federal jurisdiction bears the burden of establishing standing."  *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)).

### C. Statutory Standing in Bid Protests

While a "[t]raditional standing analysis invokes the 'case or controversy' requirement of Article III of the Constitution[,] . . . standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires that bid protests be brought by 'interested parties.'"

---

[33] In *Emerald Int'l Corp.*, Judge Allegra explained why "a constitutional doctrine ingrained in Article III of the Constitution would be applied to an Article I court":

> First, the Supreme Court has indicated that Article I courts, like their Article III counterparts, exercise the judicial power of the United States. *See, e.g., Freytag v. Commissioner*, 501 U.S. 868, 889, 111 S. Ct. 2631, 115 L.Ed.2d 764 (1991). Second, the statute empowering this court to enter final judgments specifically refers to "case or controversy," 28 U.S.C. § 2519, thereby appearing to invoke the Article III requirements.  Finally, Congress has specified that judgments of this court are reviewable by the Court of Appeals for the Federal Circuit and, ultimately, the Supreme Court, both Article III tribunals that would be unable to perform such review absent a justiciable case or controversy.

54 Fed. Cl. at 677 n.5 (internal citations omitted).

*Sys. Application & Techs.*, 691 F.3d at 1382 (internal citation omitted).  The statutory "interested party" requirement is analytically distinct from, and "imposes more stringent standing requirements than[,] Article III" alone.  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

Our appellate court has explained that there is a two-part test to determine standing for parties pursuing procurement protest claims:

> To satisfy § 1491(b)(1)'s standing requirements, a plaintiff must make ***two showings***. [*Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017).]  First, it must show that it is an "interested party."  This requires the plaintiff to show that it is "an actual or prospective bidder" and has a "direct economic interest" in the procurement or proposed procurement.  *Id.* (quoting *Digitalis*, 664 F.3d at 1384).  And "[t]o prove a direct economic interest, a party must show that it had a substantial chance of winning the contract."  *Id.* (quoting *Digitalis*, 664 F.3d at 1384).
>
> Second, the plaintiff must show that it was prejudiced by a significant error in the procurement process.  *Id.* (citing [*Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009)]); *see Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  "A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract."  *Labatt*, 577 F.3d at 1378 (emphasis added).

*CliniComp Int'l, Inc.*, 904 F.3d at 1358 (emphasis added).

### 1. Statutory standing part I: the Federal Circuit's definition of "interested party."

The Federal Circuit has defined the term "interested party" in § 1491(b) as "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (adopting the

definition of "interested party" from 31 U.S.C. § 3551(2), governing GAO protests); *see also Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) ("An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." (citation omitted)).

The Federal Circuit recently reaffirmed that "interested party" definition in *Percipient.AI, Inc. v. United States*, 153 F.4th 1226, 1243 (Fed. Cir. 2025) (en banc), *cert. denied*, 2026 WL 79975 (U.S. Jan. 12, 2026).

### 2.   Statutory standing part II: the prejudice analysis.

In addition to the "interested party" requirement, a protestor must *also* allege facts demonstrating that it was prejudiced by the alleged agency error.  The Federal Circuit emphasized that, "[a]lthough the [two] inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." *CliniComp*, 904 F.3d at 1358.[34]  Put simply, "while being an interested party and suffering prejudice are *separate requirements for standing*, the same showing may be pertinent to (and may even satisfy) both." *REV, LLC v. United States, Aptive Res., LLC*, 91 F.4th 1156, 1164 (Fed. Cir. 2024) (emphasis added); *see also Labatt*, 577 F.3d at 1379–80 (explaining that courts should not "conflat[e] the standing requirements of prejudicial error and economic interest" because doing so would mean that "there would be no such thing as an error non-prejudicial to an economically interested offeror in a bid contest").

The Federal Circuit in *REV* explained the core difference between the "interested party" and "prejudice" inquiry:

> In general, the "direct economic interest" prong of the interested party analysis is concerned with a bidder's substantial chance to be successful in the procurement process *independent of any error*, while the prejudice analysis is concerned with the *impact the alleged error* in the procurement process has on the bidder's chances of succeeding.

---

[34] *See also Government Contract Bid Protests: A Practical & Procedural Guide* § 4:18 (Aug. 2023 update) ("The concept of 'interested party' is closely linked to that of 'prejudice[.]'").

36

*REV, LLC*, 91 F.4th at 1164 n.2 (emphasis added).[35]

### 3.   Two tests for standing: post-award and pre-award protests.

The Federal Circuit has developed two distinct frameworks for evaluating standing in bid protests — including the prejudice question — calibrated to the posture of the action.  Which framework applies typically turns on whether the protest comes after an award has been made — or after the agency has effectively selected a contractor — or whether it comes before any selection has occurred, in the form of a challenge to the terms of a procurement (*i.e.*, as reflected in the governing solicitation or some other agency determination).

In a post-award protest, the standard is the one mentioned above: a plaintiff's complaint must show it had "a substantial chance of winning the contract[,]" *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013), to establish a direct economic interest and further demonstrate that "but for the [agency's] error, it would have had a substantial chance of securing the contract."   *Labatt*, 577 F.3d at 1378.  This standard is exacting because, in the post-award context, there is a factual record — proposals, evaluations, and an award decision — against which to measure a plaintiff's relative competitive position.  That is, this Court can readily ask, based on the administrative record, whether the plaintiff would have had a substantial chance of winning the contract award had the agency acted properly.  In such cases, to prove prejudice, a plaintiff must show "more than a bare possibility of receiving the award."  *Blue Water Thinking, LLC v. United States*, 2025 WL 763565, at *9 (Fed. Cl. Mar. 11, 2025) (quoting *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016)); *see also Bannum*, 404 F.3d at 1358 (rejecting standing where plaintiff's argument "rest[ed] on mere numerical possibility, not evidence").

In a true pre-award protest, however — *e.g.*, challenging the terms of a solicitation — no proposals have been submitted, no offers have been evaluated, and no award has been made.  There is therefore — as the Federal Circuit recognized in *Weeks Marine, Inc. v. United States* — "no factual foundation [] for a 'but for' prejudice analysis," because the ordinary instruments of the post-award inquiry simply do not exist.  *CliniComp*, 904 F.3d at 1359 (quoting *Weeks Marine*, 575 F.3d at 1361).  There are no bid evaluations to examine, no comparative scoring to scrutinize, and no way to ask whether a particular plaintiff might have prevailed over identifiable rivals in a competition that has not occurred.  For

---

[35] As discussed below, a plaintiff must ultimately *prove* "interested party" status and prejudice to succeed *on the merits* of its claims.

this reason, the Federal Circuit in *Weeks Marine* recognized a relaxed standing test for pre-award challenges to solicitations: a plaintiff in that posture need only demonstrate a "non-trivial competitive injury which can be addressed by judicial relief." *CliniComp,* 904 F.3d at 1359 (quoting *Weeks Marine*, 575 F.3d at 1361–62). The relaxed standing test is a direct and necessary accommodation to the evidentiary predicament inherent in challenging a solicitation before any competition or evaluation has occurred.

### 4. The post-award standard applies to protests of sole-source and limited competition procurements.

The Federal Circuit has repeatedly held that a protest challenging a sole-source contract award is governed by the post-award "substantial chance" standard — not by the relaxed *Weeks Marine* standard — even if the contract has not yet been formally executed when the protest is filed. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (citing *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001)). The reason is straightforward: the evidentiary gap that drove the *Weeks Marine* relaxation does not exist in the sole-source context. When an agency selects a sole-source contractor, it has made an award decision — it has chosen a specific contractor and necessarily excluded all others. That selection is functionally equivalent to an award for purposes of the standing inquiry: there is a concrete agency determination to measure, a specific contractor whose qualifications define the benchmark, and an identifiable basis on which to evaluate whether the excluded plaintiff could have competed for the awarded contract, considering its scope of work, as well as its ancillary terms and conditions.

Beyond that structural point, the agency's sole-source decision itself carries an important substantive implication. When an agency awards a contract on a sole-source basis — and particularly when the rationale rests on the unique qualifications of the selected contractor — the very logic of the award necessarily embeds an implicit determination that others, including the disappointed would-be offeror, *cannot* satisfy the requirement. Therefore, in such a case, this Court is not making a capability assessment on a blank slate. Rather, it is evaluating whether the plaintiff has alleged facts — and then adduced sufficient evidence — to rebut the agency's implicit judgment about that plaintiff's own capability. That burden rests with the plaintiff and cannot be discharged through silence, generalized market participation, or bare assertions of willingness to submit an offer, bid, or proposal.

38

As to the mechanics of demonstrating a "substantial chance" in the sole-source context, that standard is applied with recognition that there has been no competitive process. Accordingly, a plaintiff need not show it would have beaten identified rivals in a hypothetical competition. It must instead show only that "it 'could compete for the contract'" if the procurement were made competitive — that is, it "would have been a qualified bidder." *Myers*, 275 F.3d at 1370–71 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001)). This adaptation does not relax the standard *per se*; it describes how the standard operates in the absence of a competitive record. But a plaintiff's mere assertion that a firm would have submitted an offeror or proposal is insufficient. *Myers*, 275 F.3d at 1371. The qualified-bidder requirement is also grounded in substantive procurement law: federal regulations prohibit award to non-responsible contractors, FAR 9.103(a), and require that "[a] prospective contractor must affirmatively demonstrate its responsibility," including technical capability. FAR 9.103(c). The Federal Circuit has held that this obligation carries over into litigation, at least in the sole-source context: "In challenging an award in court, the burden rests on the protester to affirmatively demonstrate responsibility." *Myers*, 275 F.3d at 1371.

In *Myers*, the General Services Administration identified ten to fifteen firms that "might [have] be[en] able to perform" guard services in Ohio and issued solicitations only to two — implicitly excluding the plaintiff in that case as not among the capable performers. 275 F.3d at 1368. The Court of Federal Claims found that the plaintiff "made no effort to show that it was responsible and could have performed the contracts," had not proven "it had the sources or the man-power to supply the guard services," and had provided no "evidence demonstrating that it has been awarded or successfully performed contracts for similar services in the past." *Id.* at 1371 (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605, 620 (2000)). Because the plaintiff by its own admission presented no evidence of qualification, it had not shown prejudice and lacked standing. *Myers*, 275 F.3d at 1371.

The Federal Circuit's decision in *CliniComp*, 904 F.3d 1353, applied the same framework under still more pointed facts and further confirms that the *Weeks Marine* relaxation has no purchase in the sole-source (or limited competition) context. *CliniComp* involved a pre-award bid protest. *Id.* at 1356. In *CliniComp*, the Department of Veterans Affairs ("VA") issued a D&F invoking the public-interest exception to CICA's full-and-open-competition requirement, 41 U.S.C. §§ 3301, 3304(a)(7). *CliniComp*, 904 F.3d at 1356. On that basis, the VA authorized negotiation of a sole-source contract with Cerner

Corporation ("Cerner") for the acquisition of the electronic health records ("EHR") system being deployed by the Department of Defense ("DoD") — a rationale that necessarily determined that only Cerner, as the primary developer and existing deployer of that system, could satisfy the requirement. *Id.* at 1356–57. The proposed contract required comprehensive EHR services — inpatient and outpatient care, revenue cycle, home care, ancillaries, specialties including dental, and non-clinical core functions — across approximately 1,600 VA healthcare sites. *Id.* CliniComp, the incumbent VA EHR provider, had far more limited experience; it demonstrated experience at only 44 VA healthcare facilities and 56 DoD medical treatment facilities and had shown no experience providing outpatient services. *Id.* at 1357. The agency's sole-source rationale embedded an implicit finding that CliniComp — despite its incumbent role in a far smaller segment of the VA enterprise — was not capable of performing the new contract. On that record, the Court of Federal Claims found CliniComp had "failed to demonstrate a capability even approaching what would be required under a contract of this size and scope," and the Federal Circuit affirmed, finding no clear error. *Id.* at 1359.

The Federal Circuit rejected each argument CliniComp advanced to escape the trial court's conclusion. CliniComp contended that the contract's requirements were too uncertain to permit a capability assessment, but the trial court found — and our appellate court agreed — that the D&F and administrative record provided ample evidence of the contract's scope; this was "not a case where a plaintiff is unable to demonstrate its ability to compete due to a lack of information about what is required." *CliniComp*, 904 F.3d at 1360. CliniComp offered vague references to its ability to rely on subcontractors, but without specifics as to how or with whom, and the Federal Circuit found that claim "insufficient to cure CliniComp's otherwise deficient showing that it is a qualified bidder." *Id.* at 1361.[36]

Critically, in *CliniComp*, the Federal Circuit expressly held that its conclusion would have been identical under either the *Myers* qualified-bidder standard or *Weeks Marine*'s "non-trivial competitive injury" standard — further confirming that where capability is genuinely in dispute, the relaxed pre-award standard offers no escape. *CliniComp*, 904 F.3d at 1360 ("[O]ur conclusion would be the same applying the "non-trivial competitive injury" standard set forth in *Weeks Marine*."). The Federal Circuit

---

[36] CliniComp further argued that its incumbent status and the business it stood to lose supplied a freestanding injury, but the Federal Circuit held that cognizable prejudice must flow from the alleged erroneous procurement error (*i.e.*, the sole-source decision), such that CliniComp had to show it could compete if the process were made competitive. *CliniComp*, 904 F.3d at 1360.

emphasized that without a showing that CliniComp was a qualified bidder for the EHR services the VA sought, CliniComp could not show a "*competitive injury*" and thus could not satisfy the *Weeks Marine* standard either.  *Id.* (emphasis in original).

As explained in more detail *infra*, this Court concludes that the *Myers / CliniComp* standing test applies to CSI's protest before this Court.  To be sure, *Myers* and *CliniComp* both involved sole-source procurements, but this Court sees no rationale to distinguish between a sole-source and limited source procurement (*i.e.*, like the instant procurement CSI challenges, where multiple parties, but not CSI, were permitted to submit a proposal).  In other words, it makes no difference whether CSI was precluded from competing due to the agency's having selected a single contract awardee without competition (*i.e.*, a sole source process) or due to the government's having limited competition to a small set of offerors.  Either way, the government has effectively determined CSI is not capable, and awarded the contract to another party.  Moreover, while CSI had the burden to *rebut* that capability determination, CSI did not do so.

> **5. Even in a fully competitive procurement, a plaintiff-protestor must *allege* and then *prove* it is capable of performing the contract work at issue.**

Even putting aside *Myers* and *CliniComp*, the baseline requirement for *any* plaintiff protestor — both for standing and then on the merits — is that it is capable of performing the work at issue.

For example, and consistent with the principles of *Myers* and *CliniComp*, Judge Somers' recent decision in *Dev Technology Group, Inc. v. United States*, 179 Fed. Cl. 361 (2025), confirms that the requirement to demonstrate capability extends to the pleading stage in a pre-award protest where the plaintiff did not submit a bid or proposal.  It is "black letter law that allegations of agency error alone are insufficient to establish standing to bring a bid protest[.]"  *Id.* at 364 (citing *KL3, LLC v. United States*, 176 Fed. Cl. 657 (2025)).

In *Dev Technology*, an IT services company declined to submit a proposal and instead challenged the scoring provisions of the applicable solicitation.  The plaintiff's complaint offered a single conclusory paragraph asserting that the plaintiff was an interested party with a substantial chance of award if the solicitation were corrected — without any factual allegations about its business, workforce, prior contracts, or technical capabilities.  *Dev Tech.*, 179 Fed. Cl. at 371–72.  Judge Somers found this wholly

41

insufficient — "a far cry from the plausible factual allegations necessary to establish standing." *Id.* at 372. A plaintiff protestor's burden at the pleading stage is not an onerous one, but "[t]he Court cannot simply take a protestor's word that it would not have filed the protest were it incapable of performing the contract that it is challenging." *Id.* at 373.

Similarly, Judge Kaplan's recent decision in *United Defense, LLC v. United States*, 180 Fed. Cl. 405 (2026), confirms this baseline "capability" pleading requirement. In *United Defense*, the plaintiff brought a pre-award protest alleging agency violations of the Procurement Integrity Act ("PIA") in the agency's "award [of] a follow-on contract for the performance of intelligence services." *United Def.*, 180 Fed. Cl. at 407. United Defense submitted a proposal for the services sought but received an "'Unacceptable' rating for its Technical Approach, which made it ineligible for the award." *Id.* at 408. United Defense, in challenging the government's conclusion, did *not* identify or allege any defects in the agency's evaluation process or the "Unsatisfactory" rating. As a result, Judge Kaplan concluded that United Defense failed to "state a facially plausible claim" that it is an interested party or that it was prejudiced by the alleged PIA violations, and thus held that United Defense lacked statutory standing. *Id.* at 411-12.[37] Judge Kaplan explained that "[a] plaintiff who submits a proposal that is ineligible for an award lacks the direct economic interest needed to establish that it is an interested party." *Id.* at 412. Moreover, "United Defense ha[d] not shown it was prejudiced by a significant error in the procurement process" because "even if [the agency] had [committed] a PIA violation, United Defense would still not have had a substantial (or even any) chance of being awarded the contract because its Technical Approach proposal was found "'Unacceptable.'" *Id.*

As explained in more detail *infra*, CSI failed to make this baseline "capability" showing at the *pleading* stage, and similarly failed to *prove* statutory standing on the merits.

---

[37] Judge Kaplan also concluded that United Defense's claim must be dismissed for lack of Article III standing because "United Defense could not have received what it ultimately seeks here, namely, the contract award[,]" given it "ha[d] neither sufficiently alleged nor established that it suffered a concrete injury that is both traceable to the government conduct it challenges and redressable by the Court." *United Def.*, 180 Fed. Cl. at 411

### 6. Are the "interested party" and "prejudice" standing requirements jurisdictional?

The short answer is: not anymore. But where a plaintiff flunks statutory standing and, in the process, fails to meet Article III standing criteria, its case is properly dismissed for lack of jurisdiction.

The Tucker Act, by its plain terms, provides this Court with "*jurisdiction*" to decide "an action," filed "by an *interested party* objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (emphasis added). Thus, at least historically, "the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870[,] . . . define[d] not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them." *Aero Spray,* 156 Fed. Cl. at 559. Indeed, the Federal Circuit has read 28 U.S.C. § 1491(b)(1) as delineating "three related requirements that are pertinent to the *jurisdictional* inquiry. . ., with the first addressing [this Court's] subject matter jurisdiction and the second and third addressing standing." *Diaz*, 853 F.3d at 1357 (emphasis added).[38]

Notwithstanding the express statutory reference to jurisdiction even with respect to "*who*" has standing to pursue a bid protest, "the Federal Circuit — not sitting *en banc*, but in a panel decision — [held] that: (1) '[o]ur prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law[,]' [] and (2) 'the issue of prejudice is no longer jurisdictional *unless it implicates Article III considerations*, and our cases to the contrary are no longer good law[.]'" *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 266 (2024) (emphasis in original) (quoting *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151, 1153 (Fed. Cir. 2023).[39] In *REV*, the Federal Circuit reaffirmed its decision in

---

[38] In contrast, 28 U.S.C. § 1491(a) does not by its terms limit the *class* of proper plaintiffs. Rather, it provides only that this Court "shall have jurisdiction to render judgment upon *any claim*" specified in that part of the Tucker Act. 28 U.S.C. § 1491(a)(1) (emphasis added).

[39] Notably, in concluding that statutory standing does not implicate this Court's jurisdiction, *CACI* seems focused on the proposition that "so-called 'statutory standing' defects do not implicate a court's subject-matter jurisdiction." *CACI*, 67 F.4th at 1151 (quoting *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014))). But the Federal Circuit has **always**

*CACI* concerning the now-non-jurisdictional nature of the two statutory standing requirements. *REV, LLC*, 91 F.4th at 1163 ("The requirement to show prejudice, like the 'interested party' requirement, is statutory and not jurisdictional." (citing *CACI*, 67 F.4th at 1153)).

No matter how you slice it, though, "[a] sine qua non of [statutory] standing in a bid protest is that a protestor allege that it could compete for the contract[.]" *Dev Tech.*, 179 Fed. Cl. at 365. And, where a plaintiff in this Court has not plausibly alleged it could compete for the contract, by implication it cannot meet Article III injury-in-fact requirements either: without the ability to *compete* for the contract the protestor could not have been *injured* by any alleged agency errors in the procurement. *Id.* at 373. Indeed, in all but limited cases, a plaintiff that cannot demonstrate statutory standing will have a difficult, if not impossible, time satisfying *all three* prongs of Article III standing. *Id.* at n.2. As Judge Somers explained:

> Without plausibly alleging its capability to compete for the [disputed contract] . . . .[,] [a plaintiff] . . . cannot have [1] suffered an injury in fact by the alleged procurement errors[,] . . . . [2] [a]ny 'injury' that the company did suffer would be caused by the company's lack of capability, not by the government[,] [a]nd [3] . . . any 'injury' would not be redressable by the Court because fixing the procurement error would not suddenly make the company capable of performing the underlying contract.

*Id.*; *see also KL3*, 176 Fed. Cl. at 667 ("[I]f a protestor could not perform that contract, there can be no injury no matter how egregious the agency's alleged error, and the Court cannot provide any redress to an incapable protestor based on any alleged errors.").

Simply put, in all but the most unusual cases, a lack of "interested-party" status or prejudice for statutory standing purposes may be easily reframed as a lack of either injury-in-fact or redressability per *Lujan*.[40]    And Article III standing *is* treated as

recognized that part of 28 U.S.C. § 1491(b)(1) addresses subject matter jurisdiction and part addresses standing, while both are jurisdictional. *Diaz*, 853 F.3d at 1357.

[40] *Aero Spray* is an example of the rare case in which the plaintiff alleged an injury-in-fact sufficient for Article III requirements, but nevertheless failed to meet the "interested party" test. *See Aero Spray*, 156 Fed. Cl. at 574 ("The likelihood of increased competition may constitute an injury in fact for Article III purposes, but it does not follow that Aero Spray's '*direct* economic interest' is

jurisdictional.  *See Rent Stabilization Ass'n of City of New York*, 5 F.3d at 594 n.2.  Thus, a protestor that fails to demonstrate statutory standing will, in most instances, *also* fail to demonstrate Article III standing and will collide with a *jurisdictional* barrier to its suit.

The Supreme Court has recognized the interplay between statutory and Article III standing.  For example, in *Thole v. U. S. Bank N.A.*, 590 U.S. 538 (2020), the Supreme Court considered whether participants in a defined-benefit pension plan had standing to maintain a putative class action against a former employer and others, alleging breach of duties of loyalty and prudence under the Employee Retirement Income Security Act.  The district court dismissed the case, and the United States Court of Appeals for the Eighth Circuit affirmed on the ground that the plaintiffs lacked statutory standing.  *Thole v. U. S. Bank N.A.*, 873 F.3d 617, 628 (8th Cir. 2017) (holding that "the plaintiffs no longer fall within the class of plaintiffs authorized to bring suit").  The Supreme Court affirmed, but not because of a lack of statutory standing; rather, the Court affirmed "on the ground that the plaintiffs lack Article III standing."  *Thole*, 590 U.S. at 541.  The Supreme Court explained:

> [Plaintiffs] have received all of their monthly benefit payments so far, and the outcome of this suit would not affect their future benefit payments.  If [plaintiffs] were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less.  If [plaintiffs] were to *win* this lawsuit, they would still receive the exact same monthly benefits that they are already

---

impacted by the other awards. . . .").  Another case in which the distinction is important is where the would-be plaintiff is a potential subcontractor.  A potential subcontractor may suffer an injury-in-fact due to the government's procurement decision, but a subcontractor is not an actual or potential bidder and thus cannot qualify as an "interested party" for the purposes of 28 U.S.C. § 1491(b).  *See* Matthew H. Solomson & Jeffrey L. Handwerker, *Subcontractor Challenges to Federal Agency Procurement Actions*, 06-3 Briefing Papers 1, 4 (Feb. 2006) ("Because subcontractors are not actual or prospective bidders on a Government contract as required under CICA, *AFGE* and other Federal Circuit decisions following it appear to suggest that a subcontractor can never be an 'interested party' under the Tucker Act and thus cannot have standing to file a bid protest action in the [Court of Federal Claims]."); *Percipient.AI, Inc.*, F.4th at 1238 ("Congress had already considered, and rejected, the notion of allowing subcontractors to have standing in bid protests at the Court of Federal Claims and its predecessor court."); *City Of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 911 (10th Cir. 2004) ("[W]e conclude the [ADRA] did not affect the district court's ability to hear cases challenging the government's contract procurement process so long as the case is brought by someone other than an actual or potential bidder.").

slated to receive, not a penny more.  The plaintiffs therefore
have no concrete stake in this lawsuit.

*Thole*, 590 U.S. at 541.  So too, here, in bid protests.  Showing that the government erred in some procurement does not matter for an actual or prospective offeror that cannot pursue or perform the contract.  Such a plaintiff lacks any economic interest in the outcome of the procurement and is not prejudiced by the agency error.

Even after *CACI*, the Federal Circuit has agreed that failing statutory standing requirements may result in failing *jurisdictional*, Article III standing requirements.  In *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312 (Fed. Cir. 2025), for example, the Federal Circuit recognized that a lack of statutory standing *in a bid protest action* may be easily reframed as a lack of Article III standing that precludes this Court's jurisdiction. The plaintiff in that case challenged the award of a bridge contract, where the solicitation explicitly required bidders to have "a petroleum activity license or 'PAL' issued by the Djiboutian government."  *Associated Energy*, 131 F.4th at 1315-16.  However, neither the plaintiff nor its in-country suppliers had a PAL.  *Id.* at 1316.  The trial court "ruled . . . that [the plaintiff] lacked both Article III constitutional standing and Tucker Act statutory standing to challenge the [] bridge contract[.]"  *Id.* at 1317.  The Federal Circuit affirmed the trial court's dismissal for both lack of constitutional and statutory standing, reasoning that "[e]ven absent the[] alleged errors, however, [the plaintiff] would still not be able to secure the bridge contract because it has no PAL and neither do its in-country suppliers." *Id.* at 1320.

At bottom, Article III standing questions based on a lack of qualifications or ability to compete for the subject contract remain alive and well even after *CACI*.

\* \* \* \*

What emerges from all of this are the following axioms:

1. A plaintiff may allege facts constituting a cognizable injury-in-fact for the general purposes of *constitutional standing* pursuant to Article III of the United States Constitution, and still either: (a) not qualify as an "interested party" pursuant to 28 U.S.C. § 1491(b); or (b) fail to show prejudicial error for *statutory standing* purposes.  *See Aero Spray*, 156 Fed. Cl. at 574 (contract awardee on a multiple award vehicle challenging the

46

government's award to another contractor); *City of Albuquerque*, 379 F.3d at 911 (non-interested party); *Percipient.AI*, 153 F.4th at 1237 (en banc) ("Congress considered and rejected including subcontractors as interested parties[.]").

2. A plaintiff may allege facts qualifying it as an "interested party" but fail to allege facts demonstrating prejudice.

3. A plaintiff that fails to allege facts demonstrating *either* "interested party" status *or* prejudice flunks statutory standing and is properly dismissed pursuant to RCFC 12(b)(6).

4. An "interested party" that fails to allege facts demonstrating prejudice will also typically fail to establish Article III standing and, in such a case, is properly dismissed pursuant to RCFC 12(b)(1).[41]

5. An actual or prospective offeror or bidder that lacks a direct economic interest in the procurement (*i.e.*, because it cannot do the work) also cannot demonstrate prejudice and thus lacks Article III and statutory standing.

6. Even if a plaintiff alleges facts that, if true, demonstrate Article III standing *and* statutory standing — *i.e.*, interested party status and prejudice — a plaintiff may still fail to *prove* such status or prejudice on the merits. In such a case, the proper course is for the trial court to enter judgment for the defendant(s) on the merits.

## III.   STANDARD OF REVIEW

### A. Salus's Motion to Dismiss

Salus moves to dismiss CSI's complaint pursuant to RCFC 12(b)(6) on the grounds that CSI did not allege facts demonstrating that it qualifies as an "interested party," 28 U.S.C. § 1491(b). Salus MJAR at 21-25. Following *CACI*, for better or worse, such a motion to dismiss is properly made pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief may be granted. That is because if "interested party" status is no longer

---

[41] While the *CACI* panel commented that "the issue of prejudice is no longer jurisdictional unless it implicates Article III considerations," 67 F.4th at 1153, this Court has difficulty imagining any case in which an otherwise "interested party" fails to allege facts demonstrating prejudice and yet somehow still has Article III standing. *See Associated Energy Grp.*, 131 F.4th at 1317, 1320.

47

a jurisdictional issue *per se*, then it is necessarily a question of whether the plaintiff has stated a claim.[42]

When considering a motion to dismiss a complaint for failure to state a claim on which the Court may grant relief pursuant to RCFC 12(b)(6), this Court accepts as true all *factual* allegations — but not legal conclusions — contained in a plaintiff's complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  For a plaintiff's complaint to survive a motion to dismiss, this Court — viewing the facts in the light most favorable to the plaintiff — must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff may not simply plead "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted).  The Court must dismiss a complaint "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

While neither the government nor Salus argues that CSI lacks Article III standing, this Court, as explained *supra*, has an independent duty to ascertain whether it possesses jurisdiction to decide CSI's claims, including whether CSI has constitutional standing to pursue them.  *See FW/PBS, Inc.*, 493 U.S. at 231; *see also* RCFC 12(h)(3); *cf. Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte*.").

## B.  Administrative Procedure Act ("APA") Review in Bid Protest Cases

Pursuant to 28 U.S.C. § 1491(b)(4), this Court decides the merits of bid protest claims using the APA's standard of review, 5 U.S.C. § 706(2)(A), and accordingly considers a challenged agency procurement decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) ("In reviewing a grant of judgment upon the administrative record, . . . we review the agency's actions according to the standards set forth in the Administrative Procedure Act[.]"); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("[W]hen read together,

---

[42] As noted above, the government similarly argues that CSI fails to demonstrate that it is an "interested party," but the government does not indicate whether it seeks dismissal pursuant to RCFC 12(b)(1), 12(b)(6), or whether its argument goes straight to merits prejudice. *See* Def. MJAR at 19-23.

[28 U.S.C. §] 1491(b)(4) and [5 U.S.C. §] 706(2)(A) compel the conclusion that section 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A).").

An agency's decision is arbitrary and capricious — or lacks a rational basis — where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While, this Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[,]" it will "not supply a reasoned basis for the agency's action that the agency itself has not given." *Snyder v. McDonough*, 1 F.4th 996, 1005 (Fed. Cir. 2021) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)).

Once again, however, proving agency error is necessary but not sufficient. Rather, CSI must also demonstrate prejudice on the merits; "there is no starting point of presumed prejudice." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021) ("[T]he challenger of agency action generally bears the burden of showing that an error was harmful — that is, that it was prejudicial." (citing *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009))). That is, in addition to undertaking a prejudice analysis at the standing stage of a case — where the moving party need only *allege* prejudice — this Court considers prejudice at the merits stage as well, at which point the moving party must *prove* prejudice based on *record evidence*:

> For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions. But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence.

*Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226–27 (Fed. Cir. 2019) (internal citations omitted). As Judge Somers correctly observed in *Dev Technology*, "allegations and proof of agency error alone — no matter how obvious or egregious —

can neither open the courthouse door for a protestor nor lead to success on the merits of a bid protest." 179 Fed. Cl. at 365. Accordingly, this Court must determine whether any agency error is prejudicial "before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation*, 22 F.4th at 997 (*citing DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 n.6 (Fed. Cir. 2021)).

To prove merits prejudice, this Court reiterates: a plaintiff "must show there is a 'substantial chance' it would have received the contract award but for the alleged error[.]" *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (citing *Myers*, 275 F.3d at 1370).[43]

## C. Trial on the Administrative Record Requires this Court to Engage in Fact Finding, Including for the Prejudice Analysis

This Court conducts its APA review of the government's challenged procurement decision(s) — in an action pursuant to 28 U.S.C. § 1491(b) — via motions for judgment on the administrative record, RCFC 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356. The process is "designed to provide for trial on a paper record, *allowing fact-finding by the trial court*." *Id.* (emphasis added).[44] In deciding cross-MJARs, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020) (quoting *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021) (reiterating the same standard of review).[45]

---

[43] As discussed *supra*, given the now-non-jurisdictional nature of statutory standing, a plaintiff protestor must also *prove* "interested party" status on the merits, just like any other elements of its claim.

[44] "The primary difference between a typical trial and one conducted on the administrative record is that, in the latter, new evidence ordinarily may not be considered." *Superior Waste Mgmt. LLC*, 169 Fed. Cl. at 274. That is, "[b]oth the nature of APA review and this Court's rules 'restricts the evidence to the agency record, as may be supplemented consistent with [the law of this circuit].'" *Id.* (alteration in original) (quoting *Bannum*, 404 F.3d at 1356).

[45] *See also Noble Supply & Logistics LLC v. United States*, 168 Fed. Cl. 439, 447 (2023) ("[T]he court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record." (citing *Bannum*, 404 F.3d at 1355)); *Navarre Corp. v. United States*, 168 Fed. Cl. 361, 367–68 (2023) (explaining that "the parties are

As discussed *supra*, the Federal Circuit has long instructed that this Court is "*required* to determine whether errors in the procurement process significantly prejudiced [the plaintiff]." *Bannum*, 404 F.3d at 1353 (emphasis added). Thus, the trial court must "make factual findings on prejudice from the record evidence." *Id.* at 1356. In other words, when performing the mandatory prejudice analysis, this Court performs its ordinary fact-finding role and does not defer to the agency. The Federal Circuit "reviews such [factual] findings [only] for clear error[.]" *Id.* at 1354; *see also Associated Energy Grp., LLC*, 131 F.4th at 1319 ("Prejudice is a factual question that we review for clear error." (quoting cases)); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024) ("We review determinations of standing under the Tucker Act de novo. However, underlying factual findings, including prejudice, are reviewed for clear error." (citations omitted)); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) ("We review the legal standard for prejudice articulated by the Claims Court de novo, and we review the Claims Court's underlying factual findings for clear error." (citing *Bannum*, 404 F.3d at 1353–54)); *Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020) ("Prejudice is a question of fact that we review for clear error." (citing *CliniComp,* 904 F.3d at 1359)); *Am. Relocation Connections,* 789 F. App'x at 225 ("Prejudice is a question of fact, and we review the findings of the Court of Federal Claims thereon for clear error." (citation omitted)); *Diaz*, 853 F.3d at 1359 ("Prejudice is a factual question that we review for clear error." (citing *Tinton Falls*, 800 F.3d at 1357–58)); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) ("Unlike other issues in this case, prejudice is a question of fact that this court reviews for clear error." (citation omitted)).

## IV.    DISCUSSION

CSI fails to allege facts that demonstrate Article III and statutory standing. CSI's complaint thus must be dismissed pursuant to either RCFC 12(b)(1) or RCFC 12(b)(6). In the alternative, CSI fails to prove interested party status or prejudice on the merits, and judgment must be entered in favor of the government and Salus.

---

limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record" and "will then determine whether a party has met its burden of proof based on the evidence in the record" (citing *Bannum*, 404 F.3d at 1354–55)); *Karthik Consulting, LLC v. United States,* 168 Fed. Cl. 95, 103 (2023) ("The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision." (citation omitted)).

51

### A. CSI's Complaint Fails to Allege Facts Demonstrating Article III or Statutory Standing

As Judge Somers observed in *Dev Technology*, "the issue here is not that the Court considered [the plaintiff's] factual allegations and found that they could not plausibly give rise to standing; it is that [the plaintiff] failed to put forth such facts altogether." *Dev Tech.*, 179 Fed. Cl. at 372. CSI's complaint provides no factual allegations regarding CSI's capability to perform the *full scope* of CSRO services. Indeed, CSI included only a single paragraph in its complaint regarding its various government contracts and the scope of its capabilities. Compl. ¶ 1. While CSI asserts that it is an "interested party" for the CSRO procurement, Compl. ¶ 4, CSI alleges literally zero facts to support that claim. Instead, CSI makes only conclusory legal assertions that restate the applicable legal standards. The total omission of non-conclusory *factual* allegations to demonstrate CSI can perform the CSRO work sought by the government, is fatal both on Article III and statutory standing grounds, 28 U.S.C § 1491(b). *Associated Energy Grp., LLC*, 131 F.4th at 1315-16, 1320 (affirming trial court's dismissal for both lack of constitutional and statutory standing where protestor failed to allege it possessed a specific license necessary to complete the work under the contract, because "[e]ven absent the[] alleged errors, [the protestor] would still not be able to secure the [] contract"); *Myers*, 275 F.3d at 1371; *CliniComp*, 904 F.3d at 1361.

Here, DHS essentially made two related, but analytically distinct, determinations, culminating in CSI's exclusion from the CSRO procurement: **(1)** that based on "unusual and compelling urgency," DHS would not engage in full and open competition, but rather would "limit the number of sources from which it solicits bids or proposals," FAR 6.302-2(a)(2); and **(2)** that ICE Air contractors, like CSI, could not perform the scope of work the CSRO contract covers. AR 860, 915. That means that CSI had to challenge *both* determinations. If anything, the critical determination was the second, implicitly precluding CSI from participating in the CSRO procurement. Moreover, as discussed *supra*, even putting aside those DHS determinations, a plaintiff cannot qualify as an interested party — or demonstrate prejudice — unless the plaintiff alleges facts demonstrating an ability to perform the scope of work at issue. *Dev Tech.*, 179 Fed. Cl. at 372; *KL3*, 176 Fed. Cl. at 667; *United Def.*, 180 Fed. Cl. at 411-12. CSI had to allege facts demonstrating that it possessed the capability to perform the CSRO services contract. But CSI did not do so.

In this case, CSI directs no count of its complaint towards challenging DHS's determination, AR 915, that CSI, as an ICE Air contractor, was not capable of performing the CSRO contract's multifaceted scope of work. CSI's omission, in that regard, was a strategic mistake because agency error alone cannot confer standing. *Dev Tech.*, 179 Fed. Cl. at 365. In other words, even if CSI is correct that DHS improperly limited competition for the CSRO procurement (*i.e.*, contrary to CICA and the FAR), the fact that CSI could have submitted a proposal under full and open competition — in the absence of a statutory or regulatory violation — is not sufficient to give CSI standing. That is the precise holding of *CliniComp*, 954 F.3d at 1359-60, and *Myers*, 275 F.3d at 1368.[46]

What makes CSI's failure particularly egregious is that at the time CSI filed its complaint in this Court, CSI possessed DHS's MRR, AR 905-19. Indeed, CSI attached a copy of the MRR to its complaint. ECF No. 1-1 at 3-17. As discussed *supra*, DHS in its MRR: (1) concluded that ICE Air vendors, like CSI, were unable to successfully deliver the full scope of CSRO services "due to the distinct difference in scope and nature of the work being performed"; and (2) expressed skepticism that offerors could use teaming agreements to solve for a lack of direct past experience in performing specific aspects of the CSRO SOW. AR 911, 915.[47] But, CSI attempted to qualify for the CSRO procurement based on CSI's status as an ICE Air commercial vendor. *See, e.g.*, AR 1117 (CSI's explaining to DHS that CSI is "the Prime Contractor for all ICE Air Operations flights"). Indeed, CSI's complaint relies entirely on its status as an air charter services provider. For example, CSI alleges: (1) "CSI [] is a longtime provider of air charter services to the U.S. Government, having supported numerous government agencies including DHS," Compl. ¶ 1; (2) "CSI has been supporting similar ICE Air Operations for two decades," *id.* ¶ 25; (3) "CSI [is] a current ICE prime contractor with significant experience in this field," *id.* ¶ 51; and (4) "CSI has performed similar work for other government agencies and expressed a desire to compete for this procurement[,]" *id.* ¶ 63. CSI nowhere attempts to show how the scope of work in the ICE Air contracts compares with, or relates to, the CSRO scope of work.[48] Moreover, CSI's complaint does not even *mention* the idea

---

[46] *See Myers*, 275 F.3d at 1368 ("Myers asserted that it would have submitted bids for the contract procurements if the GSA had issued the procurements on a competitive basis, rather than on a sole source basis.").

[47] Although the CSRO Solicitation ultimately permitted CTAs, the Solicitation imposed requirements on an offeror's reliance on subcontractors. AR 1020-21

[48] Tr. 17:2-7 ("[THE COURT:] Is there anything in the complaint that compares the scope and nature of the work being performed under this [CSRO] procurement to the contracts that are

of using teaming agreements to fill in for gaps in CSI's experience, let alone allege supporting facts on the subject.

Put simply, beyond CSI's alleging it has experience with air charter services — the single aspect of the CSRO with which ICE Air contractors have experience, as DHS acknowledged, AR 915 — CSI resorts to only vague and conclusory allegations. For example, CSI asserts that it "is a prospective offeror under the Solicitation whose direct economic interest has been affected by the procurement errors complained of herein." Compl. ¶ 4. CSI alleges that it "suffered non-trivial competitive injury by the Agency's decision to conduct a noncompetitive procurement in violation of FAR 6.302-2 and CICA." *Id.* CSI further alleges that it "was (and remains) an interested bidder and has a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations." *Id.* But those are all classic examples of bare legal conclusions, and are insufficient to demonstrate standing, even at the complaint stage, pursuant to either RCFC 12(h)(3) — for purposes of Article III standing — or RCFC 12(b)(6), for purposes of statutory standing, 28 U.S.C. § 1491(b).

CSI further asserts that, as "a current ICE prime contractor with significant experience in this field, [CSI] would have had a *substantial chance of receiving the award*." Compl. ¶ 51 (emphasis added). Here, CSI at least admits to the applicability of the *Myers* and *CliniComp* "substantial chance" test for demonstrating "direct economic interest" in this case. *CliniComp*, 904 F.3d at 1360 ("[W]e apply the standard for prejudice as articulated in *Myers*[.]"). The fatal problem for CSI, however, is that it fails to plead *facts* — as opposed to legal conclusions — that, when assumed to be true, demonstrate a "substantial chance of receiving the award." And even under the pre-award, *Weeks Marine* standard, a plaintiff must still plead facts demonstrating that it is "at least . . . qualified to compete for the contract it seeks." *Id.* But, just as was the case for the plaintiff in *CliniComp*, CSI likewise fails to meet that more relaxed standard, particularly given DHS's determination that Ice Air contractors did not have the capability to perform the CSRO contract. *Id.* Again, CSI's complaint includes no count (or set of facts) attempting to rebut DHS's implicit conclusion that, as an ICE Air contractor, CSI lacked the capability to perform the CSRO contract. AR 915.

Even putting aside DHS's determination in the MRR with respect to ICE Air contractors, AR 915, CSI would still have to allege facts that, when assumed to be true,

---

listed in paragraph 1? [Counsel for CSI]: I don't believe so, Your Honor. THE COURT: I don't think so either.").

demonstrate that it is capable of performing the full scope of the CSRO contract. That is precisely the holding of *CliniComp*, 904 F.3d at 1359-61. There, as explained above, the trial court and the Federal Circuit compared the prior contract (and the incumbent's contractor's experience) to the new contract, and found that the plaintiff failed to demonstrate that it could perform the new contract. *Id.* at 1359-60. The Federal Circuit thus concluded that CliniComp was not a qualified bidder — and accordingly did not demonstrate standing. *Id.* Here, too, comparing the sparse facts CSI provided (regarding its capabilities as an ICE Air contractor) to the scope of the CSRO contract reveals that CSI did not allege sufficient facts to show it is a qualified bidder for the CSRO contract — the same failing as the plaintiff in *CliniComp*.

### B. CSI Fails to Prove Prejudice on the Merits

Even assuming for the sake of argument that CSI's complaint contains sufficient factual allegations *at that stage* for the purposes of Article III and statutory standing, this Court nevertheless concludes that CSI fails to demonstrate, based on record evidence, interested party status or prejudice on the merits. CSI's MJAR is utterly devoid of *any* showing that CSI "could do the work required under the proposed contract[.]" *CliniComp*, 904 F.3d at 1359. There is no discussion of CSI's qualifications, its past work and experience, its ability to engage subcontractors, the willingness of potential subcontractors to perform elements of the scope of work that CSI could not perform, or anything of that sort. That is a fatal error, on the merits, where, as here, CSI has the burden in its MJAR to *prove* via *evidence* both its interested party status and prejudicial error. *Am. Relocation Connections*, 789 F. App'x 221 at 226–27 (Federal Circuit explaining that on the merits a party must *prove* prejudice based on record *evidence*). Again, just like the plaintiff in *CliniComp*, CSI "failed to show it possessed the kind of experience that would enable it compete for the work contemplated by" DHS's "proposed contract to" Salus. *CliniComp*, 904 F.3d at 1359.

Instead — and contrary to the assertion in its complaint, Compl. ¶ 51 — CSI rests entirely on the premise that the easier *Weeks Marine* pre-award standing framework applies here. Pl. MJAR at 16. But, as the Federal Circuit observed in *CliniComp*, "[t]here was no dispute [in *Weeks Marine*] that the plaintiff in that case could do the work required under the . . . solicitation." 904 F.3d at 1359 (citing *Weeks Marine*, 575 F.3d at 1360). And just like in *CliniComp*, and "unlike in *Weeks Marine*, there **is** a dispute [here] as to whether [plaintiff] could do the work required under the proposed contract" to Salus. *Id.* (emphasis added). On the merits, CSI had to do more than rest on allegations; it had to

*prove* that it is an interested party and prejudiced by the government's errors. At a minimum, this required CSI to prove that it was capable of performing the CSRO contract.

In sum, the Federal Circuit's explanation of why the plaintiff lacked standing in *CliniComp* applies with equal force to CSI on the merits:

> This is not a case where a plaintiff is unable to demonstrate its ability to compete due to a lack of information about what is required. Here, [plaintiff] lacks standing because it failed to demonstrate an ability to perform specific requirements that are set forth in the administrative record.

904 F.3d at 1360 (rejecting CliniComp's argument "that the requirements of the proposed . . . contract are not known, and therefore, we cannot conclude that CliniComp is incapable of performing the contract").

If anything, CSI had a steeper hill to climb compared to the plaintiff in CliniComp in alleging and ultimately proving interested party status and prejudice. There are three ways in which CSI's position here is materially worse than the plaintiff in *CliniComp*.

*First*, at least the plaintiff in *CliniComp* was the "incumbent provider of EHR systems to the VA." 904 F.3d at 1357. CSI is not the incumbent provider of CSRO services to DHS. Indeed, there is no incumbent provider of such services.

*Second*, it is not at all clear whether in *CliniComp* the VA made any determinations about CliniComp's abilities, or whether only the trial court — engaged in factfinding on the administrative record — determined that "CliniComp failed to demonstrate a capability even approaching what would be required under [the] contract" awarded. *CliniComp*, 904 F.3d at 1359 (explaining that "[p]rejudice is a fact question" and concluding that there was "no clear error in the Claims Court's factfinding" (citing cases)). In contrast, here, DHS found that CSI belonged to a class of ICE contractors — ICE Air contractors — that did not have sufficient capabilities to perform the CSRO contract. AR 915.

*Third*, CliniComp on appeal posited that "it is qualified to compete because it could hire subcontractors to help do the work required under the proposed contract[.]"

*CliniComp*, 904 F.3d at 1360.  The Federal Circuit found that argument "unpersuasive" because, amongst other reasons, "CliniComp has not supplied any details regarding how, or with whom, it would subcontract to perform what is required under the proposed contract[.]"  *Id.*  Both CSI's complaint and MJAR are even more deficient in this regard. CSI makes only a passing reference in its MJAR to the fact that "the Solicitation specifically permitted various teaming arrangements," Pl. MJAR at 25, but provides zero details regarding how CSI could leverage subcontractors via CTAs to compensate for any lack of experience or expertise in certain segments of the CSRO contract.  Moreover, although CSI attempts to remedy that fatal omission in its reply brief — a problem this Court addresses *infra* — the Solicitation contained relevant *proposal* requirements regarding teaming agreements that CSI did not demonstrate it could meet in any event. In contrast, there was no indication in *CliniComp* that the solicitation in that case even mentioned CTAs, let alone set out specific teaming agreement *proposal* requirements.

Even putting aside *Myers* and *CliniComp*, the baseline requirement for *any* plaintiff protestor — both for *pleading* purposes and for *proving* standing on the merits — is that it is capable of performing the work.  *Dev Tech.*, 179 Fed. Cl. at 372 (concluding, in a fully competitive procurement, that plaintiff failed to allege and prove prejudice on the merits because plaintiff did not demonstrate it was capable of performing the contract at issue); *KL3*, 176 Fed. Cl. at 667; *United Def.*, 180 Fed. Cl. at 411-12.  CSI made no such showing in its MJAR.

Accordingly, this Court entirely agrees with the government and Salus that CSI failed to allege facts demonstrating standing, including prejudice, in CSI's complaint and then failed to *prove* interested party status and prejudice on the merits via its MJAR.  *See* Def. MJAR at 19-23 ("CSI has failed to demonstrate that it could provide the full scope of services and therefore that it has standing to protest this procurement."); Salus MJAR at 21-25 (arguing that the administrative record demonstrates that DHS found CSI "lack[ing] relevant capabilities and experience," a determination that CSI did not challenge until its reply and ultimately failed to rebut).

### C. This Court Rejects CSI's Attempt to Prove Interested Party Status and Prejudice For the First Time in Its Reply Brief and Without Moving to Supplement the Administrative Record

In CSI's reply brief, CSI attempts to remedy its fatal omissions in its complaint and MJAR, arguing for the first time that "[h]ad DHS allowed CSI to participate at the RFI or RFP stages, CSI would have demonstrated its substantial aviation and immigration

experience and its ability, *with teaming partners*, to meet all CSRO RFP requirements." Pl. Rep. at 14 (emphasis added). But the question is not what CSI might have demonstrated to DHS during its planning of the CSRO procurement or in response to the Solicitation. Rather, as a plaintiff in a bid protest action pursuant to 28 U.S.C. § 1491(b) — and as the Federal Circuit explained in *CliniComp* — CSI must *plead* facts demonstrating it is an interested party and was prejudiced by the agency errors, and *then* prove interested party status and prejudice in a trial on the administrative record. 904 F.3d at 1358 ("The party invoking federal jurisdiction bears the burden of establishing standing."). Once again, the fact that CSI could have submitted *a* proposal had DHS engaged in a full and open competition proves absolutely nothing. Indeed, as this Court explained to CSI during oral argument, Tr. 18:17-20:2, the undersigned also could have submitted a proposal for the CSRO contract in a full and open competition, but that would hardly yield "qualified bidder" status; and it would not answer the question whether the undersigned has a "direct economic interest" in the procurement. Showing *that* requires, in turn, demonstrating "a substantial chance of winning the contract." *CliniComp*, 904 F.3d at 1358 (*Digitalis*, 664 F.3d at 1384). *CliniComp* recognizes that while no showing must be made to participate in a full and open competition, the same is *not* true to *qualify* as a proper plaintiff — either to prove interested party status or prejudice on the merits — in a bid protest before this Court.

In support of its belated attempt to demonstrate standing, CSI attached a declaration to its reply brief from [* * *], the Senior Vice President of Government Services at CSI. ECF No. 36-1 ("[SVP] Decl."). CSI's declaration, *for the first time*, provides *some* details regarding its CSRO-related experience and expertise beyond just air charter services. [SVP] Decl. ¶¶ 19-30. [SVP] posits that CSI would have used teaming partners to fill gaps in CSI's experience and expertise. [SVP] Decl. ¶ 20 ("If given the opportunity to respond to the DHS CSRO RFP, CSI would have . . . teamed with partners including the [* * *], [* * *], and [* * *]."). In that regard, the declaration included a table depicting what "[t]he responsibility of each team member would [have been]" for what CSI termed the six "CSRO Core Requirement[s]:"

| CSRO Core Requirement | Responsibility |
|---|---|
| Flight Coordination & Management | CSI Aviation |
| International Staging Areas | ███████ |
| Facilities Management | |
| Security Management | |
| Healthcare Provisions | CSI Aviation Medical/███████ |
| Logistics and Administrative Support | CSI Aviation |

[SVP] Decl. ¶ 21.[49]  CSI argues that the declaration demonstrates how "CSI has the breadth and depth of experience to accomplish all of DHS's requirements for the CSRO contract." [SVP] Decl. ¶ 29.

This Court rejects CSI's attempt to cure its standing defects in a reply brief.

*First*, it's late.  Way too late.  CSI had the burden in its MJAR to demonstrate its interested party status, as well as prejudice, on the merits.  CSI did not do so.  A bid protest plaintiff cannot wait to see whether the government or an intervenor will raise the issues and thus punt them to a response and reply brief.  That is what it means for the plaintiff to have the burden to prove standing, including prejudice: interested party status, as well as prejudice, must be demonstrated in the opening brief.  The undersigned agrees with Judge Meyers:

> [A] party that fails to raise arguments in its MJAR waives them. As this Court has often stated in cases including bid protests, "[a]rguments made for the first time in a response brief — particularly those necessary to establish prejudice,

---

[49] There is an initial substantive problem with this table.  The "CSRO Core Requirement[s]" breakdown in the table is the CSRO services breakdown found in DHS's J&A for other than full and open competition. *See* AR 950-51.  It does not mirror the CSRO services as included with the RFP. AR 963.  Unlike the J&A, the RFP listed two broad CSRO requirements, each which included four sub-requirements. *Id.*  Given that CSI had a copy of the CSRO RFP for *more than seven months* before submitting the [SVP] declaration — CSI attached a copy of the RFP to its GAO protest filed on May 19, 2025 — it seems inexcusable to this Court for CSI to have mapped its CSRO capabilities to anything other than what was included in the RFP.

consistent with the plaintiff's burden — are waived." *Ahtna Logistics, LLC v. United States*, 163 Fed. Cl. 488, 516 (2022) (collecting cases).

*Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 176 (2023); *cf. Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

*Second*, CSI did not even bother to move to supplement the administrative record with the [SVP] declaration, a classic example of extra-record evidence. This approach is entirely improper. This Court is *not* saying that if CSI had filed a *timely* motion for the inclusion of such evidence, this Court surely would have granted the motion — although it likely would have — but we will never know. The point is that this Court cannot just consider whatever evidence it wants whenever it wants. *See Noblis MSD,* 2026 WL 851951, at *10-11 (discussing *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009), and other cases). Indeed, this Court recently held that filing a motion to supplement too late in the game is improper. *Id.* at * 11. Here, CSI did not file a late motion; it filed no such motion at all.

*Third*, even if this Court were to consider the [SVP] declaration, it does not plug CSI's interested party and prejudice evidentiary holes. The [SVP] declaration first addresses: (1) Flight Coordination & Management; and (2) Logistics & Administrative Support. [SVP] Decl. ¶¶ 22-25. Those are the two "CSRO Core Requirement[s]" CSI asserts it could have done on its own (*i.e.*, without subcontractors). [SVP] Decl. ¶ 21. But the assertions read like marketing puffery and contain almost no supporting detail. That approach might have been good enough at the complaint stage (had such assertions been included as factual allegations), but as far as *proof* goes, the [SVP] declaration is insufficient. Indeed, the declaration neither proffers nor attaches any *evidence* to support [SVP]'s otherwise naked assertions. And to the extent [SVP]'s assertions are themselves testimonial evidence, this Court does not find them persuasive given their lack of support.

While the [SVP] declaration also touches on CSI's putative experience with Healthcare Provisions (*i.e.*, a "CSRO Core Requirement" CSI alleges it would have performed in conjunction with a subcontractor), [SVP] Decl. ¶¶ 23, 25, CSI does not provide *evidence* of its healthcare provision experience. But on the merits mere allegations do not suffice.

60

As to the remaining three "CSRO Core Requirement[s]" — *i.e.*, International Staging Areas, Facilities Management, and Security Management — for which CSI admits it would rely *entirely* on its partners at [* * *] and [* * *] to provide, the [SVP] declaration omits critical details.  It does not: (1) explain whether CSI had ever worked with those partners in the past on the specific requirements CSI alleges would be handled by its partners;  (2) disclose if CSI had reached out to its partners at [* * *] or [* * *] *regarding the CSRO project* either for the purposes of responding to the Solicitation or at least prior to executing the declaration; or (3) disclose if CSI secured written or oral confirmation from [* * *] or [* * *] as to their interest in teaming with CSI to pursue and perform the CSRO contract.[50]

A related fatal problem for CSI — again, even if this Court were to consider the [SVP] declaration — is that the declaration does not provide nearly the level of detail the RFP required offerors to include in their CSRO proposals regarding CTAs.  Amongst other things, the RFP required offerors to identify their subcontractor relationships and even to provide the CTAs themselves.  *See, e.g.*, AR 1020-21 (RFP § L.6.6 ("Contractor Team Arrangement")); AR 1864 ("In accordance with the RFP, offering firms were required to identify any subcontractor relationships or Teaming partners associated with their Proposals for this requirement.").  Given that CSI all but admits that it contacted no potential subcontractors *until well after it filed its MJAR* (if it even did so at all), CSI cannot demonstrate that it was capable of performing the CSRO contract in full, and that DHS's implicit determination to the contrary was somehow arbitrary and capricious. *See* Tr. 36:2-24.

In sum, even if the details from CSI's reply brief (and the attached [SVP] declaration) had been included as factual allegations in CSI's complaint, that may have met Article III and statutory standing burdens for pleading purposes, but at this stage — even if considered — the details falls far short of the *proof* necessary for interested party status and prejudice on the merits.

---

[50] This Court pressed counsel for CSI for any sort of reasonable explanation of why CSI's complaint was devoid of most of the information included in CSI's [SVP] declaration.  Tr. 63:25-64:7. ("[THE COURT:] [i]n the complaint in paragraph 1 . . . which summarizes some of CSI's past contracts, it really is odd that none of that information from the affidavit and the reply is in that paragraph or anywhere else in the complaint. When was the work done to gather that information?").  In response, counsel for CSI conceded that CSI only worked on gathering the information in the declaration *after* Salus and the government moved to dismiss CSI's complaint. Tr. 64:8-10.

### V.    CSI's Motion for Leave to File an Amended Complaint is Denied

Nearly three weeks after this Court held oral argument on the parties' cross-MJARs, CSI moved for leave to file an amended complaint.  ECF No. 52.  In particular, CSI seeks leave "to amend its Complaint to add factual allegations that have already been presented to the Court[.]"  *Id.* at 2.  In other words, CSI seeks only to include information CSI already included in its reply brief and [SVP] declaration.  *Id.* at 5.  Accordingly, CSI argues that this Court can grant CSI's motion "without [the need for] any [subsequent] additional briefing" on the merits issues raised in the parties' MJARs.  *Id.*

In opposing the motion, the government argues that "even if the standing allegations CSI seeks to include would cure the *pleading* deficiency, they do not cure the prejudice problem on the merits."  ECF No. 54 at 3.  The government also argues undue delay and prejudice:

> CSI's decision to file a motion seeking leave to amend now, despite having all the relevant information needed to include these allegations in the original complaint, and rather than having amended as of right after the United States and Salus filed their motions to dismiss the complaint, is the product of undue delay that [would] impose[] burdens upon both the Court and the United States.

*Id.* at 3-4.  This Court agrees with the government on all three points.

As to futility, the government is correct regarding the deficiencies in CSI's proof.  ECF No. 54 at 4-6.  This Court agrees with the government that "[t]he [SVP] declaration does not establish that CSI could have performed the CSRO requirements as of May 2025 when the contract was awarded."  *Id.* at 6.  As discussed *supra*, that declaration used many words and jargon to project confidence in CSI's abilities to assemble a capable team, but when unpacked and compared against the CSRO scope of work, it is clear to this Court that CSI was grasping at straws to remedy its omission in its complaint and MJAR.  The [SVP] declaration also contains naked conclusions but provides little in the way of details or support to prove its allegations.  As evidence goes — if you can even call it that — the declaration is weak tea.  Moreover, the fact is that CSI *by its own admission*: (1) could not have performed the CSRO contract without outsourcing significant swaths of work to subcontractors; (2) CSI had no such subcontractors lined up in May 2025; and (3) even for the purposes of the declaration, CSI had not actually communicated with its putative,

would-be subcontractors.  On the merits at least, CSI must do more than speculate about how it might have assembled a capable team.

CSI also engaged in undue delay.  There is no question that CSI could have amended its complaint *as of right* following the filing of defendants' cross-MJARs.  ECF No. 54 at 8 (citing RCFC 15(a)(B)).  CSI inexplicably failed to do so.  CSI also waited nearly three weeks after oral argument to file its motion seeking leave to file an amended complaint.  That CSI's counsel did not agree with the quality of defendants' arguments — or appreciate their import — does not excuse CSI's delay.

In an attempt to sidestep the undue delay issue, CSI blames the lateness of its motion in part on CSI's "interpretation of the conflicting Federal Circuit case law as to what is required to establish standing in a pre-award protest[.]"  ECF No. 52 at 9.  But that is no excuse at all.  For three reasons.  First, *CliniComp* is quite clear about the applicable standard.  Second, if a party is in doubt regarding what it must plead and prove, that party should, quite obviously, err on the side of caution and satisfy even the higher standard.  That is particularly true where, as here, CSI cited the higher standard.  Compl. ¶ 51.  And third, CSI's failure to demonstrate — in both its complaint and MJAR — that it could perform the CSRO contract means that CSI flunks even the most lenient standing test (*i.e.*, the pre-award *Weeks Marine* test).

This Court further agrees with the government and Salus that the defendants would be prejudiced if this Court were to grant CSI's motion for leave to file an amended complaint.  ECF No. 54 at 3-4; ECF No. 56 at 8-10.  CSI asserts that "the parties' briefing on the merits will be unaffected" by its amended complaint and that granting its motion will "allow the Court to issue a decision solely on the merits of CSI's protest."  ECF No. 52 at 8.  But, as Salus correctly observes, had CSI "properly pled standing in its initial complaint, or amended its complaint to do so in a timely fashion, the parties and the Court could have focused [more] on the merits."  ECF No. 56 at 9.  In that regard, this Court agrees with Salus that CSI's amended complaint would almost certainly necessitate further briefing regarding the Solicitation's allowance of subcontractors and what that meant for the pool of eligible offerors.  *Id.*  Moreover, CSI would itself require a new round of MJAR briefing because CSI would have to prove the new allegations in its amended complaint, and the evidence in the record, as it stands now, is insufficient.

At bottom, this Court cannot allow CSI to amend its complaint without giving the defendants another bite at the apple as well (*i.e.*, to file a revised MJAR and have another

round of oral argument to address CSI's new theories of statutory standing, including merits prejudice). Indeed, if CSI had made an adequate standing and prejudice case at the outset, defendants likely would have focused more of their fire on the actual claims in CSI's complaint. CSI's proposed amended complaint would essentially start a new case for the parties to litigate — and for this Court to decide — from scratch.

This Court further rejects CSI's motion because of the negative impact allowing such a motion would have on the MJAR process more generally. If a plaintiff were permitted to moot a motion to dismiss that is combined with a defendant's MJAR merely by filing an amended complaint after the completion of the MJAR briefing — or worse, after oral argument — plaintiffs would have little incentive to meet their burdens in their opening brief, as required. It also would effectively waste defendants' time in moving to dismiss and the space in their respective opening briefs. The wasted space is particularly prejudicial. Had CSI timely filed an amended complaint in response to Salus's 12(b)(6) motion, for example, the defendants likely would have been granted leave to file new MJARs. As explained above, granting CSI's motion now would likely require new MJARs. This Court also frequently instructs defendants to combine any motion to dismiss with the MJAR. If the motion to dismiss part of the MJAR is always at risk of being mooted by an amended complaint *after the completion of MJAR briefing*, the government and intervenors would be smart to insist that this Court decide their motions to dismiss before the administrative record is filed or at least before the opening cross-MJARs are filed. That will substantially lengthen bid protest cases and impose additional unnecessary costs on the parties, the process, and this Court. The better rule — except perhaps in unusual circumstances not present here — is to permit defendants to include motions to dismiss in their MJARs with the (implied) concomitant assurance that they will be decided and not subject to a plaintiff's later regret (*i.e.*, post-briefing and oral argument) that its complaint or MJAR should have included more information.

In sum, CSI cannot have it both ways. *Either* its proposed amendment is futile because the evidence in the record is insufficient to prove CSI's capability to perform the CSRO contract *or* CSI requires an opportunity to provide this Court with additional record evidence via new MJARs, in which case permitting an amended complaint at this late juncture is unduly prejudicial to the government and Salus.

## VI.    CSI's Request for Judicial Notice is Denied

On April 14, 2026, CSI requested that this Court take judicial notice of particular congressional inquiries regarding DHS's dealings with Salus, including the CSRO procurement.    *See* ECF No. 61.    This Court rejects CSI's request for all the reasons provided in the government's opposition, ECF No. 64.

For starters, the mere existence of a congressional inquiry — and a partisan one at that — cannot provide any proof of CSI's standing, prejudice, or success on the merits of its claims.    An *inquiry*, by definition, is just that; it gathers information.    And one-sided political smoke does not mean there is a procurement fire.    Thus, even assuming for the sake of argument that it might be proper for this Court to consider *findings* by a legislative body or committee in some factual context, CSI provided this Court only with questions and suspicions.    There is simply nothing relevant for this Court to take notice of.

That said — and notwithstanding this Court's concerns expressed during oral argument regarding how DHS conducted the CSRO procurement, *see, e.g.*, Tr. 85:1-7, 97:6-9 — this Court's careful examination of the administrative record did not yield any evidence of bad faith or unfair dealings, neither of which CSI's complaint expressly claims in any event.    If anything, in pivoting from considering a sole-source award in response to an unsolicited proposal to engaging in at least a limited competition, DHS seems to have attempted to mitigate even the appearance of impropriety.    Moreover, the J&A supports DHS's determination that an "unusual and compelling urgency" supported a limited competition for the CSRO contract, pursuant to FAR 6.302-2.    While CSI's complaint surely paints a less-than-flattering picture of DHS and Salus, it omitted the relevant context: Salus sent DHS an unsolicited proposal and DHS properly considered it consistent with the FAR.

Whether CSI might have had a case regarding DHS's inclusion of two one-year option periods in the contract awarded to Salus, this Court cannot say, particularly given CSI's failure to allege and prove interested party status and prejudice.[51]    But this Court *is* confident that, at least based on the administrative record before this Court, DHS properly: (1) engaged with Salus during the unsolicited proposal stage; (2) decided to conduct a limited competition for the CSRO contract; and (3) awarded the contract to

---

[51] *See supra* note 16.

Salus.  (This Court reaches these merits-related conclusions *only* in response to CSI's request for judicial notice, but not in resolving the parties' respective MJARs.)

**VII.    CONCLUSION**

Pursuant to RCFC 12(h)(3), this Court **DISMISSES** CSI's complaint for lack of Article III standing.  In the alternative, this Court **GRANTS** Defendant-Intervenor's motion to dismiss for lack of statutory standing pursuant to RCFC 12(b)(6).  In the alternative, this Court **GRANTS** the government's and Defendant-Intervenor's cross-MJARs, on the grounds that CSI failed on the merits to demonstrate "interested party" status and prejudice pursuant to 28 U.S.C. § 1491(b).  CSI's MJAR is **DENIED**.  CSI's motion to amend its complaint, ECF No. 52, and its request for judicial notice, ECF No. 61, are also **DENIED**.

Accordingly, the Clerk of this Court is directed to enter **JUDGMENT** for Defendant, the United States, and Defendant-Intervenor, Salus Worldwide Solutions Corp., dismissing this case.

**IT IS SO ORDERED**.

<u>s/Matthew H. Solomson</u>
Matthew H. Solomson
Chief Judge